# STATE OF NORTH CAROLINA

File No. **25CV063076-590**

_____Mecklenburg_____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
MARK JAMES DICKMAN

Address
40 Linden Hill Drive

City, State, Zip
Crescent Springs, KY                    41017

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

**VERSUS**

G.S. 1A-1, Rules 3 and 4

Name Of Defendant(s)
Jeremy L. Bartell
Bartell Law PLLC

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

**To Each Of The Defendant(s) Named Below:**

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| Jeremy L. Bartell<br>700 12th Street NW, Suite 700<br>Washington, DC 20005 | Bartell Law PLLC<br>200 12th Street, NW, Suite 700<br>Washington, DC 20005 |

⚠️ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**

**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)
Dennis O'Dea
SFS Law Group
6416 Rea Road Ste B7 78588
Charlotte, NC 28277

Date Issued  11/21/2025    Time 2:20:11 pm  ☐ AM  ☐ PM

Signature  /s/ Brendan Daunt

☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement         Time     ☐ AM  ☐ PM

Signature

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** _Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed._

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 2 of 343

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| | ) | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | ) | |
| | ) | |
| | ) | FILE NUMBER:_____ |
| MARK JAMES DICKMAN, | ) | 25CV063076-590 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JEREMY BARTELL | ) | COMPLAINT AND JURY DEMAND |
| | ) | |
| and | ) | |
| | ) | |
| BARTELL LAW PLLC | ) | |
| DEFENDANTS | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, Mark James Dickman ("Mr. Dickman"), by and through undersigned counsel, hereby files this Complaint and Jury Demand against Jeremy Bartell and Bartell Law PLLC (collectively, "Bartell Law") alleging legal malpractice. In furtherance thereof, Plaintiff states as follows:

## PARTIES

1. Plaintiff, Mr. Dickman is a resident of Kentucky and has been working in the securities industry since 1992 and is currently a registered representative and investment advisor representative with IFP Securities, LLC (CRD #297287) and Independent Financial Partners (CRD #125112) in Crescent Springs, Kentucky. Mr. Dickman worked for LPL Financial LLC (CRD #6413) ("LPL") as a broker from 2010 to 2018 and as an investment advisor from 2010 to 2011.

Electronically Filed Date: 11/21/2025 2:15 PM Mecklenburg County Clerk of Superior Court

2. Defendant Jeremy Bartell is a natural citizen residing in Virginia. Bartell is an attorney with a principal place of business licensed in the District of Columbia and Massachusetts

3. The Plaintiff is informed and believes that Defendant Bartell Law, PLLC, is a professional limited liability company licensed to practice law in the District of Columbia and Massachusetts..

4. Bartell represents financial advisors in Financial Industry Regulatory Authority (" FINRA") Investigations, Inquiries, and Exams (FINRA Rule 8210 letters), FINRA Arbitration (customer complaints and industry disputes); FINRA Brokercheck Expungement (complaints, criminal charges, FINRA Form U5 terminations); FINRA Form U4 disclosures (criminal charges, customer complaints, outside business activities and regulatory actions); securities employment disputes (compensation, promissory notes, and FINRA Form U5 terminations); and CFP Board Notices of Investigation, Complaints, Petitions, and ethics disclosures. EXH. A. BARTELL LAW WEBPAGE.

5. This case arises from the acts and omissions of Bartell which occurred in North Carolina during the arbitration hearing on Mr. Dickman's claims against the Defendants for their actions in North Carolina in issuing false and defamatory statements in several FIRA Form U5 termination notices.

## JURISDICTION/VENUE

6. This Court has subject matter jurisdiction as it has general subject matter jurisdiction, and this is not an action that falls under the exclusive federal jurisdiction or any other recognized exception. This Court has personal jurisdiction over Jeremy Bartell and Bartell Law, PLLC since all of the alleged acts and/or omissions of Jeremy Bartell and Bartell Law, PLLC occurred in this State. NC Gen Stat § 7A-240 (2022)

7.      Venue is proper in this Court because all of the acts and/or omissions complained of herein occurred in Charlotte, Mecklenburg County, North Carolina. NC Gen Stat § 1-82The Plaintiff seeks damages in excess of the jurisdictional minimum

## BACKGROUND

8.      "FINRA") is a private, not-for-profit, self-regulatory organization, which, among other things, regulates stockbrokers through its rules and regulations, including dispute resolution among Members and Associated Persons pursuant to FINRA's Code of Arbitration Procedure ("FINRA Rules").

9.      The FINRA Rules require securities firms and registered representatives to disclose information regarding certain customer complaints against registered representatives.

10.      FINRA maintains disclosures and other registration information of securities industry personnel in an electronic database known as the Central Registration Depository ("CRD").

11.      Securities firms have access to and are required to review associated persons' full CRD record when making hiring or supervisory decisions.

12.      FINRA associated persons' registration information and certain CRD disclosures, including customer complaints and Form U5 termination disclosures ("Form U5") are available to the public through FINRA's "BrokerCheck" program. FINRA requires a readily accessible link to BrokerCheck on all financial advisors' webpages.

## FACTS

13.      Mr. Dickman worked for LPL Financial LLC ("LPL") as a FINRA registered broker from 2010 to 2018.

14. In March 2014, a former client of Mr. Dickman, Norbert Keissler, informed Mr. Dickman that he wished to name Mr. Dickman as a contingent beneficiary of a trust. Mr. Dickman immediately advised Mr. Keissler that this could not be done unless Mr. Keissler consulted counsel independently.

15. Mr. Keissler consulted with his attorney, Tom Kerr. Mr. Kerr is an attorney in Covington, Kentucky, who is very well known and respected. He served in the Kentucky House of Representatives, representing District 64 from 1985 to 2016. He still serves as counsel to the Kentucky Legislature. Mr. Kerr had been representing Mr. Keissler for many years. After such consultation, Mr. Keissler moved forward with naming Mr. Dickman as a contingent beneficiary of a trust.

16. In September 2018, Mr. Dickman was contacted by a United States Postal Service ("USPS") inspector who enquired as to Mr. Dickman's relationship with Mr. Keissler. The USPS also contacted Mr. Keissler and Mr. Kerr. Tom Kerr immediately provided them with an affidavit detailing the fact that Mr. Keissler had consulted with him, etc. and that the entire transaction was undertaken professionally and appropriately. EX. B. FEBRUARY 8, 2019, AFFIDAVIT OF TOM KERR. The USPS also contacted Mr. Dickman's employer, LPL.

17. Seemingly satisfied that the entire transaction was legitimate, the USPS, to the best of Mr. Dickman's knowledge, ceased its inquiry.

18. Following the inquiry from USPS, LPL reviewed the information about Mr. Keissler's designation of Mr. Dickman as a contingent beneficiary under Mr. Keissler 's trust created in 2014 and determined that Mr. Dickman should have disclosed that he was named as a contingent beneficiary to LPL in 2014.

19. On December 20, 2018, LPL terminated Mr. Dickman's employment since the failure to disclose that he was a contingent beneficiary under Mr. Kreissler's trust was a violation of LPL's policies and procedures.

20. When LPL terminated Mr. Dickman's employment, Mr. Dickman was also employed as an investment advisor by Independent Investment Advisors ("IAA").

21. When IAA learned of Mr. Dickman's termination from LPL, IAA also terminated him on December 20, 2018.

22. On the same date, IAA filed a required Form U-5 executed by Jessica N Sexton giving notice of Mr. Dickman's termination by IAA.

23. On or about December 20, 2018, Mr. Dickman became aware of defamatory statements made by Jessica N. Sexton (Ms. Sexton), his supervisor at LPL, relating to the transaction with Mr. Keissler.

24. Specifically, the defamatory statements were made on Dickman's U-5 form issued by IAA and signed by Ms. Sexton. On Mr. Dickman's U-5 form, Ms. Sexton had stated, wrongfully, that Mr. Dickman had engaged in fraud and the wrongful taking of property. Ex. C. DEFAMATORY U-5.

25. These defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure Report ("IAR Report").

26. The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating, falsely, that Mr. Dickman was discharged with reference to a "federal investigation" and also "some form of improper money movement of a client's funds". Ex. D. FINRA BROKER CHECK.

27. As a direct and proximate result of the defamatory statements made in Form U5, Mr. Dickman suffered devastating losses. These included damage to his personal and business

5

reputation, subjecting him to intense humiliation and impairing him from securing employment in the financial industry.

28. The financial practice he had built up over two decades came to a screeching halt, and he lost nearly every client at that time.

29. Most of his existing clients moved their assets away from Dickman to other financial advisers after Mr. Dickman was terminated by LPL and IAA and IAA issued the defamatory U5.

30. Mr. Dickman retained and engaged the Defendant on a fee-for-service basis and paid a retainer of $5,000.00 for Bartell's assistance in representing him in dealing with inquiries from the Securities and Exchange Commission and FINRA.

31. His resulting financial damages from the effect of December 20, 2018, IAA U5, and his efforts to correct it exceeded one million dollars.

32. The non-economic damages were life-altering.

33. While representing Mr. Dickman on the fee for services engagement, Bartell told Mr. Dickman that his claim for damages for the harm suffered due to the untrue defamatory statements in the IAA U-5 would entitle him to a large recovery if he filed suit against IAA and Ms. Sexton.

34. Mr. Bartell told Mr. Dickman that his claim against IAA was substantial and proposed that Mr. Dickman engage Bartell Law to sue for damages.

35. Mr. Bartell told Mr. Dickman that Bartell Law would not charge him a fee for legal services as it had in the two prior engagements, but would represent him under a contingent fee agreement, with legal fees being paid only from a successful suit or settlement.

36. Mr. Bartell told him that many lawsuits complaining of untruthful and defamatory statements in U5 reports have resulted in multi-million-dollar recoveries.

6

37.     Based upon Mr. Dickman's contractual agreements with LPL and IAA his remedies for the claimed defamation were limited to FINRA Arbitration for claims against LPL and arbitration through the American Arbitration Association. Ex. E. ARBITRATION AGREEMENTS.

38.     On or about that date, Defendant, Jeremy Bartell and Bartell Law, PLLC (collectively "Bartell Law") advertised online through the website "https://www.bartell-law.com". Bartell held himself out as an attorney experienced in FINRA arbitration. See Ex. A.

39.     Following a review of Mr. Dickman's claims, Bartell advised Mr. Dickman that he believed Mr. Dickman had an extraordinarily compelling case for defamation against IAA, LPL, Sexton, and Russo.

40.     Bartell stated to Mr. Dickman that his case was worth "millions of dollars", that he had significant experience in these types of cases, and that he would pursue the claim for him on a contingency fee basis.  Bartell advised Dickman that his claim had a value in excess of $1 million. Ex. F. AMENDED STATEMENT OF CLAIM, PP 10 -12.

41.     Mr. Dickman and Bartell entered into a contingency fee agreement, which provided, in pertinent part…

> *a.* "you have agreed to hire Bartell Law ("the Firm") to pursue claims against Independent Advisor Alliance, LLC (CRD# 168267 / SEC# 801-78808) ("IAA") concerning disclosures IAA made through FINRA Form u5 filings, which *we have reason to believe are defamatory …..*The attorney's fee shall be thirty (30%) of the gross recovery ("contingency fee"). Ex. G. AUGUST 11, 2019, CONTINGENCY FEE AGREEMENT (*Emphasis Added.)*

42.     At no time did Bartell, his representatives, employees, or agents ever advise Mr. Dickman that in the event of a loss at arbitration, Mr. Dickman may be liable for attorney fees.  To the contrary, throughout the entire process, before, during, and after the arbitration hearing that

D

followed, Bartell repeatedly assured Mr. Dickman that he would not be liable for attorney fees under North Carolina law.

43. The specific issue of liability for attorney fees came up multiple times throughout the representation. Every time the issue was raised, Bartell advised Mr. Dickman - there is no way he could ever be responsible for attorney fees, citing what Bartell frequently called the "American rule".

44. Bartell, on behalf of Mr. Dickman, filed a Statement of Claim with FINRA under FINRA Case Number 19-02406 on August 20, 2019. Therein, Bartell named Jessica Sexton as the Respondent, alleging a claim of defamation, without any citation to any particular state or federal law. See Ex. H. ORIGINAL STATEMENT OF CLAIM.

45. On or about October 16, 2019, Ms. Sexton filed her Statement of Answer denying Mr. Dickman's allegations. Sexton was represented by Jonathan S. Robbins, Esq., an attorney licensed in Florida, and Shea B. Ward, Esq., an attorney licensed in North Carolina. Sexton argued that Mr. Dickman failed to state a defamation claim, failed to state a claim for punitive damages, and that even if there were a claim, Sexton had qualified immunity. Sexton's entire legal argument was based on North Carolina Law. Sexton requested that all claims be denied and that Mr. Dickman be held liable for costs and attorney fees.    Ex. I.  RESPONDENT'S RESPONSE AND AFFIRMATIVE DEFENSES TO STATEMENT OF CLAIM

46. In response, Mr. Dickman inquired about his exposure to attorney fees. Bartell reassured him that in no way could he ever be responsible for attorney fees under the "American rule".

47. Bartell filed an Amended Statement of Claim on November 11, 2019, and again on December 20, 2019. Therein, Bartell added Robert Russo, who was at all relevant times Ms. Sexton's supervisor, and LPL Financial, who was Sexton's employer, as Respondents. Therein,

Bartell cited nine (9) FINRA arbitration awards for U-5 defamation, ranging from a few hundred thousand dollars to multi-million-dollar awards.  *See* Ex. F.

48.     On or about May 1, 2020, LPL filed its Statement of Answer denying Mr. Dickman's allegations, citing North Carolina Law, requesting that all claims be denied, and again asking that Mr. Dickman be held liable for costs and attorney fees. Ex. J. RESPONSE AND AFFIRMATIVE DEFENSES TO SECOND AMENDED STATEMENT OF CLAIM.

49.     Mr. Dickman, again, inquired as to his exposure to attorney fees. Bartell, again, continued to reassure him that in no way could he ever be responsible for attorney fees under the "American rule".

50.     Throughout the entirety of this matter, Bartell repeatedly advised Mr. Dickman that this claim could be looked at as an "asset", that he would likely be the recipient of a multimillion-dollar award, and that there was no downside for Mr. Dickman.

51.     On or about April 11, 2022, Mr. Dickman resolved his claims against LPL. As a condition of the settlement, LPL agreed to provide three witnesses, Daniel Cruse, Ian Friment, and Brad Jacobs, to testify in support of Mr. Dickman's claims against Ms. Sexton. The settlement agreement with LPL specifically provided as follows:

> "LPL agrees to provide as witnesses at a final hearing of the Arbitration Action (if Claimant wants them), Daniel Cruse, Ian Frimet, and Brad Jacobs, provided they are still employed with LPL at the time of the hearing."
>
> Ex. K. LPL SETTLEMENT.

52.     On or about April 18, 2023, approximately three weeks before the hearing, Bartell filed his requisite "Pre-hearing Exchange, Witness List" identifying the witnesses that he would call in support of Mr. Dickman's claim. The witnesses identified by Bartell included:

a.  Claimant Mark Dickman (in-person)
b.  Respondent Sexton (in-person)

c. Respondent Russo (in-person)
d. Daniel Cruse–LPL Financial, Manager, Supervisor (video conference)
e. Ian Frimet–LPL Financial, Senior VP, Associate Counsel (video conference)
f. Brad Jacobs–LPL Financial, Senior VP, Associate General Counsel (video conference)
g. Alan J. Besnoff, CFPÒ Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
h. Thomas R. Kerr, Esq.,732 Scott Street, Covington, Kentucky 41011
i. Tammy L. Dickman (Mr. Dickman's Wife)

EX. L. DICKMAN VS. SEXTON, RUSSO AND LPL FINANCIAL LLC PREHEARING EXCHANGE, WITNESS LIST.

53.	An arbitration hearing was held on May 10, 2023, in Charlotte, North Carolina.

54.	In spite of the fact that each and every one of the above-identified witnesses was available, either in person or via videoconference, the only witnesses called by Bartell were Mr. Dickman, and Mr. Besnoff. He did not call Jessica Sexton (Respondent), Robert Russo (Respondent), Daniel Cruse, Ian Friment, Brad Jacobs, Thomas Kerr, or Tammy Dickman.

55.	There is no conceivable strategic reason for Bartell's sudden decision not to call any of these witnesses. As indicated above and throughout the pleadings in the FINRA case, each of these witnesses played a crucial role in establishing Mr. Dickman's defamation claims. Sexton and Russo were the Respondents who falsely published defamatory material. Cruse, Frimet, and Jacobs were settling. Co-defendants – Senior Vice Presidents, General Counsel, and Managers at LPL Financial would have testified consistent with their settlement agreement, supporting Mr. Dickman's claims.  Thomas Kerr would have provided testimony to the panel regarding the legality of the underlying transaction with Mr. Keissler. EX. M. APRIL 29, 2024, AFFIDAVIT OF TOM KERR. Kerr was available.  EX. N. EMAIL CONFIRMING KERR'S AVAILABILITY.

56.	Despite the Defendants' request for dismissal during and at the close of the cross-examination of Mr. Dickman, claiming that his testimony did not support his claims and notice that the Defendants would renew the motion at the close of his case, Bartell failed to offer any

other witnesses to establish the Defendants' liability to Mr. Dickman for the harm he suffered. When Mr. Bartell called Alan Besnof as Mr. Dickman's expert witness to testify, he agreed with the Defendants that his expert's testimony was not offered to address the actions of the Defendants in the submission and preparation of the Form U5 but rather on the interpretation of the contents of the U5 by the public and others. The witness was offered to support the damage claim, not the grounds for a finding of liability by those damages.

57. After the testimony of Mr. Dickman and the expert, Mr. Bartell said he would call no further witnesses and rested his case. He said he may call witnesses in rebuttal after the Defendants presented their case.

58. At the close of his case, the hearing panel ruled that Mr. Bartell had failed to offer evidence supporting the claim that Mr. Russo defamed Mr. Dickman.

59. Despite arguing that neither Ms. Sexton nor Mr. Russo had a qualified privilege in the submission of Forms U5 and that malice was presumed because they did not conduct sufficient investigation to learn the correct facts despite having the means at hand to do so, he did not call Ms. Sexton to the stand to testify.

60. Ms. Sexton was physically present during the hearing but was never called. Just what Ms. Sexton did or did not do was never addressed in testimony, to provide evidence in support of the required finding of malice required to support Mr. Dickman's claim.

61. The claim that Ms. Sexton had not conducted an appropriate investigation to support the information she submitted on the U5 required her examination before the board to establish the claim. Mr. Bartell knew the necessity of calling Ms. Sexton but inexplicably failed to call her despite the extensive claims he made in the statements of claim filed in the case.

62. Despite securing LPL's agreement that it would make three of its employees available to testify and include them on the proposed list of witnesses, Mr. Bartell did not call any

11

of them to testify under the erroneous and ill-conceived assumption that the pending motion for a directed verdict that was still before the hearing board would not be granted, and that he would cross-examine witnesses offered by the Defendants and submit rebuttal testimony.

63. Mr. Bartell exhibited confusion and distress in his conversation with Mr. Dickman during the various breaks during the hearing. His failure to call these critical witnesses was not a strategic decision.

64. With a pending motion to dismiss his case following the testimony of Mr. Dickman, the first witness he called, Mr. Bartell, was reckless in ending his case in chief with only one more witness, a damages expert.

65. He failed to exercise due care and ordinary competence in neglecting to call Ms. Sexton, Mr. Russo, and the other witnesses he had planned to call to testify in his case in chief. His sudden decision to rest his case without calling the necessary witnesses and his comment that he would call them as rebuttal witnesses made no sense and left Mr. Dickman's case unfinished.

66. It was negligent to close his case without fully presenting it since a summary judgment and the absence of any witness testimony from the defendants foreclosed an offer of rebuttal witnesses.

67. At one point during a break in the proceedings, Mr. Dickman specifically asked Bartell, yet again, could he be responsible for attorney fees. Bartell replied unequivocally that the answer to that question was "no". He stated to Mr. Dickman that under the "American rule", and under North Carolina Law, Mr. Dickman had no exposure to a potential order to pay attorney fees.

68. Bartell's case in chief consisted solely of the testimony of Mr. Dickman, as well as Mr. Besnoff. Following Bartells' case in chief, the Defendants moved for a directed verdict. The arbitration panel granted the motion for a directed verdict in an Order dated May 15, 2023.

69. Bartell made no effort to reopen his case and offer any witnesses after the arbitration panel announced the granting of the directed verdict.

70. The failure of Bartell to present the evidence he forecast in his opening statement in support of the statements of claim he filed in the case, resulted in the denial of his claim for damages.

71. The statements of claim submitted by Bartell and the forecast of evidence in his opening statement set forth sufficient allegations of fact and law to entitle Mr. Dickman to a judgment for over one million dollars.

72. Bartell submitted a damage exhibit showing the calculation of a damage claim of $1,100,078, which was an accurate calculation of the damages suffered by Mr. Dickman and which he should have been awarded in the arbitration. Ex H R. Sheet A Dickman Damage Summary.

73. On June 12, 2023, the Respondents submitted a request for attorney fees. Contained therein were the various arguments for attorney fees, based on North Carolina law. EX. O. RESPONDENT'S MOTION TO DETERMINE AMOUNT OF ATTORNEY FEES AND COSTS.(EXHIBITS OMITTED)

74. On June 17, 2023, Bartell submitted its opposition to attorney fees. Therein, citing North Carolina law extensively. EX. P. CLAIMANT'S OPPOSITION TO RESPONDENT'S MOTION FOR COSTS.

75. On July 18, 2023, FINRA issued the Award, awarding Ms. Sexton and Mr. Russo attorneys' fees in the amount of $380,067.00, costs in the amount of $28,372.00, and interest at the rate of 8%. EX. Q. AWARD.

76. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in excess of $400,000.00 in attorney fees.

77. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in the loss of his arbitration matter as to his defamation claims.

78. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in the form of his additional attorney fees and costs.

79. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced herein above, Mr. Dickman has incurred damages in the form of ongoing mental anguish, pain, and suffering.

NOW THEREFORE, Mr. Dickman alleges the following counts against the Defendants named herein:

### COUNT ONE
### NEGLIGENCE
### Failure to Call Material Witnesses

A. Plaintiff fully incorporates by reference paragraphs 1 through 47 as if written fully herein.
B. Bartell Law had a duty to the Plaintiff to exercise reasonable diligence in the handling and prosecution of Plaintiff's claim.
C. Bartell breached that duty by failing to call witnesses critical to the case. These included the two Respondents who were responsible for the claimed defamation, the three supporting witnesses who had, as a condition of their settlement, agreed to testify on Mr. Dickman's behalf, Thomas Kerr, the attorney for Mr. Keissler who would have testified as to the legitimacy of the underlying transaction, and Tammy Dickman, who would have testified as to the damages incurred.

D.  As a direct and proximate result of Bartell's breach, Mr. Dickman has incurred damages, in excess of this court's minimum jurisdiction.

## COUNT TWO
## NEGLIGENCE
## Failure To Warn

A.  The Plaintiff fully incorporates by reference paragraphs 1 through 47, as if written fully herein.
B.  Bartell Law had a common law duty to inform Mr. Dickman of the risks involved in pursuing the FINRA arbitration award, including the duty to warn Mr. Dickman that he may be liable for attorney fees.
C.  The Rules of Professional Conduct in North Carolina, Washington, D.C, and Massachusetts, clearly imposed a duty upon Bartell Law to fully explain the risks and ramifications of moving forward in litigation with Mr. Dickman.
D.  Bartell breached these duties.
E.  As a direct and proximate result of Bartell's breach, Mr. Dickman has incurred damages in excess of this court's minimum jurisdiction.

## COUNT THREE
## Fraud/Misrepresentation

A.  Plaintiff fully incorporates by reference, paragraphs 1 through 47 as if written fully herein.
B.  By Bartell's own account, he believed he had a shot at a significant contingency fee based upon a multimillion-dollar award at the FINRA arbitration.
C.  As an experienced FINRA litigator, Bartell knew that Dickman could potentially be liable for attorney fees at the final arbitration.
D.  Bartell knew that had Dickman been informed of the potential for liability for attorney fees he likely would not have moved forward with the FINRA claim.
E.  Bartell made false representations to Mr. Dickman regarding his liability or potential liability for attorney's fees.

F. Bartell concealed this material fact so as to give himself a reasonable chance at a significant monetary award.

G. This concealment by Bartell was reasonably calculated to deceive Mr. Dickman.

H. This concealment did, in fact, deceive Mr. Dickman as he had every reason to believe that Bartell was a competent FINRA attorney and that Bartell had communicated all the risks involved to him.

I. As a direct result of this calculated deception, Mr. Dickman incurred damages in the form of attorney fees and costs exceeding $400,000.00.

WHEREFORE, Plaintiff requests the following relief:

A. that the court award him compensatory damages as discussed here and above:

B. that the court award him the attorney fees costs, pre- and post-judgment interest, and any other compensation this Court deems justified;

C. that the court award him punitive damages based upon the deliberate fraud and misrepresentation

This the 17th day of November 2025

Respectfully Submitted

Mark James Dickman

By his attorneys

/s/Dennis O'Dea

Dennis O'Dea
NC Bar 35072
SFS Law Group
6416 Rea Road
Suite B7 78588
Charlotte, NC 28277
(704) 780-1544
dennis.odea@sfslawgroup.com

16

# EXHIBIT A

Case 3:26-cv-00280   Document 4-1   Filed 04/08/26   Page 19 of 343



**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

**Practice Areas** ‣

**About Jeremy L. Bartell**

**Our Approach   Home**

Contact Us

# About Jeremy L. Bartell



Jeremy L. Bartell

Legal Experience

Bingham McCutchen LLP, Counsel, Broker-Dealer Group, Boston, 2004-2010.

Goodwin Procter LLP, Litigation Associate, Boston, 2001-2004.

Massachusetts Appeals Court, Judicial Clerk, Justice Raya Dreben, Boston, 2000-2001.

Education

**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

Practice Areas ▸

About Jeremy L. Bartell

Contact Us

Our Approach   Home

Certified Regulatory and Compliance Professional (CRCP®), FINRA Institute, Georgetown University, 2024.

Admissions

### Jeremy L. Bartell, J.D., CRCP®

Jeremy L. Bartell is a financial services attorney with 23 years of experience, including 10 years with two major national law firms. He has extensive experience representing many of the nation's largest broker-dealers and investment advisers in FINRA arbitration, FINRA and SEC regulatory investigations, disciplinary actions, employment disputes and registration and disclosure matters. Jeremy currently focuses on representing individual financial advisors, including registered representives, investment adviser representatives, managers and other financial professionals in FINRA inquiries, investigations, exams and disciplinary hearings; FINRA expungements; FINRA customer and industry arbitrations; employment disputes; Form U4 disclosures matters; FINRA eligibility hearings, and investigations and hearings before the Certified Financial Planner Board of Standards.

### Background and Education

Jeremy is a veteran of the U.S. Army with service in Germany and in Saudi Arabia, Iraq and Kuwait during the Gulf War. He graduated with a B.S., *summa cum laude*, in Business

**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

Practice Areas ▸

About Jeremy L. Bartell

Our Approach    Home

Contact Us

Jeremy was a litigation associate at Goodwin Procter LLP, defending financial institutions and corporations in a variety of complex commercial litigation. From 2004 to 2010, Jeremy was an associate and later Counsel in the Broker-Dealer Group at Bingham McCutchen LLP, where he focused on defending national broker-dealers, registered investment advisers, and individual financial professionals in FINRA arbitration, and in SEC and FINRA Investigations and disciplinary actions. Jeremy also holds the Certified Regulatory and Compliance Professional (CRCP®) designation from the FINRA Institute at Georgetown University. He is admitted in the District of Columbia and Massachusetts.

### FINRA Inquiries, Investigations and Disciplinary Actions

Jeremy regularly represents financial advisors in FINRA inquiries and investigations. He has also defended national broker-dealers in a number of state and federal regulatory investigations, regulatory sweeps, and administrative actions, including those by the SEC, FINRA, state securities regulators and state attorneys general. He has, for example, handled matters concerning:

- Unsuitable recommendations
- Unauthorized trading;
- Failure to disclose or update Form U4;
- Selling away;

# EXHIBIT B

## AFFIDAVIT OF THOMAS KERR

Comes now the Affiant, Thomas Kerr, and after having been duly sworn states as follows:

1. My name is Thomas Kerr. I have practiced law in Northern Kentucky since 1977. I also served as State Representative in the Kentucky General Assembly representing the 64th Legislative District from 1985 to 2016. I now serve as Chief of Staff and General Counsel for the Kentucky Justice and Public Safety Cabinet.

2. I have represented Norbert and Bonnie Keissler since 2000, and with Norbert's parents prior to that since 1997.

3. In August of 2014, Norbert and Bonnie Keissler voluntarily came to my office and advised me that they wanted to make Mark Dickman the beneficiary and contingent trustee of their family trust.

4. The Keisslers' decision was made on their own with no undue influence from Mark Dickman, as far as I knew. At the time they appeared to be mentally competent and of sound mind.

5. The Keisslers had/have no children. The natural heirs to their estate would have been Bonnie's siblings and Norbert's brother-in-law.

6. The Keisslers had apparently had a falling out with these family members and specifically requested that I exclude them from being heirs to any of their estate, requesting that they be entirely excluded from ever receiving any funds from their estate. Bonnie Keissler has since died.

7. Norbert Keissler called me in early October 2018, and explained that US Postal investigators had called him, followed by an unannounced visit. Mr. Keissler informed me that the USPS was apparently investigating Mark Dickman for allegedly victimizing Mr. Keissler.

8. Norbert Keissler met with me in early October 2018. He requested that I contact the USPS investigators, and advise them that Keissler was fully aware of any and all transactions he had done was of sound mind, and that he was never victimized by Mark Dickman.

9. On October 18, 2018, I specifically met with the USPS Investigators and advised them that I was Norbert Keissler's attorney. I advised them that I was aware of his estate plan and his designation of beneficiaries, that Norbert Keissler voluntarily determined the beneficiaries of his estate, and that he was of sound mind.

10. Throughout this time, Norbert Keissler has acted on his own, with my advice, and was and is, as of this date, of sound mind. As his attorney and as his estate planner, I have never seen any evidence of any mental defect.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
**THOMAS KERR**

**COMMONWEALTH OF KENTUCKY**
**COUNTY OF KENTON**

    The above affidavit was acknowledged and signed before me, a notary public, by **THOMAS KERR**, this _8_ day of February, 2019.

_____
NOTARY PUBLIC, STATE AT LARGE

My Commission Expires: _3-31-2022_    NOTARY ID# _597204_

# EXHIBIT C

## INDEPENDENT ADVISOR ALLIANCE, LLC(168267)

### Individual Name: DICKMAN, MARK JAMES (2066229)

**Rev. Form U5 (05/2009)**

**U5 Full - Filing ID: 50630681**

**Filing Date: 12/20/2018**

### NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for two years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495, Gaithersburg, MD 20898-9495.

### 1. General Information

| First Name: | Middle Name: | Last Name: | Suffix: |
|---|---|---|---|
| MARK | JAMES | DICKMAN | |

| Firm CRD #: | Firm Name: | Firm NFA #: | |
|---|---|---|---|
| 168267 | INDEPENDENT ADVISOR ALLIANCE, LLC | | |

| Individual CRD #: | Individual SSN: | Individual NFA #: | Firm Billing Code: |
|---|---|---|---|
| 2066229 | xxx-xx-xxxx | | |

### Office of Employment Address:

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| | | | 509 Centre View Blvd. Crestview Hills, KY 41017 United States | No | Located At | 12/10/2018 | 12/20/2018 |

### 2. Current Residential Address

| From | To | Street Address |
|---|---|---|
| 07/2015 | PRESENT | 40 LINDEN HILL DR CRESCENT SPRINGS, KY 41017 United States |

### 3. Full Termination

### Is this a FULL TERMINATION? ⦿ Yes ◯ No

Note: A "Yes" response will terminate ALL registrations with all SROs and all *jurisdictions*.

**Reason for Termination:** Discharged

**Termination Explanation:**

If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:

Our firm has limited information but we were notified by LPL Financial on 12/12/2018 that the advisor is currently undergoing a federal investigation for improper money movement of a client's funds. LPL Financial indicated they were reaching out to the advisor for some additional information and a determination was made on 12/20/2018 to terminate the relationship with LPL Financial. After further discussion with LPL Financial IAA has also made the determination that the advisor should be terminated.

## 4. Date of Termination

### Date Terminated (MM/DD/YYYY): 12/20/2018

A complete date of termination is required for *full termination*. This date represents the date the *firm* terminated the individual's association with the *firm* in a capacity for which registration is required.

For *partial termination*, the date of termination is only applicable to post-dated termination requests during the renewal period.

Notes: For *full termination*, this date is used by *jurisdictions*/SROs to determine whether an individual is required to requalify by examination or obtain an appropriate waiver upon reassociating with another *firm.*

The *SRO/jurisdiction* determines the effective date of termination of registration.

## 6. Affiliated Firm Termination

Is this a *multiple termination* with one or more *firms affiliated* with the *filing firm*?
If "yes" to the above question and the termination requests for the *filing firm* are identical to the termination requests of each *affiliated firm*, then mark the same termination request for each affiliate.
If the termination requests of the *affiliated firm(s)* differ from those of the *filing firm*, complete the SRO and/or *jurisdiction* sections for each *affiliated firm*.

     ○ Yes    ○ No

## 7. Disclosure Questions

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S). IF THE INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5, DO NOT RESUBMIT DRPs FOR THESE ITEMS. REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALICIZED WORDS.

**Disclosure Certification Checkbox (optional):** ☐

By selecting the Disclosure Certification Checkbox, the *firm* certifies that (1) there is no additional information to be reported at this time; (2) details relating to Questions 7A, 7C, 7D and 7E have been previously reported on behalf of the individual via Form U4 and/or amendments to Form U4 (if applicable); and (3) updated information will be provided, if needed, as it becomes available to the *firm*. Note: Use of "Disclosure Certification Checkbox" is optional

### Investigation Disclosure

| | Yes | No |
|---|---|---|
| **7A.** Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or *self-regulatory organization* with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.) | ● | ○ |

### Internal Review Disclosure

| | Yes | No |
|---|---|---|
| **7B.** Currently is, or at termination was, the individual under internal review for fraud or wrongful taking | ○ | ● |

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 28 of 343

of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct?

## Criminal Disclosure

|  | Yes | No |
|---|---|---|

**7C.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual:

**1.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to any *felony*?     ○ ◉

**2.** *charged* with any *felony*?     ○ ◉

**3.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving*: investments or an *investment-related* business, or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses?     ○ ◉

**4.** *charged* with a *misdemeanor* specified in 7(C)(3)?     ○ ◉

## Regulatory Action Disclosure

|  | Yes | No |
|---|---|---|

**7D.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual *involved* in any *disciplinary action* by a domestic or foreign governmental body or *self-regulatory organization* (other than those designated as a "*minor rule violation*" under a plan approved by the U.S. Securities and Exchange Commission) with jurisdiction over the *investment-related* businesses?     ○ ◉

## Customer Complaint/Arbitration/Civil Litigation Disclosure

|  | Yes | No |
|---|---|---|

**7E. 1.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations* and which:

**(a)** is still pending, or;     ○ ◉

**(b)** resulted in an arbitration award or civil judgment against the individual, regardless of amount, or;     ○ ◉

**(c)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or;     ○ ◉

**(d)** was settled, on or after 05/18/2009, for an amount of $15,000 or more?     ○ ◉

**2.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated (written or oral) complaint, which alleged that the individual was *involved* in one or more *sales practice violations*, and which

**(a)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or;     ○ ◉

**(b)** was settled, on or after 05/18/2009, for an amount of $15,000 or more?     ○ ◉

**3.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under questions 7(E)(2) above, which:

**(a)** would be reportable under question 14I(3)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or     ○ ◉

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 29 of 343

**(b)** would be reportable under question 14I(3)(b) on Form U4, if the individual were still   ○   ◉
employed by your *firm*, but which has not previously been reported on the individual's Form
U4 by your *firm*.

### Answer questions (4) and (5) below only for arbitration claims or civil litigation filed on or after 05/18/2009

4. In connection with events that occurred while the individual was employed by or associated with
   your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, arbitration
   claim or civil litigation which alleged that the individual was *involved* in one or more *sales
   practice violations*, and which:

   **(a)** was settled for an amount of $15,000 or more, or;   ○   ◉

   **(b)** resulted in an arbitration award of civil judgment against any named   ○   ◉
   respondent(s)/defendant(s), regardless of amount?

5. In connection with events that occurred while the individual was employed by or associated with
   your *firm*, was the individual the subject of an investment-related, consumer-initiated, arbitration
   claim or civil litigation not otherwise reported under question 7E(4) above, which:

   **(a)** would be reportable under question 14I(5)(a) on Form U4, if the individual were still   ○   ◉
   employed by your *firm*, but which has not previously been reported on the individual's Form
   U4 by your *firm*; or

   **(b)** would be reportable under question 14I(5)(b) on Form U4, if the individual were still   ○   ◉
   employed by your *firm*, but which has not previously been reported on the individual's Form
   U4 by your *firm*.

### Termination Disclosure

|  | Yes | No |
|---|---|---|

**7F.** Did the individual voluntarily *resign* from your *firm*, or was the individual discharged or permitted to
*resign* from your *firm*, after allegations were made that accused the individual of:

1. violating *investment-related* statutes, regulations, rules or industry standards of conduct?   ◉   ○

2. fraud or the wrongful taking of property?   ◉   ○

3. failure to supervise in connection with *investment-related* statutes, regulations, rules or industry   ○   ◉
   standards of conduct?

---

### 8. Signature

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic
form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this
field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her
legally binding signature.

8A. FIRM ACKNOWLEDGMENT

This section must be completed on all U5 form filings submitted by the *firm*.

8B. INDIVIDUAL ACKNOWLEDGMENT AND CONSENT

This section must be completed on amendment U5 form filings where the individual is submitting changes to
Part II of the INTERNAL REVIEW DRP or changes to Section 2 (CURRENT RESIDENTIAL ADDRESS).

### 8A. FIRM ACKNOWLEDGMENT

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

| **Person to contact for further information** | **Telephone # of person to contact** |
|---|---|
| Jessica Sexton | 9803185425 |

**Signature of *Appropriate Signatory***       **Date (MM/DD/YYYY)**

Jessica Sexton       12/20/2018

**Signature** _____

---

## Criminal DRP

No Information Filed

## Customer Complaint DRP

No Information Filed

## Internal Review DRP

No Information Filed

## Investigation DRP

---

This Disclosure Reporting Page is an  ⦿ **INITIAL** or  ○ **AMENDED** response to report details for affirmative response(s) to *Question(s) 7A* on Form U5;

**Check the question(s) you are responding to, regardless of whether you are answering the question(s) "yes" or amending the answer(s) to "no":**

<table>
<tr><td align="center">**Investigation**</td><td align="right">Rev. DRP (05/2009)</td></tr>
</table>

☑ **7A**

Click here to view question text

Complete this DRP only if you are answering "yes" to Item 7(A) to report an *investigation. Complete a Regulatory Action DRP if you answered "yes" to item 7(A) and are reporting details of either a pending or final proceeding. If you have been notified that the investigation has been concluded without formal action, complete items 4 and 5 of this DRP to update. One event may result in more than one investigation. If more than one authority is investigating, use a separate DRP to provide details.*

1. *Investigation initiated by:*

    A. Notice Received From (select appropriate item):

    ○ *SRO*    ○ *Foreign Financial Regulatory Authority*    ○ *Jurisdiction*

    ○ *SEC*    ○ *Other Federal Agency*    ⦿ *Other*

    B. Full name of regulator (other than SEC) that initiated the *investigation*:
    LPL Financial

2. Notice Date (MM/DD/YYYY):

    12/12/2018  ⦿ Exact   ○ Explanation

If not exact, provide explanation:

3. Describe briefly the nature of the *investigation*, if known. (Your information must fit within the space provided.):
We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.

4. Is *investigation* pending? ⊙ Yes ○ No
If no, complete item 5. If yes, skip to item 6.

5. Resolution Details:

A. Date Closed/Resolved (MM/DD/YYYY):

○ Exact ○ Explanation
If not exact, provide explanation:

B. How was *investigation* resolved? (select appropriate item):

○ Closed Without Further Action

○ Closed – Regulatory Action Initiated

○ Other:

6. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the *investigation*, as well as the current status or final disposition and/or finding(s). Your information must fit within the space provided.

We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor.

---

**Regulatory Action DRP**

No Information Filed

**Termination DRP**

---

This Disclosure Reporting Page is an ⊙ **INITIAL** or ○ **AMENDED** response to report details for affirmative response(s) to **Question(s) 7F** on Form U5;
**Check the question(s) you are responding to, regardless of whether you are answering the question(s) "yes" or amending the answer(s) to "no":**

<table>
<tr><td></td><td>**Termination**</td><td>Rev. DRP (05/2009)</td></tr>
<tr><td>☑ 7F(1)</td><td>☑ 7F(2)</td><td>☐ 7F(3)</td></tr>
</table>

**Click here to view question text**

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to the same termination.

1. Firm Name:
Independent Advisor Alliance

2. Termination Type:
Discharged

3. Termination Date:

12/20/2018 ⊙ Exact ○ Explanation

Case 3:26-cv-00280 Document 4-1 Filed 04/08/26 Page 32 of 343

If not exact, provide explanation:

4. Allegation(s):
We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.

5. Product Type(s): (select all that apply)

| | | |
|---|---|---|
| ☐ No Product | ☐ Derivative | ☐ Mutual Fund |
| ☐ Annuity-Charitable | ☐ Direct Investment-DPP & LP Interests | ☐ Oil & Gas |
| ☐ Annuity-Fixed | ☐ Equipment Leasing | ☐ Options |
| ☐ Annuity-Variable | ☐ Equity Listed (Common & Preferred Stock) | ☐ Penny Stock |
| ☐ Banking Products (other than CDs) | ☐ Equity-OTC | ☐ Prime Bank Instrument |
| ☐ CD | ☐ Futures Commodity | ☐ Promissory Note |
| ☐ Commodity Option | ☐ Futures-Financial | ☐ Real Estate Security |
| ☐ Debt-Asset Backed | ☐ Index Option | ☐ Security Futures |
| ☐ Debt-Corporate | ☐ Insurance | ☐ Unit Investment Trust |
| ☐ Debt-Government | ☐ Investment Contract | ☐ Viatical Settlement |
| ☐ Debt-Municipal | ☐ Money Market Fund | ☑ Other: We were informed it was an annuity but have limited details as to the type and aren't sure if this is the only account involved. |

6. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the termination. Your information must fit within the space provided.
We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor.

© 2019 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.
Privacy | Legal | Terms & Conditions

# EXHIBIT D



## Investment Adviser Representative Public Disclosure Report

# MARK JAMES DICKMAN

CRD# 2066229

Report #47332-68934, data current as of Monday, January 28, 2019.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure Information | 5 |



**IAPD Information about Investment Adviser Representatives**

IAPD offers information on all current-and many former-Investment Adviser Representatives. Investors are strongly encouraged to use IAPD to check the background of Investment Adviser Representatives before deciding to conduct, or continue to conduct, business with them.

- **What is included in a IAPD report?**
- IAPD reports for individual Investment Adviser Representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

- It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
- The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD®, (see more on CRD below) and is a combination of:

  - information the states require Investment Adviser Representatives and firms to submit as part of the registration and licensing process, and
  - information that state regulators report regarding disciplinary actions or allegations against Investment Adviser Representatives.
  - 
- **How current is this information?**
- Generally, Investment Adviser Representatives are required to update their professional and disciplinary information in IARD within 30 days.

- **Need help interpreting this report?**
- For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm.

- **What if I want to check the background of an Individual Broker or Brokerage firm?**
- To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

- **Are there other resources I can use to check the background of investment professionals?**
- It is recommended that you learn as much as possible about an individual Investment Adviser Representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org.


# Investment Adviser Representative Report Summary

## MARK JAMES DICKMAN (CRD# 2066229)

The report summary provides an overview of the Investment Adviser Representative's professional background and conduct. The information contained in this report has been provided by the Investment Adviser Representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the Investment Adviser Representative, a previous employing firm, or a securities regulator on **01/11/2019**.

## CURRENT EMPLOYERS

This individual is not currently registered as an Investment Adviser Representative.

## QUALIFICATIONS

This individual is not currently registered as an Investment Adviser Representative.

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## REGISTRATION HISTORY

This Investment Adviser Representative was previously registered with the following Investment Adviser firms:

| FIRM (IARD#) - LOCATION | REGISTRATION DATES |
|---|---|
| INDEPENDENT ADVISOR ALLIANCE, LLC (IARD# 168267) - Crestview Hills, KY | 12/10/2018 - 12/20/2018 |
| INDEPENDENT FINANCIAL PARTNERS (IARD# 125112) - Crestview Hills, KY | 10/11/2018 - 12/07/2018 |
| INDEPENDENT FINANCIAL PARTNERS (IARD# 125112) - CRESTVIEW HILLS, KY | 03/01/2011 - 10/10/2018 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this Investment Adviser Representative?     **Yes**

The following types of events are disclosed about this Investment Adviser Representative:

| Type | Count |
|---|---|
| Investigation | 1 |
| Customer Dispute | 1 |
| Termination | 2 |




## Investment Adviser Representative Qualifications

### REGISTRATIONS

This section provides the states and U.S. territories in which the Investment Adviser Representative is currently registered and licensed, the category of each registration, and the date on which the registration became effective. This section also provides, for each firm with which the Investment Adviser Representative is currently employed, the address of each location where the Investment Adviser Representative works.

This individual is not currently registered as an Investment Adviser Representative.

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 38 of 343

 
## Investment Adviser Representative Qualifications

### PASSED INDUSTRY EXAMS

This section includes all required state securities exams that the Investment Adviser Representative has passed. Under limited circumstances, an Investment Adviser Representative may attain registration after receiving an exam waiver based on a combination of exams the Investment Adviser Representative has passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on an Investment Adviser Representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

This individual has passed the following exams:

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination (S63) | Series 63 | 11/18/1993 |
| Uniform Investment Adviser Law Examination (S65) | Series 65 | 05/30/2006 |

### PROFESSIONAL DESIGNATIONS

This section details that the Investment Adviser Representative has reported **0** professional designation(s).

No information reported.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 39 of 343



# Investment Adviser Representative Registration and Employment History

## PREVIOUSLY REGISTERED WITH THE FOLLOWING INVESTMENT ADVISER FIRMS

This section indicates that state registration records show this Investment Adviser Representative previously held registrations with the following firms:

| Registration Dates | Firm Name | IARD# | Branch Location |
|---|---|---|---|
| 12/10/2018 - 12/20/2018 | INDEPENDENT ADVISOR ALLIANCE, LLC | 168267 | Crestview Hills, KY |
| 10/11/2018 - 12/07/2018 | INDEPENDENT FINANCIAL PARTNERS | 125112 | Crestview Hills, KY |
| 03/01/2011 - 10/10/2018 | INDEPENDENT FINANCIAL PARTNERS | 125112 | CRESTVIEW HILLS, KY |
| 08/03/2010 - 05/11/2011 | LPL FINANCIAL LLC | 6413 | CRESTVIEW HILLS, KY |
| 05/31/2006 - 08/06/2010 | U.S. BANCORP INVESTMENTS, INC. | 17868 | CARROLLTON, KY |

## EMPLOYMENT HISTORY

Below is the Investment Adviser Representative's employment history for up to the last 10 years.

**Please note that the Investment Adviser Representative is required to provide this information only while registered and the information is not updated after the Investment Adviser Representative ceases to be registered, with a state regulator. Therefore, an employment end date of "Present" may not reflect the Investment Adviser Representative's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 12/2018 - Present | Independent Advisor Alliance | Charlotte, NC |
| 10/2013 - Present | Independent Financial Partners | CRESTVIEW HILLS, KY |
| 08/2010 - Present | LPL Financial, LLC | CRESTVIEW HILLS, KY |
| 12/2001 - 08/2010 | U.S. BANCORP INVESTMENTS, INC. | COVINGTON, KY |

## OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the Investment Adviser Representative regarding other business activities the Investment Adviser Representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

(1) 12/08/2015 * Darpel, Dickman & Harrigan Wealth Management * DBA for LPL Business (entity for LPL business) * Darpel, Dickman & Harrigan Wealth Management * inv rel * at reported business location(s) * start 01/01/2016 * 20 hrs/mo during secs trdg hrs.

(2) 12/10/2018 * Darpel, Dickman & Harrigan Wealth Management * Registered Investment Advisor DBA * (HYBRID)Darpel, Dickman & Harrigan Wealth Mgmt. * INV REL * AT REPORTED BUSINESS LOCATION(S) * START 01/01/2016 * 20 HRS/MO DURING SECS TRDG HRS.

(3) 10/22/2018 - No Business Name - Not Investment Related - Home Based, and Highland Heights KY 41076 & Erlanger KY 41018 - Real Estate Rental - Started 05/01/2018 - 4 Hours Per Month/0 Hours During Securities Trading - Added a second rental home.

(4) 12/10/2018 - Independent Advisor Alliance - RIA only - Investment Advisor Representative - Charlotte, NC - 0%

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

 

# Investment Adviser Representative Disclosure Summary

## Disclosure Information

**What you should know about reported disclosure events:**

**(1) Certain thresholds must be met before an event is reported to IARD, for example:**

- A law enforcement agency must file formal charges before an Investment Adviser Representative is required to report a particular criminal event.;

- A customer dispute must involve allegations that an Investment Adviser Representative engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

**(2) Disclosure events in IAPD reports come from different sources:**

As mentioned in the "About IAPD" section on page 1 of this report, information contained in IAPD comes from Investment Adviser Representatives, firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the IAPD report. The different versions will be separated by a solid line with the reporting source labeled.

**(3) There are different statuses and dispositions for disclosure events:**

- A disclosure event may have a status of *pending, on appeal,* or *final*.

  - A "pending" disclosure event involves allegations that have not been proven or formally adjudicated.

  - A disclosure event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.

  - A "final" disclosure event has been concluded and its resolution is not subject to change.

- A final disclosure event generally has a disposition of *adjudicated, settled* or *otherwise resolved*.

  - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.

  - A "settled" matter generally represents a disposition wherein the parties involved in a dispute reach an agreement to resolve the matter. Please note that Investment Adviser Representatives and firms may choose to settle customer disputes or regulatory matters for business or other reasons.

  - A "resolved" matter usually includes a disposition wherein no payment is made to the customer or there is no finding of wrongdoing on the part of the Investment Adviser Representative. Such matters generally involve customer disputes.

**(4) You may wish to contact the Investment Adviser Representatives to obtain further information regarding any of the disclosure events contained in this IAPD report.**

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280   Document 4-1   Filed 04/08/26   Page 41 of 343



## DISCLOSURE EVENT DETAILS

When evaluating this information, please keep in mind that some items may involve pending actions or allegations that may be contested and have not been resolved or proven. The event may, in the end, be withdrawn, dismissed, resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to the Investment Adviser Registration Depository. Some of the specific data fields contained in the report may be blank if the information was not provided.

The following types of events are disclosed about this Investment Adviser Representative:

| Type | Count |
|------|-------|
| Customer Dispute | 1 |
| Investigation | 1 |
| Termination | 2 |

## Customer Dispute

This section provides information regarding a customer dispute that was reported to the Investment Adviser Registration Depository (IARD) by the Investment Adviser Representative (IAR), an investment adviser and/or securities firm, and/or a securities regulator. The event may include a consumer-initiated, investment-related complaint, arbitration proceeding or civil suit that contains allegations of sales practice violations against the individual.

The customer dispute may be pending or may have resulted in a civil judgment, arbitration award, monetary settlement, closure without action, withdrawal, dismissal, denial, or other outcome.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Individual |
| **Employing firm when activities occurred which led to the complaint:** | LPL FINANCIAL, LLC |
| **Allegations:** | CUSTOMER ALLEGES ADVICE TO SELL SECURITIES LED TO UNEXPECTED CAPITAL GAINES. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $0.00 |
| **Alleged Damages Amount Explanation (if amount not exact):** | DAMAGES UNSPECIFIED BUT REASONABLY BELIEVED TO BE GREATER THAN $5,000. |
| **Is this an oral complaint?** | No |
| **Is this a written complaint?** | Yes |
| **Is this an arbitration/CFTC reparation or civil litigation?** | No |

### Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/13/2016 |
| **Complaint Pending?** | No |
| **Status:** | Settled |
| **Status Date:** | 07/20/2016 |

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 42 of 343



| | |
|---|---|
| **Settlement Amount:** | $15,000.00 |
| **Individual Contribution Amount:** | $5,000.00 |
| **Broker Statement** | THE COMPLAINT WAS SETTLED WITHOUT ANY ADMISSION OF LIABILITY WHATSOEVER ON THE PART OF THE FINANCIAL ADVISOR WHO CONTINUES TO DENY ANY WRONGDOING.  RATHER, THE COMPLAINT WAS SETTLED AS A BUSINESS DECISION BY THE FIRM TO RESOLVE THE ISSUE WITH THE CUSTOMER BEFORE IT BECAME AN ARBITRATION.  THE CUSTOMER ACKNOWLEDGED IN HIS COMPLAINT THAT HE WAS AWARE OF THE REDUCED COST BASIS OF THE STOCKS BEFORE THE ADVISOR RECOMMEDED THE LIQUIDATION OF THOSE POSITIONS. |

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 43 of 343



## Investigation

This disclosure event involves any ongoing formal investigation such as a grand jury investigation, a Securities and Exchange Commission investigation, a formal investigation by a self-regulatory organization (e.g., FINRA), or an action or procedure designated as an investigation by a state or other regulator. Subpoenas, preliminary or routine regulatory inquiries, and general requests by these regulatory bodies for information are not considered investigations and therefore are not required to be reported.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Initiated By:** | LPL Financial |
| **Notice Date:** | 12/12/2018 |
| **Details:** | We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds. |
| **Is Investigation pending?** | Yes |
| **Firm Statement** | We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor. |

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 44 of 343


## Termination

This disclosure event involves a situation where the Investment Adviser Representative voluntarily resigned, was discharged or was permitted to resign after allegations were made that accused the Investment Adviser Representative of violating investment-related statutes, regulations, rules or industry standards of conduct; fraud or the wrongful taking of property; or failure to supervise in connection with investment-related statutes, regulations, rules or industry standards of conduct.

### Disclosure 1 of 2

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Firm Name:** | LPL Financial LLC |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/20/2018 |
| **Allegations:** | Non-disclosure of beneficiary status within client trust, in violation of Firm policy. |
| **Product Type:** | No Product |

### Disclosure 2 of 2

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Firm Name:** | Independent Advisor Alliance |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/20/2018 |
| **Allegations:** | Terminated as a result of termination from his registered broker-dealer. |
| **Product Type:** | Other: We were informed it was an annuity but have limited details as to the type and aren't sure if this is the only account involved. |
| **Firm Statement** | Terminated as a result of termination from his registered broker-dealer. |

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.


www.adviserinfo.sec.gov

**End of Report**

This page is intentionally left blank.

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 46 of 343

# EXHIBIT E

| | |
|---|---|
| **MARK JAMES DICKMAN** **(CRD#: 2066229)** | |
| **CLAIMANT,** | |
| **v.** | |
| **JESSICA N. SEXTON** **(CRD#: 5260955),** | **FINRA ARBITRATION** **NO. 19-02406** |
| **RESPONDENT.** | |

## AMENDED STATEMENT OF CLAIM

This is an Amended Statement of Claim by Mark J. Dickman. It is amended to explain that Respondent Sexton, in her Response to the Statement of Claim, shifts the blame by claiming that LPL Financial LLC provided her with false Form U5 reportable information for her use on the Form U5 she executed, which egregiously defamed Claimant Dickman. Given her position, Claimant will need to add LPL Financial LLC as a Respondent by motion after the Panel is appointed. It is also amended to add further discussions of Robert P. Russo's role, a Series 24 registered principal with LPL Financial and Ms. Sexton's supervisor. Claimant will also move to add Mr. Russo as a Respondent after the Panel has been appointed. The amendment also corrects and replaces the document under Exhibit B with the correct exhibit (LPL Financial's Form U5 dated 12/27/2018), and updates and amends various paragraphs concerning published cases and remedies sought.

As discussed in detail below, Respondent Jessica Sexton, a Series 24 Supervisor and Principal with the broker-dealer LPL Financial LLC, violated one of her most important and sensitive regulatory obligations by filing a false Form U5 Termination Notice with FINRA, the accuracy and completeness of which she was required by law to verify.

Despite her regulatory obligation, she repeatedly made false statements concerning Mr. Dickman's termination, including false statements added entirely unnecessarily and gratuitously, that depicted Mr. Dickman as some sort of criminal engaged in "fraud or the wrongful taking of property" and "improper money movement of a client's funds," among several other defamatory assertions. As described below, the defamatory nature of the Form U5 at issue here appears unprecedented.

Robert Russo, who was at all relevant times Ms. Sexton's supervisor, failed to prevent these damaging and false allegations from being filed and placed upon Mr. Dickman's records with FINRA and the SEC, and with the CRD system, and thus made available to the entire public and potential employers to see.

At the time, Mr. Russo was engaged in an overly aggressive campaign to take as many customers as possible from a rival firm that was experiencing a major transformation. Mr. Russo's relentless drive to grow at his competitor's expense was widely reported in the press, including one well-known publication that explained how Mr. Russo "goes for the jugular." When Mr. Dickman was terminated, Mr. Russo kept Mr. Dickman's customers, which had taken him decades to acquire. Mr. Russo also kept two other advisors and their clients that Mr. Dickman had arranged to join Mr. Russo's firm with him.

As discussed below, the false statements destroyed not only Mr. Dickman's hard-earned business reputation with his long-term clients and business colleagues, but also subjected him to intense personal humiliation with his own family and friends. The Form U5 rendered him entirely unemployable despite having nearly three decades of impeccable service in the advisory industry and it destroyed over half of his painstakingly generated book of business.

As will be proven at the hearing, Mr. Dickman's financial damages well exceed $1.4 million dollars and are accumulating. Given the sheer number of blatant falsehoods reported by Ms. Sexton (which violated her regulatory obligations to FINRA, the SEC, and to the state regulators, under Mr. Russo's watch) we are also seeking punitive damages of treble the compensatory damages. The nearly unprecedented level of defamation involved here is far worse than that typically found in the published Form U5 defamation cases that have awarded punitive damages and attorneys' fees on top of compensatory damages.

## THE PARTIES

- **Mark J. Dickman (CRD# 2066229)**

Claimant Mark J. Dickman has been a registered financial advisor since 1992. Over nearly three decades, he has painstakingly built a loyal following of satisfied long-term customers. Over that period, he has never had any regulatory problems, has never previously been discharged by a financial firm and has had only a single customer complaint – a minor and meritless claim settled for nuisance value. As the arbitration panel will see at the hearing, Mr. Dickman is a courteous, deferential and ethical man and he bears no resemblance to the false picture painted by Ms. Sexton through her unlawful and defamatory Form U5 filing.

- **Jessica N. Sexton (CRD# 5260955)**

Respondent Jessica N. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008. She also holds a Series 7 and Series 66. She is, and was at all relevant times, a FINRA-registered Series 24 principal and supervisor with the broker-dealer LPL Financial LLC. She operates from, and oversees, one of LPL Financial's FINRA OSJs (Office of Supervisor Jurisdiction), where Mr. Dickman was FINRA-registered at the relevant time. Ms. Sexton also claims to be the "Chief Compliance Officer" of Independent Advisor Alliance, LLC. And she also

claims to be the "Chief Compliance Officer" of some outfit called "InVestra Financial Services Incorporated."

## OTHER PARTIES

- **Robert P. Russo (CRD# 4466372)**

Robert P. Russo has been a FINRA-registered Series 24 principal and supervisor since 2007. He also holds a Series 7, 63, and 66 with LPL Financial LLC. Mr. Russo operates the same major FINRA OSJ mentioned above for the broker-dealer LPL Financial LLC. He is also the CEO of Independent Advisor Alliance, LLC. Mr. Russo was at all relevant times Ms. Sexton's supervisor. Mr. Russo was also in charge of his firm's aggressive recruiting efforts in 2018, which resulted in the recruiting of Mr. Dickman (and his two colleagues).

- **LPL Financial LLC (CRD#: 6413)**

LPL Financial is one of the largest and most well-known broker-dealers in the country. Dickman, Sexton, and Russo were registered with LPL Financial during time periods relevant hereto.

## INTRODUCTION
## THE FORM U5 UNIFORM TERMINATION NOTICE

As the arbitration panel is aware, FINRA has two well-known forms. The first is Form U4, which is the "Uniform Application for Securities Industry Registration or Transfer" and is the form used by qualified individuals to associate with a broker-dealer or investment advisor. The second is the Form U5, which is the "Uniform Termination Notice for Securities Industry Registration," which is used by firms to terminate the registration of an individual. This case involves Form U5.

Under SEC, FINRA and state securities rules, the Form U5 requests various information about the reasons that an individual's securities registration has been terminated. There are several places on the Form U5 where the financial firm must expound on the circumstances. It is required by regulation that an appropriate individual at the financial firm verify the accuracy of representations made on a Form U5 because the information is available to federal and state regulators, and for the most part, to anyone with an Internet connection. FINRA summed it up succinctly in a widely distributed and well-known regulatory notice:

> Form U5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA. It is imperative that firms file complete and accurate Forms U5 in a timely manner because the reported information is used by a number of constituencies for a variety of reasons. For instance, FINRA uses the information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations. FINRA, other self-regulatory organizations and state regulatory and licensing authorities also use the information to make informed registration and licensing decisions. Firms use the information to help them make informed employment decisions. Further, investors use the Form U5 information that is

displayed through BrokerCheck when considering whether to do business with a registered (or formerly registered) person.

Regulatory Notice 10-39 (*"Form U5 Obligation to Provide Timely, Complete and Accurate Information on Form U5"*).

This same regulatory mandate is echoed directly above Ms. Sexton's signature on the Form U5 at issue here:

> ***"I verify the accuracy and completeness of the information contained in and with this form."***

She signed it, verifying the accuracy and completeness, but as discussed below, her representations on that form were so blatantly false and defamatory that it is difficult to find examples of *more* defamatory statements among the FINRA Awards granting compensatory and punitive damages to defamed representatives. The assassination of Mr. Dickman's character here is inexcusable from a compliance standpoint and downright disgusting in terms of basic human decency.

## THE DEFAMATORY STATEMENTS

The main Form U5 at issue was filed by Ms. Sexton on December 20, 2018 and is attached at **Exhibit A**. Her signature, directly above which she represents: "I verify the accuracy and completeness of the information contained in and with this form" appears on page 5 of 7. Her signature on that page is one of the most egregious actions a Series 24 principal could ever make.

### 1. Fraud or the Wrongful Taking of Property

The first defamatory falsehood on this Form U5 is found in the "Termination Disclosure," which is question 7F (on page 4). On that page, Ms. Sexton reported that Mr. Dickman was terminated:

> "after allegations were made that accused the individual of: *2. fraud or the wrongful taking of property*."

This is false.

Falsely checking "yes" on this box (7F.2.) is the equivalent of handing Mr. Dickman a career death sentence. As everyone in the industry knows, FINRA *permanently bars* representatives for conversion of customer funds "regardless of amount converted."[1]

This false disclosure, alone, destroyed any possibility of Mr. Dickman joining another investment advisor or broker-dealer. Financial firms reading this Form U5 well know that Mr. Dickman inevitably faces an imminent FINRA, SEC and/or state securities inquiry, with the very real

---

[1] FINRA Sanctions Guidelines, page 36. https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf

4

prospect of a permanent bar. This falsehood rendered Mr. Dickman, who has worked as an advisor for nearly three decades, *unemployable*.

As will be shown at the hearing, neither Ms. Sexton, nor Mr. Russo, even bothered to call Mr. Dickman to verify the supposed "fraud" or "wrongful taking of property" allegation before checking this career-destroying box. Mr. Dickman was apparently not even deserving of the courtesy of a call from anyone at Mr. Russo's firm before the filing.

With nearly three decades of impeccable service, Mr. Dickman deserved more. Any advisor would. This misconduct falls well below what is expected of a Series 24 registered principal with one of the largest broker-dealers in the country. It is sanctionable misconduct by Ms. Sexton, on Mr. Russo's watch. Regrettably, this false and essentially criminal disclosure is only the beginning.

## 2. Federal "Investigation" for "Improper Money Movement of a Client's funds."

In box 3 (on page 1), which requests a "Termination Explanation," Ms. Sexton reported that her firm was notified by LPL Financial that "***the advisor is currently undergoing a federal investigation for improper money movement of a client's funds***."

This is false. And also, outrageous.

It is difficult to imagine a more defamatory statement to place on an advisor's Form U5. No financial institution would hire someone under "federal investigation" for "improper money movement of a client's funds." One would expect a couple of Series 24s to look into the matter with some care before reporting such a devastating disclosure.

Contrary to Ms. Sexton's false report, there was no "investigation" here.

Question 7A (on page 2) is the "**Investigation Disclosure**" question. Ms. Sexton falsely answered "yes" to this question, which asks:

> Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page).

As anyone in the industry knows, the italicized words on Form U5 are specifically defined terms.

And if anyone in the industry does not know this, the Form U5 itself explains this, directly above Ms. Sexton's false "yes" answer, where the form states, in all capital letters: "REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALCIZED WORDS." *See* Exhibit A, page 2.

The word "investigation" is italicized because it is a carefully defined word for the purposes of Form U5 reporting. In order to answer "yes" here, Ms. Sexton had the regulatory obligation to *verify* that there was an "*investigation*" that fits this definition:

**Investigation**
Includes: (a) grand jury investigations; (b) U.S. Securities and Exchange Commission investigations after the "Wells" notice has been given; (c) FINRA investigations after the "Wells" notice has been given or after a person associated with a member, as defined by The FINRA By-Laws, has been advised by the staff that it intends to recommend formal disciplinary action; (d) NYSE Regulation investigations after the "Wells" notice has been given or after a person over whom NYSE Regulation has jurisdiction, as defined in the applicable rules, has been advised by NYSE Regulation that it intends to recommend formal disciplinary action; (e) formal investigations by other SROs; or (f) actions or procedures designated as investigations by jurisdictions. The term investigation does not include subpoenas, preliminary or routine regulatory inquiries or requests for information, deficiency letters, "blue sheet" requests or other trading questionnaires, or examinations.

*See* FINRA Form U5 Explanation of Terms, page 5.[2]

Looking at this definition, it is clear that none of the categories ever existed here. There was no "grand jury investigation" (item a); no "wells notice[s]" (items b through d); no formal investigation by some "other SRO" (item e), and no actions or procedures designated as investigations by "jurisdictions," which is defined on page 4: "Jurisdiction - Means a state, District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands or any subdivision or regulatory body thereof." None of that happened here.

Moreover, the last sentence expressly states that the term "investigation" "does not include" "requests for information."

There simply was no "investigation."

Checking "yes" to this question falsely reported that Mr. Dickman was under "investigation" as that term is specifically defined for reporting purposes. As defined, that would ordinarily be considered a very serious situation by a potential employer. For example, a "Wells notice" is sent *after* FINRA or the SEC has already decided to recommend the filing of a disciplinary action against an individual, has already identified the securities laws violated, and requests a submission from the individual addressing the recommendation. No reputable financial firm would hire someone facing that situation. In any event, the "investigation" disclosure is flat false and defamatory.

---

[2] Form U5 Explanation of Terms ("The following definitions apply to terms that are italicized in Form U5") https://www.finra.org/sites/default/files/AppSupportDoc/p468051.pdf

But the defamatory content did not end there. Because Ms. Sexton answered "yes" to the Investigation Disclosure question, she was required to fill out the Investigation Disclosure Reporting Page (DRP), which is found on pages 5-6. On page 6, Ms. Sexton informed the regulators that "LPL informed us that the advisor was *currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds*." And she reported at item 4 that this (non-existent) "*investigation*" was "*pending*."

All false.

### 3. Sexton Misrepresents LPL Financial's Reason for Termination (Gratuitously)

But it gets worse still. Ms. Sexton then gratuitously availed herself of the "optional" right to make a "comment" on the Form U5. In item 6 (page 7), Ms. Sexton entirely unnecessarily and falsely suggested that LPL Financial had decided to terminate Mr. Dickman because of "additional information" learned about some supposedly pending federal investigation. This statement misrepresents the reason for termination by Ms. Sexton's own broker-dealer, LPL Financial.

*LPL Financial terminated Mr. Dickman for no such reason.* This is clear from LPL Financial's own Form U5 filing. LPL Financial's Form U5 is dated 12/27/2018 and is attached at **Exhibit B**. As the Panel will notice, LPL Financial correctly checked "*no*" to the Investigation Disclosure question, unlike Ms. Sexton. This is correct because there was no investigation.

The Panel will also see that LPL Financial *did not* falsely check "yes" to question 7F.2., as Ms. Sexton did, falsely claiming that there were allegations that Mr. Dickman engaged in "fraud or the wrongful taking of property." LPL Financial also did not include any references to "improper money movement of a client's funds." Nor did LPL Financial add any information gratuitously, as did Ms. Sexton.

Indeed, the only thing LPL Financial reported on Form U5 was that there were allegations of "Non-disclosure of beneficiary status within client trust, in violation of Firm policy." That was the only termination reason LPL provided.[3]

### 4. Sexton Gratuitously Suggests Other Accounts May be Involved.

Unfortunately, there is a final piece of defamatory information added (again gratuitously) by Ms. Sexton. On page 7, the Termination DRP asks what "product type" is involved. Ms. Sexton checked "other" and wrote this ominous sentence: "We were informed it was an *annuity* but have limited details as to the type *and aren't sure if this is the only account involved*."

That certainly allows the mind to wander, particularly when coupled with the false "investigation," the false "improper money movement" of clients' funds, and the false "fraud" or "wrongful taking of property" assertions.

---

[3] The non-disclosure was an alleged failure by Dickman to notify LPL Financial that he had been named a *contingent* beneficiary in a trust. *The primary beneficiary was the client's own wife.* And nothing even happened as a result of that beneficiary designation.

This is death by Form U5. And it is all false.

Ms. Sexton had a regulatory obligation (as well as an obligation of basic human courtesy and decency) to verify that these damning and ruinous assertions were accurate *before* etching them in stone on the Central Registration Depository system for all to see. Despite the regulatory obligation to verify the accuracy, it appears that Ms. Sexton conducted no internal review to verify the information. Thus, Form U5, Question 7B asks:

> Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct?

Ms. Sexton checked "no."

No?

She conducted no internal review before reporting the existence of a federal "investigation" and allegations of "fraud or the wrongful taking of property," and allegations of "improper money movement of a client's funds," in apparently some unspecified number of accounts?

Why not?

This is clearly sanctionable behavior by a Series 24 supervisor of LPL Financial. And the extreme and unusual nature of the reporting here quite clearly would have caught the attention of, and been reviewed by, Mr. Russo.

### SEXTON REPORTS THE DEFAMATORY INFORMATION TO FINRA, THE SEC, STATE SECURITIES REGULATORS, AND FOR THE MOST PART, TO ANYONE WITH AN INTERNET CONNECTION.

As Ms. Sexton knew would happen, several of these defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure Report ("IAR Report"). For example, the report dated January 28, 2019 – more than a month after his termination – falsely informed anyone with an Internet connection that Mr. Dickman had an "Investigation" as defined on Form U5. Page 8 of that public report informs the world that "*the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.*" In the "Firm Statement" section of that same report (at page 8), Ms. Sexton falsely suggests that LPL Financial and her firm decided to terminate Mr. Dickman because of "additional information" about this so-called "pending" "investigation." Not true. Further, page 9 informs the world that an annuity was involved and that other accounts might be involved. Again, not true.

The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating that Mr. Dickman was discharged,

referencing a "federal investigation" and also "some form of improper money movement of a client's funds."[4]

With these false and damning disclosures, no financial firm would consider associating with Mr. Dickman. Indeed, it is hard to imagine any reputable company even *outside* of the financial industry hiring him with this information publicly available. Further, no customer who read the public IAR Report or the public Brokercheck Report would seriously consider having their accounts managed by Mr. Dickman. They would be warranted in assuming that their funds would go missing.

This is in addition to Mr. Dickman's business and other colleagues who read this defamatory content and assumed it was true; not to mention members of his own family who can hardly be blamed for demanding explanations.

The misery this caused Mr. Dickman is difficult to quantify. But at the hearing, through witnesses and expert testimony, we will prove that this sort of defamation was devastating in a way that few advisors could even begin to withstand. Ms. Sexton is lucky Mr. Dickman did not jump from a bridge.

As a Series 24 with LPL Financial, Ms. Sexton's conduct here is inexcusable. She has violated her regulatory duties to FINRA and the SEC, and also to the various state securities regulators. Her conduct here is sanctionable. She destroyed Mr. Dickman's reputation and vaporized over half his life's work in one afternoon. While she advertises herself as a Series 24 supervisor with LPL Financial LLC, and a "Chief Compliance Officer" of two additional firms, she is the one who is out of legal compliance.[5] When the facts come in at the hearing, a panel referral to FINRA enforcement seems inevitable.

Despite Mr. Dickman paying attorneys to try to address this disaster, it was not until March 20, 2019 – three months after his termination – that Ms. Sexton finally filed an amended U5 to address the lingering publicly-available false information. As the panel will know, in an industry where days matter, sidelining an advisor for three months is outrageous. And very costly.

In the amended Form U5 Ms. Sexton filed on March 20, 2019, she omitted all of the false information and provided an entirely new reason for termination. The new reason that she provided: *"Terminated as a result of termination from his registered broker-dealer."* Fair enough. That sounds right. It is three months late, and Dickman lost half his livelihood, and his reputation is in tatters, but at least it is now accurate.

---

[4] There are many other public examples as well. We are in the process of collecting all historical versions of the public IAR Report and the public Brokercheck Report which also reflected examples of the defamatory content that Ms. Sexton put there.

[5] One of those firms is InVestra Financial Services Inc. On its website, below Sexton's photograph and biography as Chief Compliance Officer, is a link to "Legal Information." That page contains over 2,300 words swiped directly from Merrill Lynch's website. It twice absurdly refers to "InVestra, Pierce, Fenner and Smith Incorporated," and it bizarrely claims that InVestra settled a famous SEC auction rate securities case for $1.5 million, and it even contains Merrill's paragraph about respecting "the intellectual property of others…" https://investrafinancial.com/info-legal/

Unfortunately, some of Sexton's defamatory reporting (namely, an "investigation") still resides on Mr. Dickman's CRD as an "archived" disclosure for potential brokerage or advisory employers to contemplate with justified concern. Ms. Sexton has done nothing to fix that.

## LPL FINANCIAL

As mentioned above, Ms. Sexton has chosen to blame LPL Financial for her own false regulatory filings in the Response to the Statement of Claim that she filed on October 16, 2019. In particular, in an attempt to shift the blame to LPL Financial, Sexton wrote:

> Upon effectuation of Claimant's transfer from [his prior firm] to IAA in late 2018, Ms. Sexton and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, **and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG** for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status.[6]

Later, Sexton informs the panel that the allegations were "relayed to her by LPL."[7] This attempt to shift the blame is remarkable – after all, LPL Financial filed *its own Form U5*, and as discussed above, it contained *none* of the defamatory statements Sexton made. *Not one. See* Exhibit B. Nevertheless, if Sexton is correct that LPL is to blame for the blatant falsehoods she placed on the Form U5, then LPL is liable to Claimant. For this reason, Claimant will move to add LPL Financial as a Respondent after Panel appointment.

## THE DAMAGING NATURE OF THE FALSE STATEMENTS
## MADE ABOUT DICKMAN APPEAR UNPRECEDENTED IN PUBLISHED AWARDS

It is difficult to find a more egregious case of Form U5 defamation. There appear to be no reported FINRA awards in recent history where the defamatory statements come anywhere near the horrendous nature of those made here.

Consider, for example the nine reported FINRA awards summarized below based upon available information found in the reported awards and public reports. Although these panels awarded six and seven figure compensatory damages awards, and four included very large punitive awards, and five included large attorney fee awards, the apparent nature of the defamation in these cases is nowhere near as bad that here ("fraud or the wrongful taking of property," and under "federal investigation" and "improper money movement of a client's funds"). Indeed, the defamation involved in these cases seems downright innocuous in comparison:

---

[6] *See* Respondent's Responses and Affirmative Defenses to Statement of Claim, 10/16/2019, page 4 (emphasis added).

[7] *See id.* at 5.

- *Rathmanner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, #18-03461 (Panel awarded $3.75 million in compensatory damages in a Form U5 defamation case where the defamatory allegations were "*Conduct involving making representations on behalf of the Firm without authority*," involving a single signature).

- *Przybyla and Johnson v. USAA Financial*, FINRA #17-03279 (Panel awarded $700,000 in punitive damages, $850,000 in compensatory damages, and $250,000 in attorneys' fees, where the Form U5 defamatory comment was: "*Allegations that registered representative improperly sought compensation credit to which he was not entitled*," in connection with the preparation and publishing of financial plans).

- *Haney and Stanton v. Deutsche Bank Securities, Inc.* FINRA #16-02761 (Panel awarded $2.76 million in compensatory damages, and $142,749 in attorneys' fees for defamatory Form U5 *disclosures concerning two customer complaints*, which were then expunged).

- *Petersen v. Raymond James Financial Services, Inc.*, FINRA #17-02974 (Panel awarded over $360,000 in compensatory damages and $100,000 in sanctions, where the firm falsely claimed its reason for termination on Form U5 was that claimant *had signed her husband's name out of convenience to a letter the husband had authorized in connection with the husband's duties as a Trustee*).

- *Rusk v. First Republic Securities*, FINRA #16-03411 (Panel awarded $727,000 in compensatory damages, plus $256,717 in attorneys' fees involving Form U5 defamation falsely accusing the advisor of *failing to disclose an outside business activity*).

- *Mennemeyer v. PNC Investments*, FINRA #15-03275 (Panel awarded $1.5 million in punitive damages and $300,000 in compensatory damages concerning a Form U5 that falsely alleged claimant *had violated a PNC Investments policy*).

- *Howard v. RBS Securities, Inc.*, FINRA #14-03432 (Panel awarded $2.05 million in compensatory damages for false Form u5 falsely reporting alleged *violations of RBS Human Resource and other policies*).

- *Minevich v. Wells Fargo Advisors, LLC*, FINRA #10-04973 (Panel awarded punitive damages of $400,000, plus $100,000 in compensatory damages, and $31,600 in attorneys' fees for false Form U5 reporting concerning *one verbal complaint that was resolved to the satisfaction of the customer*).

- *Olson v. World Equity Group*, FINRA #10-01803 (Panel awarded $575,000 in punitive damages, $282,822 in attorneys' fees and $285,000 in compensatory damages involving a Form U5 defamatory comment: "*Disagreement over advertising policy, rules, and advertising protocol.*")

## CLAIMS

As will be shown at the hearing, Mr. Dickman was entirely unemployable after the Form U5 was filed. No financial firm would consider hiring him. Given his hopeless situation, he considered selling the book of business that he had developed over nearly 30 years, but even then, Mr. Russo intervened to try to prevent that, and he has taken no responsibility for Ms. Sexton's false reporting. Mr. Russo has not even offered an apology to Mr. Dickman, an advisor he was previously so eager to recruit.

At the hearing, we will prove financial damages through documents, testimony and expert testimony that are conservatively estimated at $1.4 million dollars (and growing). This does not include accounting for the intense humiliation Mr. Dickman faced before industry colleagues, before his long-term customers, and before his own family, which in fairness deserves substantial compensation.

On the question of punitive damages, we respectfully submit that the conduct described above warrants treble damages, *if ever a case did*. Cases, such as those above, where very large punitive damage awards were issued all involved defamatory statements far less egregious than those involved here.

Claimant Dickman will continue to amend this Statement of Claim as the facts are further developed. For now, Mr. Dickman brings claims against Ms. Sexton for: defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm.

## DAMAGES AND REMEDIES

As for damages and remedies, Claimant requests an Award including the following:

1.  Compensatory damages of at least $1.4 million (or as proven at the hearing);

2.  Punitive damages;

3.  Reasonable Attorneys' fees in pursuing this case;

4.  Pre and post award interest at the statutory rate;

5.  All filing fees, hearing fees and other FINRA arbitration costs;

6.  Reimbursement of all other costs, including for the Claimant's expert witnesses;

7.  Expungement of any remaining references on the FINRA CRD system, and/or corrective disclosures;

8.  An order that Sexton draft a corrective letter explaining that she defamed Mr. Dickman in her Form U5 reporting, a copy of which shall be transmitted to counsel for Dickman, and

the letter may subsequently be sent to any or all of Dickman's past or current customers.

Respectfully submitted,

Mark J. Dickman, through counsel:

Jeremy L. Bartell
BARTELL LAW PLLC
700 12th Street, NW, Ste. 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

# EXHIBIT F

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

August 11, 2019

Mark J. Dickman
40 Linden Hill Drive
Crescent Springs, KY 41017

**VIA:** Email / PDF – (markjd229@gmail.com)

**RE: Contingency Fee Agreement**

Dear Mark:

As discussed, you have agreed to hire Bartell Law ("the Firm") to pursue claims against Independent Advisor Alliance, LLC (CRD# 168267 / SEC# 801-78808) ("IAA") concerning disclosures IAA made through FINRA Form u5 filings, which we have reason to believe are defamatory. This Firm has no obligations to provide legal services on this matter until you sign and return this agreement to the Firm ("Agreement"). Please note that the terms of this Agreement are open to negotiation prior to execution should you wish to suggest changes. The Firm agrees to provide legal services only as described below.

## SCOPE

The scope of this representation is as follows:

- This engagement pertains only to the affirmative assertion of claims by the Firm, on your behalf, against IAA concerning the FINRA Form u5 filings IAA made concerning you. This includes claims for defamation, breach of contract and any other claims as may legally arise from these filings, if advisable to also assert ("the Claims").

- Bartell Law will send a demand letter to IAA, and will draft any necessary additional correspondence, and engage in any necessary negotiation with IAA's representatives, in an attempt to settle the Claims without litigation.

- If necessary and advisable, this Firm agrees to bring a lawsuit asserting the Claims against IAA. Our current understanding is that such a lawsuit against IAA is, by your agreement with IAA, required to be brought before the American Arbitration Association (AAA). This Firm agrees to bring such a lawsuit only before the AAA. Should any other judicial or arbitral tribunal be required to assert the claims, a new, mutually-agreeable agreement would be required to proceed in such forum.

# BartellLaw

- This Agreement does not include any matters outside of the scope described above. By way of example only, it does not include any motions to confirm or vacate an arbitration award brought in any court. It does not include any litigation not before the AAA. It also does not include defending against any counterclaims IAA brings against you, or defending against any claims brought against you by any third-party. These, and any other matters outside the scope described above, will be handled by this Firm only if the parties agree to a mutually-agreeable agreement covering such additional matters (otherwise, you will need to retain other counsel to handle these matters).

## COSTS

You are responsible to pay directly, when due, all costs of pursuing this matter, whether AAA fees, or other litigation fees, expert witness costs (if necessary) and any costs associated with document copying, travel, lodging and other costs items. This firm does not advance or pay costs. You agree that the Firm may withdraw should you fail to pay any costs when due.

## ATTORNEY FEES

Except as provided below, this firm will be compensated for legal services rendered only if a recovery is obtained for you. The fee to be paid to the Firm will be a percentage of the gross recovery. Gross recovery means the total of all amounts (or reasonable value, if not funds) received from any source, whether by settlement, arbitration award, judgment, sanction's order, attorney's fee award, or in another manner. The attorney's fee shall be thirty (30%) of the gross recovery ("contingency fee"). You agree than the gross recovery received will be made payable directly to Bartell Law PLLC (or successor firm), which amounts the Firm will deposit into the Firm's attorney trust account. From there, and only after the funds have fully cleared, the firm will deduct its contingency fee, and then remit the remainder to you by check from the trust account. Please note that any costs you owe to the Firm, but did not yet pay, will be deducted from your share of the gross recovery before any payment is made to you. The Firm will provide you with an accounting at that time.

## STATEMENTS

In the event the Firm incurs costs not directly paid by you, the Firm will send you a billing statement by email itemizing those costs, payment of which is due within seven days calendar of the date of the statement.

## DISCHARGE AND WITHDRAWAL

Lawyer may withdraw with your consent or for good cause. Good cause includes, but is not limited to, your breach of this Agreement, refusal to cooperate, failure to follow this Firm's advice

2

# BartellLaw

on a material matter, or if any fact or circumstance arises that would render this Firm's continuing representation unlawful or unethical, or if the representation results in an unreasonable financial burden on the Firm, or if the representation has been rendered unreasonably difficult by the client. Please note that the Firm will maintain electronic versions of the files for this matter only for a period of six years, during which you may request a copy, but if no request is made the files may be destroyed after five years without further notice. You may discharge the Firm at any time, however, you agree that upon payment of any settlement, award or judgement in your favor in this matter, this Firm is entitled to be paid a reasonable fee for the legal services provided to the extent such services contributed to the result obtained (and to the extent permitted by law, this Firm shall have a lien on any such amounts).

## ENTIRE AGREEMENT

This Agreement contains the entire agreement of the parties. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties. If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect. This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them or an oral agreement only to the extent that the parties carry it out. You agree that you have had an opportunity to negotiate this Agreement and to seek independent counsel of your choice to review you it if desired.

**DRAFT**

_____

Bartell Law PLLC
By: Jeremy L. Bartell, Esq. (Sole member)
700 12th Street NW, Suite 700
Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

Agreed to:
Date: August ___, 2019


_____

Mark James Dickman
40 Linden Hill Drive
Crescent Springs, KY 41017

3

# EXHIBIT G

|  | |
|---|---|
| **MARK JAMES DICKMAN**<br>**(CRD#: 2066229)**<br><br>    **CLAIMANT,**<br><br>    **v.**<br><br>**JESSICA NADINE SEXTON**<br>**(CRD#: 5260955).**<br><br>    **RESPONDENT.** | **FINRA ARBITRATION**<br>**NO.** _____ |

## STATEMENT OF CLAIM

This is a Statement of Claim by Mark J. Dickman, who has been a FINRA-registered financial advisor for nearly three decades and is a former registered representative of LPL Financial LLC against Jessica N. Sexton, a Series 24 Securities Principal registered with LPL Financial. As described below, as a registered principal and supervisor at LPL Financial, Ms. Sexton violated her regulatory obligations by filing, with FINRA, Form U5 termination notices (the accuracy of which she claims to have verified) in which she repeatedly made false statements that depicted Mr. Dickman as some sort of criminal, and which destroyed not only his personal and business reputation (and subjected him to intense humiliation) but also prevented him from securing any employment in the financial industry (while Ms. Sexton's own office kept most of his clients). As will be proven at the hearing, Mr. Dickman's financial damages well exceed one million dollars and are accumulating. As also discussed below, given the sheer number of blatant falsehoods at issue, the assertion of which by Ms. Sexton violated her regulatory obligations to FINRA, the SEC, and to the state regulators, we are also seeking punitive damages.

## THE PARTIES

- **Mark J. Dickman (CRD# 2066229)**

Claimant Mark J. Dickman has been a FINRA-registered financial advisor since 1992. Over nearly three decades, he has painstakingly built a loyal following of satisfied long-term customers. Over that period, he has never had any regulatory problems, has never previously been discharged by a financial firm and has had only a single customer complaint – a minor and meritless claim settled for nuisance value. As the arbitration panel will see at the hearing, Mr. Dickman is a courteous, deferential and ethical man and he bears no resemblance to the false picture painted by Ms. Sexton through her unlawful and defamatory Form U5 filings, which are described in detail below.

- **Jessica N. Sexton (CRD# 5260955)**

Respondent Jessica Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008. She also holds a Series 7 and Series 66. She is, and was at all relevant times, a FINRA-registered Series 24 principal and supervisor with the broker-dealer LPL Financial LLC. She operates from, and oversees, one of LPL Financial's OSJs (Office of Supervisor Jurisdiction), where Mr. Dickman was FINRA-registered at the relevant time. Ms. Sexton also claims to be the "Chief Compliance Officer" of "Independent Advisor Alliance," and also the "Chief Compliance Officer" of some outfit called "InVestra Financial Services Incorporated," although with respect to the latter, she falsely claims on her own biography webpage that "InVestra" offers "inVestment advice" through the well-known advisory firm "Independent Financial Partners." That is false.[1]

## INTRODUCTION

As the arbitration panel is aware, FINRA has two well-known forms. The first is the Form U4, which is the "Uniform Application for Securities Industry Registration or Transfer" and is the form used by qualified individuals to associate with a broker-dealer or investment advisor. The second is the Form U5, which is the "Uniform Termination Notice for Securities Industry Registration," which is used by firms to terminate the registration of an individual.

Under SEC, FINRA and state securities rules, the Form U5 requests various information about the reasons that an individual's securities registration has been terminated. There are also several places on that form where the financial firm must expound on the circumstances. It is required by regulation that someone with supervisory authority at the financial firm "verify" the accuracy of representations made on a Form U5 because the information is available to federal and state regulators, and for the most part, to anyone with an Internet connection. FINRA summed it up succinctly in a widely distributed and well-known regulatory notice:

> Form U5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA. It is imperative that firms file complete and accurate Forms U5 in a timely manner because the reported information is used by a number of constituencies for a variety of reasons. For instance, FINRA uses the information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations. FINRA, other self-regulatory organizations and state regulatory and licensing authorities also use the information to make informed registration and licensing decisions. Firms use the information to help them make informed employment decisions. Further, investors use the Form U5 information that is displayed through BrokerCheck when considering whether to do business with a registered (or formerly registered) person.

Regulatory Notice 10-39 ("*Form U5 Obligation to Provide Timely, Complete and Accurate Information on Form U5*").

This same regulatory mandate is echoed directly above Ms. Sexton's signature on the Form U5

---

[1] "Chief Compliance Officer" Sexton's false marketing on her own biography page is available here. https://investrafinancial.com/jessica-sexton/

discussed below: "*I verify the accuracy and completeness of the information contained in and with this form.*" She signed it, verifying the accuracy and completeness, but as discussed below, her representations on that form were so blatantly false and defamatory that it is difficult to find examples of *more* defamatory statements among the FINRA Awards granting compensatory and punitive damages to defamed Claimants. The assassination of Mr. Dickman's character here is inexcusable from a compliance standpoint and downright disgusting in terms of basic human decency.

## THE DEFAMATORY STATEMENTS

The main Form U5 at issue was filed by Ms. Sexton on December 20, 2018 and is attached at **Exhibit A**. Her signature, in which she represents: "I verify the accuracy and completeness of the information contained in and with this form" appears on page 5 of 7. Her signature there is one of the most egregious actions a Series 24 principal could ever make. There are literally no comparison cases to the degree of outright defamation involved here.

The first defamatory falsehood on this Form U5 is found in the "Termination Disclosure," which is question 7F (on page 4). On that page, Ms. Sexton reported that Mr. Dickman was terminated:

> "after allegations were made that accused the individual of: *2. fraud or the wrongful taking of property.*"

This is false.

Falsely checking "yes" on this box (7F.2.) is the equivalent of handing Mr. Dickman a career death sentence. As everyone in the industry knows, FINRA *permanently bars* representatives for conversion of customer funds "regardless of amount converted."[2]

This false disclosure alone destroyed any possibility of Mr. Dickman joining another investment advisor or broker-dealer after leaving LPL Financial. Financial firms reading this Form U5 well know that Mr. Dickman inevitably faces an imminent FINRA, SEC and/or state securities inquiry, with the very real prospect of a permanent bar looming. This falsehood alone rendered Mr. Dickman *unemployable*.

As will be shown at the hearing, Ms. Sexton never even bothered to call Mr. Dickman to verify the supposed "fraud" or "wrongful taking of property" allegation before checking this career-destroying box. Mr. Dickman was apparently not even deserving of the courtesy of a call from *anyone* at Ms. Sexton's firm (or firms, whichever is accurate).

With nearly three decades of impeccable service, Mr. Dickman deserved more. Any advisor would. This conduct falls well below what is expected of a Series 24, registered principal with one of the largest broker-dealers in the country. It is sanctionable misconduct.

Regrettably, this false and essentially criminal disclosure is only the beginning. In box 3 (on page 1), which requests a "Termination Explanation," Ms. Sexton reported that her firm was notified by LPL Financial that "*the advisor is currently undergoing a federal investigation for improper*

---

[2] FINRA Sanctions Guidelines, page 36. https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf

***money movement of a client's funds.***"

This is false. And also outrageous.

It is difficult to imagine a more defamatory statement to place on an advisor's Form U5. No financial institution would hire someone under "federal investigation" for "improper money movement of a client's funds." One would expect a Series 24 at LPL Financial to look into the matter with some care before reporting such a devastating disclosure.

Contrary to Ms. Sexton's false report, there was no "investigation" here.

Question 7A (on page 2) is the "**Investigation Disclosure**" question. Ms. Sexton falsely answered "yes" to this question, which asks:

> Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.

As anyone in the industry knows, the italicized words on Form U5 are specifically defined terms. And if anyone in the industry does not know this, the Form U5 itself explains this, directly above Ms. Sexton's false "yes" answer, where the form states, in all capital letters: "REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALCIZED WORDS." *See* Exhibit A, page 2.

The word "investigation" is italicized because it is a carefully defined word for the purposes of Form U5 reporting. In order to answer "yes" here, Ms. Sexton had the regulatory obligation to *verify* that there was an "*investigation*" that fits this definition:

**Investigation**
Includes: (a) grand jury investigations; (b) U.S. Securities and Exchange Commission investigations after the "Wells" notice has been given; (c) FINRA. investigations after the "Wells" notice has been given or after a person associated with a member, as defined by The FINRA By-Laws, has been advised by the staff that it intends to recommend formal disciplinary action; (d) NYSE Regulation investigations after the "Wells" notice has been given or after a person over whom NYSE Regulation has jurisdiction, as defined in the applicable rules, has been advised by NYSE Regulation that it intends to recommend formal disciplinary action; (e) formal investigations by other SROs; or (f) actions or procedures designated as investigations by jurisdictions. The term investigation does not include subpoenas, preliminary or routine regulatory inquiries or requests for information, deficiency letters, "blue sheet" requests or other trading questionnaires, or examinations.

*See* FINRA Form U5 Explanation of Terms, page 5.[3]

---

[3] Form U5 Explanation of Terms ("The following definitions apply to terms that are italicized in Form U5") https://www.finra.org/sites/default/files/AppSupportDoc/p468051.pdf

Looking at this definition, it is clear that none of these categories ever existed here. There was no "grand jury investigation" (item a); no "wells notice[s]" (items b through d); no formal investigation by some "other SRO" (item e), and no actions or procedures designated as investigations by "jurisdictions," which is defined on page 4: "Jurisdiction - Means a state, District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands or any subdivision or regulatory body thereof." None of that happened here.

Moreover, the last sentence expressly states that the term "investigation" "does not include" "requests for information."

There simply was no "investigation."

Checking "yes" to this question falsely reported that Mr. Dickman was under "investigation" as that term is specifically defined for reporting purposes. As defined, that would ordinarily be considered a very serious situation by a potential employer. For example, a "Wells notice" is sent *after* FINRA or the SEC has already decided to recommend the filing of a disciplinary action against an individual, has already identified the securities laws violated, and requests a submission from the individual addressing the recommendation. No reputable financial firm would hire someone facing that situation.

But the defamatory content did not end there. Because Ms. Sexton answered "yes" to the Investigation Disclosure question, she was required to fill out the Investigation Disclosure Reporting Page (DRP), which is found on pages 5-6. On page 6, Ms. Sexton informed the regulators that "LPL informed us that the advisor was **currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds**." And she reported at item 4 that this (non-existent) "*investigation*" was "***pending***."

This is false.

But it gets worse still. Ms. Sexton then gratuitously availed herself of the "optional" right to make a "comment" on the Form U5. In item 6 (page 7), Ms. Sexton entirely unnecessarily and falsely suggested that LPL Financial had decided to terminate Mr. Dickman because of "additional information" learned about some supposedly pending federal investigation. This statement misrepresents the reasons for termination by Ms. Sexton's own broker-dealer, LPL Financial, one of the largest brokerages in the country. *LPL Financial terminated Mr. Dickman for no such reason.*

This is clear from LPL Financial's own Form U5 filing. LPL Financial's Form U5 is dated 12/27/2018 and is attached at **Exhibit B**.

As the Panel will notice, LPL Financial correctly checked "***no***" to the Investigation Disclosure question, unlike Ms. Sexton.

LPL was correct. There was no reportable investigation.

The Panel will also see that LPL Financial did not falsely check "yes" to question 7F.2., as Ms.

Sexton did, claiming that there were allegations that Mr. Dickman engaged in "fraud or the wrongful taking of property." LPL Financial did not include any false disclosures or references to "fraud" or "wrongful taking of property," or "federal investigations" or "improper movement" of client's funds.

Indeed, the only thing LPL Financial reported on Form U5 was that there were allegations of "Non-disclosure of beneficiary status within client trust, in violation of Firm policy." That was the only termination reason provided.[4]

Unfortunately, there is a final piece of defamatory information added (again gratuitously) by Ms. Sexton. On page 7, the Termination DRP asks what "product type" is involved. Ms. Sexton checked "other" and wrote this ominous sentence: "We were informed it was an *annuity* but have limited details as to the type *and aren't sure if this is the only account involved*."

That certainly allows the mind to wander, particularly when coupled with the false "investigation," the false "improper movement" of clients' funds, and the false "fraud" or "wrongful taking of property" assertions.

This is death by Form U5. And it is all false.

Ms. Sexton had a regulatory obligation (as well as an obligation of basic human courtesy and decency) to verify that these damning and ruinous assertions were accurate *before* etching them in stone on the Central Registration Depository system for all to see. Despite the regulatory obligation to verify the accuracy, it appears that Ms. Sexton conducted no internal review to verify the information. Thus, Form U5, Question 7B asks:

> Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct?

Ms. Sexton checked "no."

No?

She conducted no internal review before reporting the existence of a federal "investigation" and allegations of "fraud or the wrongful taking of property" and allegations of "improper money movement of a client's funds?"

Why not?

This is clearly sanctionable behavior by a Series 24 supervisor of LPL Financial.

As Ms. Sexton knew would happen, several of these defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure

---

[4] The non-disclosure was an alleged failure to notify LPL Financial that Plaintiff had been named a contingent beneficiary in a trust. The primary beneficiary was the client's own wife. And nothing even happened as a result of that beneficiary designation.

Report ("IAR Report"). For example, the report dated January 28, 2019 – more than a month after his termination – falsely informed anyone with an Internet connection that Plaintiff had an "Investigation" as defined on Form U5. Page 8 of that public report informs the world that "*the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.*" In the "Firm Statement" section of that same report (at page 8), Ms. Sexton falsely suggests that LPL Financial and her firm decided to terminate Plaintiff because of "additional information" about this so-called "pending" "investigation." Not true. Further, page 9 informs the world that an annuity was involved and that other accounts might be involved. Again, not true.

The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating that Mr. Dickman was discharged, referencing a "federal investigation" and also "some form of improper money movement of a client's funds."[5]

With these false and damning disclosures, no financial firm would consider associating with Mr. Dickman. Indeed, it is hard to imagine any reputable company even *outside* of the financial industry hiring him with this information publicly available. Further, no customer who read the public IAR Report or the public Brokercheck Report would seriously consider having their accounts managed by Mr. Dickman. They would be warranted in assuming that their funds would go missing.

As a Series 24 with LPL Financial, Ms. Sexton's conduct here is inexcusable. She has violated her regulatory duties to FINRA and the SEC, and also to the various state securities regulators. Her conduct here is sanctionable. She destroyed Mr. Dickman's reputation and vaporized over half his life's work in one afternoon. While she advertises herself as a Series 24 and a "Chief Compliance Officer" of two different firms, she is the one who is out of legal compliance. When the facts come in at the hearing, a panel referral to FINRA enforcement seems inevitable.

Despite Mr. Dickman paying attorneys to try address this disaster, it was not until March 20, 2019 – three months after his termination – that Ms. Sexton somehow found it in her heart to finally file an amended U5 to address the lingering publicly-available false information. As the panel will know, in an industry where days matter, sidelining an advisor for three months is outrageous.

Ultimately, Ms. Sexton changed course, and instead of continuing to fraudulently call Mr. Dickman a criminal, who wrongfully takes client funds from who knows how many accounts, she filed an amended Form U5 on March 20, 2019. This amendment omitted all of the false information and provided a revised reason for termination. The reason she provided: "*Terminated as a result of termination from his registered broker-dealer.*" Fair enough. That sounds right. It is three months late, but at least it is accurate.

Unfortunately, some of her defamatory information (an "investigation") still resides on Mr. Dickman's CRD as an "archived" disclosure for potential brokerage or advisory employers to contemplate with justified concern.

---

[5] There are many other public examples as well. We are in the process of collecting all historical versions of the public IAR Report and the public Brokercheck Report which also reflected examples of the defamatory content that Ms. Sexton put there.

At the hearing, we will prove financial damages through documents, testimony and expert testimony that are conservatively estimated at 1.4 million dollars (and growing). This does not include accounting for the intense humiliation Mr. Dickman faced before industry colleagues, before his own long-term customers, and before his own family, which in fairness deserves substantial compensation. Further, as mentioned, we believe the circumstances here clearly warrant punitive damages of at least double the compensatory damages.

Claimant Dickman will amend this Statement of Claim as the facts are further developed, but for now, brings claims against Ms. Sexton for: defamation, fraud, tortious interference, breach of contract, breach of regulatory duty causing harm and unjust enrichment.

Respectfully submitted,

Mark J. Dickman, through counsel:

Jeremy L. Bartell
BARTELL LAW PLLC
700 12th Street, NW, Ste. 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

# EXHIBIT H

Case 3:26-cv-00280 Document 4-1 Filed 04/08/26 Page 74 of 343

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

In the Matter of an Arbitration Between:    )
    )
MARK JAMES DICKMAN,    )
(CRD#: 2066229)    )
    )
    Claimant,    )
    )
and    )
    )
    )    **FINRA NO. 19-02406**
JESSICA NADINE SEXTON,    )
(CRD#: 5260955)    )
    )
and,    )
    )
ROBERT P. RUSSO    )
(CRD#: 4466372),    )
    )
and,    )
    )
LPL Financial LLC    )
(CRD#: 6413)    )
    )
    Respondents.    )
    )

## RESPONSE AND AFFIRMATIVE DEFENSES
## TO SECOND AMENDED STATEMENT OF CLAIM AND MOTION TO CHANGE
## HEARING LOCATION

Respondents, Jessica Nadine Sexton ("Ms. Sexton") and Robert P. Russo ("Mr. Russo," and together with Ms. Sexton, the "Respondents"), by and through the undersigned counsel, hereby submits the following Response and Affirmative Defenses to the Second Amended Statement of Claim filed by Mark James Dickman ("Mr. Dickman" or "Claimant"). Ms. Sexton's Response to Claimant's initial Statement of Claim is restated in its entirety except as otherwise amended to address the addition of Mr. Russo as a party, address the claims now brought against him, and to include Respondents' Motion to Change Hearing Location. Accordingly, each of the Respondents hereby state as follows:

1

## I.     Introduction and Initial Response

The allegations contained in Mr. Dickman's Statement of Claim are factually and legally without merit and should be dismissed.  The inception of Mr. Dickman's troubles stem from his own failure to disclose to LPL Financial ("LPL") that he was a contingent beneficiary in a client's trust—a fact he also affirmatively attested to in the negative over the course of four (4) consecutive years.  While seemingly minor, the omission violated LPL's fiduciary capacity policy and initiated a series of unfortunate events, the resulting consequences of which Mr. Dickman inappropriately blames on Respondents.

Ultimately, Mr. Dickman's non-disclosure and, upon information and belief, related investigation by the U.S. Postal Service Office of Inspector General ("USPS OIG"), led to the termination of his registration with LPL and, consequently, his relationship and registration with Independent Adviser Alliance ("IAA").  Contrary to Mr. Dickman's misstatement of the law in his Statement of Claim, the SEC, FINRA, and state securities regulations do not *request* information related to the termination of an investment advisor.  Rather, the terminating firm is *required* to file with FINRA a Uniform Termination Notice on Form U5 ("Form U5" or "U5") providing the reasons for an involuntary termination within thirty days of termination.  IAA was required to fill out the Form U5 in performance of its own regulatory obligations as an SEC-Registered Investment Advisor ("RIA").

Ms. Sexton, IAA's Chief Compliance Officer[1] ("CCO"), correctly and properly provided the required information related to Mr. Dickman's termination when she filed the Form U5. The information included therein was factual and accurate as provided by LPL.  Although he attempts

---

[1]Mr. Dickman accuses Ms. Sexton of falsely representing that she is also the CCO for Investra Financial Services ("IFS").  However, a cursory review of IAA's registration status and public disclosures clearly denotes IFS as a doing-business-as ("d/b/a") entity of IAA.  Acting as CCO for both IAA and IFS is entirely permissible under FINRA and SEC standards.

2

to downplay the severity of his omission, Mr. Dickman admits he *did* fail to disclose his beneficiary status in a client's trust in violation of LPL's firm policy[2]. Additionally, Respondents were in fact notified by LPL that Mr. Dickman was under investigation by USPS OIG for some sort of improper money movement as a result of, or related to, the non-disclosure. As a result, the filing of the Form U5 by Respondents was proper and in accordance with the standard of care that would be reasonably afforded to Mr. Dickman under the circumstances. Much to Mr. Dickman's chagrin, the mandatory reporting of the existence of allegations as reasons for his termination do not amount to defamation, or suggest any level of incompetence on behalf of Respondents, simply because the nature of the existing allegations against him are unsavory.

Additionally, the disclosures on Mr. Dickman's Form U5 relating to his termination are protected by, at a minimum, qualified privilege. Even assuming, *arguendo*, the truthful statements in the Form U5 do somehow amount to defamation, Mr. Dickman cannot recover absent a showing of actual malice on Ms. Sexton's part[3]. In fact, Ms. Sexton has never met Mr. Dickman, had no working relationship with him during Claimant's (less than one-week) association with IAA, and has had no interaction with him outside of limited email correspondence in December 2018 regarding the Commonwealth of Kentucky's initial approval of Claimant's IAR registration with IAA. To insinuate that she acted with any malice and would have had any reason or incentive to do so when submitting his Form U5 is completely unfounded and nonsensical. Mr. Dickman must agree as his Second Amended Statement of Claim is entirely devoid of any such allegations, failing to support even an inference of malice. Instead, Mr. Dickman wraps up his Second Amended Statement of Claim with a series of conclusory claims against Respondents of fraud, tortious

---

[2]Claimant's Second Amended Statement of Claim, fn 3.

[3]As Mr. Dickman brings allegations against Mr. Russo for derivative claims that rely on the existence of the commission of an actionable tort, any reference to Ms. Sexton's behavior, actions, knowledge, or drafting, filing, or submitting the Form U5 is also a response on behalf of Mr. Russo.

3

interference, breach of contract, breach of regulatory duty causing harm, and unjust enrichment—none of which he provides enumerated facts or allegations to support.

Finally, Mr. Dickman also makes a blanket demand for relief against Mr. Russo based on claims for negligent hiring, failure to train, failure to supervise, and respondent superior. Again, Mr. Dickman fails to meet event basic pleading standards required to support these claims. While North Carolina recognizes a cause of action for negligent supervision and retention of an employee, Mr. Dickman cannot satisfy the requisite elements to succeed on such theories. Not only does Mr. Dickman fail to establish an actionable tort has been committed, but he also fails to allege that Ms. Sexton is incompetent or that Mr. Russo had any prior knowledge, constructive or actual, that Ms. Sexton was incompetent. As a result, Mr. Dickman's claims against both Respondents fail to meet necessary pleading standards and should be dismissed.

## II.     Factual Background

Because Mr. Dickman purposefully attempts to attenuate the relationships between LPL, IAA, and Independent Financial Partners ("IFP")[4], it is necessary to briefly detail the actual working relationships between the three entities at the outset.

LPL Financial is a registered broker-dealer and FINRA member firm that provides financial services to clients through independent financial advisers and adviser firms. IAA is an RIA, and LPL office of supervisory jurisdiction ("OSJ") with its corporate offices located in North Carolina[5] that offers support and services to advisers through various advisory programs and by leveraging LPL's broker-dealer platform. IFP, at all times relevant to this matter, was an RIA and

---

[4] Mr. Dickman purposefully attenuates the relationships between IAA, LPL, and IFP in an effort to suggest some sort of nefarious recruiting scheme in support of any future claims of unjust enrichment, etc. that he has threatened but, thus far, failed to claim against IAA.

[5] Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision and a forum-selection clause acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA.

4

until May of 2019 (when it commenced operations as its own broker-dealer), also an LPL OSJ utilizing LPL's platforms. About one (1) year prior to IFP and LPL officially parting ways, LPL, in conjunction with IAA and a number of other LPL OSJ/RIA firms, offered an optional program where IFP advisers could choose to remain with LPL's broker-dealer platform through IAA's OSJ rather than breaking away from LPL to associate with IFP's new broker-dealer. Mr. Dickman was one such adviser who was associated with IFP's RIA/OSJ at the time of their well-publicized split from LPL. Although he fails to disclose so in his Second Amended Statement of Claim, and in direct contravention to his allegations regarding any "overly aggressive" recruiting efforts by Mr. Russo[6], Mr. Dickman contacted IAA in order to stay and remain on the LPL platform by taking advantage of the RIA programs offered by IAA.

Upon effectuation of Claimant's transfer from IFP to IAA in late 2018, Respondents and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status. After further discussions between Mr. Dickman, LPL, and IAA, IAA was informed by LPL that they would be terminating Mr. Dickman's registrations and terminating him for cause. Mr. Dickman was then terminated by both LPL as well as by IAA, as required in its own capacity as an RIA, and pursuant to its OSJ contractual relationship with LPL.

---

[6] Claimant's Second Amended Statement of Claim, p. 2, para. 3.

5

### III. Specific Response to Defamation Claim

In order to establish a claim for defamation in North Carolina, Mr. Dickman must establish that Respondents published a statement that they knew or should have known was false and defamatory, and that Claimant incurred actual damages[7] as a consequence. *Tyson L'eggs Products, Inc.,* 84 N.C. App. 484 (2008). Mr. Dickman cannot satisfy these requisites.

Primarily, Mr. Dickman argues that Ms. Sexton made false assertions in the Form U5 related to the reasons for his termination. However, Mr. Dickman repeatedly conflates, for his benefit, actionable statements—false statements of fact regarding an individual—with the non-actionable—statements that certain allegations relating to an individual merely exist. At all times, the relevant statements at issue in this matter involve the latter and do not and cannot support a claim for defamation.

It is undisputed that LPL did in fact contact IAA and Ms. Sexton to notify her that Mr. Dickman had violated LPL's fiduciary policy by failing to disclose his beneficiary status in a client's trust, and that he was under investigation by the USPS OIG for some sort of improper money movement. Because this collective exchange between LPL and Ms. Sexton is undisputed, the gravamen of Mr. Dickman's claims is really that Ms. Sexton identified the allegations against him without fully investigating the truthfulness of the allegations relayed to her by LPL. By claiming Ms. Sexton instead "depicted Mr. Dickman as some sort of criminal[8]" in the Form U5,

---

[7]Because Ms. Sexton's statements were truthful, Mr. Dickman cannot satisfy the primary requisite element of a defamation claim. In addition, he fails to provide any basis whatsoever for alleged damages suffered by Mr. Dickman, how those damages have been calculated, and fails to allege or establish that Ms. Sexton's statements in the Form U5, rather than his own violation of fiduciary policy and resulting termination, were the causation of the supposed damages. Upon information and belief, Mr. Dickman's previous RIA/OSJ, IFP, was aware of the USPS OIG and non-disclosure shortly after, if not before, his termination with both LPL and IAA. Indeed, it is curious that while Mr. Dickman's Statement of Claim insinuates that "no reputable firm" would hire him, Mr. Dickman was able to quickly reaffiliate with IFP, shortly after his termination by LPL and IAA, and prior to Ms. Sexton's final U5 amendment.
[8] Claimant's Second Amended Statement of Claim, p. 2, para. 1.

6

he suggests that the allegations in the Form U5 carries an innuendo that Mr. Dickman was in fact guilty of such violations. This cannot give rise to a claim for defamation.

Question 7F(1) asked Ms. Sexton to provide information only about the *existence* of allegations related to violations of "investment-related statutes" or the wrongful taking of property and imposes no duty to withhold information until a full investigation can run its course. See *e.g. Whitaker v. Wells Fargo Advisors, LLC*, Civil Action No. 3:11CV380-HEH (E.D. Va. Sep. 29, 2011) (In representing merely that the subject was discharged after *allegations were made* that accused him of misconduct, an affirmative answer to Question 7F(1) neither indicates nor implies that the employee actually committed the underlying misdeeds) (emphasis in original). Where, as here, a statement cannot be reasonably interpreted as stating actual facts about an individual's conduct, it cannot be the subject of a defamation suit. *Craven v. Cope*, 656 S.E.2d 729 (N.C. Ct. App. 2008).

Nowhere in the Form U5 filed by Respondents is anything disclosed other than the mere existence of allegations of wrongdoing on Mr. Dickman's part. Where Respondents were either required by the Form U5 to provide additional details related to the reason for termination in the Investigation Disclosure Reporting Page ("DRP"), or were given the option to, it was again carefully and clearly denoted that LPL provided information relating only to *allegations* of improper money movement and pending investigation by USPS OIG, but that information was "limited." While Mr. Dickman claims this "certainly allows the mind to wander[9]" regarding Mr. Dickman's conduct, at no point do Respondents state actual facts regarding Mr. Dickman's culpability.

Further, the statements regarding the *existence* of these allegations are in fact true and therefore cannot be defamatory. Truth of the matter or substantial truth is a complete defense to a

---

[9] Claimant's Second Amended Statement of Claim, p. 8, para. 2.

7

claim for defamation. *Kwan-Sa You v. Roe,* 97 N.C. App. 1, 10-11 (challenged statements were "based on fact," true, and therefore not defamatory). It is true there were indeed allegations against Mr. Dickman related to violations of "investment-related" standards of conduct and this is the extent of the representations made by Respondents in the Form U5. It is also true that Mr. Dickman was terminated by LPL after "additional information" was received — Mr. Dickman admitted to repeatedly, over the course of four (4) years, failing to disclose his beneficiary status in a client's trust, a violation of LPL's fiduciary policy. As a result, Mr. Dickman was discharged for cause by LPL and, as required after termination by his registered broker-dealer, then terminated by IAA as his RIA.

Mr. Dickman's Claims for Punitive Damages Should be Stricken and Dismissed

Punitive damages may be awarded only if Mr. Dickman proves Respondents are liable for compensatory damages *and* that one or more aggravating factors (malice, fraud, or willful and wanton conduct) were present and related to the injury for which the compensatory damages were awarded. N.C. Gen. Stat. § 1D-15. Because the claims alleged in the Second Amended Statement of Claim have no factual or legal merit, Mr. Dickman's blanket and conclusory demand for punitive damages should be stricken and denied. The allegations made by Mr. Dickman, and any evidence he could possibly present to support them, do not and cannot demonstrate any misconduct on behalf of Respondents or any other basis that would warrant or support a claim for defamation, much less an award of punitive damages. Because Mr. Dickman has not alleged, and cannot prove, any set of facts to support fraud, malice, or willful and wanton conduct on behalf of Respondents to warrant an award of punitive damages, his claims should be stricken and dismissed.

Statements Made in the Form U5 Termination Notice are Protected by Qualified Privilege

As a preliminary matter and as discussed above, the information contained in the Form U5 truthfully reported the mere existence of allegations against Mr. Dickman regarding non-disclosure

8

of beneficiary status, improper money movement, and pending investigation. Respondents' statements were accurate and non-defamatory. However, assuming, *arguendo,* the statements in the Form U5 are somehow defamatory, Mr. Dickman's claims are further unavailing because he cannot overcome the qualified privilege these statements enjoy[10].

Under North Carolina law, a statement is protected by a qualified privilege if made in good faith and without actual malice upon a subject in which the communicating party has an interest or with respect to which she has some duty, and made to a person or persons having a corresponding right, interest, or duty, even if its content would otherwise be actionable. *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278 (1971).

It is undeniable Respondents were required to provide an explanation for Mr. Dickman's registration termination by way of the Form U5. *See* Article V, Section 3 of the FINRA By-Laws. Where, as here, such a duty exists, North Carolina courts have consistently applied the qualified privilege defense to such corporate matters and interests. *See*, *e.g. Hanton v. Gilbert,* 126 N.C. App. 561, *rev. denied,* 347 N.C. 266 (1997) (statements concerning plaintiff's dismissal from employment); *Long v. Vertical Technologies, Inc.,* 113 N.C. App 598 (1994) (statement by corporation to employees regarding plaintiff's discharge); *Alpar v. Weyerhaeuser,* 20 N.C. Appl. 340, *cert. denied,* 285 N.C. 85 (1974) (statements to employees regarding plaintiff's mental state).

The Form U5 disclosure provides protection to future prospective customers of a registered representative who most certainly rely on accurate and unfiltered information regarding an individual when making decisions regarding their investments. Additionally, future prospective

---

[10] Respondents conservatively assert the affirmative defense of qualified privilege; however, it is likely the statements made on the Form U5 more appropriately enjoy an absolute privilege. See N.C. Gen. Stat. Ann. § 96-4(t)(5) (providing absolute immunity for employer's statements made to North Carolina's employment agencies in connection with unemployment benefits). Similar to FINRA's Form U5 compulsory disclosure requirement, the statute requires employers to provide requisite information to the state's employment agencies. *See also Rosenberg v. Metlife, Inc.,* 493 F.3d 290 (2d Cir. (N.Y.) 2007) (holding defamatory statements within a Form U5 are subject to an absolute privilege from civil liability); *accord, Fontani v. Wells Fargo Inv., LLC,* 28 Cal. Rptr. 3d 833, 842 (Cal. Ct. App. 2005).

broker-dealer employers of a registered representative are required to consider disclosures on the Form U5 when making hiring decisions. *See* FINRA Regulatory Notice 10-39 (September 2010).

There can be no doubt the statements made by Respondents in Mr. Dickman's Form U5 are protected by, at a minimum, qualified privilege. Where qualified privilege exists, any inference of malice is rebutted and makes a showing of falsity *and* actual malice essential to the right of recovery. *Stewart, supra,* at 285 (emphasis added). Actual malice may be proven by evidence of the declarant's ill-will or personal hostility toward the claimant, or showing the statements were made with knowledge they were false, made with reckless disregard for the truth, or with a high degree of awareness of probable falsity. *Clark v. Brown*, 99 N.C. App. 255 (1990). Mr. Dickman cannot meet his burden of showing actual malice and, as a result, qualified privilege bars any recovery from the communication, irrespective of its falsity. *Id.* at 262-263.

Again, as is the case relating to Mr. Dickman's claims for punitive damages, so lacking is the existence of any factual basis to support a showing of actual malice or any other basis of recovery that Mr. Dickman's Second Amended Statement of Claim is completely devoid of any such allegations. Given the extremely low pleading standard, his failure to even suggest malice on Ms. Sexton's part highlights the absence of facts necessary to overcome the qualified privilege afforded to Ms. Sexton in this case. See *Presnell v. Pell*, 298 N.C. 715, 720 (1979) (merely alleging a defendant's actual malice in making defamatory statements is sufficient to overcome the qualified privilege at the pleading stage). Because Mr. Dickman has not alleged that Ms. Sexton acted with actual malice or in filing his Form U-5 in connection with the termination of his employment, and Ms. Sexton did not act with any malice, Mr. Dickman has not met his burden, the statements are protected by qualified privilege, and he is barred from recovery from either Respondent.

.

10

## IV.    Specific Response to Derivative Claims Against Mr. Russo

In order to succeed on a claim for negligent supervision, Mr. Dickman must establish that (i) Ms. Sexton is an incompetent employee, either by inherent unfitness or by previous specific acts of negligence from which incompetency may be inferred[11], (ii) that Ms. Sexton committed a tortious act resulting in injury to Mr. Dickman; and (iii) that Mr. Russo knew or had reason to know of Ms. Sexton's incompetency.  Smith v. Privette, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998), (quoting Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 495, 340 S.E.2d 116, 124, *disc. review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986)).  Again, Mr. Dickman fails to meet his burden at each turn.

First, Mr. Dickman makes no such allegations that, even when viewed in the light most favorable to him, support even an inference that Ms. Sexton is an incompetent or unfit employee. As recognized by Mr. Dickman, Ms. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008[12] while serving as IAA's CCO since 2014.  Second, as discussed above, Respondents statements in the Form U5 were accurate and non-defamatory and therefore are not actionable statements resulting in injury to Mr. Dickman.  Finally, within the decade of Ms. Sexton's industry tenure preceding the submission of the Form U5 in this matter, Mr. Dickman is unable to provide a single previous act of negligence by Ms. Sexton that suggests she is inherently unfit or from which incompetency may be inferred.  Accordingly, he fails to allege with any specificity that Mr. Russo knew or had reason to know that Ms. Sexton was incompetent and is again barred from recovery.

---

[11] *See* Medlin v. Bass, 398 S.E.2d 460 (N.C. 1990).

[12] Claimant's Second Amended Statement of Claim, p. 3, para. 1.

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 85 of 343

## V.    Specific Response to Remaining Claims

The remaining claims in Mr. Dickman's Second Amended Statement of Claim are wholly unsupported by any factual allegations to state a plausible claim for relief and should therefore be dismissed. In a single-sentence paragraph at the end of Mr. Dickman's Second Amended Statement of Claim, he summarily states that, in addition to defamation, he also brings claims against Respondents "for defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm, and further, against Mr. Russo for negligent hiring, failure to train, failure to supervise, and respondeat superior[13]." However, there are no factual allegations related to these additional claims preceding this sentence or following it. No level of liberal review of the entirety of the Second Amended Statement of Claim would allow the panel to determine Mr. Dickman has pled any plausible claims for relief with such a bald assertion. Plausibility exists only when a claimant pleads factual content that would allow this panel to draw the reasonable inference that the respondent is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A speculation of a mere possibility of misconduct is insufficient to support a plausible claim. *Id.* at 679. Because Mr. Dickman makes only "naked assertion[s]" devoid of "further factual enhancement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), his conclusory statements with respect to the remaining claims fail to meet requisite pleading standards and should be dismissed.

## VI.    Other Affirmative Defenses

While the Second Amended Statement of Claim contains no enumerated allegations, Respondents deny any allegation or inference of wrongdoing contained throughout and deny that

---

[13] Claimant's Second Amended Statement of Claim, p. 12, para. 7.

Mr. Dickman is entitled to any monetary damages, including without limitation, any compensatory damages or punitive damages, attorney's fees, or costs. In addition to the affirmative defense of qualified privilege asserted above, Respondents also assert the following affirmative defenses:

1. The Second Amended Statement of Claim fails to state any cause of action against Respondents.

2. Respondents' statements in the Form U5 are protected by absolute privilege.

3. Mr. Dickman's claims fails to allege any claim with the requisite particularity.

4. Respondents are not liable for Mr. Dickman's claims because any damages sustained by Mr. Dickman were not actually or proximately caused by Respondents.

5. Mr. Dickman has failed to state a claim for negligence, or any derivative thereof, as there was no duty owed or breached, at any time, by either Respondent.

6. No private right of action exists for violations of FINRA Rules or the FINRA Code of Conduct.

7. Respondents cannot be held individually or personally liable for any allegations contained herein, as at all times they acted within the scope of their employment at IAA.

8. Mr. Dickman is not entitled to recovery for unjust enrichment because the parties had a relationship based upon a written contract.

9. At all times, Respondents acted with due diligence, in good faith, and with the degree of care required.

13

## VII. Reservation of Right to Amend

Respondents reserve the right to amend this Response and Affirmative Defenses as necessary and appropriate to assert any potential counterclaims, including attorney's fees[14], defenses, third-party defenses, facts, and affirmative defenses as further facts and information are developed.

## VIII. Motion to Change Hearing Location Pursuant to FINRA Rule 13213(a)

The arbitration proceedings should be conducted in North Carolina rather than in Louisville, Kentucky, pursuant to FINRA Rule 13213(a) as North Carolina—not Kentucky—is the proper hearing location. Mr. Dickman's claims against Respondents arise out of his affiliation with IAA. As explained in greater detail below, North Carolina is the only state with any meaningful connection to the operative facts at issue in Mr. Dickman's Second Amended Statement of Claim. Further, Mr. Dickman acknowledges in his Agreement[15] that North Carolina is the proper venue with respect to arbitration of any disputes, claims, or controversies relating to his association or termination from IAA.

Pursuant to FINRA Rule 13213(a), [t]he Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration."[16] "In cases involving members only or more than one associated person, the Director will consider a variety of factors, including: [t]he

---

[14] Mr. Dickman's Agreement with IAA provides the prevailing party shall be entitled to reasonable attorney's fees in addition to any such other relief that is just and proper.

[15] *See* n. 5, *supra.*

[16] FINRA Rule 13213(a) also states "[i]n cases involving an associated person, the Director will generally select the hearing location closest to where the associated person was employed at the time of the events giving rise to the dispute, unless the hearing location closest to the associated person's employment is in a different state, in which case the associated person may request a hearing location in his or her state of employment at the time of the events giving rise to the dispute." However, the remainder of the rule provides for the procedures in cases where more than one associated person is involved. With the addition of Mr. Russo, this portion of the rule is inapplicable to this matter and an analysis considering the various factors in determining whether to change the hearing location is proper.

14

parties' signed agreement to arbitrate, if any; [w]hich party initiated the transaction or business in issue; and [t]he location of essential witnesses and documents." FINRA R. 13213(a); *see also* FINRA Office of Dispute Resolution Arbitrator's Guide pp. 44-45. Here, the facts supporting each factor weigh in favor of a finding that Mr. Dickman's claims should be arbitrated in North Carolina rather than Kentucky.

As to the first factor, Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision *and* forum-selection clause, acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA. The second factor weighs in favor of conducting the arbitration in North Carolina as IAA terminated the relationship with Mr. Dickman and filed the Form U5 at issue on December 20, 2018 from its North Carolina office. While IAA is not a party to this action, Mr. Dickman does bring claims against Respondents in their individual capacities for their role in the Form U5 submission, which he attributes to the initiation of the transaction at issue.[17] Both Respondents live and work in Charlotte, North Carolina in order to be close to IAA's home office there. As a result, the third factor also weighs in favor of conducting the arbitration in North Carolina. While some of Respondents' witnesses may reside in Kentucky, each of the Respondents, the entity terminating Mr. Dickman giving rise to the claims at issue, and a vast majority of all essential witnesses and documents, are located in North Carolina. LPL Financial does have office space in Kentucky but, "as one of the largest and most well-known broker-dealers in the country,"[18] also has locations throughout North Carolina. Their largest primary office is

---

[17] Claimant's Second Amended Statement of Claim, p. 4, para. 6.
[18] Claimant's Second Amended Statement of Claim, p. 3, para. 3.

15

located in Fort Mill, South Carolina[19], approximately fifteen to twenty minutes from IAA's Charlotte, North Carolina location.

In addition to FINRA Rule 13213, the federal venue statute and case law interpreting the same is instructive. 28 U.S.C. § 1404(a) provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought . . ." 28 U.S.C. § 1404(a). In deciding whether to transfer an action to a different venue, federal courts in the Sixth Circuit, which encompasses Kentucky, perform a two-step analysis: (1) whether the action could have initially been brought in the court where the transfer is sought[20] and, if so, (2) whether the transfer is appropriate under a balance of convenience and justice factors. *Badger v. Speedway, LLC,* No. 3:14-cv-7, 2014 U.S. Dist. LEXIS 184426, *2-3 (S.D. Ohio Dec. 5, 2014).

### The Convenience of the Parties and Witnesses and the Interests of Justice

In determining whether to transfer venue under § 1404(a), the court must consider "the private interests of the parties, including their convenience and the convenience of potential

---

[19] LPL's other two primary locations are located in San Diego, California and Boston, Massachusetts, respectively.

[20] 28 U.S.C. § 1404(a) specifically limits transfer authority to "actions commenced in a district court where both personal jurisdiction and venue are proper." *Newberry v. Silverman,* 789 F.3d 636, 641 (6th Cir. 2015). Where no personal jurisdiction exists over a Defendant, federal courts may only transfer cases under 28 U.S.C. §§ 1406(a) and 1631, *Flynn v. Greg Anthony Constr. Co.,* 95 F. App'x 726, 738 (6th Cir. 2003). In lieu of dismissal, courts may rely on §1406(a) "if it be in the interest of justice . . . to any district or division in which [the case] could have been brought," *Martin v. Stokes,* 623 F.2d 469, 471 (6th Cir. 1980), or §1631 "in the interest of justice" . . . when the court finds "a want of jurisdiction." *Stanifer v. Brannan,* 564 F.3d 455, 456-457 (6th Cir. 2009). As Mr. Dickman has brought claims against Respondents in their personal capacity, and failed to bring any claim against IAA, a federal court would likely not have personal jurisdiction over Respondents, therefore requiring a comparative analysis to 28 U.S.C. §§ 1406(a) or 1631, respectively rather than §1404(a). The statute applied is usually significant as where venue is transferred under §1404(a), the substantive law (including any choice of law rule) of the transferor court applies. *Newberry,* 789 F.3d at 640. However, here the technical distinction is without difference as FINRA rules govern the transfer and Mr. Dickman has consented to North Carolina as the proper forum. Further, where a change of venue is sought pursuant to §§1406(a) or 1631, the considerations as to the convenience of the parties, witnesses, operative facts relating to the claim, and other judicial interest concerns, are still given. Therefore, analysis between the federal rules and FINRA Rule 13213 is made within, for supporting purposes only, with § 1404(a), and addressing only the balance of convenience and justice factors consistent throughout §§1404(a), 1406(a), and 1631, respectively.

witnesses, as well as other public-interest concerns, such as systemic integrity and fairness which come under the rubric of "interests of justice." *Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1136-37 (6th Cir.), *cert. denied,* 502 U.S. 821 (1991). The private interests considered include the plaintiff's choice of forum and the location of records, as well as the convenience of witnesses. *Id.* Such an analysis is a fact-intensive inquiry, requiring case-by-case consideration of both convenience and fairness of the parties involved. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22 (1988). Therefore, no one factor is dispositive. *Id.* Here, considering the convenience of all parties, witnesses, operative facts relating to the claims, and the Agreement between the parties agreeing to venue, the appropriate forum for this arbitration is North Carolina. The only connection that this matter has to the state of Kentucky is that Mr. Dickman happens to reside there. This fact alone is wholly insufficient to justify conducting the arbitration in Kentucky rather than North Carolina.

As mentioned above, while some witnesses called by Respondents may live in Kentucky, the majority of the testimony will come from Respondents themselves. Mr. Dickman's claims arise out of his affiliation with both IAA and LPL. IAA's principle place of business is located in Charlotte, North Carolina. As a result, both Mr. Russo and Ms. Sexton reside in North Carolina as well and, at all relevant times related to the claims brought by Mr. Dickman, any communication between Mr. Dickman and Respondents originated from their office in North Carolina. The Form U5 containing the statements Mr. Dickman claims are defamatory, was filed by Respondents out of the North Carolina office as well. As the operative facts in this arbitration occurred in North Carolina, the vast majority, if not all, of the documents in this dispute are located on IAA's computer system in North Carolina.

17

While a plaintiff's home or chosen forum is generally given great weight, it is not the dispositive factor in determining appropriate venue. *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 413 (6th Cir. 1998). This is especially so where, as here, little to none of the conduct giving rise to the action—the filing of the allegedly defamatory Form U5— occurred in the chosen forum. *Neff Ath. Lettering Co. v. Walters*, 524 F. Supp. 268, 272-73 (S.D. Ohio 1981) (granting transfer and finding deference to plaintiff's freedom to select his home forum had "minimal value" given the cause of action had little connection to the same). Instead, given the geographic distribution of parties and witnesses[21], the most appropriate venue for this arbitration lies in North Carolina.

Finally, in his Investment Adviser Representative Agreement with IAA, Mr. Dickman expressly agreed that any such arbitration made necessary as the result of a dispute, claim, or controversy related to his association with or termination from IAA would occur in Charlotte, North Carolina. While the presence of such a forum-selection clause is not dispositive, it is "a significant factor that figures centrally in the district court's calculus." *Stewart Org.*, 487 U.S. at 31. However, when considered in conjunction of the other public- and private-interest concerns detailed above, this factor also weighs heavily in favor of transferring this arbitration to North Carolina.

Based on the foregoing, the arbitration should be conducted in North Carolina, and not in Kentucky. This matter has minimal connection to Kentucky, consisting entirely of Mr. Dickman's residence there. Under FINRA Rule 13213(a) and 28 U.S.C. § 1404(a), this, without more, is not enough to maintain the proceeding in Kentucky.

---

[21] The Initial Pre-Hearing Conference ("IPHC") with counsel for Ms. Sexton and Mr. Dickman occurred on January 7, 2020 wherein Ms. Sexton failed to raise any objection to venue. However, neither Mr. Russo nor LPL had been added as parties at that time and were therefore unrepresented during the IPHC and could make no objection. Now that Mr. Russo has been added as a Respondent and retained counsel, especially given his domicile in North Carolina along with Ms. Sexton's, the motion to change venue is both timely and appropriate.

18

**WHEREFORE**, Respondents respectfully request:

1.      that the claims against them be denied in their entirety;

2.      that all forum fees be awarded against Mr. Dickman;

3.      that Respondents be awarded costs and attorney's fees associated with responding to these claims;

4.      that the arbitration is conducted in North Carolina pursuant to FINRA Rule 13213(a);

5.      that the panel grant such other and further relief as it deems just and proper.

This the 1st day of May, 2020.

Respectfully submitted,
**AKERMAN LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Phone: (954) 463-2700
Fax: (954) 463-2224

By:_____/s/ Jonathan S. Robbins_____
**Jonathan S. Robbins, Esq.**
Florida Bar Number: 989428
Email: jonathan.robbins@akerman.com
*Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

**Shea B. Ward, Esq.**
North Carolina Bar Number: 49787
Email: bree.ward@akerman.com
*Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was served on this 1st day of May, 2020, upon all other parties to this action through the FINRA DR Portal, addressed as follows:

Jeremy L. Bartall, Esq.
*Counsel for Claimant Mark J. Dickman*
Bartell Law PLLC
700 12th Street NW
Suite 700
Washington, D.C. 20005
Email:
jeremybartell@bartell-law.com

Michael A. Brady, Esq.
*Counsel for Respondent LPL Financial LLC*
The Tower at Peabody Place
100 Peabody Place
Suite 1300
Memphis, TN 38103
Email:
mbrady@bassberry.com

Elizabeth A. Muldoon
Senior Case Administrator
FINRA Office of Dispute Resolution
Midwest Regional Office
55 West Monroe Street
Suite 2600
Chicago, IL 60603-5104

_____/s/ Jonathan S. Robbins_____
Jonathan S. Robbins

20

# EXHIBIT I

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

| | | |
|---|---|---|
| In the Matter of an Arbitration Between: | ) | |
| | ) | |
| MARK JAMES DICKMAN, | ) | |
| (CRD#: 2066229) | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| and | ) | |
| | ) | **FINRA NO. 19-02406** |
| JESSICA NADINE SEXTON, | ) | |
| (CRD#: 5260955) | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ROBERT P. RUSSO | ) | |
| (CRD#: 4466372), | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| LPL Financial LLC | ) | |
| (CRD#: 6413) | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RESPONSE AND AFFIRMATIVE DEFENSES
## TO SECOND AMENDED STATEMENT OF CLAIM AND MOTION TO CHANGE
## HEARING LOCATION

Respondents, Jessica Nadine Sexton ("Ms. Sexton") and Robert P. Russo ("Mr. Russo," and together with Ms. Sexton, the "Respondents"), by and through the undersigned counsel, hereby submits the following Response and Affirmative Defenses to the Second Amended Statement of Claim filed by Mark James Dickman ("Mr. Dickman" or "Claimant"). Ms. Sexton's Response to Claimant's initial Statement of Claim is restated in its entirety except as otherwise amended to address the addition of Mr. Russo as a party, address the claims now brought against him, and to include Respondents' Motion to Change Hearing Location. Accordingly, each of the Respondents hereby state as follows:

1

## I.    Introduction and Initial Response

The allegations contained in Mr. Dickman's Statement of Claim are factually and legally without merit and should be dismissed. The inception of Mr. Dickman's troubles stem from his own failure to disclose to LPL Financial ("LPL") that he was a contingent beneficiary in a client's trust—a fact he also affirmatively attested to in the negative over the course of four (4) consecutive years. While seemingly minor, the omission violated LPL's fiduciary capacity policy and initiated a series of unfortunate events, the resulting consequences of which Mr. Dickman inappropriately blames on Respondents.

Ultimately, Mr. Dickman's non-disclosure and, upon information and belief, related investigation by the U.S. Postal Service Office of Inspector General ("USPS OIG"), led to the termination of his registration with LPL and, consequently, his relationship and registration with Independent Adviser Alliance ("IAA"). Contrary to Mr. Dickman's misstatement of the law in his Statement of Claim, the SEC, FINRA, and state securities regulations do not *request* information related to the termination of an investment advisor. Rather, the terminating firm is *required* to file with FINRA a Uniform Termination Notice on Form U5 ("Form U5" or "U5") providing the reasons for an involuntary termination within thirty days of termination. IAA was required to fill out the Form U5 in performance of its own regulatory obligations as an SEC-Registered Investment Advisor ("RIA").

Ms. Sexton, IAA's Chief Compliance Officer[1] ("CCO"), correctly and properly provided the required information related to Mr. Dickman's termination when she filed the Form U5. The information included therein was factual and accurate as provided by LPL. Although he attempts

---

[1]Mr. Dickman accuses Ms. Sexton of falsely representing that she is also the CCO for Investra Financial Services ("IFS"). However, a cursory review of IAA's registration status and public disclosures clearly denotes IFS as a doing-business-as ("d/b/a") entity of IAA. Acting as CCO for both IAA and IFS is entirely permissible under FINRA and SEC standards.

to downplay the severity of his omission, Mr. Dickman admits he *did* fail to disclose his beneficiary status in a client's trust in violation of LPL's firm policy[2]. Additionally, Respondents were in fact notified by LPL that Mr. Dickman was under investigation by USPS OIG for some sort of improper money movement as a result of, or related to, the non-disclosure. As a result, the filing of the Form U5 by Respondents was proper and in accordance with the standard of care that would be reasonably afforded to Mr. Dickman under the circumstances. Much to Mr. Dickman's chagrin, the mandatory reporting of the existence of allegations as reasons for his termination do not amount to defamation, or suggest any level of incompetence on behalf of Respondents, simply because the nature of the existing allegations against him are unsavory.

Additionally, the disclosures on Mr. Dickman's Form U5 relating to his termination are protected by, at a minimum, qualified privilege. Even assuming, *arguendo*, the truthful statements in the Form U5 do somehow amount to defamation, Mr. Dickman cannot recover absent a showing of actual malice on Ms. Sexton's part[3]. In fact, Ms. Sexton has never met Mr. Dickman, had no working relationship with him during Claimant's (less than one-week) association with IAA, and has had no interaction with him outside of limited email correspondence in December 2018 regarding the Commonwealth of Kentucky's initial approval of Claimant's IAR registration with IAA. To insinuate that she acted with any malice and would have had any reason or incentive to do so when submitting his Form U5 is completely unfounded and nonsensical. Mr. Dickman must agree as his Second Amended Statement of Claim is entirely devoid of any such allegations, failing to support even an inference of malice. Instead, Mr. Dickman wraps up his Second Amended Statement of Claim with a series of conclusory claims against Respondents of fraud, tortious

---

[2]Claimant's Second Amended Statement of Claim, fn 3.
[3]As Mr. Dickman brings allegations against Mr. Russo for derivative claims that rely on the existence of the commission of an actionable tort, any reference to Ms. Sexton's behavior, actions, knowledge, or drafting, filing, or submitting the Form U5 is also a response on behalf of Mr. Russo.

3

interference, breach of contract, breach of regulatory duty causing harm, and unjust enrichment—none of which he provides enumerated facts or allegations to support.

Finally, Mr. Dickman also makes a blanket demand for relief against Mr. Russo based on claims for negligent hiring, failure to train, failure to supervise, and respondent superior. Again, Mr. Dickman fails to meet event basic pleading standards required to support these claims. While North Carolina recognizes a cause of action for negligent supervision and retention of an employee, Mr. Dickman cannot satisfy the requisite elements to succeed on such theories. Not only does Mr. Dickman fail to establish an actionable tort has been committed, but he also fails to allege that Ms. Sexton is incompetent or that Mr. Russo had any prior knowledge, constructive or actual, that Ms. Sexton was incompetent. As a result, Mr. Dickman's claims against both Respondents fail to meet necessary pleading standards and should be dismissed.

## II.   Factual Background

Because Mr. Dickman purposefully attempts to attenuate the relationships between LPL, IAA, and Independent Financial Partners ("IFP")[4], it is necessary to briefly detail the actual working relationships between the three entities at the outset.

LPL Financial is a registered broker-dealer and FINRA member firm that provides financial services to clients through independent financial advisers and adviser firms. IAA is an RIA, and LPL office of supervisory jurisdiction ("OSJ") with its corporate offices located in North Carolina[5] that offers support and services to advisers through various advisory programs and by leveraging LPL's broker-dealer platform. IFP, at all times relevant to this matter, was an RIA and

---

[4] Mr. Dickman purposefully attenuates the relationships between IAA, LPL, and IFP in an effort to suggest some sort of nefarious recruiting scheme in support of any future claims of unjust enrichment, etc. that he has threatened but, thus far, failed to claim against IAA.

[5] Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision and a forum-selection clause acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA.

4

until May of 2019 (when it commenced operations as its own broker-dealer), also an LPL OSJ utilizing LPL's platforms. About one (1) year prior to IFP and LPL officially parting ways, LPL, in conjunction with IAA and a number of other LPL OSJ/RIA firms, offered an optional program where IFP advisers could choose to remain with LPL's broker-dealer platform through IAA's OSJ rather than breaking away from LPL to associate with IFP's new broker-dealer. Mr. Dickman was one such adviser who was associated with IFP's RIA/OSJ at the time of their well-publicized split from LPL. Although he fails to disclose so in his Second Amended Statement of Claim, and in direct contravention to his allegations regarding any "overly aggressive" recruiting efforts by Mr. Russo[6], Mr. Dickman contacted IAA in order to stay and remain on the LPL platform by taking advantage of the RIA programs offered by IAA.

Upon effectuation of Claimant's transfer from IFP to IAA in late 2018, Respondents and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status. After further discussions between Mr. Dickman, LPL, and IAA, IAA was informed by LPL that they would be terminating Mr. Dickman's registrations and terminating him for cause. Mr. Dickman was then terminated by both LPL as well as by IAA, as required in its own capacity as an RIA, and pursuant to its OSJ contractual relationship with LPL.

---

[6] Claimant's Second Amended Statement of Claim, p. 2, para. 3.

5

### III. Specific Response to Defamation Claim

In order to establish a claim for defamation in North Carolina, Mr. Dickman must establish that Respondents published a statement that they knew or should have known was false and defamatory, and that Claimant incurred actual damages[7] as a consequence. *Tyson L'eggs Products, Inc.,* 84 N.C. App. 484 (2008). Mr. Dickman cannot satisfy these requisites.

Primarily, Mr. Dickman argues that Ms. Sexton made false assertions in the Form U5 related to the reasons for his termination. However, Mr. Dickman repeatedly conflates, for his benefit, actionable statements—false statements of fact regarding an individual—with the non-actionable—statements that certain allegations relating to an individual merely exist. At all times, the relevant statements at issue in this matter involve the latter and do not and cannot support a claim for defamation.

It is undisputed that LPL did in fact contact IAA and Ms. Sexton to notify her that Mr. Dickman had violated LPL's fiduciary policy by failing to disclose his beneficiary status in a client's trust, and that he was under investigation by the USPS OIG for some sort of improper money movement. Because this collective exchange between LPL and Ms. Sexton is undisputed, the gravamen of Mr. Dickman's claims is really that Ms. Sexton identified the allegations against him without fully investigating the truthfulness of the allegations relayed to her by LPL. By claiming Ms. Sexton instead "depicted Mr. Dickman as some sort of criminal[8]" in the Form U5,

---

[7]Because Ms. Sexton's statements were truthful, Mr. Dickman cannot satisfy the primary requisite element of a defamation claim. In addition, he fails to provide any basis whatsoever for alleged damages suffered by Mr. Dickman, how those damages have been calculated, and fails to allege or establish that Ms. Sexton's statements in the Form U5, rather than his own violation of fiduciary policy and resulting termination, were the causation of the supposed damages. Upon information and belief, Mr. Dickman's previous RIA/OSJ, IFP, was aware of the USPS OIG and non-disclosure shortly after, if not before, his termination with both LPL and IAA. Indeed, it is curious that while Mr. Dickman's Statement of Claim insinuates that "no reputable firm" would hire him, Mr. Dickman was able to quickly reaffiliate with IFP, shortly after his termination by LPL and IAA, and prior to Ms. Sexton's final U5 amendment.
[8] Claimant's Second Amended Statement of Claim, p. 2, para. 1.

6

he suggests that the allegations in the Form U5 carries an innuendo that Mr. Dickman was in fact guilty of such violations. This cannot give rise to a claim for defamation.

Question 7F(1) asked Ms. Sexton to provide information only about the *existence* of allegations related to violations of "investment-related statutes" or the wrongful taking of property and imposes no duty to withhold information until a full investigation can run its course. See *e.g. Whitaker v. Wells Fargo Advisors, LLC*, Civil Action No. 3:11CV380-HEH (E.D. Va. Sep. 29, 2011) (In representing merely that the subject was discharged after *allegations were made* that accused him of misconduct, an affirmative answer to Question 7F(1) neither indicates nor implies that the employee actually committed the underlying misdeeds) (emphasis in original). Where, as here, a statement cannot be reasonably interpreted as stating actual facts about an individual's conduct, it cannot be the subject of a defamation suit. *Craven v. Cope*, 656 S.E.2d 729 (N.C. Ct. App. 2008).

Nowhere in the Form U5 filed by Respondents is anything disclosed other than the mere existence of allegations of wrongdoing on Mr. Dickman's part. Where Respondents were either required by the Form U5 to provide additional details related to the reason for termination in the Investigation Disclosure Reporting Page ("DRP"), or were given the option to, it was again carefully and clearly denoted that LPL provided information relating only to *allegations* of improper money movement and pending investigation by USPS OIG, but that information was "limited." While Mr. Dickman claims this "certainly allows the mind to wander[9]" regarding Mr. Dickman's conduct, at no point do Respondents state actual facts regarding Mr. Dickman's culpability.

Further, the statements regarding the *existence* of these allegations are in fact true and therefore cannot be defamatory. Truth of the matter or substantial truth is a complete defense to a

---

[9] Claimant's Second Amended Statement of Claim, p. 8, para. 2.

claim for defamation. *Kwan-Sa You v. Roe,* 97 N.C. App. 1, 10-11 (challenged statements were "based on fact," true, and therefore not defamatory). It is true there were indeed allegations against Mr. Dickman related to violations of "investment-related" standards of conduct and this is the extent of the representations made by Respondents in the Form U5. It is also true that Mr. Dickman was terminated by LPL after "additional information" was received — Mr. Dickman admitted to repeatedly, over the course of four (4) years, failing to disclose his beneficiary status in a client's trust, a violation of LPL's fiduciary policy. As a result, Mr. Dickman was discharged for cause by LPL and, as required after termination by his registered broker-dealer, then terminated by IAA as his RIA.

<u>Mr. Dickman's Claims for Punitive Damages Should be Stricken and Dismissed</u>

Punitive damages may be awarded only if Mr. Dickman proves Respondents are liable for compensatory damages *and* that one or more aggravating factors (malice, fraud, or willful and wanton conduct) were present and related to the injury for which the compensatory damages were awarded. N.C. Gen. Stat. § 1D-15. Because the claims alleged in the Second Amended Statement of Claim have no factual or legal merit, Mr. Dickman's blanket and conclusory demand for punitive damages should be stricken and denied. The allegations made by Mr. Dickman, and any evidence he could possibly present to support them, do not and cannot demonstrate any misconduct on behalf of Respondents or any other basis that would warrant or support a claim for defamation, much less an award of punitive damages. Because Mr. Dickman has not alleged, and cannot prove, any set of facts to support fraud, malice, or willful and wanton conduct on behalf of Respondents to warrant an award of punitive damages, his claims should be stricken and dismissed.

<u>Statements Made in the Form U5 Termination Notice are Protected by Qualified Privilege</u>

As a preliminary matter and as discussed above, the information contained in the Form U5 truthfully reported the mere existence of allegations against Mr. Dickman regarding non-disclosure

of beneficiary status, improper money movement, and pending investigation. Respondents' statements were accurate and non-defamatory. However, assuming, *arguendo,* the statements in the Form U5 are somehow defamatory, Mr. Dickman's claims are further unavailing because he cannot overcome the qualified privilege these statements enjoy[10].

Under North Carolina law, a statement is protected by a qualified privilege if made in good faith and without actual malice upon a subject in which the communicating party has an interest or with respect to which she has some duty, and made to a person or persons having a corresponding right, interest, or duty, even if its content would otherwise be actionable. *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278 (1971).

It is undeniable Respondents were required to provide an explanation for Mr. Dickman's registration termination by way of the Form U5. *See* Article V, Section 3 of the FINRA By-Laws. Where, as here, such a duty exists, North Carolina courts have consistently applied the qualified privilege defense to such corporate matters and interests. *See, e.g. Hanton v. Gilbert,* 126 N.C. App. 561, *rev. denied*, 347 N.C. 266 (1997) (statements concerning plaintiff's dismissal from employment); *Long v. Vertical Technologies, Inc.*, 113 N.C. App 598 (1994) (statement by corporation to employees regarding plaintiff's discharge); *Alpar v. Weyerhaeuser*, 20 N.C. Appl. 340, *cert. denied*, 285 N.C. 85 (1974) (statements to employees regarding plaintiff's mental state).

The Form U5 disclosure provides protection to future prospective customers of a registered representative who most certainly rely on accurate and unfiltered information regarding an individual when making decisions regarding their investments. Additionally, future prospective

---

[10] Respondents conservatively assert the affirmative defense of qualified privilege; however, it is likely the statements made on the Form U5 more appropriately enjoy an absolute privilege. See N.C. Gen. Stat. Ann. § 96-4(t)(5) (providing absolute immunity for employer's statements made to North Carolina's employment agencies in connection with unemployment benefits). Similar to FINRA's Form U5 compulsory disclosure requirement, the statute requires employers to provide requisite information to the state's employment agencies. *See also Rosenberg v. Metlife, Inc.*, 493 F.3d 290 (2d Cir. (N.Y.) 2007) (holding defamatory statements within a Form U5 are subject to an absolute privilege from civil liability); *accord, Fontani v. Wells Fargo Inv., LLC,* 28 Cal. Rptr. 3d 833, 842 (Cal. Ct. App. 2005).

9

broker-dealer employers of a registered representative are required to consider disclosures on the Form U5 when making hiring decisions. *See* FINRA Regulatory Notice 10-39 (September 2010).

There can be no doubt the statements made by Respondents in Mr. Dickman's Form U5 are protected by, at a minimum, qualified privilege. Where qualified privilege exists, any inference of malice is rebutted and makes a showing of falsity *and* actual malice essential to the right of recovery. *Stewart, supra,* at 285 (emphasis added). Actual malice may be proven by evidence of the declarant's ill-will or personal hostility toward the claimant, or showing the statements were made with knowledge they were false, made with reckless disregard for the truth, or with a high degree of awareness of probable falsity. *Clark v. Brown*, 99 N.C. App. 255 (1990). Mr. Dickman cannot meet his burden of showing actual malice and, as a result, qualified privilege bars any recovery from the communication, irrespective of its falsity. *Id.* at 262-263.

Again, as is the case relating to Mr. Dickman's claims for punitive damages, so lacking is the existence of any factual basis to support a showing of actual malice or any other basis of recovery that Mr. Dickman's Second Amended Statement of Claim is completely devoid of any such allegations. Given the extremely low pleading standard, his failure to even suggest malice on Ms. Sexton's part highlights the absence of facts necessary to overcome the qualified privilege afforded to Ms. Sexton in this case. See *Presnell v. Pell*, 298 N.C. 715, 720 (1979) (merely alleging a defendant's actual malice in making defamatory statements is sufficient to overcome the qualified privilege at the pleading stage). Because Mr. Dickman has not alleged that Ms. Sexton acted with actual malice or in filing his Form U-5 in connection with the termination of his employment, and Ms. Sexton did not act with any malice, Mr. Dickman has not met his burden, the statements are protected by qualified privilege, and he is barred from recovery from either Respondent.

## IV. Specific Response to Derivative Claims Against Mr. Russo

In order to succeed on a claim for negligent supervision, Mr. Dickman must establish that (i) Ms. Sexton is an incompetent employee, either by inherent unfitness or by previous specific acts of negligence from which incompetency may be inferred[11], (ii) that Ms. Sexton committed a tortious act resulting in injury to Mr. Dickman; and (iii) that Mr. Russo knew or had reason to know of Ms. Sexton's incompetency. Smith v. Privette, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998), (quoting Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 495, 340 S.E.2d 116, 124, *disc. review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986)). Again, Mr. Dickman fails to meet his burden at each turn.

First, Mr. Dickman makes no such allegations that, even when viewed in the light most favorable to him, support even an inference that Ms. Sexton is an incompetent or unfit employee. As recognized by Mr. Dickman, Ms. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008[12] while serving as IAA's CCO since 2014. Second, as discussed above, Respondents statements in the Form U5 were accurate and non-defamatory and therefore are not actionable statements resulting in injury to Mr. Dickman. Finally, within the decade of Ms. Sexton's industry tenure preceding the submission of the Form U5 in this matter, Mr. Dickman is unable to provide a single previous act of negligence by Ms. Sexton that suggests she is inherently unfit or from which incompetency may be inferred. Accordingly, he fails to allege with any specificity that Mr. Russo knew or had reason to know that Ms. Sexton was incompetent and is again barred from recovery.

---

[11] *See* Medlin v. Bass, 398 S.E.2d 460 (N.C. 1990).

[12] Claimant's Second Amended Statement of Claim, p. 3, para. 1.

11

## V. Specific Response to Remaining Claims

The remaining claims in Mr. Dickman's Second Amended Statement of Claim are wholly unsupported by any factual allegations to state a plausible claim for relief and should therefore be dismissed. In a single-sentence paragraph at the end of Mr. Dickman's Second Amended Statement of Claim, he summarily states that, in addition to defamation, he also brings claims against Respondents "for defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm, and further, against Mr. Russo for negligent hiring, failure to train, failure to supervise, and respondeat superior[13]." However, there are no factual allegations related to these additional claims preceding this sentence or following it. No level of liberal review of the entirety of the Second Amended Statement of Claim would allow the panel to determine Mr. Dickman has pled any plausible claims for relief with such a bald assertion. Plausibility exists only when a claimant pleads factual content that would allow this panel to draw the reasonable inference that the respondent is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A speculation of a mere possibility of misconduct is insufficient to support a plausible claim. *Id.* at 679. Because Mr. Dickman makes only "naked assertion[s]" devoid of "further factual enhancement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), his conclusory statements with respect to the remaining claims fail to meet requisite pleading standards and should be dismissed.

## VI. Other Affirmative Defenses

While the Second Amended Statement of Claim contains no enumerated allegations, Respondents deny any allegation or inference of wrongdoing contained throughout and deny that

---

[13] Claimant's Second Amended Statement of Claim, p. 12, para. 7.

12

Mr. Dickman is entitled to any monetary damages, including without limitation, any compensatory damages or punitive damages, attorney's fees, or costs. In addition to the affirmative defense of qualified privilege asserted above, Respondents also assert the following affirmative defenses:

1. The Second Amended Statement of Claim fails to state any cause of action against Respondents.

2. Respondents' statements in the Form U5 are protected by absolute privilege.

3. Mr. Dickman's claims fails to allege any claim with the requisite particularity.

4. Respondents are not liable for Mr. Dickman's claims because any damages sustained by Mr. Dickman were not actually or proximately caused by Respondents.

5. Mr. Dickman has failed to state a claim for negligence, or any derivative thereof, as there was no duty owed or breached, at any time, by either Respondent.

6. No private right of action exists for violations of FINRA Rules or the FINRA Code of Conduct.

7. Respondents cannot be held individually or personally liable for any allegations contained herein, as at all times they acted within the scope of their employment at IAA.

8. Mr. Dickman is not entitled to recovery for unjust enrichment because the parties had a relationship based upon a written contract.

9. At all times, Respondents acted with due diligence, in good faith, and with the degree of care required.

## VII.  Reservation of Right to Amend

Respondents reserve the right to amend this Response and Affirmative Defenses as necessary and appropriate to assert any potential counterclaims, including attorney's fees[14], defenses, third-party defenses, facts, and affirmative defenses as further facts and information are developed.

## VIII.  Motion to Change Hearing Location Pursuant to FINRA Rule 13213(a)

The arbitration proceedings should be conducted in North Carolina rather than in Louisville, Kentucky, pursuant to FINRA Rule 13213(a) as North Carolina—not Kentucky—is the proper hearing location.  Mr. Dickman's claims against Respondents arise out of his affiliation with IAA.  As explained in greater detail below, North Carolina is the only state with any meaningful connection to the operative facts at issue in Mr. Dickman's Second Amended Statement of Claim.  Further, Mr. Dickman acknowledges in his Agreement[15] that North Carolina is the proper venue with respect to arbitration of any disputes, claims, or controversies relating to his association or termination from IAA.

Pursuant to FINRA Rule 13213(a), [t]he Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration."[16] "In cases involving members only or more than one associated person, the Director will consider a variety of factors, including: [t]he

---

[14] Mr. Dickman's Agreement with IAA provides the prevailing party shall be entitled to reasonable attorney's fees in addition to any such other relief that is just and proper.

[15] *See* n. 5, *supra*.

[16] FINRA Rule 13213(a) also states "[i]n cases involving an associated person, the Director will generally select the hearing location closest to where the associated person was employed at the time of the events giving rise to the dispute, unless the hearing location closest to the associated person's employment is in a different state, in which case the associated person may request a hearing location in his or her state of employment at the time of the events giving rise to the dispute." However, the remainder of the rule provides for the procedures in cases where more than one associated person is involved.  With the addition of Mr. Russo, this portion of the rule is inapplicable to this matter and an analysis considering the various factors in determining whether to change the hearing location is proper.

14

parties' signed agreement to arbitrate, if any; [w]hich party initiated the transaction or business in issue; and [t]he location of essential witnesses and documents." FINRA R. 13213(a); *see also* FINRA Office of Dispute Resolution Arbitrator's Guide pp. 44-45. Here, the facts supporting each factor weigh in favor of a finding that Mr. Dickman's claims should be arbitrated in North Carolina rather than Kentucky.

As to the first factor, Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision *and* forum-selection clause, acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA. The second factor weighs in favor of conducting the arbitration in North Carolina as IAA terminated the relationship with Mr. Dickman and filed the Form U5 at issue on December 20, 2018 from its North Carolina office. While IAA is not a party to this action, Mr. Dickman does bring claims against Respondents in their individual capacities for their role in the Form U5 submission, which he attributes to the initiation of the transaction at issue.[17] Both Respondents live and work in Charlotte, North Carolina in order to be close to IAA's home office there. As a result, the third factor also weighs in favor of conducting the arbitration in North Carolina. While some of Respondents' witnesses may reside in Kentucky, each of the Respondents, the entity terminating Mr. Dickman giving rise to the claims at issue, and a vast majority of all essential witnesses and documents, are located in North Carolina. LPL Financial does have office space in Kentucky but, "as one of the largest and most well-known broker-dealers in the country,"[18] also has locations throughout North Carolina. Their largest primary office is

---

[17] Claimant's Second Amended Statement of Claim, p. 4, para. 6.
[18] Claimant's Second Amended Statement of Claim, p. 3, para. 3.

located in Fort Mill, South Carolina[19], approximately fifteen to twenty minutes from IAA's Charlotte, North Carolina location.

In addition to FINRA Rule 13213, the federal venue statute and case law interpreting the same is instructive. 28 U.S.C. § 1404(a) provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought . . ." 28 U.S.C. § 1404(a). In deciding whether to transfer an action to a different venue, federal courts in the Sixth Circuit, which encompasses Kentucky, perform a two-step analysis: (1) whether the action could have initially been brought in the court where the transfer is sought[20] and, if so, (2) whether the transfer is appropriate under a balance of convenience and justice factors. *Badger v. Speedway, LLC,* No. 3:14-cv-7, 2014 U.S. Dist. LEXIS 184426, *2-3 (S.D. Ohio Dec. 5, 2014).

## The Convenience of the Parties and Witnesses and the Interests of Justice

In determining whether to transfer venue under § 1404(a), the court must consider "the private interests of the parties, including their convenience and the convenience of potential

---

[19] LPL's other two primary locations are located in San Diego, California and Boston, Massachusetts, respectively.

[20] 28 U.S.C. § 1404(a) specifically limits transfer authority to "actions commenced in a district court where both personal jurisdiction and venue are proper." *Newberry v. Silverman,* 789 F.3d 636, 641 (6th Cir. 2015). Where no personal jurisdiction exists over a Defendant, federal courts may only transfer cases under 28 U.S.C. §§ 1406(a) and 1631, *Flynn v. Greg Anthony Constr. Co.,* 95 F. App'x 726, 738 (6th Cir. 2003). In lieu of dismissal, courts may rely on §1406(a) "if it be in the interest of justice . . . to any district or division in which [the case] could have been brought," *Martin v. Stokes,* 623 F.2d 469, 471 (6th Cir. 1980), or §1631 "in the interest of justice" . . . when the court finds "a want of jurisdiction." *Stanifer v. Brannan,* 564 F.3d 455, 456-457 (6th Cir. 2009). As Mr. Dickman has brought claims against Respondents in their personal capacity, and failed to bring any claim against IAA, a federal court would likely not have personal jurisdiction over Respondents, therefore requiring a comparative analysis to 28 U.S.C. §§ 1406(a) or 1631, respectively rather than §1404(a). The statute applied is usually significant as where venue is transferred under §1404(a), the substantive law (including any choice of law rule) of the transferor court applies. *Newberry,* 789 F.3d at 640. However, here the technical distinction is without difference as FINRA rules govern the transfer and Mr. Dickman has consented to North Carolina as the proper forum. Further, where a change of venue is sought pursuant to §§1406(a) or 1631, the considerations as to the convenience of the parties, witnesses, operative facts relating to the claim, and other judicial interest concerns, are still given. Therefore, analysis between the federal rules and FINRA Rule 13213 is made within, for supporting purposes only, with § 1404(a), and addressing only the balance of convenience and justice factors consistent throughout §§1404(a), 1406(a), and 1631, respectively.

witnesses, as well as other public-interest concerns, such as systemic integrity and fairness which come under the rubric of "interests of justice." *Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1136-37 (6th Cir.), *cert. denied,* 502 U.S. 821 (1991). The private interests considered include the plaintiff's choice of forum and the location of records, as well as the convenience of witnesses. *Id.* Such an analysis is a fact-intensive inquiry, requiring case-by-case consideration of both convenience and fairness of the parties involved. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22 (1988). Therefore, no one factor is dispositive. *Id.* Here, considering the convenience of all parties, witnesses, operative facts relating to the claims, and the Agreement between the parties agreeing to venue, the appropriate forum for this arbitration is North Carolina. The only connection that this matter has to the state of Kentucky is that Mr. Dickman happens to reside there. This fact alone is wholly insufficient to justify conducting the arbitration in Kentucky rather than North Carolina.

As mentioned above, while some witnesses called by Respondents may live in Kentucky, the majority of the testimony will come from Respondents themselves. Mr. Dickman's claims arise out of his affiliation with both IAA and LPL. IAA's principle place of business is located in Charlotte, North Carolina. As a result, both Mr. Russo and Ms. Sexton reside in North Carolina as well and, at all relevant times related to the claims brought by Mr. Dickman, any communication between Mr. Dickman and Respondents originated from their office in North Carolina. The Form U5 containing the statements Mr. Dickman claims are defamatory, was filed by Respondents out of the North Carolina office as well. As the operative facts in this arbitration occurred in North Carolina, the vast majority, if not all, of the documents in this dispute are located on IAA's computer system in North Carolina.

17

While a plaintiff's home or chosen forum is generally given great weight, it is not the dispositive factor in determining appropriate venue. *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 413 (6th Cir. 1998). This is especially so where, as here, little to none of the conduct giving rise to the action—the filing of the allegedly defamatory Form U5— occurred in the chosen forum. *Neff Ath. Lettering Co. v. Walters*, 524 F. Supp. 268, 272-73 (S.D. Ohio 1981) (granting transfer and finding deference to plaintiff's freedom to select his home forum had "minimal value" given the cause of action had little connection to the same). Instead, given the geographic distribution of parties and witnesses[21], the most appropriate venue for this arbitration lies in North Carolina.

Finally, in his Investment Adviser Representative Agreement with IAA, Mr. Dickman expressly agreed that any such arbitration made necessary as the result of a dispute, claim, or controversy related to his association with or termination from IAA would occur in Charlotte, North Carolina. While the presence of such a forum-selection clause is not dispositive, it is "a significant factor that figures centrally in the district court's calculus." *Stewart Org.,* 487 U.S. at 31. However, when considered in conjunction of the other public- and private-interest concerns detailed above, this factor also weighs heavily in favor of transferring this arbitration to North Carolina.

Based on the foregoing, the arbitration should be conducted in North Carolina, and not in Kentucky. This matter has minimal connection to Kentucky, consisting entirely of Mr. Dickman's residence there. Under FINRA Rule 13213(a) and 28 U.S.C. § 1404(a), this, without more, is not enough to maintain the proceeding in Kentucky.

---

[21] The Initial Pre-Hearing Conference ("IPHC") with counsel for Ms. Sexton and Mr. Dickman occurred on January 7, 2020 wherein Ms. Sexton failed to raise any objection to venue. However, neither Mr. Russo nor LPL had been added as parties at that time and were therefore unrepresented during the IPHC and could make no objection. Now that Mr. Russo has been added as a Respondent and retained counsel, especially given his domicile in North Carolina along with Ms. Sexton's, the motion to change venue is both timely and appropriate.

18

**WHEREFORE**, Respondents respectfully request:

1.      that the claims against them be denied in their entirety;

2.      that all forum fees be awarded against Mr. Dickman;

3.      that Respondents be awarded costs and attorney's fees associated with responding to these claims;

4.      that the arbitration is conducted in North Carolina pursuant to FINRA Rule 13213(a);

5.      that the panel grant such other and further relief as it deems just and proper.

This the 1st day of May, 2020.

> Respectfully submitted,
> **AKERMAN LLP**
> Las Olas Centre II, Suite 1600
> 350 East Las Olas Boulevard
> Fort Lauderdale, FL 33301-2999
> Phone: (954) 463-2700
> Fax: (954) 463-2224
>
> By:_____/s/ Jonathan S. Robbins_____
> **Jonathan S. Robbins, Esq.**
> Florida Bar Number: 989428
> Email: jonathan.robbins@akerman.com
> *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*
>
> **Shea B. Ward, Esq.**
> North Carolina Bar Number: 49787
> Email: bree.ward@akerman.com
> *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was served on this 1st day of May, 2020, upon all other parties to this action through the FINRA DR Portal, addressed as follows:

Jeremy L. Bartall, Esq.
*Counsel for Claimant Mark J. Dickman*
Bartell Law PLLC
700 12th Street NW
Suite 700
Washington, D.C. 20005
Email:
jeremybartell@bartell-law.com

Michael A. Brady, Esq.
*Counsel for Respondent LPL Financial LLC*
The Tower at Peabody Place
100 Peabody Place
Suite 1300
Memphis, TN 38103
Email:
mbrady@bassberry.com

Elizabeth A. Muldoon
Senior Case Administrator
FINRA Office of Dispute Resolution
Midwest Regional Office
55 West Monroe Street
Suite 2600
Chicago, IL 60603-5104

_/s/ Jonathan S. Robbins____
Jonathan S. Robbins

20

# EXHIBIT J

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

April 18, 2023

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe, Suite 2600
Chicago, Illinois 60603
Phone: 312-899-4425

**VIA: FINRA Portal**

**RE: 19-02406 - Dickman vs. Sexton, Russo and LPL Financial LLC**
 **Prehearing Exchange, Witness List**

Dear Ms. Muldoon:

Pursuant to FINRA Rule 13514, this is Claimant Mark Dickman's Witness list:

1. Claimant Mark Dickman (in-person)
2. Respondent Sexton (in-person)
3. Respondent Russo (in-person)
4. Daniel Cruse  − LPL Financial, Manager, Supervisor (video conference)
5. Ian Frimet  − LPL Financial, Senior VP, Associate Counsel (video conference)
6. Brad Jacobs  − LPL Financial, Senior VP, Associate General Counsel (video conference)
7. Alan J. Besnoff, CFP® Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
8. Thomas R. Kerr, Esq., 732 Scott Street Covington, Kentucky 41011 (telephone, if needed).
9. Tammy L. Dickman (40 Linden Hill Drive, Crescent Springs, KY 41017) (video conference).
10. Any witness identified by Respondents.

Claimant reserves the right to call witnesses in rebuttal, impeachment, or to authenticate an exhibit if necessary. In addition, under separate cover, Claimant has produced to Respondents' counsel documents Claimant intends to use at the hearing not already provided, pursuant to Rule 13514.

Claimant reserves the right to use as exhibits all documents Respondents produce in response to the Order dated April 11, 2023. Further, Claimant reserves the right to introduce any documents exchanged between the parties and any documents Respondents produce in their Rule 13514 exchange, and any publicly available information and legal and regulatory authority.

 BartellLaw

Sincerely,

Jeremy L. Bartell

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 118 of 343

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

April 18, 2023

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe, Suite 2600
Chicago, Illinois 60603
Phone: 312-899-4425

**VIA: FINRA Portal**

**RE: 19-02406 - Dickman vs. Sexton, Russo and LPL Financial LLC**
    **Prehearing Exchange, Witness List**

Dear Ms. Muldoon:

Pursuant to FINRA Rule 13514, this is Claimant Mark Dickman's Witness list:

1. Claimant Mark Dickman (in-person)
2. Respondent Sexton (in-person)
3. Respondent Russo (in-person)
4. Daniel Cruse  – LPL Financial, Manager, Supervisor (video conference)
5. Ian Frimet    – LPL Financial, Senior VP, Associate Counsel (video conference)
6. Brad Jacobs   – LPL Financial, Senior VP, Associate General Counsel (video conference)
7. Alan J. Besnoff, CFP® Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
8. Thomas R. Kerr, Esq., 732 Scott Street Covington, Kentucky 41011 (telephone, if needed).
9. Tammy L. Dickman (40 Linden Hill Drive, Crescent Springs, KY 41017) (video conference).
10. Any witness identified by Respondents.

Claimant reserves the right to call witnesses in rebuttal, impeachment, or to authenticate an exhibit if necessary. In addition, under separate cover, Claimant has produced to Respondents' counsel documents Claimant intends to use at the hearing not already provided, pursuant to Rule 13514.

Claimant reserves the right to use as exhibits all documents Respondents produce in response to the Order dated April 11, 2023. Further, Claimant reserves the right to introduce any documents exchanged between the parties and any documents Respondents produce in their Rule 13514 exchange, and any publicly available information and legal and regulatory authority.



**BartellLaw**

Sincerely,

Jeremy L. Bartell

# EXHIBIT K

<u>SETTLEMENT AGREEMENT AND RELEASE</u>

This Settlement Agreement and Release (the "Agreement") is made as of the date this Agreement is executed by the parties, by and between Mark James Dickman ("Dickman"), on the one hand, and LPL Financial, LLC ("LPL" or "Respondent"), on the other hand. Claimant and Respondent are collectively referred to as the "Parties".

WHEREAS the Parties wish to compromise and fully resolve the issues between them arising from all claims Claimant and Respondent asserted or could have asserted in the arbitration captioned *Mark James Dickman v. Jessica N. Sexton, Robert P. Russo, and LPL Financial, LLC,* FINRA No. 19-02406 (the "Arbitration Action"), and thus obviate the need for the Parties to incur the burden and expense of further litigation;

NOW, THEREFORE, the Parties, intending to be legally bound, and in consideration of the mutual covenants and other good and valuable consideration set forth below, agree as follows:

1.      <u>Payment</u>.  Subject to the terms and conditions of this Agreement, LPL shall, within thirty (30) days of receipt by its counsel of a copy of this fully executed Agreement and an IRS W-9 form from Claimant, pay or cause to be paid to Claimant the sum of five thousand dollars ($5,000.00)(the "Settlement Payment") by wiring the funds in that amount pursuant to the following wire instructions for the payee, as supplied and verified by Claimant:

Receiving Bank: PNC Bank

PNC Bank ABA: 031000053

Beneficiary: Bartell Law PLLC DC Iolta Account

Beneficiary Account Number: 5310813456

The Parties agree that each Party shall pay its own respective attorneys' fees and costs, including all forum fees, as assessed by FINRA.

2.      <u>LPL Documents and Witnesses</u>.  Provided Claimant has provided LPL with a signed copy of the Agreement, LPL will use its best efforts to provide Claimant with documents reflecting fees and commissions paid to Claimant, by client name, for 2017 and 2018 ("Documents") by March 28, 2022. LPL agrees to provide as witnesses at a final hearing of the Arbitration Action (if Claimant wants them), Daniel Cruse, Ian Frimet, and Brad Jacobs, provided they are still employed with LPL at the time of the hearing.  Claimant agrees to employ his best efforts to avoid redundancy to limit the number of witnesses if possible and to allow the LPL witnesses to appear via video conference or telephone if permitted by the panel.

3.      <u>Dismissal of Claims</u>.  Claimant shall promptly notify FINRA of the settlement of the claims against LPL in the Arbitration Action so that LPL will not have to further participate

1

Case 3:26-cv-00280     Document 4-1     Filed 04/08/26     Page 122 of 343

in the Arbitration Action and agrees to take all steps necessary to dismiss his claims with prejudice. No more than five (5) days after receipt of the Settlement Payment and the Documents from LPL, Claimant will dismiss LPL from the Arbitration Action with prejudice, each party to bear his/its own costs. The Parties agree to take all other executory actions necessary to withdraw, discontinue, and end the Arbitration Action as to LPL with prejudice.

4. <u>No Other Proceedings</u>. With the exception of the Arbitration Action, the Parties represent and warrant that they and/or their affiliates have filed no claims and know of no other claims filed, in court, arbitration, or in any other forum between these Parties pertaining to the specific subject matter of the Arbitration Action and/or this Agreement, and in the event that any such claims do exist, the Parties agree to immediately withdraw and dismiss such claims with prejudice.

5. <u>Mutual Releases</u>. Claimant, on the one hand, and Respondent, on the other hand, hereby mutually release each other and their past, present and future agents, shareholders, partners, principals, affiliates, parent companies, subsidiaries, employers, officers, directors, employees, agents, predecessors, successors, heirs, executors, attorneys, and assigns, from any and all legal, equitable or other claims, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckonings, bonds, bills, covenants, promises, variances, trespasses, damages, extents, executions, judgments, findings, controversies and disputes, and any past, present or future duties, responsibilities or obligations, from the beginning of the world to the date hereof, whether known or unknown, related to Dickman and his employment by and separation from LPL and any U5s filed in connection with his separation from LPL or Independent Advisors Alliance, including any and all claims and counterclaims raised and/or that could have been raised in the Arbitration Action.

Notwithstanding the foregoing, this Release does not apply to: a) claims asserted by Claimant in the Arbitration Action against Jessica Sexton and Robert Russo; b) claims initiated by third parties, including customer complaints; c) compliance, regulatory or other matters initiated by a government entity or a securities industry self-regulatory organization; d) claims that arise as a result of conduct that occurs after the Effective Date; and e) the enforcement of the terms of this Agreement.

6. <u>Confidentiality</u>.

(a) The Parties agree to maintain in confidence, and not to disclose to any other person or entity (but subject to subparagraphs 6(b) and (c) below), including, without limitation, members of the press, communications media, and/or social media, the terms of this Agreement.

(b) Notwithstanding the foregoing, this paragraph 6 does not prohibit or restrict the Parties (or their attorneys) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, FINRA, any other self-regulatory organization or any other state or federal regulatory authority, regarding this settlement or its underlying facts and circumstances. In addition, this Agreement does not prohibit or restrict the Parties from testifying truthfully in any FINRA arbitration or court

2

proceeding so long as they do not disclose the terms of this Agreement other than as provided in this paragraph 6. To the extent the Parties are asked by a client about the Arbitration Action, they may state that the matter has been amicably resolved. Further, to the extent this Agreement and/or its terms are the subject of a subpoena or discovery request in litigation, arbitration, and/or a regulatory request involving any of the Parties, the Party receiving such subpoena or request shall undertake reasonable efforts to provide the other Parties with sufficient notice to allow for the assertion of an objection to disclosure and/or the implementation of other reasonable steps to preserve the confidentiality thereof.

(c)     LPL may disclose the terms or existence of this Agreement to its accountants, employees and attorneys on an as-needed basis, upon strict instructions to and an agreement by them to preserve the confidentiality of this Agreement and its terms. Claimant may, likewise, disclose the terms or existence of this Agreement to accountant(s) and attorneys on an as-needed basis, upon strict instructions to and an agreement by them to preserve the confidentiality of this Agreement and its terms.

7.     Compromise. This Agreement and the mutual general releases contained herein effect the compromise and settlement of disputed claims and nothing contained herein shall be construed as an admission by any party hereto of any liability of any kind to any other party.

8.     Further Assurances. The Parties agree to execute such other documents and to take such other action as may be reasonably necessary to further the purposes of this Agreement.

9.     Amendments: Waivers. This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by each of the Parties affected thereby. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power under this Agreement preclude any other or further exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity.

10.     Voluntary Agreement. The Parties represent that they have carefully read this Agreement, know its contents and execute the Agreement voluntarily.

11.     Severability. If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement shall be construed, performed, and enforced as if the invalid or unenforceable provision had not been included in the text of the Agreement.

12.     Drafting. The Parties have each participated in the drafting and negotiation of this Agreement.

13.     Counterparts. This Agreement may be executed in any number of counterparts by the Parties and/or in separate counterparts, each of which when signed and delivered by

3

any means, including mail, email, or facsimile, to the Parties' representatives shall be deemed to be an original, and all of which, taken together, shall constitute one and the same Agreement.

14. <u>Entire Agreement</u>. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties hereto concerning the subject matter hereof are contained in this Agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning this subject matter hereof are merged herein.

15. <u>Attorneys' Fees and Costs</u>. Each party shall bear its, his own attorneys' fees and costs.

16. <u>Authority</u>. The Parties represent and warrant that they have full power, authority and capacity to execute this Agreement and perform this obligation hereunder.

17. <u>Signatures</u>. The Parties signify their agreement to the above terms by their signatures below. Signatures may be electronically affixed to the documents to the same effect as an actual "wet" signature. The Parties are executing this Agreement on his/its own behalf and represent that he/ it has had sufficient time to review this Agreement and has had an opportunity to consult with an attorney prior to signing this Agreement.

**As agreed by the Parties and intending to be legally bound:**

DATED _____          MARK JAMES DICKMAN

By: _____
Name:
Title:

DATED_____          LPL FINANCIAL, LLC

By: _____
Name:
Title:

4

Case 3:26-cv-00280   Document 4-1   Filed 04/08/26   Page 125 of 343

# EXHIBIT L

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

April 18, 2023

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe, Suite 2600
Chicago, Illinois 60603
Phone: 312-899-4425

**VIA: FINRA Portal**

**RE: 19-02406 - Dickman vs. Sexton, Russo and LPL Financial LLC**
     **Prehearing Exchange, Witness List**

Dear Ms. Muldoon:

Pursuant to FINRA Rule 13514, this is Claimant Mark Dickman's Witness list:

1. Claimant Mark Dickman (in-person)
2. Respondent Sexton (in-person)
3. Respondent Russo (in-person)
4. Daniel Cruse – LPL Financial, Manager, Supervisor (video conference)
5. Ian Frimet – LPL Financial, Senior VP, Associate Counsel (video conference)
6. Brad Jacobs – LPL Financial, Senior VP, Associate General Counsel (video conference)
7. Alan J. Besnoff, CFP® Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
8. Thomas R. Kerr, Esq., 732 Scott Street Covington, Kentucky 41011 (telephone, if needed).
9. Tammy L. Dickman (40 Linden Hill Drive, Crescent Springs, KY 41017) (video conference).
10. Any witness identified by Respondents.

Claimant reserves the right to call witnesses in rebuttal, impeachment, or to authenticate an exhibit if necessary. In addition, under separate cover, Claimant has produced to Respondents' counsel documents Claimant intends to use at the hearing not already provided, pursuant to Rule 13514.

Claimant reserves the right to use as exhibits all documents Respondents produce in response to the Order dated April 11, 2023. Further, Claimant reserves the right to introduce any documents exchanged between the parties and any documents Respondents produce in their Rule 13514 exchange, and any publicly available information and legal and regulatory authority.

# BartellLaw

Sincerely,

Jeremy L. Bartell

# EXHIBIT M

<center>AFFIDAVIT OF THOMAS KERR</center>

COMES NOW the Affiant Thomas Kerr, and after having been duly sworn states as follows:

1. My name is Thomas Kerr. I have been a licensed attorney in the Commonwealth of Kentucky since 1977. I served in the Kentucky House of Representatives, representing District 64, from 1985 to 2016. From 2016 through 2020, I also served as the Chief of Staff for the Commonwealth of Kentucky Justice and Public Safety Cabinet.

2. In my capacity as an attorney, I have represented Norbert and Bonnie Keissler since 2000. Between 2014 and 2019 I assisted the Keisslers in the drafting of documents in connection with their estate plan.

3. In October of 2018 I learned from Mr. Keissler that his estate plan and transactions with his beneficiary and trustee, Mark Dickman, were being questioned by The US Postal Inspectors. My understanding was that US Postal Inspectors were concerned that Keissler was somehow victimized by Mark Dickman.

4. On October 18, 2018, I specifically met with the US Postal Inspectors, the FBI, and FINRA representatives and advised them that I was Norbert Keissler's attorney. I advised them that I was aware of his estate plan and his designation of beneficiaries, that Norbert Keissler voluntarily determined the beneficiaries of his estate, and that he was of sound mind when doing so. I further advised them that I was familiar with the transactions between Norbert Keissler and Mark Dickman, and that they were all above board.

5. As far as I know, following an investigation into these transactions, the US Postal Inspectors closed the case.

6. In 2019 I became aware of a U-5 defamation case being brought by Mark Dickman, specifically FINRA Case No. **19-02406,** *Dickman v. Sexton et. al.* **My understanding is the U-5 defamation case stemmed directly from Mark Dickman's** transactions with Keisslers.

7. In early March 2023, was contacted by Jeremy Bartell, of Bartell Law. Mr. Bartell represented Mark Dickman in FINRA Case No. **19-02406. He sought my assistance as a witness in** FINRA Case No. **19-02406, specifically as it related to the transaction between** Norbert Keissler and Mark Dickman.

8. Through my conversations with Bartell, I learned that the primary defense being raised in FINRA Case No. **19-02406 was a claim of "wrongful conduct" on the part of** Mark Dickman. My understanding was that the Respondent's claimed that Dickman had taken advantage of the Keisslers.

9. I advised Mr. Bartell that I would be prepared to offer testimony at the hearing in FINRA Case No. **19-02406. My testimony would have been that, as the attorney for the Keisslers, I was intimately familiar with all of the financial transactions in question, that it was my opinion that the Keisslers were not victimized, and that Mark Dickman acted in accordance with the Keisslers' wishes.**

10. In early 2023 had a specific phone conversation with Jeremy Bartell regarding the hearing. I was informed that the hearing would be held on May 7-9, 2023. I agreed to be available via telephone or video conference to offer my testimony as outlined above.

11. Mr. Bartell stated that my testimony would work to demonstrate to the arbitration panel that the conduct by Mark Dickman, as part of the transactions with my clients, was above board, and in the best interest of Keissler.

12. On the day of the hearing, I was ready, willing, and able to testify on behalf of Mark

Dickman as detailed above. My understanding was that I was listed on the "witness list" submitted by Mr. Bartell prior to the hearing. Bartell had my contact information. I never received a call, and I was never asked to provide testimony.

13. Based on my understanding of the issues involved in FINRA Case No. **19-02406**, it is my **belief that my testimonial evidence regarding these financial transactions with my client, which were the core of the respondent's defense, was material evidence which the panel should have heard prior to rendering any decision.**

FURTHER AFFIANT SAYETH NAUGHT.

THOMAS KERR

COMMONWEALTH OF KENTUCKY

COUNTY OF KENTON

The above affidavit was acknowledged and signed before me, a notary public, this 29th day of _April_, 2024, by **THOMAS KERR**

Notary Public, State at Large

My Commission Expires: 3-31-2026

Notary ID# KYNP 45616

# EXHIBIT N

Case 3:26-cv-00280　　Document 4-1　　Filed 04/08/26　　Page 132 of 343

# Mark Dickman / Keissler    Inbox

 



**Thomas Kerr** <tom@thomaskerr.com>
to Jeremy, me

Received!

On Apr 17, 2023, at 6:57 PM, Jeremy L. Bartell <jeremybartell@bartell-law.com> wrote:

Tom:

It was nice speaking with you and Mark on Friday. Attached is the affidavit I mentioned.

As also mentioned, Mark and I have a FINRA arbitration on May 9, 10, and 11.

If for some reason opposing counsel insists on authenticating this affidavit, we would like to telephone you during the hearing. Of course we would

Please let me know of any questions. I will keep you posted as we move closer.

Please let me know you received.

Best regards,

Jeremy L. Bartell

## BartellLaw
Jeremy L. Bartell
Bartell Law pllc
700 12th Street NW, Suite 700

Case 3:26-cv-00280     Document 4-1     Filed 04/08/26     Page 133 of 343

Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

Notice: This email and any attachments are confidential and may contain proprietary and privileged information. Any review, distribution, disclosure recipient, or received this email in error, please notify me immediately by reply email, delete the email and any copies, and do not disclose its cont

# EXHIBIT O

| | |
|---|---|
| MARK JAMES DICKMAN<br>(CRD#: 2066229)<br><br>CLAIMANT,<br><br>V.<br><br>JESSICA N. SEXTON<br>(CRD#: 5260955),<br><br>and<br><br>ROBERT P. RUSSO<br>(CRD#: 4466372),<br><br>RESPONDENTS. | FINRA ARBITRATION<br>NO. 19-02406 |

## RESPONDENTS' MOTION TO DETERMINE AMOUNT OF ATTORNEYS' FEES AND COSTS

Respondents Jessica Sexton and Robert Russo ("Respondents"), by and through their undersigned counsel, hereby move this Panel to determine the amount of reasonable attorneys' fees and costs incurred in this action, and in support thereof states as follows:

### INTRODUCTION

The parties appeared before the FINRA Arbitration Panel on May 9 and 10, 2023, to arbitrate claims asserted by Claimant Mark Dickman ("Dickman") against Respondents in their individual capacity. As the Panel is aware, the claims asserted by Dickman arise out of his employment with Independent Advisor Alliance ("IAA") and subsequent termination by IAA. Importantly, Dickman's Advisory Representative Agreement that he signed with IAA specifically provides that "the prevailing party shall be entitled to reasonable attorney's fees in addition to any other relief to which he/she may be entitled." A true and correct copy of Dickman's Advisory

1

70845406;5

Representative Agreement is attached hereto as **Exhibit 1**. Moreover, in Dickman's Second Amended Statement of Claim, Dickman requested an award from the Panel including "Reasonable Attorneys' fees in pursing this case; All filing fees, hearing fees and other FINRA arbitration costs; Reimbursement of all other costs, including for the Claimant's expert witnesses." *See* Claimant's Second Amended Statement of Claim. In Respondents' Answer, Respondents similarly requested "that all forum fees be awarded against Mr. Dickman; [and] that Respondents be awarded costs and attorneys' fees associated with responding to these claims." *See* Respondents' Answer to Claimants Second Amended Statement of Claim.

After the conclusion of Claimant's case, Respondents' moved for a directed verdict or dismissal of all claims asserted by Dickman and asked the Panel to grant Respondents' request for entitlement to attorneys' fees and costs. After careful consideration, the Panel granted Respondents' motion for directed verdict and determined that there was no evidence presented against Mr. Russo, and that the evidence presented against Ms. Sexton was insufficient to meet the evidentiary standard for liability. A true and correct copy of the Panel's May 15, 2023 Order is attached hereto as **Exhibit 2**. Additionally, the Panel awarded Respondents their costs and attorneys' fees in defending against Dickman's unfounded and meritless claims.[1] *See* Exhibit 1, Rulings. Accordingly, as set forth herein, Respondents' are entitled to their reasonable attorneys' fees and costs in defending against Dickman's claims.

---

[1] Because the Panel has already evaluated and ruled upon Respondents' entitlement to attorneys' fees and costs, this Motion will not discuss Respondents' entitlement but will focus solely upon the reasonableness of the attorneys' fees and costs associated with Respondents' defense to Dickman's claims.

2

<u>**MEMORANDUM OF LAW**</u>

**Legal Standard**

As the Panel is patently aware, FINRA Code of Arbitration Procedure for Industry Disputes, Rule 13904 permits the Panel to issue an award containing, among other items: "The damages and other relief requested; the damages and other relief awarded; [and,] The allocation of forum fees and any other fees allocable by the panel." North Carolina courts have determined that an arbitration panel's award of attorneys' fees is proper where the NYSE allows for costs and expenses to be awarded and where both parties request attorneys' fees be awarded. *See First Union Securities, Inc. v. Lorelli*, 168 N.C. App. 398 (2005). In *First Union*, the court held that NYSE Rule 629 allowed the arbitrator to determine in the award "the amount of costs incurred...and...other costs and expenses of the parties. The arbitrator(s) shall determine by whom such costs shall be borne." The court went on to state that the fact that both parties requested that an award include attorneys' fees, provided a separate ground for which the court can affirm the panel's decision to award attorneys' fees. Moreover, in *Prudential-Bache Securities, Inc. v. Tanner*, 72 F.3d 234 (1st Cir. 1995), the court held that "the rule states that it provides for 'costs and expenses, unless applicable law directs otherwise.' We read this language to include attorney's fees, and have no case law suggesting otherwise." The court further held that "the record reveals that both parties requested attorney's fees from the panel, suggesting that awarding fees was contemplated by the parties to be within the scope of the agreement to arbitrate."

As such, because FINRA rule 13904 similarly allows for the panel to award fees, which the courts have continuously held includes attorneys' fees, coupled with the fact that both Claimant and Respondent requested attorneys' fees, the Panel properly awarded Respondents' its attorneys' fees, therefore, entitlement to fees is not in dispute.

3

70845406;5

Turning to the fees themselves, the Panel must determine what attorneys' fees are reasonable given the circumstances. In North Carolina, when determining reasonable fees, courts consider the following factors: 1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; 2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; 3) the fee customarily charged in the locality for similar legal services; 4) the amount involved and the results obtained; 5) the time limitations imposed by the client or by the circumstances; 6) the nature and length of the professional relationship with the client; 7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and 8) whether the fee is fixed or contingent. *See* N.C. Rule of Professional Conduct 1.5.

**Respondents' Attorneys' Fees in this Action Are Reasonable**

In connection with this action, Respondents' retained Akerman LLP and agreed to pay reasonable attorneys' fees for services and any legal costs or charged incurred in connection with this action. As of May 31, 2023, the Respondents have incurred reasonable attorneys' fees in connection with Akerman LLP's representation in this matter totaling $380,067.[2] [3]

The below analysis will assist the Panel's determination of reasonableness:

(a)     <u>The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.</u> The total amount of time recorded by Akerman LLP with regard to its representation of Respondents, from on or about September 2019

---

[2] The amount of attorneys' fees listed above does not include the fees associated with the drafting and preparation of the motion, and redaction of the invoices. Respondents' request that the Panel add an additional 20 hours to the attorneys' fee recovery to account for the fees associated with the preparation of this motion and attached exhibits.
[3] The Panel has not requested an affidavit in support of the Motion, but upon request, Respondents' can supplement this Motion with an affidavit.

4

through May 2023, is 819.9 hours, and the total fees sought are $380,067. *See* **Composite Exhibit 3**. The rates charged by Akerman LLP timekeepers on this matter are:

| Timekeeper | Position | Rate |
| --- | --- | --- |
| Jonathan S. Robbins | Partner - 2019 | $565.00 |
| Paul J. Foely | Partner - 2019 | $550.00 |
| S.B. Ward | Associate - 2019 | $275.00 |
| Jonathan S. Robbins | Partner - 2020 | $575.00 |
| S.B. Ward | Associate - 2020 | $300.00 |
| Jonathan S. Robbins | Partner - 2021 | $595.00 |
| S.B. Ward | Associate - 2021 | $315.00 |
| Angela M. Starling | Paralegal - 2021 | $290.00 |
| Kimberly Shinder | Paralegal - 2021 | $310.00 |
| Bobbi Engelke | Paralegal - 2021 | $290.00 |
| Jonathan S. Robbins | Partner - 2022 | $645.00 |
| Paul J. Foely | Partner - 2022 | $675.00 |
| Kiki M. Scarff | Partner - 2022 | $545.00 |
| S.B. Ward | Associate - 2022 | $375.00 |
| Scott Miller | Associate - 2022 | $550.00 |
| C.R. Cotler | Paralegal - 2022 | $340.00 |
| Nicole Villamar | Associate - 2022 | $490.00 |
| Kelly S. Connolly | Paralegal - 2022 | $335.00 |
| Jonathan S. Robbins | Partner - 2023 | $645.00 |
| Scott Miller | Associate - 2023 | $580.00 |
| Kelly S. Connolly | Paralegal - 2023 | $385.00 |
| C.W. Wood | Library | $140.00 |

(b)     The preclusion of other employment. Although no specific employment was precluded as a result of the acceptance of this case, counsel for the Respondents has devoted significant time and effort to this case and were unable to devote that time to other client matters. At a minimum, this factor should be neutral, especially where counsel is seeking its reasonable attorneys' fees actually expended in this matter and is not seeking a contingency fee or multiplier.

70845406;5

(c) <u>The fee customarily charged in the locality for similar legal services.</u> The rates charged by Akerman LLP are within range of the fees customarily charged by similar attorneys handling similar matters in the Charlotte, North Carolina area. Additionally, Akerman LLP maintains an office in Winston Salem, North Carolina, where the hourly rates charged are similar to that charged here. It should be noted that, as the result of Akerman's long-standing relationship with the Respondents, Akerman LLP actually discounted its standard rates by over 6%, thus there should be no dispute as to the reasonableness of hourly rates. Additionally, Akerman LLP extended a courtesy discount of almost $5,000 to Respondents.

(d) <u>The amount involved and the results obtained.</u> The Respondents' successfully obtained a directed verdict upon the close of Claimant's case in chief on all claims asserted by Claimant. Claimant sought recovery of at least $1,400,000 plus punitive damages of treble the compensatory damages, exposing Respondents to over $4,200,000 in potential damages.

(e) <u>The time limitations imposed by the client or by the circumstances.</u> Prior to arbitration, there were no time limitations imposed by the client or the circumstances in particular, other than the normal imitations and necessity to comply with deadlines arising in litigation. At arbitration, the circumstances required that counsel be present in Charlotte, North Carolina, from May 8-10, 2023.

(f) <u>The nature and length of the professional relationship with the client.</u> Akerman LLP has represented the Respondents since 2019 in this matter, spanning the institution of this action, multiple amendments to the statement of claim, mediations, extensive discovery, extensive motion practice and a postponement of the arbitration from October 2022 to May 2023. The matter has taken several years due to the delays concerning Claimant's substitution and addition of parties, discovery disputes, and the postponement of the arbitration by the previous panel.

6

70845406;5

(g)     <u>The experience, reputation, and ability of the lawyer or lawyers performing the services</u>. Akerman LLP is a full-service law firm employing experienced litigators at all levels who are capable of performing the legal work required in litigation matters of this type at a satisfactory level. Akerman LLP timekeepers involved in this matter have previous experience litigating FINRA arbitrations. The biographies of the Akerman attorneys involved in this matter are attached hereto as **Composite Exhibit 4**.

(h)     <u>Whether the fee is fixed or contingent</u>. The fee is fixed and is to be paid based on the number of hours worked multiplied by an hourly rate. No contingency multiplier is sought in this case.

**Respondents' Are Entitled To Recover Their Costs in this Action and Are Reasonable**

In addition to the attorneys' fees, the Panel also awarded Respondents their costs associated with the defense against Dickman's claims. Respondents' costs include FINRA fees, flights to Charlotte for the arbitration, hotels in Charlotte for the arbitration, copying and shipping fees for the materials used during the arbitration, and the fees for Respondents' expert, Alan Wolper. Respondents' costs are reasonable and necessary to its defense against Dickman's claims for damages in excess of $4,000,000. An accounting of Respondents costs outlined above are outlined in the chart below.

7

70845406;5

| VENDOR | DATE | COSTS |
|---|---|---|
| Service of Process - Subpoena for Darpel | 08/19/21 | $130.00 |
| Service of Process - Subpoena for Bosch | 08/20/21 | $130.00 |
| Service of Process - Subpoena for US Postal Service | 08/24/21 | $130.00 |
| Service of Process - Subpoena for Harrington | 08/30/21 | $130.00 |
| Mediation | 03/18/22 | $250.00 |
| Library Fees | 03/31/23 | $35.27 |
| Travel Expense - Jonathan Robbins | 04/26/23 | $850.28 |
| Federal Express | 05/04/23 | $479.80 |
| Pictera - Copies of Exhibits | 05/04/23 | $3,413.35 |
| Uber/Lyft - Jonathan Robbins | 05/08/23 | $37.80 |
| Uber/Lyft - Jonathan Robbins | 05/08/23 | $37.80 |
| Hotel Expense - Jonathan Robbins | 05/10/23 | $816.14 |
| Parking - Jonathan Robbins | 05/10/23 | $60.00 |
| Travel Expense - Scott Miller | 05/15/23 | $756.25 |
| Hotel Expense - Scott Miller | 05/15/23 | $562.42 |
| Uber/Lyft - Scott Miller | 05/15/23 | $140.31 |
| Technology during Arbitration | 05/15/23 | $412.80 |
| | | |
| GRAND TOTAL | | $8,372.22 |

**WHEREFORE**, Respondents respectfully request that the Panel award Respondents their reasonable attorneys' fees and costs in the amount of $388,439.22, plus post-judgment interest at the statutory rate, along with any and other relief that this Panel deems just and proper.

Respectfully submitted this the 12 day of June, 2023.

Respectfully submitted,
**AKERMAN LLP**
201 East Las Olas Boulevard – Suite 1800
Ft. Lauderdale, Florida 33301
Tel.: 954-463-2700
Fax: 954-468-2454

By: */s/ Jonathan S. Robbins*
Jonathan S. Robbins, Esq.
Florida Bar No. 989428
Telephone: (954) 463-2700

8

70845406;5

Facsimile: (954) 463-2224
E-Mail: jonathan.robbins@akerman.com

*Counsel for Respondents Jessica N. Sexton
and Robert P. Russo*

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that I have caused a copy of the foregoing has been submitted electronically through the FINRA DR Portal to Jeremy L. Bartell, Esq., 700 12th Street NW, Suite 700, Washington, D.C. 20005 and to Elizabeth A. Muldoon, Senior Case Administrator, FINRA Office of Dispute Resolution, Midwest Regional Office, 55 West Monroe Street, Suite 2600, Chicago, IL 60603-5104 on this the 12 day of June, 2023.

*/s/ Jonathan S. Robbins*

9

70845406:5

# EXHIBIT P

|  |  |
|---|---|
| **MARK JAMES DICKMAN** (CRD#: 2066229) **CLAIMANT,** v. **JESSICA N. SEXTON** (CRD#: 5260955), **and** **ROBERT P. RUSSO** (CRD#: 4466372), **and,** **LPL Financial LLC** (CRD#: 6413) (dismissed) **RESPONDENTS.** | **FINRA ARBITRATION NO. 19-02406** |

## CLAIMANT'S OPPOSITION
## TO RESPONDENTS' MOTION ON COSTS

### I.    Introduction

In the Order dated May 15, 2023, the Panel granted a motion for directed verdict, and ordered that: *"The cost[s] will be awarded to Respondents after the parties have prepared a motion for the amount requested..."* Although the Respondents have prevailed in this arbitration, they are not entitled to attorneys' fees as part of costs under the governing law of North Carolina. As discussed below, North Carolina specifically prohibits awards of attorneys' fees as costs unless expressly allowed by a North Carolina statute. Here, no statute applies. As such, awarding

1

attorneys' fees in this case would be in disregard of governing law and subject to vacatur by a court.

Further, an award of fees in this case would be entirely unjust. While the panel dismissed Claimant's case, it was nevertheless a meritorious case. We have shown that Respondents Sexton filed a Form U5 in December of 2018 – the completeness and accuracy of which she verified – that reported there were allegations of fraud or wrongful taking of property (and a federal investigation and other statements). She subsequently filed *four* Form U5s reporting that there were *no* allegations of fraud or wrongful taking of property (and that there was *no* investigation). Quite clearly the first Form U5 was not accurate.

As discussed at length in Claimant's Prehearing Brief, untrue statements about someone's profession are *per se* defamatory and malice can be presumed in such case. *See* Claimant's Prehearing Brief at 15, citing among others, Gibby v. Murphy, 73 N.C. App. 128, 131 (1985) *"Statements that are slanderous per se may form the basis of an action because in such cases* ***malice and damages are presumed as a matter of law.*** *Among statements which are slanderous per se are accusation of crimes or offenses involving moral turpitude, defamatory* ***statements about a person with respect to his trade or profession,*** *and imputation that a person has a loathsome disease."*).

Further, in the Brief, we set forth at great length how the defense of qualified privilege is *not* available here for three different reasons (page 16). One of those reasons is that the defense is not available if the defendant published the statement, as the North Carolina Supreme Court put it, ***"without checking for truth by means at hand."*** *See* Prehearing Brief at 16-17, citing *Ponder v. Cobb,* 257 N.C. 281, 294 (1962) and other cases on the "means at hand" test. At the

2

hearing, Mr. Dickman testified that Respondent Sexton never even called him or the client before reporting fraud or wrongful taking of property or an investigation. Clearly a phone call is a "means at hand." Nor for that matter, did Respondent Sexton follow LPL Financial's Form U5, which did not report *any* of the defamatory information, and, as the evidence at the hearing showed, *LPL Financial was the one conducting the internal review of Claimant*. A simple call to LPL Financial would have avoided her false reporting entirely, and that is also clearly a "means at hand." *See* Prehearing Brief at 17.

In addition, you heard from Alan Besnoff, an experienced expert witness with decades of experience as a manager recruiting in the financial industry, who repeatedly testified that the disclosures on the Form U5 – fraud or wrongful taking of property, or the "investigation" disclosure that kept appearing in the subsequent Form U5s Respondent Sexton filed, would all but preclude employment. And it did preclude employment, as Claimant testified, until the damage was finally amended away in Respondent Sexton's four subsequent Form U5s.

Further, we presented evidence of the precipitous drop in Claimant's income following the Form U5 as he scrambled to try to sell his book in a fire sale, and ultimately managed to get back on his with old firm when the Form U5 had been finally cleaned up. Because the Panel gave no reasons, we do not know why the Panel feels the burden was not met. But it cannot be said the case lacks merit. It is a sound case and that is why, as discussed below, Respondents fought it with six attorneys (three partners, three associates, and four paralegals), including a lead out-of-state attorney, and why they had to expend substantial funds defending the case. Had Respondent filed an accurate Form U5 as FINRA rules require, and as would have happened if Respondent availed herself of "means at hand" for ascertaining the truth, this case would have

3

been avoided. Instead, Claimant had to endure being falsely associated with fraud or wrongful taking of property and the other defamatory statements, all of which Respondent Sexton later removed.

II.      **Attorneys' Fees Cannot be Awarded Under Governing North Carolina Law Unless Expressly Authorized by Statute, and No Statute Authorizes Fees as Damages or Costs in this Case.[1]**

As the Supreme Court of North Carolina has repeatedly held, attorneys' fees may not be recovered, whether as costs or as an item of damages, unless such a recovery is expressly authorized by *statute*:

> *"[T]he general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. Hicks v. Albertson, 284 N.C. 236, 200 S.E.2d 40 (1972).*

Stillwell Enterprises, Inc. v. Interstate Equip. Co., 300 N.C. 286, 289 (1980) (reversing attorneys' fees award).

> *The general rule in this State is that, in the absence of statutory authority therefor, a court may not include an allowance of attorneys' fees as part of the costs recoverable by the successful party to an action or proceeding.' In re King, 281 N.C. 533, 540, 189 S.E.2d 158, 162.*

Hicks v. Albertson, 284 N.C. 236, 238 (1973).

> *"Except as so provided by statute, attorneys' fees are not allowable."*

Baxter v. Jones, 283 N.C. 327, 330 (1973).

> *"Except as otherwise provided by statute . . . attorneys' fees are not now regarded as a part of the court costs in this jurisdiction."*

---

[1] In this case, the parties agree that North Carolina law is governing. *See* Respondents' Response and Affirmative Defenses to the Statement of Claim, page 3, n. 4 (referring to North Carolina law as "the proper controlling authority...") and both parties have cited North Carolina cases throughout their prehearing briefs.

4

Wachovia Bank & Tr. Co. v. Schneider, 235 N.C. 446, 454 (1952) (citations omitted).

In addition to these binding Supreme Court cases, the Court of Appeals of North Carolina has also repeatedly so held. Here are just a few examples:

> *"[A] successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute." . . . The general rule in North Carolina is that attorney's fees are not allowed as a part of the costs in civil actions or special proceedings, unless there is **express statutory authority** for fixing and awarding the attorney's fees.* Bowman v. Comfort Chair Co., *271 N.C. 702, 704, 157 S.E.2d 378, 379 (1967) (citations omitted).*

Alston v. Fed. Exp. Corp., 200 N.C. App. 420, 424, 684 S.E.2d 705, 707 (2009) (internal cite omitted).

> *Moreover, "'the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**.'" Delta Env. Consultants,*132 N.C.App. at 167, 510 S.E.2d at 695. . .

Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp., 145 N.C. App. 290, 297–98 (2001).

> *The general rule in this state is "a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**." Southland Amusements and Vending, Inc. v. Rourk,* 143 N.C.App. 88, 94, 545 S.E.2d 254, 257 (2001) (internal quotations omitted).

Calhoun v. WHA Med. Clinic, PLLC, 178 N.C. App. 585, 603 (2006).

> "[T]he general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is ***expressly authorized by statute***." *Enterprises, Inc. v. Interstate Equipment Co.,* 300 N.C. 286, 289, 266 S.E.2d 812, 814 (1980).

Delta Env't Consultants of N. Carolina, Inc. v. Wysong & Miles Co., 132 N.C. App. 160, 167, 510 S.E.2d 690, 695 (1999)

5

Under these governing authorities, attorneys' fees cannot be recovered unless expressly authorized by statute. While there are several statutes that allow for attorney fees in specific types of cases in North Carolina, none of them apply to this case. Nor have the Respondents identified any such statute. As such, attorneys' fees may not be recovered under the clearly governing authorities.

### III.   Under Governing North Carolina Law, Respondents' Cannot Rely on an Attorney Fee Provision in a Contract with Claimant.

Respondents' Motion asserts that the "claims asserted by Dickman arise out of his employment with Independent Advisor Alliance ("IAA")." Respondents' Motion at 1. Respondents then point to an attorneys' fees provision in a contract between IAA and Claimant. *See* Exhibit 1 to Respondents' Motion (IAA contract with Claimant). The provision of that contract provides:

> This Agreement shall be construed in accordance with the laws of the State of North Carolina. If any legal action is necessary to enforce any of the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees in addition to any other relief to which he/she may be entitled.

Exhibit 1 to Respondents' Motion.

This contract, however, provides no basis for an award of attorneys' fees in this case. First, ***this contract is between the company, <u>IAA</u>, and Claimant*** – Respondents Sexton and Russo are not parties:

> *This Agreement is entered into between Independent Advisor Alliance, LLC ("IAA")*
> *and Mark Dickman, an Advisory Representative ("Representative).*

*See* Exhibit 1 to Respondents' Motion. As such, it is signed only by Claimant, and by a "compliance analyst" on behalf of "Independent Advisors, Alliance, LLC":

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on _October 30 2018_

_(signature)_     *MARK T DICKMAN*     *October 30 2018*

Representative Signature     Name Printed     Date

Independent Advisors Alliance, LLC

By _(signature)_     *Compliance Analyst*     *11/1/18*

By     Title     Date

Second, the attorneys' fees provision only applies where: *"legal action is necessary to enforce any of the terms of this agreement…"* Exhibit 1 to Respondents' Motion (Respondents omit this language from their quote). IAA has obviously not brought any legal action to enforce any terms of the agreement – IAA has brought no action at all. As for Respondents Sexton and Russo, who are not even parties to the agreement, they have also not brought any "legal action" to "enforce any terms of the agreement." Neither IAA, nor Sexton or Russo have a breach of contract claim. So this agreement involves the *wrong party* (IAA, not Sexton or Russo); and no legal action has been brought to enforce its terms, which is required to trigger its application. It is simply not relevant to this case.

Moreover, *even if* this contract were between the right parties, and there were a breach of contract action brought to enforce its terms, it still does not provide a basis for an award of attorneys' fees under North Carolina Law. As the North Carolina Supreme Court has held, even if there is a contract provision, the provision is "invalid" absent express statutory authority:

> Thus the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. . . . ***Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor.***

Stillwell Enterprises, Inc. v. Interstate Equip. Co., 300 N.C. 286, 289 (1980) (emphasis added; citations omitted).

7

In North Carolina, *"'[a]s a general rule[,] <u>contractual provisions</u> for attorney's fees are invalid in the absence of statutory authority. This is a principle that has long been settled in North Carolina and fully reviewed by our Supreme Court....'"*

<u>Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp.</u>, 145 N.C. App. 290, 297–98 (2001) (emphasis added).

> It is well established in this State that "[e]ven in the face of a carefully drafted contractual provision indemnifying a party for such attorney[']s[ ] fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor." *Stillwell Enterprises, Inc. v. Interstate Equipment Co.,* 300 N.C. 286, 289, 266 S.E.2d 812, 814–15 (1980); *see Delta Env. Consultants of N.C. v. Wysong & Miles Co.,* 132 N.C.App. 160, 167, 510 S.E.2d 690, 695, *disc. *12 review denied and appeal dismissed,* 350 N.C. 379, 536 S.E.2d 70 (1999) (successful litigant cannot recover attorney's fees as costs absent an express statutory basis for such an award). *In this case, despite a contractual provision in the agreement providing the breaching party pay attorney's fees in the event the non-breaching party brings suit to enforce the agreement, there is no express statutory authority permitting the award of attorney's fees in breach of contract cases.*

<u>Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.</u>, 143 N.C. App. 1, 11–12, <u>aff'd,</u> 354 N.C. 565, 556 S.E.2d 293 (2001).

> [E]ven though the consent order contained an express provision permitting the parties to seek recovery of attorneys' fees, *neither party is entitled to an award of fees absent statutory authority.* See *Harborgate Prop. Owners Ass'n v. Mountain Lake Shores Dev. Corp.,* 145 N.C.App. 290, 297–98, 551 S.E.2d 207, 212 (2001) (*provision in consent judgment for attorneys' fees invalid in absence of statutory authority*)...

<u>Carswell v. Hendersonville Country Club, Inc.</u>, 169 N.C. App. 227, 231 (2005); <u>Ehrenhaus v. Baker,</u> 216 N.C. App. 59, 94 (2011) (same).

As such, even if the agreement were with the Respondents (it is not; it is with IAA); and even if Respondents had brought a "legal action" to "enforce any of the terms" (they did not), such a clause would still be *"invalid"* because there is no express statutory basis. As quoted

8

above, in binding North Carolina Supreme Court precedent, *"contractual provisions for attorney's fees are invalid in the absence of statutory authority..."*). <u>Stillwell</u>, 300 N.C. at 289.

Further, North Carolina has a statute that applies to attorney fees provisions in business contracts, but it is not applicable here. The statute is N.C. Gen. Stat. Ann. § 6-21.6 (*Reciprocal attorneys' fees provisions in business contracts*). This statute provides:

> Reciprocal attorneys' fees provisions in business contracts are valid and enforceable for the recovery of reasonable attorneys' fees and expenses only if all of the parties to the business contract sign by hand the business contract....

<u>Id.</u> This provision is inapplicable for two clear reasons. First, "business contract" is defined in the statute to *exclude* "an employment contract":

> Business contract. --A contract entered into primarily for business or commercial purposes. The term does not include a consumer contract, **an employment contract,** or a contract to which a government or a governmental agency of this State is a party.

Further, the statute defines "employment contract" to specifically include *independent contractors* like Claimant:

> Employment contract. -- A contract between an individual and another party to provide personal services by that individual to the other party, **whether the relationship is in the nature of employee-employer or principal-independent contractor.**

<u>Id.</u> The contract between IAA and Claimant expressly provides it is an independent contractor relationship. *See* Exhibit 1 to Respondents' Motion, page 4 (describing independent contractor relationship).

Further, under this statute, fees are awarded "only if all of the parties to the business contract sign by hand the business contract..." N.C. Gen. Stat. Ann. § 6-21.6(b). Here,

9

Respondents Sexton and Russo are not even parties to the agreement and obviously did not sign

it by hand, or at all.

Finally, Respondents' Motion refers to "Dickman's unfounded and meritless claims." (at

page 2). Although Respondents cite no statute, North Carolina does have a statute for

"nonjudiciable cases" but the standard to meet that statute could never be met in this case, as it

applies to "imagined or fanciful" cases:

> A justiciable issue is one that is "real and present as opposed to imagined or
> fanciful." *Sunamerica,* 328 N.C. at 257, 400 S.E.2d at 437. " 'Complete absence of
> a justiciable issue' suggests that it must conclusively appear that such issues are
> absent even giving the losing party's pleadings the indulgent treatment which they
> receive on motions for summary judgment or to dismiss." *Sprouse v. North River
> Ins. Co.,* 81 N.C.App. 311, 326 (1986), *disc. rev. denied,* 318 N.C. 284 (1986).

Lincoln v. Bueche, 166 N.C. App. 150, 154 (2004).

> ***As an exception to the general rule that each party bears its own costs, the
> statute [N.C. Gen.Stat. § 6–21.5] must be strictly construed.*** *Winston–Salem
> Wrecker Ass'n v. Barker,* 148 N.C.App. 114, 121 (2001). To impose attorneys' fees
> upon an unsuccessful litigant, "plaintiff must reasonably have been aware, at the
> time the complaint was filed, that the pleading contained no such issue or plaintiff
> must be found to have persisted in litigating [a] case after [the] point when he or
> she should reasonably have become aware that pleading filed no longer contained
> justiciable issue." *Brooks v. Giesey,* 334 N.C. 303, 309, 432 S.E.2d 339, 342 (1993).
> In this case, the court cannot find that Mr. Anderson had a reasonable belief that
> his legal actions contained no justiciable issues, and the court will not award
> attorneys' fees under N.C. Gen.Stat. § 6–21.5.

In re Brokers, Inc., 396 B.R. 146, 171 (Bankr. M.D.N.C. 2008).

Here, however, it cannot be said Claimant's case is "imagined or fanciful." As discussed in

the introduction above, this case undeniably has merit *and respondents treated it as such.*

Respondents cite two cases that supposedly allow for attorneys' fees here. Neither are

applicable. Respondents cite Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 237 (1st Cir. 1995)

and First Union Sec., Inc. v. Lorelli, 168 N.C. App. 398, 607 S.E.2d 674 (2005). Both of these cases

10

involve a plaintiff, not a defendant, seeking fees. As an initial matter, Prudential is an opinion from the United States Court of Appeals, First Circuit, in Massachusetts, reviewing a federal district court case in Puerto Rico. As such, this federal case is neither binding nor even relevant in North Carolina.[2] Further, Prudential and First Union both involve a New York Stock Exchange arbitration, and both turn on their interpretation of New York Stock Exchange Rule 629 (a rule that has been defunct since 2007) which does not apply to this arbitration. See First Union, supra ("attorneys' fees were properly awarded pursuant to NYSE Rule 629(c)"); Prudential (same, NYSE Rule 629(c)).

The North Carolina cases cited above prohibit an award of attorneys' fees to Respondent as there is no statutory basis. An award of fees here would be in disregard of the controlling legal authority presented above that holds that a statutory basis for fees is required, and none is available here.

## IV.    The Requested Fees are Highly Unreasonable.

As discussed above, an award of attorneys' fees in this case is contrary to North Carolina law (in addition to being grossly unfair to Claimant). But for completeness, we will review the factors supplied by Respondents most of which do not support the reasonableness of the fees claimed.

---

[2] State v. Woods, 136 N.C. App. 386, 390, 524 S.E.2d 363, 365 (2000) ("[f]ederal appellate decisions are not binding upon either the appellate or trial courts of this State.").

**Respondents' First Factor**

In claiming attorneys' fees, Respondents' Motion cites as factor (1) *"the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly."* Respondents' Motion at page 4. In addressing this factor, Respondents include a chart of the timekeepers involved in this matter (page 5). Against Claimant and his sole practitioner attorney, Respondents list billings from *three* partners (Robbins, Foley, Scarff), *three* associates (Ward, Miller and Villamar), and *four* paralegals (Starling, Shinder, Engelke, Cotler, and Connolly). No explanation is provided for why six attorneys are on this case, or four paralegals. Further, no explanation is provided on how "novel" or "difficult" the questions involved were.

Nor could Respondent's claim anything novel or difficult here. This was a straight forward Form U5 defamation case as was apparent from the documents in Respondent's possession from the beginning of the case. It is highly unreasonably for three partners, three associates and four paralegals to bill on a straightforward case. Further, no explanation is provided for the "skill" needed to conduct this case; the factor is simply ignored. No more than one attorney is appropriate here. Should the panel order fees, only the billings for one attorney, Mr. Robbins as lead counsel, should be permitted as reasonable.

**Respondents' Second Factor**

As for Respondents' second factor – *preclusion of other employment* – Respondents admit that "no specific employment was precluded" (page 5). This factor weighs against the reasonableness of the fees requested.

12

**Respondents' Third Factor**

As for Respondent's third factor – *the fee customarily charged in the locality* – Respondents simply assert – without any support – that the fees are reasonable for legal services in North Carolina (page 6). Indeed, the only support provided at all is the assertion that the Akerman firm charges "similar" rates for its office in North Carolina. That may be so (although Respondents provide no evidence of that), but the question is what the prevailing rates are in North Carolina, not what Akerman's rates are in that state. Further, no explanation is provided for why it is reasonable for North Carolina based Respondents to hire Mr. Robbins who is in Fort Lauderdale, Florida. As set forth in the chart, Mr. Robbins claims $645 per hour. No explanation is provided at all for how $645 per hour is reasonable – this rate is entirely unsupported by Respondents and therefore cannot support an award for attorneys' fees. <u>WFC Lynnwood I LLC v. Lee of Raleigh, Inc.</u>, 259 N.C. App. 925, 935 (2018) ("*[T]he affidavit offers no statement with respect to comparable rates in this field of practice...It is therefore clear that there was insufficient evidence before the trial court of "the customary fee for like work" for the trial court to make a finding on that point, and to award attorneys' fees accordingly.*").

Indeed, the rates seem highly inflated for a North Carolina attorney. For example, Clio, the well-known national provider of law firm case management, reports that the prevailing hourly rate for an arbitration lawyer in North Carolina is $267 per hour.[3] Because the

---

[3] The Clio report is found here: https://www.clio.com/resources/legal-trends/compare-lawyer-rates/nc/

13

Respondent's rates are entirely unsupported, if the panel awards fees, the attorneys' hourly rates should be adjusted to $267 per hour.

Further, no explanation or support is offered for the paralegal rates in the chart which range from $385 to $290. They are simply asserted as reasonable. But again, as Clio reports in the same report, the hourly rate for non-lawyers such as the four paralegals is $136 per hour. Because no support is provided for the paralegal fees, the rate for them should be limited to $136 per hour.

**Respondents' Fourth Factor**

In Respondent's fourth factor — *the amount involved and the results obtained.* — Respondents provide no explanation or support other than to claim exposure to $4.2 million. The claimed exposure of $4.2 million is exaggerated, as it assumes treble damages of the full amount of the damages claimed, a highly unlikely scenario. Indeed, Claimant testified his damages were approximately $1 million, and Claimant offered to settle for $325,000 in mediation on May 21, 2022, *a year before the hearing*. This factor is considered relevant in North Carolina. For example, "the timing of settlement offers" and "the amounts of settlement offers" are both listed factors for reasonableness under N.C. Gen. Stat. Ann. § 6-21.6, the statute referenced above for reciprocal attorney fees which does not apply here, but informs the panel on relevant factors considered by the court. The panel should weigh this factor against reasonableness of fees.

**Respondents' Fifth Factor**

Respondents' fifth factor — *"the time limitations imposed by the client or by the circumstances"* — Respondents admit in their brief "there were no time limitations imposed by the client or the circumstances in particular." Indeed, this case was repeatedly delayed during

14

Covid, was delayed while the parties mediated, and was delayed when the first three arbitrators simply abandoned the case not long before the hearing. Because no support is offered on this factor, it must be rejected as a basis for reasonableness of fees.

**Respondents' Sixth Factor**

Respondents' sixth factor – *"the nature and length of the professional relationship with the client"* – Respondents offer no support at all for this factor. Instead, they assert only that they have represented Respondents in this case since 2019. This detracts from the reasonableness of the fees.

**Respondents' Seventh Factor**

Respondents' seventh factor – *"the experience, reputation, and ability of the lawyer or lawyers performing the services"* – Respondents simply assert, as a full-service firm, that the lawyers have the requisite experience, reputation and ability, and that the timekeepers involved have previous experience litigating FINRA arbitrations. That may be so, but as discussed above, the rates are excessive for North Carolina and there are too many attorneys and paralegals involved. Because this factor is unsupported, it too should be weighed against the reasonableness of the fees.

**Respondents' Eighth Factor**

Respondent's eight Factor – *whether the fee is fixed or contingent* – is not relevant as the fees are neither fixed nor contingent.

In addition, the Panel should know that the vast majority of the litigation action in this case was generated by the Respondents. Thus, for example, on March 9, 2020, Respondent Sexton responded to Claimant's request for Discovery. In that response, *Respondent Sexton*

15

*objected to every single request* for documents and information. Respondent Russo did the same. Repeated efforts to get compliance failed and as a result Claimant had to file a motion to compel discovery. This was filed on August 28, 2021. The (then) Chairman of the Panel held a hearing, and on November 7, 2021 ordered Respondents to produce documents, overruling their baseless objections that Respondent Russo did not have custody of his own firm's documents. As the panel knows, this led to further motions and hearing on the scope of the prior order, litigation activity that was only necessitated because of Respondents' blanket objections and failure to produce documents for years. Any potential award of attorneys' fees should be discounted greatly due to Respondents' uncooperative discovery practices.

## CONCLUSION

As discussed above, Respondents are not entitled to an award of attorneys' fees as costs under governing North Carolina law, and thus their motion for costs – insofar as it seeks attorneys' fees – should be rejected.

June 17, 2023

Counsel for the Claimant,

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

## Certificate of Service

I certify that I served this on counsel for all parties through the FINRA DR Portal on June

16

17, 2023.

_(signature)_

_____

Jeremy L. Bartell

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 162 of 343

# EXHIBIT Q

# Award
## FINRA Dispute Resolution Services

In the Matter of the Arbitration Between:

Claimant
Mark James Dickman

Case Number: 19-02406

vs.

Respondents
LPL Financial LLC,
Jessica N. Sexton, and
Robert P. Russo

Hearing Site: Charlotte, North Carolina

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Persons

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Mark James Dickman ("Claimant"): Jeremy L. Bartell, Esq., Bartell Law PLLC, Washington, District of Columbia.

For Respondent LPL Financial LLC ("LPL"): Michael A. Brady, Esq., Bass, Berry & Sims PLC, Memphis, Tennessee.

For Respondents Jessica N. Sexton ("Sexton") and Robert P. Russo ("Russo"): Jonathan S. Robbins, Esq., Akerman LLP, Ft. Lauderdale, Florida.

LPL, Sexton, and Russo, collectively, are referred to as "Respondents".

## CASE INFORMATION

Statement of Claim filed on or about: August 20, 2019.
Claimant signed the Submission Agreement: August 20, 2019.
First Amended Statement of Claim filed on or about: November 11, 2019.
Second Amended Statement of Claim filed on or about: December 20, 2019.

Statement of Answer to the Second Amended Statement of Claim filed by LPL on or about: May 1, 2020.
LPL signed the Submission Agreement: April 30, 2020.

Statement of Answer filed by Sexton on or about: October 16, 2019.
Statement of Answer to the Second Amended Statement of Claim filed by Sexton and Russo on or about: May 1, 2020.
Sexton signed the Submission Agreement: November 15, 2019.
Russo did not sign the Submission Agreement.

## CASE SUMMARY

In the Second Amended Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory in nature and asserted the following causes of action: defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, intentional infliction of emotional harm, negligent hiring, failure to train, failure to supervise, respondeat superior, and aiding and abetting tortious conduct.

Unless specifically admitted in the Statement of Answer to the Statement of Claim, Sexton denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Statement of Answer to the Second Amended Statement of Claim, LPL denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Statement of Answer to the Second Amended Statement of Claim, Sexton and Russo denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the Form U5 filed by LPL, compensatory damages of at least $1,400,000.00; punitive damages; attorneys' fees; pre and post award interest at the statutory rate; all filing fees, hearing fees, and other FINRA arbitration costs; reimbursement of all other costs, including for Claimant's expert witness; and an Order that Sexton draft a corrective letter that may be sent to Claimant's past or current customers.

In the Statement of Answer to the Statement of Claim, Sexton requested that the claims against her be denied in their entirety, that all forum fees be awarded against Claimant, that she be awarded costs and attorneys' fees associated with responding to these claims, and that the Panel grant such other and further relief as it deems just and proper.

In the Statement of Answer to the Second Amended Statement of Claim, LPL requested that the claims be denied in all respects, that the Panel direct that all costs and assessments by FINRA be borne by Claimant and that LPL be awarded its preparation costs, travel expenses, attorneys' fees, expert witness fees, and such other further and general relief to which it may be entitled.

In the Statement of Answer to the Second Amended Statement of Claim, Sexton and Russo requested that the claims against them be denied in their entirety, that all forum fees be

awarded against Claimant, that Sexton and Russo be awarded costs and attorneys' fees associated with responding to these claims, and that the Panel grant such other and further relief as it deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

Russo did not file a properly executed Submission Agreement but is required to submit to arbitration pursuant to the Code of Arbitration Procedure ("Code") and, having answered the claim, appeared, and testified at the hearing, is bound by the determination of the Panel on all issues submitted.

On December 20, 2019, Claimant filed a Motion to Amend Statement of Claim, to which no response was filed. In an Order dated January 7, 2020, the Panel granted the Motion to Amend Statement of Claim.

On April 11, 2022, Claimant filed a Withdrawal of Claims Against LPL. Therefore, the Panel made no determination with respect to any of the relief requests against LPL contained in the Second Amended Statement of Claim.

At the evidentiary hearing on May 10, 2023, after Claimant's case-in-chief, Sexton and Russo moved for a directed verdict and requested an award of costs. In an Order dated May 15, 2023, the Panel granted Sexton and Russo's Motion for a Directed Verdict because the evidence presented was insufficient to meet the evidentiary standard for liability with respect to Sexton and there was no evidence presented by Claimant with respect to Russo. The Panel ordered briefing and oral argument on the request for costs.

On June 12, 2023, Sexton and Russo filed a Motion to Determine Amount of Attorneys' Fees and Costs. On June 17, 2023, Claimant filed an Opposition to Motion to Determine Amount of Attorneys' Fees and Costs.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims, including Claimant's request for expungement, are denied in their entirety.

2. Claimant is liable for and shall pay to Sexton and Russo the sum of $380,067.00 in attorneys' fees pursuant to *First Union Securities, Inc. v. Lorelli*, 168 N.C. App. 398 (2005) and *Prudential-Bache Securities, Inc. v. Tanner*, 72 F.3d 234 (1st Cir. 1995).

3. Claimant is liable for and shall pay to Sexton and Russo the sum of $28,372.00 in costs.

4. Claimant is liable for and shall pay to Sexton and Russo interest on the sums in Items #2 and #3 above at the rate of 8% per annum from the Date of Service of the Award through and including the date the Award is paid in full.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages and treble damages, are denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 2,000.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, LPL is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 3,025.00 |
| Member Process Fee | =$ | 6,175.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | | |
|---|---|---|
| October 21-23, 2020, postponement requested jointly by the parties | =$ | 1,400.00 |
| October 12-14, 2022, postponement requested jointly Claimant, Sexton, and Russo | | Waived |
| Total Postponement Fees | =$ | 1,400.00 |

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees jointly and severally to Respondents.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | =$ | 450.00 |
| Pre-Hearing Conference: November 3, 2021    1 session | | |

| Six (6) pre-hearing sessions with the Panel @ $1,400.00/session | | =$ | 8,400.00 |
|---|---|---|---|
| Pre-Hearing Conferences: January 7, 2020 | 1 session | | |
| June 29, 2021 | 1 session | | |
| March 24, 2022 | 1 session | | |
| December 15, 2022 | 1 session | | |
| March 14, 2023 | 1 session | | |
| April 10, 2023 | 1 session | | |

| Five (5) hearing sessions @ $1,400.00/session | | =$ | 7,000.00 |
|---|---|---|---|
| Hearings: May 9, 2023 | 2 sessions | | |
| May 10, 2023 | 2 sessions | | |
| June 27, 2023 | 1 session | | |

| Total Hearing Session Fees | =$ | 15,850.00 |
|---|---|---|

The Panel has assessed $11,425.00 of the hearing session fees to Claimant.

The Panel has assessed $2,325.00 of the hearing session fees jointly and severally to Respondents.

The Panel has assessed $2,100.00 of the hearing session fees jointly and severally to Sexton and Russo.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa Bass Morris | - | Public Arbitrator, Presiding Chairperson |
| Eric C. Chilton | - | Public Arbitrator |
| Rebecca Sofley Henderson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

*Lisa Bass Morris*                                          **07/17/2023**

Lisa Bass Morris                                          Signature Date
Public Arbitrator, Presiding Chairperson


*Eric C Chilton*                                          **07/18/2023**

Eric C. Chilton                                          Signature Date
Public Arbitrator


*Rebecca Sofley Henderson*                                **07/17/2023**

Rebecca Sofley Henderson                                Signature Date
Non-Public Arbitrator


Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


July 18, 2023

Date of Service (For FINRA Dispute Resolution Services use only)

# SFS LAW GROUP

Dennis O'Dea
11035 Golf Links Drive
No. 78588
Charlotte, NC 28277
Tel: 704-780-1544
Fax: 704-973-0043
*dennis.odea@sfslawgroup.com*

November 14, 2025

Robin Woodard
1113 Mountain Street
Kannapolis, NC 28681

Dear Mr. Woodard:

This letter will confirm that Robin Woodard ("You") has retained Dennis O'Dea, SFS Law Group (the "Firm") to provide legal advice and representation to You regarding the litigation against you in the case of Straight Path Real Estate Solutions v=LLC v Woodard et all in the Rowan /County Superior 24CVS342 in which a judgment was entered against after a summary judgment hearing. The Firm will review the history of the case and consider whether Richard Locklear provided competent representation and whether you may hold a claim for damages for legal malpractice against him. The Firm will also assist you in responding to the Judgment that will be entered against you and whether you have remedies to reduce the amount you must pay.

This Engagement Letter Agreement (the "Engagement Letter") sets forth the terms of engagement of the Firm, which is made in and shall be governed by the internal law of North Carolina, United States of America. You may request other services from the Firm for other matters that will also be governed by the terms of this Engagement Letter.

The fees for professional services provided by the Firm are currently calculated under a base hourly time value (the "Base Attorney Rate") for attention to and work on the engagement. Fees for paralegal services are currently calculated on a base hourly rate of $200.00 (the "Base Paralegal Rate") for attention to and work on the engagement. The Base Attorney Rate for Dennis O'Dea is $400.00. If any other attorney services are required, you will be charged at the Base Attorney Rate then in effect, which will be provided to you.

In addition to payment of fees for professional services, the Firm will separately charge all charges and expenses incurred in connection with the engagement. Charges and expenses will be identified in your statement. Statements (the "Statements") are usually issued monthly and are due fifteen days from their issue date. Prompt payment is an essential term of this agreement.

As a condition to providing the services requested under this Engagement Letter, the SFS Law Group requires payment of a retainer of $5,000.00 (the "Retainer"). The

# SFS LAW GROUP

Firm may apply and utilize the funds held in the Retainer to pay its fees, charges, and expenses as they arise from time to time or are incurred in representing and advising You. The Firm's Statements will include the amount, if any, necessary to maintain the Retainer balance at $5,000.00. At the conclusion of the engagement and payment of the fees, charges, and expenses due, the balance of any remaining retainer funds will be returned to You.

The Firm acknowledges that you have paid the $5,000 retainer.

The Firm appreciates the opportunity to represent You and assist You in this matter. Your execution of this Engagement Letter constitutes Your representation that You agree to the terms of the engagement set forth in this Engagement Letter.

This Engagement Letter Agreement may be executed in counterparts, each of which will be deemed to be original and all of which taken together constitute one and the same agreement.

Sincerely,

Dennis O'Dea

Accepted, Executed, and Agreed to as of November 14, 2025

_____
Robin Woodard

## DOCUMENT RETENTION POLICY DISCLOSURE

The Firm's document retention and file destruction policy, consistent with the relevant Rules of Professional Conduct or as otherwise agreed between You and the Firm, provides for the retention of the files relating to the engagement for a period of six (6) years following the termination of the engagement governed by this agreement (the "Retention Period"). At the end of that period (the "Disposition Date"), the files will be destroyed in a manner consistent with the relevant Rules of Professional Conduct. Should You wish to have the files delivered to You before the Disposition Date, please provide written notice of that desire to the SFS Law Group, Dennis O'Dea at the address set forth in this letter or such other address as may be provided to You by the Firm.

STATE OF NORTH CAROLINA          )          IN THE GENERAL COURT OF JUSTICE
                                 )                SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG            )
                                 )          FILE NUMBER: 25CV063076-590
                                 )
MARK JAMES DICKMAN,              )
Plaintiff,                       )
v.                               )
                                 )
JEREMY BARTELL                   )          AMENDED COMPLAINT AND JURY DEMAND
                                 )
and                              )
                                 )
BARTELL LAW PLLC                 )
DEFENDANTS                       )

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Mark James Dickman ("Mr. Dickman"), by and through undersigned counsel, hereby files this Amended Complaint and Jury Demand against Jeremy Bartell and Bartell Law PLLC (collectively, "Bartell Law") alleging legal malpractice. In furtherance thereof, Plaintiff states as follows:

## PARTIES

1.     Plaintiff, Mr. Dickman is a resident of Kentucky and has been working in the securities industry since 1992 and is currently a registered representative and investment advisor representative with IFP Securities, LLC (CRD #297287) and Independent Financial Partners (CRD #125112) in Crescent Springs, Kentucky. Mr. Dickman worked for LPL Financial LLC (CRD #6413) ("LPL") as a broker from 2010 to 2018 and as an investment advisor from 2010 to 2011.

2. Defendant Jeremy Bartell is a natural citizen residing in Virginia. Bartell is an attorney with a principal place of business licensed in the District of Columbia and Massachusetts

3. The Plaintiff is informed and believes that Defendant Bartell Law, PLLC, is a professional limited liability company licensed to practice law in the District of Columbia and Massachusetts..

4. Bartell represents financial advisors in Financial Industry Regulatory Authority (" FINRA") Investigations, Inquiries, and Exams (FINRA Rule 8210 letters), FINRA Arbitration (customer complaints and industry disputes); FINRA Brokercheck Expungement (complaints, criminal charges, FINRA Form U5 terminations); FINRA Form U4 disclosures (criminal charges, customer complaints, outside business activities and regulatory actions); securities employment disputes (compensation, promissory notes, and FINRA Form U5 terminations); and CFP Board Notices of Investigation, Complaints, Petitions, and ethics disclosures. EXH. A. BARTELL LAW WEBPAGE.

5. This case arises from the acts and omissions of Bartell which occurred in North Carolina during the arbitration hearing on Mr. Dickman's claims against the Defendants for their actions in North Carolina in issuing false and defamatory statements in several FIRA Form U5 termination notices.

### JURISDICTION/VENUE

6. This Court has subject matter jurisdiction as it has general subject matter jurisdiction, and this is not an action that falls under the exclusive federal jurisdiction or any other recognized exception. This Court has personal jurisdiction over Jeremy Bartell and Bartell Law, PLLC since all of the alleged acts and/or omissions of Jeremy Bartell and Bartell Law, PLLC occurred in this State. NC Gen Stat § 7A-240 (2022)

7. Venue is proper in this Court because all of the acts and/or omissions complained of herein occurred in Charlotte, Mecklenburg County, North Carolina. NC Gen Stat § 1-82The Plaintiff seeks damages in excess of the jurisdictional minimum

## **BACKGROUND**

8. "FINRA") is a private, not-for-profit, self-regulatory organization, which, among other things, regulates stockbrokers through its rules and regulations, including dispute resolution among Members and Associated Persons pursuant to FINRA's Code of Arbitration Procedure ("FINRA Rules").

9. The FINRA Rules require securities firms and registered representatives to disclose information regarding certain customer complaints against registered representatives.

10. FINRA maintains disclosures and other registration information of securities industry personnel in an electronic database known as the Central Registration Depository ("CRD").

11. Securities firms have access to and are required to review associated persons' full CRD record when making hiring or supervisory decisions.

12. FINRA associated persons' registration information and certain CRD disclosures, including customer complaints and Form U5 termination disclosures ("Form U5") are available to the public through FINRA's "BrokerCheck" program. FINRA requires a readily accessible link to BrokerCheck on all financial advisors' webpages.

## **FACTS**

13. Mr. Dickman worked for LPL Financial LLC ("LPL") as a FINRA registered broker from 2010 to 2018.

14. In March 2014, a former client of Mr. Dickman, Norbert Keissler, informed Mr. Dickman that he wished to name Mr. Dickman as a contingent beneficiary of a trust. Mr. Dickman immediately advised Mr. Keissler that this could not be done unless Mr. Keissler consulted counsel independently.

15. Mr. Keissler consulted with his attorney, Tom Kerr. Mr. Kerr is an attorney in Covington, Kentucky, who is very well known and respected. He served in the Kentucky House of Representatives, representing District 64 from 1985 to 2016. He still serves as counsel to the Kentucky Legislature. Mr. Kerr had been representing Mr. Keissler for many years. After such consultation, Mr. Keissler moved forward with naming Mr. Dickman as a contingent beneficiary of a trust.

16. In September 2018, Mr. Dickman was contacted by a United States Postal Service ("USPS") inspector who enquired as to Mr. Dickman's relationship with Mr. Keissler. The USPS also contacted Mr. Keissler and Mr. Kerr. Tom Kerr immediately provided them with an affidavit detailing the fact that Mr. Keissler had consulted with him, etc. and that the entire transaction was undertaken professionally and appropriately. EX. B. FEBRUARY 8, 2019, AFFIDAVIT OF TOM KERR. The USPS also contacted Mr. Dickman's employer, LPL.

17. Seemingly satisfied that the entire transaction was legitimate, the USPS, to the best of Mr. Dickman's knowledge, ceased its inquiry.

18. Following the inquiry from USPS, LPL reviewed the information about Mr. Keissler's designation of Mr. Dickman as a contingent beneficiary under Mr. Keissler 's trust created in 2014 and determined that Mr. Dickman should have disclosed that he was named as a contingent beneficiary to LPL in 2014.

4

19. On December 20, 2018, LPL terminated Mr. Dickman's employment since the failure to disclose that he was a contingent beneficiary under Mr. Kreissler's trust was a violation of LPL's policies and procedures.

20. When LPL terminated Mr. Dickman's employment, Mr. Dickman was also employed as an investment advisor by Independent Investment Advisors ("IAA").

21. When IAA learned of Mr. Dickman's termination from LPL, IAA also terminated him on December 20, 2018.

22. On the same date, IAA filed a required Form U-5 executed by Jessica N Sexton giving notice of Mr. Dickman's termination by IAA.

23. On or about December 20, 2018, Mr. Dickman became aware of defamatory statements made by Jessica N. Sexton (Ms. Sexton), his supervisor at LPL, relating to the transaction with Mr. Keissler.

24. Specifically, the defamatory statements were made on Dickman's U-5 form issued by IAA and signed by Ms. Sexton. On Mr. Dickman's U-5 form, Ms. Sexton had stated, wrongfully, that Mr. Dickman had engaged in fraud and the wrongful taking of property. Ex. C. DEFAMATORY U-5.

25. These defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure Report ("IAR Report").

26. The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating, falsely, that Mr. Dickman was discharged with reference to a "federal investigation" and also "some form of improper money movement of a client's funds". Ex. D. FINRA BROKER CHECK.

27. As a direct and proximate result of the defamatory statements made in Form U5, Mr. Dickman suffered devastating losses. These included damage to his personal and business

5

reputation, subjecting him to intense humiliation and impairing him from securing employment in the financial industry.

28. The financial practice he had built up over two decades came to a screeching halt, and he lost nearly every client at that time.

29. Most of his existing clients moved their assets away from Dickman to other financial advisers after Mr. Dickman was terminated by LPL and IAA and IAA issued the defamatory U5.

30. Mr. Dickman retained and engaged the Defendant on a fee-for-service basis and paid a retainer of $5,000.00 for Bartell's assistance in representing him in dealing with inquiries from the Securities and Exchange Commission and FINRA.

31. His resulting financial damages from the effect of December 20, 2018, IAA U5, and his efforts to correct it exceeded one million dollars.

32. The non-economic damages were life-altering.

33. While representing Mr. Dickman on the fee for services engagement, Bartell told Mr. Dickman that his claim for damages for the harm suffered due to the untrue defamatory statements in the IAA U-5 would entitle him to a large recovery if he filed suit against IAA and Ms. Sexton.

34. Mr. Bartell told Mr. Dickman that his claim against IAA was substantial and proposed that Mr. Dickman engage Bartell Law to sue for damages.

35. Mr. Bartell told Mr. Dickman that Bartell Law would not charge him a fee for legal services as it had in the two prior engagements, but would represent him under a contingent fee agreement, with legal fees being paid only from a successful suit or settlement.

36. Mr. Bartell told him that many lawsuits complaining of untruthful and defamatory statements in U5 reports have resulted in multi-million-dollar recoveries.

6

37. Based upon Mr. Dickman's contractual agreements with LPL and IAA his remedies for the claimed defamation were limited to FINRA Arbitration for claims against LPL and arbitration through the American Arbitration Association. Ex. E. ARBITRATION AGREEMENTS.

38. On or about that date, Defendant, Jeremy Bartell and Bartell Law, PLLC (collectively "Bartell Law") advertised online through the website "https://www.bartell-law.com". Bartell held himself out as an attorney experienced in FINRA arbitration. See Ex. A.

39. Following a review of Mr. Dickman's claims, Bartell advised Mr. Dickman that he believed Mr. Dickman had an extraordinarily compelling case for defamation against IAA, LPL, Sexton, and Russo.

40. Bartell stated to Mr. Dickman that his case was worth "millions of dollars", that he had significant experience in these types of cases, and that he would pursue the claim for him on a contingency fee basis. Bartell advised Dickman that his claim had a value in excess of $1 million. Ex. F. AMENDED STATEMENT OF CLAIM, PP 10-12.

41. Mr. Dickman and Bartell entered into a contingency fee agreement, which provided, in pertinent part…

   *a.* "you have agreed to hire Bartell Law ("the Firm") to pursue claims against Independent Advisor Alliance, LLC (CRD# 168267 / SEC# 801-78808) ("IAA") concerning disclosures IAA made through FINRA Form u5 filings, which ***we have reason to believe are defamatory …..***The attorney's fee shall be thirty (30%) of the gross recovery ("contingency fee"). Ex. G. AUGUST 11, 2019, CONTINGENCY FEE AGREEMENT (***Emphasis Added.)***

42. At no time did Bartell, his representatives, employees, or agents ever advise Mr. Dickman that in the event of a loss at arbitration, Mr. Dickman may be liable for attorney fees. To the contrary, throughout the entire process, before, during, and after the arbitration hearing that

followed, Bartell repeatedly assured Mr. Dickman that he would not be liable for attorney fees under North Carolina law.

43.     The specific issue of liability for attorney fees came up multiple times throughout the representation. Every time the issue was raised, Bartell advised Mr. Dickman - there is no way he could ever be responsible for attorney fees, citing what Bartell frequently called the "American rule".

44.     Bartell, on behalf of Mr. Dickman, filed a Statement of Claim with FINRA under FINRA Case Number 19-02406 on August 20, 2019. Therein, Bartell named Jessica Sexton as the Respondent, alleging a claim of defamation, without any citation to any particular state or federal law. See Ex. H. ORIGINAL STATEMENT OF CLAIM.

45.     On or about October 16, 2019, Ms. Sexton filed her Statement of Answer denying Mr. Dickman's allegations. Sexton was represented by Jonathan S. Robbins, Esq., an attorney licensed in Florida, and Shea B. Ward, Esq., an attorney licensed in North Carolina. Sexton argued that Mr. Dickman failed to state a defamation claim, failed to state a claim for punitive damages, and that even if there were a claim, Sexton had qualified immunity. Sexton's entire legal argument was based on North Carolina Law. Sexton requested that all claims be denied and that Mr. Dickman be held liable for costs and attorney fees.     EX. I.  RESPONDENT'S RESPONSE AND AFFIRMATIVE DEFENSES TO STATEMENT OF CLAIM

46.     In response, Mr. Dickman inquired about his exposure to attorney fees. Bartell reassured him that in no way could he ever be responsible for attorney fees under the "American rule".

47.     Bartell filed an Amended Statement of Claim on November 11, 2019, and again on December 20, 2019. Therein, Bartell added Robert Russo, who was at all relevant times Ms. Sexton's supervisor, and LPL Financial, who was Sexton's employer, as Respondents. Therein,

Bartell cited nine (9) FINRA arbitration awards for U-5 defamation, ranging from a few hundred thousand dollars to multi-million-dollar awards. *See* Ex. F.

48.     On or about May 1, 2020, LPL filed its Statement of Answer denying Mr. Dickman's allegations, citing North Carolina Law, requesting that all claims be denied, and again asking that Mr. Dickman be held liable for costs and attorney fees. Ex. J. RESPONSE AND AFFIRMATIVE DEFENSES TO SECOND AMENDED STATEMENT OF CLAIM.

49.     Mr. Dickman, again, inquired as to his exposure to attorney fees. Bartell, again, continued to reassure him that in no way could he ever be responsible for attorney fees under the "American rule".

50.     Throughout the entirety of this matter, Bartell repeatedly advised Mr. Dickman that this claim could be looked at as an "asset", that he would likely be the recipient of a multimillion-dollar award, and that there was no downside for Mr. Dickman.

51.     On or about April 11, 2022, Mr. Dickman resolved his claims against LPL. As a condition of the settlement, LPL agreed to provide three witnesses, Daniel Cruse, Ian Friment, and Brad Jacobs, to testify in support of Mr. Dickman's claims against Ms. Sexton. The settlement agreement with LPL specifically provided as follows:

> "LPL agrees to provide as witnesses at a final hearing of the Arbitration Action (if Claimant wants them), Daniel Cruse, Ian Frimet, and Brad Jacobs, provided they are still employed with LPL at the time of the hearing."

> Ex. K. LPL SETTLEMENT.

52.     On or about April 18, 2023, approximately three weeks before the hearing, Bartell filed his requisite "Pre-hearing Exchange, Witness List" identifying the witnesses that he would call in support of Mr. Dickman's claim. The witnesses identified by Bartell included:

a. Claimant Mark Dickman (in-person)
b. Respondent Sexton (in-person)

c. Respondent Russo (in-person)
d. Daniel Cruse–LPL Financial, Manager, Supervisor (video conference)
e. Ian Frimet–LPL Financial, Senior VP, Associate Counsel (video conference)
f. Brad Jacobs–LPL Financial, Senior VP, Associate General Counsel (video conference)
g. Alan J. Besnoff, CFPO̒ Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
h. Thomas R. Kerr, Esq.,732 Scott Street, Covington, Kentucky 41011
i. Tammy L. Dickman (Mr. Dickman's Wife)

Ex. L. DICKMAN VS. SEXTON, RUSSO AND LPL FINANCIAL LLC PREHEARING EXCHANGE, WITNESS LIST.

53. An arbitration hearing was held on May 10, 2023, in Charlotte, North Carolina.

54. In spite of the fact that each and every one of the above-identified witnesses was available, either in person or via videoconference, the only witnesses called by Bartell were Mr. Dickman, and Mr. Besnoff. He did not call Jessica Sexton (Respondent), Robert Russo (Respondent), Daniel Cruse, Ian Friment, Brad Jacobs, Thomas Kerr, or Tammy Dickman.

55. There is no conceivable strategic reason for Bartell's sudden decision not to call any of these witnesses. As indicated above and throughout the pleadings in the FINRA case, each of these witnesses played a crucial role in establishing Mr. Dickman's defamation claims. Sexton and Russo were the Respondents who falsely published defamatory material. Cruse, Frimet, and Jacobs were settling. Co-defendants – Senior Vice Presidents, General Counsel, and Managers at LPL Financial would have testified consistent with their settlement agreement, supporting Mr. Dickman's claims. Thomas Kerr would have provided testimony to the panel regarding the legality of the underlying transaction with Mr. Keissler. Ex. M. APRIL 29, 2024, AFFIDAVIT OF TOM KERR. Kerr was available. Ex. N. EMAIL CONFIRMING KERR'S AVAILABILITY.

56. Despite the Defendants' request for dismissal during and at the close of the cross-examination of Mr. Dickman, claiming that his testimony did not support his claims and notice that the Defendants would renew the motion at the close of his case, Bartell failed to offer any

10

other witnesses to establish the Defendants' liability to Mr. Dickman for the harm he suffered. When Mr. Bartell called Alan Besnof as Mr. Dickman's expert witness to testify, he agreed with the Defendants that his expert's testimony was not offered to address the actions of the Defendants in the submission and preparation of the Form U5 but rather on the interpretation of the contents of the U5 by the public and others. The witness was offered to support the damage claim, not the grounds for a finding of liability by those damages.

57. After the testimony of Mr. Dickman and the expert, Mr. Bartell said he would call no further witnesses and rested his case. He said he may call witnesses in rebuttal after the Defendants presented their case.

58. At the close of his case, the hearing panel ruled that Mr. Bartell had failed to offer evidence supporting the claim that Mr. Russo defamed Mr. Dickman.

59. Despite arguing that neither Ms. Sexton nor Mr. Russo had a qualified privilege in the submission of Forms U5 and that malice was presumed because they did not conduct sufficient investigation to learn the correct facts despite having the means at hand to do so, he did not call Ms. Sexton to the stand to testify.

60. Ms. Sexton was physically present during the hearing but was never called. Just what Ms. Sexton did or did not do was never addressed in testimony, to provide evidence in support of the required finding of malice required to support Mr. Dickman's claim.

61. The claim that Ms. Sexton had not conducted an appropriate investigation to support the information she submitted on the U5 required her examination before the board to establish the claim. Mr. Bartell knew the necessity of calling Ms. Sexton but inexplicably failed to call her despite the extensive claims he made in the statements of claim filed in the case.

62. Despite securing LPL's agreement that it would make three of its employees available to testify and include them on the proposed list of witnesses, Mr. Bartell did not call any

of them to testify under the erroneous and ill-conceived assumption that the pending motion for a directed verdict that was still before the hearing board would not be granted, and that he would cross-examine witnesses offered by the Defendants and submit rebuttal testimony.

63. Mr. Bartell exhibited confusion and distress in his conversation with Mr. Dickman during the various breaks during the hearing. His failure to call these critical witnesses was not a strategic decision.

64. With a pending motion to dismiss his case following the testimony of Mr. Dickman, the first witness he called, Mr. Bartell, was reckless in ending his case in chief with only one more witness, a damages expert.

65. He failed to exercise due care and ordinary competence in neglecting to call Ms. Sexton, Mr. Russo, and the other witnesses he had planned to call to testify in his case in chief. His sudden decision to rest his case without calling the necessary witnesses and his comment that he would call them as rebuttal witnesses made no sense and left Mr. Dickman's case unfinished.

66. It was negligent to close his case without fully presenting it since a summary judgment and the absence of any witness testimony from the defendants foreclosed an offer of rebuttal witnesses.

67. At one point during a break in the proceedings, Mr. Dickman specifically asked Bartell, yet again, could he be responsible for attorney fees. Bartell replied unequivocally that the answer to that question was "no". He stated to Mr. Dickman that under the "American rule", and under North Carolina Law, Mr. Dickman had no exposure to a potential order to pay attorney fees.

68. Bartell's case in chief consisted solely of the testimony of Mr. Dickman, as well as Mr. Besnoff. Following Bartells' case in chief, the Defendants moved for a directed verdict. The arbitration panel granted the motion for a directed verdict in an Order dated May 15, 2023.

69.     Bartell made no effort to reopen his case and offer any witnesses after the arbitration panel announced the granting of the directed verdict.

70.     The failure of Bartell to present the evidence he forecast in his opening statement in support of the statements of claim he filed in the case, resulted in the denial of his claim for damages.

71.     The statements of claim submitted by Bartell and the forecast of evidence in his opening statement set forth sufficient allegations of fact and law to entitle Mr. Dickman to a judgment for over one million dollars.

72.     Bartell submitted a damage exhibit showing the calculation of a damage claim of $1,100,078, which was an accurate calculation of the damages suffered by Mr. Dickman and which he should have been awarded in the arbitration. Ex H R. Sheet A Dickman Damage Summary.

73.     On June 12, 2023, the Respondents submitted a request for attorney fees. Contained therein were the various arguments for attorney fees, based on North Carolina law. Ex. O. RESPONDENT'S MOTION TO DETERMINE  AMOUNT OF ATTORNEY FEES AND COSTS.(EXHIBITS OMITTED)

74.     On June 17, 2023, Bartell submitted its opposition to attorney fees. Therein, citing North Carolina law extensively. EX. P. CLAIMANT'S OPPOSITION TO RESPONDENT'S MOTION FOR COSTS.

75.     On July 18, 2023, FINRA issued the Award, awarding Ms. Sexton and Mr. Russo attorneys' fees in the amount of $380,067.00, costs in the amount of $28,372.00, and interest at the rate of 8%. EX. Q. AWARD.

76. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in excess of $400,000.00 in attorney fees.

77. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in the loss of his arbitration matter as to his defamation claims.

78. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced hereinabove, Mr. Dickman has incurred damages in the form of his additional attorney fees and costs.

79. As a direct and proximate result of the acts and/or omissions of Bartell Law as referenced herein above, Mr. Dickman has incurred damages in the form of ongoing mental anguish, pain, and suffering.

NOW THEREFORE, Mr. Dickman alleges the following counts against the Defendants named herein:

### COUNT ONE
### NEGLIGENCE
### Failure to Call Material Witnesses

A. Plaintiff fully incorporates by reference paragraphs 1 through 47 as if written fully herein.

B. Bartell Law had a duty to the Plaintiff to exercise reasonable diligence in the handling and prosecution of Plaintiff's claim.

C. Bartell breached that duty by failing to call witnesses critical to the case. These included the two Respondents who were responsible for the claimed defamation, the three supporting witnesses who had, as a condition of their settlement, agreed to testify on Mr. Dickman's behalf, Thomas Kerr, the attorney for Mr. Keissler who would have testified as to the legitimacy of the underlying transaction, and Tammy Dickman, who would have testified as to the damages incurred.

D. As a direct and proximate result of Bartell's breach, Mr. Dickman has incurred damages, in excess of this court's minimum jurisdiction.

<div align="center">

**C**OUNT **T**WO
**NEGLIGENCE**
**Failure To Warn**

</div>

A. The Plaintiff fully incorporates by reference paragraphs 1 through 47, as if written fully herein.

B. Bartell Law had a common law duty to inform Mr. Dickman of the risks involved in pursuing the FINRA arbitration award, including the duty to warn Mr. Dickman that he may be liable for attorney fees.

C. The Rules of Professional Conduct in North Carolina, Washington, D.C, and Massachusetts, clearly imposed a duty upon Bartell Law to fully explain the risks and ramifications of moving forward in litigation with Mr. Dickman.

D. Bartell breached these duties.

E. As a direct and proximate result of Bartell's breach, Mr. Dickman has incurred damages in excess of this court's minimum jurisdiction.

<div align="center">

**C**OUNT **T**HREE
**Fraud/Misrepresentation**

</div>

A. Plaintiff fully incorporates by reference, paragraphs 1 through 47 as if written fully herein.

B. By Bartell's own account, he believed he had a shot at a significant contingency fee based upon a multimillion-dollar award at the FINRA arbitration.

C. As an experienced FINRA litigator, Bartell knew that Dickman could potentially be liable for attorney fees at the final arbitration.

D. Bartell knew that had Dickman been informed of the potential for liability for attorney fees he likely would not have moved forward with the FINRA claim.

E. Bartell made false representations to Mr. Dickman regarding his liability or potential liability for attorney's fees.

F.  Bartell concealed this material fact so as to give himself a reasonable chance at a significant monetary award.

G.  This concealment by Bartell was reasonably calculated to deceive Mr. Dickman.

H.  This concealment did, in fact, deceive Mr. Dickman as he had every reason to believe that Bartell was a competent FINRA attorney and that Bartell had communicated all the risks involved to him.

I.  As a direct result of this calculated deception, Mr. Dickman incurred damages in the form of attorney fees and costs exceeding $400,000.00.

WHEREFORE, Plaintiff requests the following relief:

A.  that the court award him compensatory damages as discussed here and above:

B.  that the court award him the attorney fees costs, pre- and post-judgment interest, and any other compensation this Court deems justified;

C.  that the court award him punitive damages based upon the deliberate fraud and misrepresentation

This the fifth day of January 2026

Respectfully Submitted

Mark James Dickman

By his attorneys

/s/Dennis O'Dea

Dennis O'Dea
NC Bar 35072
SFS Law Group
6416 Rea Road
Suite B7 78588
Charlotte, NC 28277
(704) 780-1544
dennis.odea@sfslawgroup.com

# EXHIBIT A



**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

Practice Areas ▸

About Jeremy L. Bartell

Our Approach   Home

Contact Us

# About Jeremy L. Bartell



Jeremy L. Bartell

Legal Experience

Bingham McCutchen LLP, Counsel, Broker-Dealer Group, Boston, 2004-2010.

Goodwin Procter LLP, Litigation Associate, Boston, 2001-2004.

Massachusetts Appeals Court, Judicial Clerk, Justice Raya Dreben, Boston, 2000-2001.

Education

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 189 of 343

**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

Practice Areas ▸

About Jeremy L. Bartell

Our Approach   Home

Contact Us

Certified Regulatory and Compliance Professional (CRCP®), FINRA Institute, Georgetown University, 2024.

Admissions

## Jeremy L. Bartell, J.D., CRCP®

Jeremy L. Bartell is a financial services attorney with 23 years of experience, including 10 years with two major national law firms. He has extensive experience representing many of the nation's largest broker-dealers and investment advisers in FINRA arbitration, FINRA and SEC regulatory investigations, disciplinary actions, employment disputes and registration and disclosure matters. Jeremy currently focuses on representing individual financial advisors, including registered representives, investment adviser representatives, managers and other financial professionals in FINRA inquiries, investigations, exams and disciplinary hearings; FINRA expungements; FINRA customer and industry arbitrations; employment disputes; Form U4 disclosures matters; FINRA eligibility hearings, and investigations and hearings before the Certified Financial Planner Board of Standards.

### Background and Education

Jeremy is a veteran of the U.S. Army with service in Germany and in Saudi Arabia, Iraq and Kuwait during the Gulf War. He graduated with a B.S., *summa cum laude*, in Business

**BARTELL LAW PLLC**
DEFENDING FINANCIAL PROFESSIONALS

Practice Areas ▸

About Jeremy L. Bartell

Contact Us

Our Approach   Home

Jeremy was a litigation associate at Goodwin Procter LLP, defending financial institutions and corporations in a variety of complex commercial litigation. From 2004 to 2010, Jeremy was an associate and later Counsel in the Broker-Dealer Group at Bingham McCutchen LLP, where he focused on defending national broker-dealers, registered investment advisers, and individual financial professionals in FINRA arbitration, and in SEC and FINRA Investigations and disciplinary actions. Jeremy also holds the Certified Regulatory and Compliance Professional (CRCP®) designation from the FINRA Institute at Georgetown University. He is admitted in the District of Columbia and Massachusetts.

## FINRA Inquiries, Investigations and Disciplinary Actions

Jeremy regularly represents financial advisors in FINRA inquiries and investigations. He has also defended national broker-dealers in a number of state and federal regulatory investigations, regulatory sweeps, and administrative actions, including those by the SEC, FINRA, state securities regulators and state attorneys general. He has, for example, handled matters concerning:

- Unsuitable recommendations
- Unauthorized trading;
- Failure to disclose or update Form U4;
- Selling away;

https://www.bartell-law.com/about-us

# EXHIBIT B

## AFFIDAVIT OF THOMAS KERR

Comes now the Affiant, Thomas Kerr, and after having been duly sworn states as follows:

1. My name is Thomas Kerr. I have practiced law in Northern Kentucky since 1977. I also served as State Representative in the Kentucky General Assembly representing the 64th Legislative District from 1985 to 2016. I now serve as Chief of Staff and General Counsel for the Kentucky Justice and Public Safety Cabinet.

2. I have represented Norbert and Bonnie Keissler since 2000, and with Norbert's parents prior to that since 1997.

3. In August of 2014, Norbert and Bonnie Keissler voluntarily came to my office and advised me that they wanted to make Mark Dickman the beneficiary and contingent trustee of their family trust.

4. The Keisslers' decision was made on their own with no undue influence from Mark Dickman, as far as I knew. At the time they appeared to be mentally competent and of sound mind.

5. The Keisslers had/have no children. The natural heirs to their estate would have been Bonnie's siblings and Norbert's brother-in-law.

6. The Keisslers had apparently had a falling out with these family members and specifically requested that I exclude them from being heirs to any of their estate, requesting that they be entirely excluded from ever receiving any funds from their estate. Bonnie Keissler has since died.

7. Norbert Keissler called me in early October 2018, and explained that US Postal investigators had called him, followed by an unannounced visit. Mr. Keissler informed me that the USPS was apparently investigating Mark Dickman for allegedly victimizing Mr. Keissler.

8. Norbert Keissler met with me in early October 2018. He requested that I contact the USPS investigators, and advise them that Keissler was fully aware of any and all transactions he had done was of sound mind, and that he was never victimized by Mark Dickman.

9. On October 18, 2018, I specifically met with the USPS Investigators and advised them that I was Norbert Keissler's attorney. I advised them that I was aware of his estate plan and his designation of beneficiaries, that Norbert Keissler voluntarily determined the beneficiaries of his estate, and that he was of sound mind.

10. Throughout this time, Norbert Keissler has acted on his own, with my advice, and was and is, as of this date, of sound mind. As his attorney and as his estate planner, I have never seen any evidence of any mental defect.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
**THOMAS KERR**

**COMMONWEALTH OF KENTUCKY**
**COUNTY OF KENTON**

The above affidavit was acknowledged and signed before me, a notary public, by **THOMAS KERR**, this _8_ day of February, 2019.

_____
NOTARY PUBLIC, STATE AT LARGE

My Commission Expires: _3-31-2022_      NOTARY ID# _597204_

# EXHIBIT C

**INDEPENDENT ADVISOR ALLIANCE, LLC(168267)**

**Individual Name: DICKMAN, MARK JAMES (2066229)**

**Rev. Form U5 (05/2009)**

**U5 Full - Filing ID: 50630681**

**Filing Date: 12/20/2018**

### NOTICE TO THE INDIVIDUAL WHO IS THE SUBJECT OF THIS FILING

Even if you are no longer registered you continue to be subject to the jurisdiction of regulators for at least two years after your registration is terminated and may have to provide information about your activities while associated with this firm. Therefore, you must forward any residential address changes for two years following your termination date or last Form U5 amendment to: CRD Address Changes, P.O. Box 9495, Gaithersburg, MD 20898-9495.

## 1. General Information

| First Name: | Middle Name: | Last Name: | Suffix: |
|---|---|---|---|
| MARK | JAMES | DICKMAN | |

| *Firm* CRD #: | *Firm* Name: | *Firm* NFA #: | |
|---|---|---|---|
| 168267 | INDEPENDENT ADVISOR ALLIANCE, LLC | | |

| Individual CRD #: | Individual SSN: | Individual NFA #: | *Firm* Billing Code: |
|---|---|---|---|
| 2066229 | xxx-xx-xxxx | | |

**Office of Employment Address:**

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| | | | 509 Centre View Blvd. Crestview Hills, KY 41017 United States | No | Located At | 12/10/2018 | 12/20/2018 |

## 2. Current Residential Address

| From | To | Street Address |
|---|---|---|
| 07/2015 | PRESENT | 40 LINDEN HILL DR CRESCENT SPRINGS, KY 41017 United States |

## 3. Full Termination

**Is this a *FULL TERMINATION*?** ⦿ **Yes** ○ **No**

Note: A "Yes" response will terminate ALL registrations with all SROs and all *jurisdictions*.

**Reason for Termination:** Discharged

**Termination Explanation:**

If the Reason for Termination entered above is Permitted to Resign, Discharged or Other, provide an explanation below:

Our firm has limited information but we were notified by LPL Financial on 12/12/2018 that the advisor is currently undergoing a federal investigation for improper money movement of a client's funds. LPL Financial indicated they were reaching out to the advisor for some additional information and a determination was made on 12/20/2018 to terminate the relationship with LPL Financial. After further discussion with LPL Financial IAA has also made the determination that the advisor should be terminated.

## 4. Date of Termination

### Date Terminated (MM/DD/YYYY): 12/20/2018

A complete date of termination is required for *full termination*. This date represents the date the *firm* terminated the individual's association with the *firm* in a capacity for which registration is required.

For *partial termination*, the date of termination is only applicable to post-dated termination requests during the renewal period.

Notes: For *full termination*, this date is used by *jurisdictions*/SROs to determine whether an individual is required to requalify by examination or obtain an appropriate waiver upon reassociating with another *firm*.

The *SRO/jurisdiction* determines the effective date of termination of registration.

## 6. Affiliated Firm Termination

Is this a *multiple termination* with one or more *firms affiliated* with the *filing firm*?
If "yes" to the above question and the termination requests for the *filing firm* are identical to the termination requests of each *affiliated firm*, then mark the same termination request for each affiliate. If the termination requests of the *affiliated firm(s)* differ from those of the *filing firm*, complete the *SRO* and/or *jurisdiction* sections for each *affiliated firm*.

C Yes    C No

## 7. Disclosure Questions

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IN SECTION 7 IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S). IF THE INFORMATION IN SECTION 7 HAS ALREADY BEEN REPORTED ON FORM U4 OR FORM U5, DO NOT RESUBMIT DRPs FOR THESE ITEMS. REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALICIZED WORDS.

**Disclosure Certification Checkbox (optional):** ☐

By selecting the Disclosure Certification Checkbox, the *firm* certifies that (1) there is no additional information to be reported at this time; (2) details relating to Questions 7A, 7C, 7D and 7E have been previously reported on behalf of the individual via Form U4 and/or amendments to Form U4 (if applicable); and (3) updated information will be provided, if needed, as it becomes available to the *firm*. Note: Use of "Disclosure Certification Checkbox" is optional

### Investigation Disclosure

|  | Yes | No |
|---|---|---|

**7A.** Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or *self-regulatory organization* with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.)

⦿ Yes    C No

### Internal Review Disclosure

|  | Yes | No |
|---|---|---|

**7B.** Currently is, or at termination was, the individual under internal review for fraud or wrongful taking

C Yes    ⦿ No

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 197 of 343

of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct?

## Criminal Disclosure

|  | Yes | No |
|---|---|---|
| **7C.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual: | | |
| **1.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to any *felony*? | ○ | ◉ |
| **2.** *charged* with any *felony*? | ○ | ◉ |
| **3.** convicted of or did the individual plead guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving*: investments or an *investment-related* business, or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| **4.** *charged* with a *misdemeanor* specified in 7(C)(3)? | ○ | ◉ |

## Regulatory Action Disclosure

|  | Yes | No |
|---|---|---|
| **7D.** While employed by or associated with your *firm*, or in connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual *involved* in any *disciplinary action* by a domestic or foreign governmental body or *self-regulatory organization* (other than those designated as a "*minor rule violation*" under a plan approved by the U.S. Securities and Exchange Commission) with jurisdiction over the *investment-related* businesses? | ○ | ◉ |

## Customer Complaint/Arbitration/Civil Litigation Disclosure

|  | Yes | No |
|---|---|---|
| **7E. 1.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual named as a respondent/defendant in an *investment-related*, consumer-initiated arbitration or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations* and which: | | |
| **(a)** is still pending, or; | ○ | ◉ |
| **(b)** resulted in an arbitration award or civil judgment against the individual, regardless of amount, or; | ○ | ◉ |
| **(c)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or; | ○ | ◉ |
| **(d)** was settled, on or after 05/18/2009, for an amount of $15,000 or more? | ○ | ◉ |
| **2.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated (written or oral) complaint, which alleged that the individual was *involved* in one or more *sales practice violations*, and which | | |
| **(a)** was settled, prior to 05/18/2009, for an amount of $10,000 or more, or; | ○ | ◉ |
| **(b)** was settled, on or after 05/18/2009, for an amount of $15,000 or more? | ○ | ◉ |
| **3.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under questions 7(E)(2) above, which: | | |
| **(a)** would be reportable under question 14I(3)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or | ○ | ◉ |

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 198 of 343

**(b)** would be reportable under question 14I(3)(b) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*.

    ○    ◉

### Answer questions (4) and (5) below only for arbitration claims or civil litigation filed on or after 05/18/2009

**4.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an *investment-related*, consumer-initiated, arbitration claim or civil litigation which alleged that the individual was *involved* in one or more *sales practice violations*, and which:

     **(a)** was settled for an amount of $15,000 or more, or;      ○    ◉

     **(b)** resulted in an arbitration award of civil judgment against any named respondent(s)/defendant(s), regardless of amount?      ○    ◉

**5.** In connection with events that occurred while the individual was employed by or associated with your *firm*, was the individual the subject of an investment-related, consumer-initiated, arbitration claim or civil litigation not otherwise reported under question 7E(4) above, which:

     **(a)** would be reportable under question 14I(5)(a) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*; or      ○    ◉

     **(b)** would be reportable under question 14I(5)(b) on Form U4, if the individual were still employed by your *firm*, but which has not previously been reported on the individual's Form U4 by your *firm*.      ○    ◉

### Termination Disclosure

                   **Yes No**

**7F.** Did the individual voluntarily *resign* from your *firm*, or was the individual discharged or permitted to *resign* from your *firm*, after allegations were made that accused the individual of:

     **1.** violating *investment-related* statutes, regulations, rules or industry standards of conduct?      ◉    ○

     **2.** fraud or the wrongful taking of property?      ◉    ○

     **3.** failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct?      ○    ◉

---

## 8. Signature

Please Read Carefully

All signatures required on this Form U5 filing must be made in this section.

A "Signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

8A. FIRM ACKNOWLEDGMENT

     This section must be completed on all U5 form filings submitted by the *firm*.

8B. INDIVIDUAL ACKNOWLEDGMENT AND CONSENT

     This section must be completed on amendment U5 form filings where the individual is submitting changes to Part II of the INTERNAL REVIEW DRP or changes to Section 2 (CURRENT RESIDENTIAL ADDRESS).

### 8A. FIRM ACKNOWLEDGMENT

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 199 of 343

I VERIFY THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN AND WITH THIS FORM.

**Person to contact for further information**

Jessica Sexton

**Telephone # of person to contact**

9803185425

**Signature of *Appropriate Signatory***

Jessica Sexton

**Signature** _____

**Date (MM/DD/YYYY)**

12/20/2018

---

## Criminal DRP

No Information Filed

## Customer Complaint DRP

No Information Filed

## Internal Review DRP

No Information Filed

## Investigation DRP

---

This Disclosure Reporting Page is an ⊙ **INITIAL** or ○ **AMENDED** response to report details for affirmative response(s) to ***Question(s) 7A*** on Form U5;

**Check the question(s) you are responding to, regardless of whether you are answering the question(s) "yes" or amending the answer(s) to "no":**

**Investigation**                                          Rev. DRP (05/2009)

☑ **7A**

Click here to view question text

Complete this DRP only if you are answering "yes" to Item 7(A) to report an *investigation. Complete a Regulatory Action DRP if you answered "yes" to item 7(A) and are reporting details of either a pending or final proceeding. If you have been notified that the investigation has been concluded without formal action, complete items 4 and 5 of this DRP to update. One event may result in more than one investigation. If more than one authority is investigating, use a separate DRP to provide details.*

1.  *Investigation initiated by:*

    A. Notice Received From (select appropriate item):

    ○ *SRO*   ○ *Foreign Financial Regulatory Authority*   ○ *Jurisdiction*

    ○ SEC   ○ *Other Federal Agency*   ⊙ Other

    B. Full name of regulator (other than SEC) that initiated the *investigation*:
    LPL Financial

2.  Notice Date (MM/DD/YYYY):

    12/12/2018 ⊙ Exact   ○ Explanation

https://crd.firms.finra.org/FRM/PrintHist/U5/U5H_AllSections.aspx?FilingPk=50630681&RL=                                          5/7

If not exact, provide explanation:

3.  Describe briefly the nature of the *investigation*, if known. (Your information must fit within the space provided.):
    We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.

4.  Is *investigation* pending?  ⦿ Yes  ○ No
    If no, complete item 5. If yes, skip to item 6.

5.  Resolution Details:

    A. Date Closed/Resolved (MM/DD/YYYY):

    ○ Exact  ○ Explanation
    If not exact, provide explanation:

    B. How was *investigation* resolved? (select appropriate item):

    ○ Closed Without Further Action

    ○ Closed – Regulatory Action Initiated

    ○ Other:

6.  Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the *investigation*, as well as the current status or final disposition and/or finding(s). Your information must fit within the space provided.

    We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor.

---

**Regulatory Action DRP**

No Information Filed

**Termination DRP**

---

This Disclosure Reporting Page is an  ⦿ **INITIAL** or  ○ **AMENDED**  response to report details for affirmative response(s) to **Question(s) 7F** on Form U5;

**Check the question(s) you are responding to, regardless of whether you are answering the question(s) "yes" or amending the answer(s) to "no":**

|  | **Termination** | Rev. DRP (05/2009) |
|---|---|---|
| ☑ 7F(1) | ☑ 7F(2) | ☐ 7F(3) |

**Click here to view question text**

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to the same termination.

1.  Firm Name:
    Independent Advisor Alliance

2.  Termination Type:
    Discharged

3.  Termination Date:

    12/20/2018  ⦿ Exact  ○ Explanation

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 201 of 343

If not exact, provide explanation:

4. Allegation(s):
We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.

5. Product Type(s): (select all that apply)

| | | |
|---|---|---|
| ☐ No Product | ☐ Derivative | ☐ Mutual Fund |
| ☐ Annuity-Charitable | ☐ Direct Investment-DPP & LP Interests | ☐ Oil & Gas |
| ☐ Annuity-Fixed | ☐ Equipment Leasing | ☐ Options |
| ☐ Annuity-Variable | ☐ Equity Listed (Common & Preferred Stock) | ☐ Penny Stock |
| ☐ Banking Products (other than CDs) | ☐ Equity-OTC | ☐ Prime Bank Instrument |
| ☐ CD | ☐ Futures Commodity | ☐ Promissory Note |
| ☐ Commodity Option | ☐ Futures-Financial | ☐ Real Estate Security |
| ☐ Debt-Asset Backed | ☐ Index Option | ☐ Security Futures |
| ☐ Debt-Corporate | ☐ Insurance | ☐ Unit Investment Trust |
| ☐ Debt-Government | ☐ Investment Contract | ☐ Viatical Settlement |
| ☐ Debt-Municipal | ☐ Money Market Fund | ☑ Other: We were informed it was an annuity but have limited details as to the type and aren't sure if this is the only account involved. |

6. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the termination. Your information must fit within the space provided.
We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor.

© 2019 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.
Privacy | Legal | Terms & Conditions

# EXHIBIT D



www.adviserinfo.sec.gov

Investment Adviser Representative Public Disclosure Report

# MARK JAMES DICKMAN

CRD# 2066229

Report #47332-68934, data current as of Monday, January 28, 2019.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Qualifications | 2 - 3 |
| Registration and Employment History | 4 |
| Disclosure Information | 5 |



**IAPD Information about Investment Adviser Representatives**

IAPD offers information on all current-and many former-Investment Adviser Representatives. Investors are strongly encouraged to use IAPD to check the background of Investment Adviser Representatives before deciding to conduct, or continue to conduct, business with them.

- **What is included in a IAPD report?**
- IAPD reports for individual Investment Adviser Representatives include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards.

- It is important to note that the information contained in an IAPD report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**
- The information contained in IAPD comes from the Investment Adviser Registration Depository (IARD) and FINRA's Central Registration Depository, or CRD®, (see more on CRD below) and is a combination of:

  - o information the states require Investment Adviser Representatives and firms to submit as part of the registration and licensing process, and
  - o information that state regulators report regarding disciplinary actions or allegations against Investment Adviser Representatives.
  - o
- **How current is this information?**
- Generally, Investment Adviser Representatives are required to update their professional and disciplinary information in IARD within 30 days.

- **Need help interpreting this report?**
- For help understanding how to read this report, please consult NASAA's IAPD Tips page http://www.nasaa.org/IAPD/IARReports.cfm.

- **What if I want to check the background of an Individual Broker or Brokerage firm?**
- To check the background of an Individual Broker or Brokerage firm, you can search for the firm or individual in IAPD. If your search is successful, click on the link provided to view the available licensing and registration information in FINRA's BrokerCheck website.

- **Are there other resources I can use to check the background of investment professionals?**
- It is recommended that you learn as much as possible about an individual Investment Adviser Representative or Investment Adviser firm before deciding to work with them. Your state securities regulator can help you research individuals and certain firms doing business in your state. The contact information for state securities regulators can be found on the website of the North American Securities Administrators Association http://www.nasaa.org.



# Investment Adviser Representative Report Summary

## MARK JAMES DICKMAN (CRD# 2066229)

The report summary provides an overview of the Investment Adviser Representative's professional background and conduct. The information contained in this report has been provided by the Investment Adviser Representative, investment adviser and/or securities firms, and/or securities regulators as part of the states' investment adviser registration and licensing process. The information contained in this report was last updated by the Investment Adviser Representative, a previous employing firm, or a securities regulator on **01/11/2019**.

## CURRENT EMPLOYERS

This individual is not currently registered as an Investment Adviser Representative.

## QUALIFICATIONS

This individual is not currently registered as an Investment Adviser Representative.

**Note:** Not all jurisdictions require IAR registration or may have an exemption from registration.
Additional information including this individual's qualification examinations and professional designations is available in the Detailed Report.

## REGISTRATION HISTORY

This Investment Adviser Representative was previously registered with the following Investment Adviser firms:

| FIRM (IARD#) - LOCATION | REGISTRATION DATES |
|---|---|
| INDEPENDENT ADVISOR ALLIANCE, LLC (IARD# 168267) - Crestview Hills, KY | 12/10/2018 - 12/20/2018 |
| INDEPENDENT FINANCIAL PARTNERS (IARD# 125112) - Crestview Hills, KY | 10/11/2018 - 12/07/2018 |
| INDEPENDENT FINANCIAL PARTNERS (IARD# 125112) - CRESTVIEW HILLS, KY | 03/01/2011 - 10/10/2018 |

For additional registration and employment history details as reported by the individual, refer to the Registration and Employment History section of the Detailed Report.

## DISCLOSURE INFORMATION

Disclosure events include certain criminal charges and convictions, formal investigations and disciplinary actions initiated by regulators, customer disputes and arbitrations, and financial disclosures such as bankruptcies and unpaid judgments or liens.

Are there events disclosed about this Investment Adviser Representative?     **Yes**

The following types of events are disclosed about this Investment Adviser Representative:

| Type | Count |
|---|---|
| Investigation | 1 |
| Customer Dispute | 1 |
| Termination | 2 |

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.


## Investment Adviser Representative Qualifications

### REGISTRATIONS

This section provides the states and U.S. territories in which the Investment Adviser Representative is currently registered and licensed, the category of each registration, and the date on which the registration became effective. This section also provides, for each firm with which the Investment Adviser Representative is currently employed, the address of each location where the Investment Adviser Representative works.

This individual is not currently registered as an Investment Adviser Representative.

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.




## Investment Adviser Representative Qualifications

### PASSED INDUSTRY EXAMS

This section includes all required state securities exams that the Investment Adviser Representative has passed. Under limited circumstances, an Investment Adviser Representative may attain registration after receiving an exam waiver based on a combination of exams the Investment Adviser Representative has passed and qualifying work experience. Likewise, a new exam requirement may be grandfathered based on an Investment Adviser Representative's specific qualifying work experience. Exam waivers and grandfathering are not included below.

This individual has passed the following exams:

| Exam | Category | Date |
|---|---|---|
| Uniform Securities Agent State Law Examination (S63) | Series 63 | 11/18/1993 |
| Uniform Investment Adviser Law Examination (S65) | Series 65 | 05/30/2006 |

### PROFESSIONAL DESIGNATIONS

This section details that the Investment Adviser Representative has reported **0** professional designation(s).

No information reported.



www.adviserinfo.sec.gov

# Investment Adviser Representative Registration and Employment History

## PREVIOUSLY REGISTERED WITH THE FOLLOWING INVESTMENT ADVISER FIRMS

This section indicates that state registration records show this Investment Adviser Representative previously held registrations with the following firms:

| Registration Dates | Firm Name | IARD# | Branch Location |
|---|---|---|---|
| 12/10/2018 - 12/20/2018 | INDEPENDENT ADVISOR ALLIANCE, LLC | 168267 | Crestview Hills, KY |
| 10/11/2018 - 12/07/2018 | INDEPENDENT FINANCIAL PARTNERS | 125112 | Crestview Hills, KY |
| 03/01/2011 - 10/10/2018 | INDEPENDENT FINANCIAL PARTNERS | 125112 | CRESTVIEW HILLS, KY |
| 08/03/2010 - 05/11/2011 | LPL FINANCIAL LLC | 6413 | CRESTVIEW HILLS, KY |
| 05/31/2006 - 08/06/2010 | U.S. BANCORP INVESTMENTS, INC. | 17868 | CARROLLTON, KY |

## EMPLOYMENT HISTORY

Below is the Investment Adviser Representative's employment history for up to the last 10 years.

**Please note that the Investment Adviser Representative is required to provide this information only while registered and the information is not updated after the Investment Adviser Representative ceases to be registered, with a state regulator. Therefore, an employment end date of "Present" may not reflect the Investment Adviser Representative's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 12/2018 - Present | Independent Advisor Alliance | Charlotte, NC |
| 10/2013 - Present | Independent Financial Partners | CRESTVIEW HILLS, KY |
| 08/2010 - Present | LPL Financial, LLC | CRESTVIEW HILLS, KY |
| 12/2001 - 08/2010 | U.S. BANCORP INVESTMENTS, INC. | COVINGTON, KY |

## OTHER BUSINESS ACTIVITIES

This section includes information, if any, as provided by the Investment Adviser Representative regarding other business activities the Investment Adviser Representative is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent, or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious, or fraternal and is recognized as tax exempt.

(1) 12/08/2015 * Darpel, Dickman & Harrigan Wealth Management * DBA for LPL Business (entity for LPL business) * Darpel, Dickman & Harrigan Wealth Management * inv rel * at reported business location(s) * start 01/01/2016 * 20 hrs/mo during secs trdg hrs.

(2) 12/10/2018 * Darpel, Dickman & Harrigan Wealth Management * Registered Investment Advisor DBA * (HYBRID)Darpel, Dickman & Harrigan Wealth Mgmt. * INV REL * AT REPORTED BUSINESS LOCATION(S) * START 01/01/2016 * 20 HRS/MO DURING SECS TRDG HRS.

(3) 10/22/2018 - No Business Name - Not Investment Related - Home Based, and Highland Heights KY 41076 & Erlanger KY 41018 - Real Estate Rental - Started 05/01/2018 - 4 Hours Per Month/0 Hours During Securities Trading - Added a second rental home.

(4) 12/10/2018 - Independent Advisor Alliance - RIA only - Investment Advisor Representative - Charlotte, NC - 0%


# Investment Adviser Representative Disclosure Summary

## Disclosure Information

**What you should know about reported disclosure events:**

**(1) Certain thresholds must be met before an event is reported to IARD, for example:**

- A law enforcement agency must file formal charges before an Investment Adviser Representative is required to report a particular criminal event.;

- A customer dispute must involve allegations that an Investment Adviser Representative engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

**(2) Disclosure events in IAPD reports come from different sources:**

As mentioned in the "About IAPD" section on page 1 of this report, information contained in IAPD comes from Investment Adviser Representatives, firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the IAPD report. The different versions will be separated by a solid line with the reporting source labeled.

**(3) There are different statuses and dispositions for disclosure events:**

- A disclosure event may have a status of *pending, on appeal,* or *final.*

    o A "pending" disclosure event involves allegations that have not been proven or formally adjudicated.

    o A disclosure event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.

    o A "final" disclosure event has been concluded and its resolution is not subject to change.

- A final disclosure event generally has a disposition of *adjudicated, settled* or *otherwise resolved.*

    o An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.

    o A "settled" matter generally represents a disposition wherein the parties involved in a dispute reach an agreement to resolve the matter. Please note that Investment Adviser Representatives and firms may choose to settle customer disputes or regulatory matters for business or other reasons.

    o A "resolved" matter usually includes a disposition wherein no payment is made to the customer or there is no finding of wrongdoing on the part of the Investment Adviser Representative. Such matters generally involve customer disputes.

**(4) You may wish to contact the Investment Adviser Representatives to obtain further information regarding any of the disclosure events contained in this IAPD report.**


# DISCLOSURE EVENT DETAILS

When evaluating this information, please keep in mind that some items may involve pending actions or allegations that may be contested and have not been resolved or proven. The event may, in the end, be withdrawn, dismissed, resolved in favor of the Investment Adviser Representative, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to the Investment Adviser Registration Depository. Some of the specific data fields contained in the report may be blank if the information was not provided.

The following types of events are disclosed about this Investment Adviser Representative:

| Type | Count |
|---|---|
| Customer Dispute | 1 |
| Investigation | 1 |
| Termination | 2 |

## Customer Dispute

This section provides information regarding a customer dispute that was reported to the Investment Adviser Registration Depository (IARD) by the Investment Adviser Representative (IAR), an investment adviser and/or securities firm, and/or a securities regulator. The event may include a consumer-initiated, investment-related complaint, arbitration proceeding or civil suit that contains allegations of sales practice violations against the individual.

The customer dispute may be pending or may have resulted in a civil judgment, arbitration award, monetary settlement, closure without action, withdrawal, dismissal, denial, or other outcome.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Individual |
| **Employing firm when activities occurred which led to the complaint:** | LPL FINANCIAL, LLC |
| **Allegations:** | CUSTOMER ALLEGES ADVICE TO SELL SECURITIES LED TO UNEXPECTED CAPITAL GAINES. |
| **Product Type:** | Equity Listed (Common & Preferred Stock) |
| **Alleged Damages:** | $0.00 |
| **Alleged Damages Amount Explanation (if amount not exact):** | DAMAGES UNSPECIFIED BUT REASONABLY BELIEVED TO BE GREATER THAN $5,000. |
| **Is this an oral complaint?** | No |
| **Is this a written complaint?** | Yes |
| **Is this an arbitration/CFTC reparation or civil litigation?** | No |

### Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 05/13/2016 |
| **Complaint Pending?** | No |
| **Status:** | Settled |
| **Status Date:** | 07/20/2016 |

©2019 FINRA. All rights reserved. Report# 47332-68934 requested on Monday, January 28, 2019 about MARK JAMES DICKMAN.

Case 3:26-cv-00280   Document 4-1   Filed 04/08/26   Page 211 of 343



| | |
|---|---|
| **Settlement Amount:** | $15,000.00 |
| **Individual Contribution Amount:** | $5,000.00 |
| **Broker Statement** | THE COMPLAINT WAS SETTLED WITHOUT ANY ADMISSION OF LIABILITY WHATSOEVER ON THE PART OF THE FINANCIAL ADVISOR WHO CONTINUES TO DENY ANY WRONGDOING.  RATHER, THE COMPLAINT WAS SETTLED AS A BUSINESS DECISION BY THE FIRM TO RESOLVE THE ISSUE WITH THE CUSTOMER BEFORE IT BECAME AN ARBITRATION.  THE CUSTOMER ACKNOWLEDGED IN HIS COMPLAINT THAT HE WAS AWARE OF THE REDUCED COST BASIS OF THE STOCKS BEFORE THE ADVISOR RECOMMEDED THE LIQUIDATION OF THOSE POSITIONS. |



## Investigation

This disclosure event involves any ongoing formal investigation such as a grand jury investigation, a Securities and Exchange Commission investigation, a formal investigation by a self-regulatory organization (e.g., FINRA), or an action or procedure designated as an investigation by a state or other regulator. Subpoenas, preliminary or routine regulatory inquiries, and general requests by these regulatory bodies for information are not considered investigations and therefore are not required to be reported.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Initiated By:** | LPL Financial |
| **Notice Date:** | 12/12/2018 |
| **Details:** | We have limited information but LPL informed us that the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds. |
| **Is Investigation pending?** | Yes |
| **Firm Statement** | We have very limited information but were notified by LPL Financial on 12/12/2018 that the advisor was under investigation by the USPS OIG. They indicated they were reaching out to the rep to gain some additional information and they'd keep us informed. We were notified late on 12/19/2018 that they intended to terminate the representative. They were able to provide some additional information regarding the USPS OIG's investigation. IAA made the decision to also terminate the advisor. |

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 213 of 343


## Termination

This disclosure event involves a situation where the Investment Adviser Representative voluntarily resigned, was discharged or was permitted to resign after allegations were made that accused the Investment Adviser Representative of violating investment-related statutes, regulations, rules or industry standards of conduct; fraud or the wrongful taking of property; or failure to supervise in connection with investment-related statutes, regulations, rules or industry standards of conduct.

**Disclosure 1 of 2**

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Firm Name:** | LPL Financial LLC |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/20/2018 |
| **Allegations:** | Non-disclosure of beneficiary status within client trust, in violation of Firm policy. |
| **Product Type:** | No Product |

**Disclosure 2 of 2**

| | |
|---|---|
| **Reporting Source:** | Firm |
| **Firm Name:** | Independent Advisor Alliance |
| **Termination Type:** | Discharged |
| **Termination Date:** | 12/20/2018 |
| **Allegations:** | Terminated as a result of termination from his registered broker-dealer. |
| **Product Type:** | Other: We were informed it was an annuity but have limited details as to the type and aren't sure if this is the only account involved. |
| **Firm Statement** | Terminated as a result of termination from his registered broker-dealer. |

Case 3.26-cv-00280   Document 4-1   Filed 04/08/26   Page 214 of 343

 

**End of Report**

This page is intentionally left blank.

# EXHIBIT E

|  |  |
|---|---|
| **MARK JAMES DICKMAN**<br>**(CRD#: 2066229)**<br><br>**CLAIMANT,**<br><br>v.<br><br>**JESSICA N. SEXTON**<br>**(CRD#: 5260955),**<br><br>**RESPONDENT.** | **FINRA ARBITRATION**<br>**NO. 19-02406** |

## AMENDED STATEMENT OF CLAIM

This is an Amended Statement of Claim by Mark J. Dickman. It is amended to explain that Respondent Sexton, in her Response to the Statement of Claim, shifts the blame by claiming that LPL Financial LLC provided her with false Form U5 reportable information for her use on the Form U5 she executed, which egregiously defamed Claimant Dickman. Given her position, Claimant will need to add LPL Financial LLC as a Respondent by motion after the Panel is appointed. It is also amended to add further discussions of Robert P. Russo's role, a Series 24 registered principal with LPL Financial and Ms. Sexton's supervisor. Claimant will also move to add Mr. Russo as a Respondent after the Panel has been appointed. The amendment also corrects and replaces the document under Exhibit B with the correct exhibit (LPL Financial's Form U5 dated 12/27/2018), and updates and amends various paragraphs concerning published cases and remedies sought.

As discussed in detail below, Respondent Jessica Sexton, a Series 24 Supervisor and Principal with the broker-dealer LPL Financial LLC, violated one of her most important and sensitive regulatory obligations by filing a false Form U5 Termination Notice with FINRA, the accuracy and completeness of which she was required by law to verify.

Despite her regulatory obligation, she repeatedly made false statements concerning Mr. Dickman's termination, including false statements added entirely unnecessarily and gratuitously, that depicted Mr. Dickman as some sort of criminal engaged in "fraud or the wrongful taking of property" and "improper money movement of a client's funds," among several other defamatory assertions. As described below, the defamatory nature of the Form U5 at issue here appears unprecedented.

Robert Russo, who was at all relevant times Ms. Sexton's supervisor, failed to prevent these damaging and false allegations from being filed and placed upon Mr. Dickman's records with FINRA and the SEC, and with the CRD system, and thus made available to the entire public and potential employers to see.

At the time, Mr. Russo was engaged in an overly aggressive campaign to take as many customers as possible from a rival firm that was experiencing a major transformation. Mr. Russo's relentless drive to grow at his competitor's expense was widely reported in the press, including one well-known publication that explained how Mr. Russo "goes for the jugular." When Mr. Dickman was terminated, Mr. Russo kept Mr. Dickman's customers, which had taken him decades to acquire. Mr. Russo also kept two other advisors and their clients that Mr. Dickman had arranged to join Mr. Russo's firm with him.

As discussed below, the false statements destroyed not only Mr. Dickman's hard-earned business reputation with his long-term clients and business colleagues, but also subjected him to intense personal humiliation with his own family and friends. The Form U5 rendered him entirely unemployable despite having nearly three decades of impeccable service in the advisory industry and it destroyed over half of his painstakingly generated book of business.

As will be proven at the hearing, Mr. Dickman's financial damages well exceed $1.4 million dollars and are accumulating. Given the sheer number of blatant falsehoods reported by Ms. Sexton (which violated her regulatory obligations to FINRA, the SEC, and to the state regulators, under Mr. Russo's watch) we are also seeking punitive damages of treble the compensatory damages. The nearly unprecedented level of defamation involved here is far worse than that typically found in the published Form U5 defamation cases that have awarded punitive damages and attorneys' fees on top of compensatory damages.

## THE PARTIES

- **Mark J. Dickman (CRD# 2066229)**

Claimant Mark J. Dickman has been a registered financial advisor since 1992. Over nearly three decades, he has painstakingly built a loyal following of satisfied long-term customers. Over that period, he has never had any regulatory problems, has never previously been discharged by a financial firm and has had only a single customer complaint – a minor and meritless claim settled for nuisance value. As the arbitration panel will see at the hearing, Mr. Dickman is a courteous, deferential and ethical man and he bears no resemblance to the false picture painted by Ms. Sexton through her unlawful and defamatory Form U5 filing.

- **Jessica N. Sexton (CRD# 5260955)**

Respondent Jessica N. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008. She also holds a Series 7 and Series 66. She is, and was at all relevant times, a FINRA-registered Series 24 principal and supervisor with the broker-dealer LPL Financial LLC. She operates from, and oversees, one of LPL Financial's FINRA OSJs (Office of Supervisor Jurisdiction), where Mr. Dickman was FINRA-registered at the relevant time. Ms. Sexton also claims to be the "Chief Compliance Officer" of Independent Advisor Alliance, LLC. And she also

claims to be the "Chief Compliance Officer" of some outfit called "InVestra Financial Services Incorporated."

## OTHER PARTIES

- **Robert P. Russo (CRD# 4466372)**

Robert P. Russo has been a FINRA-registered Series 24 principal and supervisor since 2007. He also holds a Series 7, 63, and 66 with LPL Financial LLC. Mr. Russo operates the same major FINRA OSJ mentioned above for the broker-dealer LPL Financial LLC. He is also the CEO of Independent Advisor Alliance, LLC. Mr. Russo was at all relevant times Ms. Sexton's supervisor. Mr. Russo was also in charge of his firm's aggressive recruiting efforts in 2018, which resulted in the recruiting of Mr. Dickman (and his two colleagues).

- **LPL Financial LLC (CRD#: 6413)**

LPL Financial is one of the largest and most well-known broker-dealers in the country. Dickman, Sexton, and Russo were registered with LPL Financial during time periods relevant hereto.

## INTRODUCTION
## THE FORM U5 UNIFORM TERMINATION NOTICE

As the arbitration panel is aware, FINRA has two well-known forms. The first is Form U4, which is the "Uniform Application for Securities Industry Registration or Transfer" and is the form used by qualified individuals to associate with a broker-dealer or investment advisor. The second is the Form U5, which is the "Uniform Termination Notice for Securities Industry Registration," which is used by firms to terminate the registration of an individual. This case involves Form U5.

Under SEC, FINRA and state securities rules, the Form U5 requests various information about the reasons that an individual's securities registration has been terminated. There are several places on the Form U5 where the financial firm must expound on the circumstances. It is required by regulation that an appropriate individual at the financial firm verify the accuracy of representations made on a Form U5 because the information is available to federal and state regulators, and for the most part, to anyone with an Internet connection. FINRA summed it up succinctly in a widely distributed and well-known regulatory notice:

> Form U5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA. It is imperative that firms file complete and accurate Forms U5 in a timely manner because the reported information is used by a number of constituencies for a variety of reasons. For instance, FINRA uses the information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations. FINRA, other self-regulatory organizations and state regulatory and licensing authorities also use the information to make informed registration and licensing decisions. Firms use the information to help them make informed employment decisions. Further, investors use the Form U5 information that is

displayed through BrokerCheck when considering whether to do business with a registered (or formerly registered) person.

Regulatory Notice 10-39 (*"Form U5 Obligation to Provide Timely, Complete and Accurate Information on Form U5"*).

This same regulatory mandate is echoed directly above Ms. Sexton's signature on the Form U5 at issue here:

> ***"I verify the accuracy and completeness of the information contained in and with this form."***

She signed it, verifying the accuracy and completeness, but as discussed below, her representations on that form were so blatantly false and defamatory that it is difficult to find examples of *more* defamatory statements among the FINRA Awards granting compensatory and punitive damages to defamed representatives. The assassination of Mr. Dickman's character here is inexcusable from a compliance standpoint and downright disgusting in terms of basic human decency.

## THE DEFAMATORY STATEMENTS

The main Form U5 at issue was filed by Ms. Sexton on December 20, 2018 and is attached at **Exhibit A**. Her signature, directly above which she represents: "I verify the accuracy and completeness of the information contained in and with this form" appears on page 5 of 7. Her signature on that page is one of the most egregious actions a Series 24 principal could ever make.

### 1. Fraud or the Wrongful Taking of Property

The first defamatory falsehood on this Form U5 is found in the "Termination Disclosure," which is question 7F (on page 4). On that page, Ms. Sexton reported that Mr. Dickman was terminated:

> "after allegations were made that accused the individual of: *2. fraud or the wrongful taking of property*."

This is false.

Falsely checking "yes" on this box (7F.2.) is the equivalent of handing Mr. Dickman a career death sentence. As everyone in the industry knows, FINRA *permanently bars* representatives for conversion of customer funds "regardless of amount converted."[1]

This false disclosure, alone, destroyed any possibility of Mr. Dickman joining another investment advisor or broker-dealer. Financial firms reading this Form U5 well know that Mr. Dickman inevitably faces an imminent FINRA, SEC and/or state securities inquiry, with the very real

---

[1] FINRA Sanctions Guidelines, page 36. https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf

prospect of a permanent bar. This falsehood rendered Mr. Dickman, who has worked as an advisor for nearly three decades, *unemployable*.

As will be shown at the hearing, neither Ms. Sexton, nor Mr. Russo, even bothered to call Mr. Dickman to verify the supposed "fraud" or "wrongful taking of property" allegation before checking this career-destroying box. Mr. Dickman was apparently not even deserving of the courtesy of a call from anyone at Mr. Russo's firm before the filing.

With nearly three decades of impeccable service, Mr. Dickman deserved more. Any advisor would. This misconduct falls well below what is expected of a Series 24 registered principal with one of the largest broker-dealers in the country. It is sanctionable misconduct by Ms. Sexton, on Mr. Russo's watch. Regrettably, this false and essentially criminal disclosure is only the beginning.

### 2. Federal "Investigation" for "Improper Money Movement of a Client's funds."

In box 3 (on page 1), which requests a "Termination Explanation," Ms. Sexton reported that her firm was notified by LPL Financial that *"the advisor is currently undergoing a federal investigation for improper money movement of a client's funds."*

This is false. And also, outrageous.

It is difficult to imagine a more defamatory statement to place on an advisor's Form U5. No financial institution would hire someone under "federal investigation" for "improper money movement of a client's funds." One would expect a couple of Series 24s to look into the matter with some care before reporting such a devastating disclosure.

Contrary to Ms. Sexton's false report, there was no "investigation" here.

Question 7A (on page 2) is the "**Investigation Disclosure**" question. Ms. Sexton falsely answered "yes" to this question, which asks:

> Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page).

As anyone in the industry knows, the italicized words on Form U5 are specifically defined terms.

And if anyone in the industry does not know this, the Form U5 itself explains this, directly above Ms. Sexton's false "yes" answer, where the form states, in all capital letters: "REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALCIZED WORDS." *See* Exhibit A, page 2.

The word "investigation" is italicized because it is a carefully defined word for the purposes of Form U5 reporting. In order to answer "yes" here, Ms. Sexton had the regulatory obligation to *verify* that there was an "*investigation*" that fits this definition:

**Investigation**
Includes: (a) grand jury investigations; (b) U.S. Securities and Exchange Commission investigations after the "Wells" notice has been given; (c) FINRA investigations after the "Wells" notice has been given or after a person associated with a member, as defined by The FINRA By-Laws, has been advised by the staff that it intends to recommend formal disciplinary action; (d) NYSE Regulation investigations after the "Wells" notice has been given or after a person over whom NYSE Regulation has jurisdiction, as defined in the applicable rules, has been advised by NYSE Regulation that it intends to recommend formal disciplinary action; (e) formal investigations by other SROs; or (f) actions or procedures designated as investigations by jurisdictions. The term investigation does not include subpoenas, preliminary or routine regulatory inquiries or requests for information, deficiency letters, "blue sheet" requests or other trading questionnaires, or examinations.

*See* FINRA Form U5 Explanation of Terms, page 5.[2]

Looking at this definition, it is clear that none of the categories ever existed here. There was no "grand jury investigation" (item a); no "wells notice[s]" (items b through d); no formal investigation by some "other SRO" (item e), and no actions or procedures designated as investigations by "jurisdictions," which is defined on page 4: "Jurisdiction - Means a state, District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands or any subdivision or regulatory body thereof." None of that happened here.

Moreover, the last sentence expressly states that the term "investigation" "does not include" "requests for information."

There simply was no "investigation."

Checking "yes" to this question falsely reported that Mr. Dickman was under "investigation" as that term is specifically defined for reporting purposes. As defined, that would ordinarily be considered a very serious situation by a potential employer. For example, a "Wells notice" is sent *after* FINRA or the SEC has already decided to recommend the filing of a disciplinary action against an individual, has already identified the securities laws violated, and requests a submission from the individual addressing the recommendation. No reputable financial firm would hire someone facing that situation. In any event, the "investigation" disclosure is flat false and defamatory.

---

[2] Form U5 Explanation of Terms ("The following definitions apply to terms that are italicized in Form U5") https://www.finra.org/sites/default/files/AppSupportDoc/p468051.pdf

But the defamatory content did not end there. Because Ms. Sexton answered "yes" to the Investigation Disclosure question, she was required to fill out the Investigation Disclosure Reporting Page (DRP), which is found on pages 5-6. On page 6, Ms. Sexton informed the regulators that "LPL informed us that the advisor was *currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds*." And she reported at item 4 that this (non-existent) "*investigation*" was "*pending*."

All false.

### 3. Sexton Misrepresents LPL Financial's Reason for Termination (Gratuitously)

But it gets worse still. Ms. Sexton then gratuitously availed herself of the "optional" right to make a "comment" on the Form U5. In item 6 (page 7), Ms. Sexton entirely unnecessarily and falsely suggested that LPL Financial had decided to terminate Mr. Dickman because of "additional information" learned about some supposedly pending federal investigation. This statement misrepresents the reason for termination by Ms. Sexton's own broker-dealer, LPL Financial.

*LPL Financial terminated Mr. Dickman for no such reason.* This is clear from LPL Financial's own Form U5 filing. LPL Financial's Form U5 is dated 12/27/2018 and is attached at **Exhibit B**. As the Panel will notice, LPL Financial correctly checked "*no*" to the Investigation Disclosure question, unlike Ms. Sexton. This is correct because there was no investigation.

The Panel will also see that LPL Financial *did not* falsely check "yes" to question 7F.2., as Ms. Sexton did, falsely claiming that there were allegations that Mr. Dickman engaged in "fraud or the wrongful taking of property." LPL Financial also did not include any references to "improper money movement of a client's funds." Nor did LPL Financial add any information gratuitously, as did Ms. Sexton.

Indeed, the only thing LPL Financial reported on Form U5 was that there were allegations of "Non-disclosure of beneficiary status within client trust, in violation of Firm policy." That was the only termination reason LPL provided.[3]

### 4. Sexton Gratuitously Suggests Other Accounts May be Involved.

Unfortunately, there is a final piece of defamatory information added (again gratuitously) by Ms. Sexton. On page 7, the Termination DRP asks what "product type" is involved. Ms. Sexton checked "other" and wrote this ominous sentence: "We were informed it was an *annuity* but have limited details as to the type *and aren't sure if this is the only account involved*."

That certainly allows the mind to wander, particularly when coupled with the false "investigation," the false "improper money movement" of clients' funds, and the false "fraud" or "wrongful taking of property" assertions.

---

[3] The non-disclosure was an alleged failure by Dickman to notify LPL Financial that he had been named a *contingent* beneficiary in a trust. *The primary beneficiary was the client's own wife*. And nothing even happened as a result of that beneficiary designation.

This is death by Form U5. And it is all false.

Ms. Sexton had a regulatory obligation (as well as an obligation of basic human courtesy and decency) to verify that these damning and ruinous assertions were accurate *before* etching them in stone on the Central Registration Depository system for all to see. Despite the regulatory obligation to verify the accuracy, it appears that Ms. Sexton conducted no internal review to verify the information. Thus, Form U5, Question 7B asks:

> Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct?

Ms. Sexton checked "no."

No?

She conducted no internal review before reporting the existence of a federal "investigation" and allegations of "fraud or the wrongful taking of property," and allegations of "improper money movement of a client's funds," in apparently some unspecified number of accounts?

Why not?

This is clearly sanctionable behavior by a Series 24 supervisor of LPL Financial. And the extreme and unusual nature of the reporting here quite clearly would have caught the attention of, and been reviewed by, Mr. Russo.

### SEXTON REPORTS THE DEFAMATORY INFORMATION TO FINRA, THE SEC, STATE SECURITIES REGULATORS, AND FOR THE MOST PART, TO ANYONE WITH AN INTERNET CONNECTION.

As Ms. Sexton knew would happen, several of these defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure Report ("IAR Report"). For example, the report dated January 28, 2019 – more than a month after his termination – falsely informed anyone with an Internet connection that Mr. Dickman had an "Investigation" as defined on Form U5. Page 8 of that public report informs the world that *"the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds."* In the "Firm Statement" section of that same report (at page 8), Ms. Sexton falsely suggests that LPL Financial and her firm decided to terminate Mr. Dickman because of "additional information" about this so-called "pending" "investigation." Not true. Further, page 9 informs the world that an annuity was involved and that other accounts might be involved. Again, not true.

The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating that Mr. Dickman was discharged,

referencing a "federal investigation" and also "some form of improper money movement of a client's funds."[4]

With these false and damning disclosures, no financial firm would consider associating with Mr. Dickman. Indeed, it is hard to imagine any reputable company even *outside* of the financial industry hiring him with this information publicly available. Further, no customer who read the public IAR Report or the public Brokercheck Report would seriously consider having their accounts managed by Mr. Dickman. They would be warranted in assuming that their funds would go missing.

This is in addition to Mr. Dickman's business and other colleagues who read this defamatory content and assumed it was true; not to mention members of his own family who can hardly be blamed for demanding explanations.

The misery this caused Mr. Dickman is difficult to quantify. But at the hearing, through witnesses and expert testimony, we will prove that this sort of defamation was devastating in a way that few advisors could even begin to withstand. Ms. Sexton is lucky Mr. Dickman did not jump from a bridge.

As a Series 24 with LPL Financial, Ms. Sexton's conduct here is inexcusable. She has violated her regulatory duties to FINRA and the SEC, and also to the various state securities regulators. Her conduct here is sanctionable. She destroyed Mr. Dickman's reputation and vaporized over half his life's work in one afternoon. While she advertises herself as a Series 24 supervisor with LPL Financial LLC, and a "Chief Compliance Officer" of two additional firms, she is the one who is out of legal compliance.[5] When the facts come in at the hearing, a panel referral to FINRA enforcement seems inevitable.

Despite Mr. Dickman paying attorneys to try to address this disaster, it was not until March 20, 2019 – three months after his termination – that Ms. Sexton finally filed an amended U5 to address the lingering publicly-available false information. As the panel will know, in an industry where days matter, sidelining an advisor for three months is outrageous. And very costly.

In the amended Form U5 Ms. Sexton filed on March 20, 2019, she omitted all of the false information and provided an entirely new reason for termination. The new reason that she provided: *"Terminated as a result of termination from his registered broker-dealer."* Fair enough. That sounds right. It is three months late, and Dickman lost half his livelihood, and his reputation is in tatters, but at least it is now accurate.

---

[4] There are many other public examples as well. We are in the process of collecting all historical versions of the public IAR Report and the public Brokercheck Report which also reflected examples of the defamatory content that Ms. Sexton put there.

[5] One of those firms is InVestra Financial Services Inc. On its website, below Sexton's photograph and biography as Chief Compliance Officer, is a link to "Legal Information." That page contains over 2,300 words swiped directly from Merrill Lynch's website. It twice absurdly refers to "InVestra, Pierce, Fenner and Smith Incorporated," and it bizarrely claims that InVestra settled a famous SEC auction rate securities case for $1.5 million, and it even contains Merrill's paragraph about respecting "the intellectual property of others…" https://investrafinancial.com/info-legal/

Unfortunately, some of Sexton's defamatory reporting (namely, an "investigation") still resides on Mr. Dickman's CRD as an "archived" disclosure for potential brokerage or advisory employers to contemplate with justified concern. Ms. Sexton has done nothing to fix that.

## LPL FINANCIAL

As mentioned above, Ms. Sexton has chosen to blame LPL Financial for her own false regulatory filings in the Response to the Statement of Claim that she filed on October 16, 2019. In particular, in an attempt to shift the blame to LPL Financial, Sexton wrote:

> Upon effectuation of Claimant's transfer from [his prior firm] to IAA in late 2018, Ms. Sexton and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, **and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG** for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status.[6]

Later, Sexton informs the panel that the allegations were "relayed to her by LPL."[7] This attempt to shift the blame is remarkable – after all, LPL Financial filed *its own Form U5*, and as discussed above, it contained *none* of the defamatory statements Sexton made. *Not one. See* Exhibit B. Nevertheless, if Sexton is correct that LPL is to blame for the blatant falsehoods she placed on the Form U5, then LPL is liable to Claimant. For this reason, Claimant will move to add LPL Financial as a Respondent after Panel appointment.

## THE DAMAGING NATURE OF THE FALSE STATEMENTS
## MADE ABOUT DICKMAN APPEAR UNPRECEDENTED IN PUBLISHED AWARDS

It is difficult to find a more egregious case of Form U5 defamation. There appear to be no reported FINRA awards in recent history where the defamatory statements come anywhere near the horrendous nature of those made here.

Consider, for example the nine reported FINRA awards summarized below based upon available information found in the reported awards and public reports. Although these panels awarded six and seven figure compensatory damages awards, and four included very large punitive awards, and five included large attorney fee awards, the apparent nature of the defamation in these cases is nowhere near as bad that here ("fraud or the wrongful taking of property," and under "federal investigation" and "improper money movement of a client's funds"). Indeed, the defamation involved in these cases seems downright innocuous in comparison:

---

[6] *See* Respondent's Responses and Affirmative Defenses to Statement of Claim, 10/16/2019, page 4 (emphasis added).

[7] *See id.* at 5.

- *Rathmanner v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, #18-03461 (Panel awarded $3.75 million in compensatory damages in a Form U5 defamation case where the defamatory allegations were "*Conduct involving making representations on behalf of the Firm without authority*," involving a single signature).

- *Przybyla and Johnson v. USAA Financial*, FINRA #17-03279 (Panel awarded $700,000 in punitive damages, $850,000 in compensatory damages, and $250,000 in attorneys' fees, where the Form U5 defamatory comment was: "*Allegations that registered representative improperly sought compensation credit to which he was not entitled*," in connection with the preparation and publishing of financial plans).

- *Haney and Stanton v. Deutsche Bank Securities, Inc.* FINRA #16-02761 (Panel awarded $2.76 million in compensatory damages, and $142,749 in attorneys' fees for defamatory Form U5 *disclosures concerning two customer complaints*, which were then expunged).

- *Petersen v. Raymond James Financial Services, Inc.,* FINRA #17-02974 (Panel awarded over $360,000 in compensatory damages and $100,000 in sanctions, where the firm falsely claimed its reason for termination on Form U5 was that claimant *had signed her husband's name out of convenience to a letter the husband had authorized in connection with the husband's duties as a Trustee*).

- *Rusk v. First Republic Securities*, FINRA #16-03411 (Panel awarded $727,000 in compensatory damages, plus $256,717 in attorneys' fees involving Form U5 defamation falsely accusing the advisor of *failing to disclose an outside business activity*).

- *Mennemeyer v. PNC Investments*, FINRA #15-03275 (Panel awarded $1.5 million in punitive damages and $300,000 in compensatory damages concerning a Form U5 that falsely alleged claimant *had violated a PNC Investments policy*).

- *Howard v. RBS Securities, Inc.*, FINRA #14-03432 (Panel awarded $2.05 million in compensatory damages for false Form u5 falsely reporting alleged *violations of RBS Human Resource and other policies*).

- *Minevich v. Wells Fargo Advisors, LLC*, FINRA #10-04973 (Panel awarded punitive damages of $400,000, plus $100,000 in compensatory damages, and $31,600 in attorneys' fees for false Form U5 reporting concerning *one verbal complaint that was resolved to the satisfaction of the customer*).

- *Olson v. World Equity Group*, FINRA #10-01803 (Panel awarded $575,000 in punitive damages, $282,822 in attorneys' fees and $285,000 in compensatory damages involving a Form U5 defamatory comment: "*Disagreement over advertising policy, rules, and advertising protocol.*")

## CLAIMS

As will be shown at the hearing, Mr. Dickman was entirely unemployable after the Form U5 was filed. No financial firm would consider hiring him. Given his hopeless situation, he considered selling the book of business that he had developed over nearly 30 years, but even then, Mr. Russo intervened to try to prevent that, and he has taken no responsibility for Ms. Sexton's false reporting. Mr. Russo has not even offered an apology to Mr. Dickman, an advisor he was previously so eager to recruit.

At the hearing, we will prove financial damages through documents, testimony and expert testimony that are conservatively estimated at $1.4 million dollars (and growing). This does not include accounting for the intense humiliation Mr. Dickman faced before industry colleagues, before his long-term customers, and before his own family, which in fairness deserves substantial compensation.

On the question of punitive damages, we respectfully submit that the conduct described above warrants treble damages, *if ever a case did*. Cases, such as those above, where very large punitive damage awards were issued all involved defamatory statements far less egregious than those involved here.

Claimant Dickman will continue to amend this Statement of Claim as the facts are further developed. For now, Mr. Dickman brings claims against Ms. Sexton for: defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm.

## DAMAGES AND REMEDIES

As for damages and remedies, Claimant requests an Award including the following:

1. Compensatory damages of at least $1.4 million (or as proven at the hearing);

2. Punitive damages;

3. Reasonable Attorneys' fees in pursuing this case;

4. Pre and post award interest at the statutory rate;

5. All filing fees, hearing fees and other FINRA arbitration costs;

6. Reimbursement of all other costs, including for the Claimant's expert witnesses;

7. Expungement of any remaining references on the FINRA CRD system, and/or corrective disclosures;

8. An order that Sexton draft a corrective letter explaining that she defamed Mr. Dickman in her Form U5 reporting, a copy of which shall be transmitted to counsel for Dickman, and

the letter may subsequently be sent to any or all of Dickman's past or current customers.

Respectfully submitted,

Mark J. Dickman, through counsel:

Jeremy L. Bartell
BARTELL LAW PLLC
700 12th Street, NW, Ste. 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

# EXHIBIT F

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

August 11, 2019

Mark J. Dickman
40 Linden Hill Drive
Crescent Springs, KY 41017

**VIA:** Email / PDF – (markjd229@gmail.com)

**RE:  Contingency Fee Agreement**

Dear Mark:

As discussed, you have agreed to hire Bartell Law ("the Firm") to pursue claims against Independent Advisor Alliance, LLC (CRD# 168267 / SEC# 801-78808) ("IAA") concerning disclosures IAA made through FINRA Form u5 filings, which we have reason to believe are defamatory. This Firm has no obligations to provide legal services on this matter until you sign and return this agreement to the Firm ("Agreement"). Please note that the terms of this Agreement are open to negotiation prior to execution should you wish to suggest changes. The Firm agrees to provide legal services only as described below.

<u>SCOPE</u>

The scope of this representation is as follows:

- This engagement pertains only to the affirmative assertion of claims by the Firm, on your behalf, against IAA concerning the FINRA Form u5 filings IAA made concerning you. This includes claims for defamation, breach of contract and any other claims as may legally arise from these filings, if advisable to also assert ("the Claims").

- Bartell Law will send a demand letter to IAA, and will draft any necessary additional correspondence, and engage in any necessary negotiation with IAA's representatives, in an attempt to settle the Claims without litigation.

- If necessary and advisable, this Firm agrees to bring a lawsuit asserting the Claims against IAA. Our current understanding is that such a lawsuit against IAA is, by your agreement with IAA, required to be brought before the American Arbitration Association (AAA). This Firm agrees to bring such a lawsuit only before the AAA. Should any other judicial or arbitral tribunal be required to assert the claims, a new, mutually-agreeable agreement would be required to proceed in such forum.

# BartellLaw

- This Agreement does not include any matters outside of the scope described above. By way of example only, it does not include any motions to confirm or vacate an arbitration award brought in any court. It does not include any litigation not before the AAA. It also does not include defending against any counterclaims IAA brings against you, or defending against any claims brought against you by any third-party. These, and any other matters outside the scope described above, will be handled by this Firm only if the parties agree to a mutually-agreeable agreement covering such additional matters (otherwise, you will need to retain other counsel to handle these matters).

## COSTS

You are responsible to pay directly, when due, all costs of pursuing this matter, whether AAA fees, or other litigation fees, expert witness costs (if necessary) and any costs associated with document copying, travel, lodging and other costs items. This firm does not advance or pay costs. You agree that the Firm may withdraw should you fail to pay any costs when due.

## ATTORNEY FEES

Except as provided below, this firm will be compensated for legal services rendered only if a recovery is obtained for you. The fee to be paid to the Firm will be a percentage of the gross recovery. Gross recovery means the total of all amounts (or reasonable value, if not funds) received from any source, whether by settlement, arbitration award, judgment, sanction's order, attorney's fee award, or in another manner. The attorney's fee shall be thirty (30%) of the gross recovery ("contingency fee"). You agree than the gross recovery received will be made payable directly to Bartell Law PLLC (or successor firm), which amounts the Firm will deposit into the Firm's attorney trust account. From there, and only after the funds have fully cleared, the firm will deduct its contingency fee, and then remit the remainder to you by check from the trust account. Please note that any costs you owe to the Firm, but did not yet pay, will be deducted from your share of the gross recovery before any payment is made to you. The Firm will provide you with an accounting at that time.

## STATEMENTS

In the event the Firm incurs costs not directly paid by you, the Firm will send you a billing statement by email itemizing those costs, payment of which is due within seven days calendar of the date of the statement.

## DISCHARGE AND WITHDRAWAL

Lawyer may withdraw with your consent or for good cause. Good cause includes, but is not limited to, your breach of this Agreement, refusal to cooperate, failure to follow this Firm's advice

2

# BartellLaw

on a material matter, or if any fact or circumstance arises that would render this Firm's continuing representation unlawful or unethical, or if the representation results in an unreasonable financial burden on the Firm, or if the representation has been rendered unreasonably difficult by the client. Please note that the Firm will maintain electronic versions of the files for this matter only for a period of six years, during which you may request a copy, but if no request is made the files may be destroyed after five years without further notice. You may discharge the Firm at any time, however, you agree that upon payment of any settlement, award or judgement in your favor in this matter, this Firm is entitled to be paid a reasonable fee for the legal services provided to the extent such services contributed to the result obtained (and to the extent permitted by law, this Firm shall have a lien on any such amounts).

## ENTIRE AGREEMENT

This Agreement contains the entire agreement of the parties. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties. If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect. This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them or an oral agreement only to the extent that the parties carry it out. You agree that you have had an opportunity to negotiate this Agreement and to seek independent counsel of your choice to review you it if desired.

**DRAFT**

_____
Bartell Law PLLC
By: Jeremy L. Bartell, Esq. (Sole member)
700 12th Street NW, Suite 700
Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

Agreed to:
Date: August ___, 2019

_____
Mark James Dickman
40 Linden Hill Drive
Crescent Springs, KY 41017

3

# EXHIBIT G

# FINANCIAL INDUSTRY REGULATORY AUTHORITY
## DISPUTE RESOLUTION

| | |
|---|---|
| **MARK JAMES DICKMAN** <br> **(CRD#: 2066229)** <br><br> **CLAIMANT,** <br><br> **v.** <br><br> **JESSICA NADINE SEXTON** <br> **(CRD#: 5260955).** <br><br> **RESPONDENT.** | **FINRA ARBITRATION** <br> **NO. _____** |

## STATEMENT OF CLAIM

This is a Statement of Claim by Mark J. Dickman, who has been a FINRA-registered financial advisor for nearly three decades and is a former registered representative of LPL Financial LLC against Jessica N. Sexton, a Series 24 Securities Principal registered with LPL Financial. As described below, as a registered principal and supervisor at LPL Financial, Ms. Sexton violated her regulatory obligations by filing, with FINRA, Form U5 termination notices (the accuracy of which she claims to have verified) in which she repeatedly made false statements that depicted Mr. Dickman as some sort of criminal, and which destroyed not only his personal and business reputation (and subjected him to intense humiliation) but also prevented him from securing any employment in the financial industry (while Ms. Sexton's own office kept most of his clients). As will be proven at the hearing, Mr. Dickman's financial damages well exceed one million dollars and are accumulating. As also discussed below, given the sheer number of blatant falsehoods at issue, the assertion of which by Ms. Sexton violated her regulatory obligations to FINRA, the SEC, and to the state regulators, we are also seeking punitive damages.

## THE PARTIES

- **Mark J. Dickman (CRD# 2066229)**

Claimant Mark J. Dickman has been a FINRA-registered financial advisor since 1992. Over nearly three decades, he has painstakingly built a loyal following of satisfied long-term customers. Over that period, he has never had any regulatory problems, has never previously been discharged by a financial firm and has had only a single customer complaint – a minor and meritless claim settled for nuisance value. As the arbitration panel will see at the hearing, Mr. Dickman is a courteous, deferential and ethical man and he bears no resemblance to the false picture painted by Ms. Sexton through her unlawful and defamatory Form U5 filings, which are described in detail below.

- **Jessica N. Sexton (CRD# 5260955)**

Respondent Jessica Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008. She also holds a Series 7 and Series 66. She is, and was at all relevant times, a FINRA-registered Series 24 principal and supervisor with the broker-dealer LPL Financial LLC. She operates from, and oversees, one of LPL Financial's OSJs (Office of Supervisor Jurisdiction), where Mr. Dickman was FINRA-registered at the relevant time. Ms. Sexton also claims to be the "Chief Compliance Officer" of "Independent Advisor Alliance," and also the "Chief Compliance Officer" of some outfit called "InVestra Financial Services Incorporated," although with respect to the latter, she falsely claims on her own biography webpage that "InVestra" offers "inVestment advice" through the well-known advisory firm "Independent Financial Partners." That is false.[1]

## INTRODUCTION

As the arbitration panel is aware, FINRA has two well-known forms. The first is the Form U4, which is the "Uniform Application for Securities Industry Registration or Transfer" and is the form used by qualified individuals to associate with a broker-dealer or investment advisor. The second is the Form U5, which is the "Uniform Termination Notice for Securities Industry Registration," which is used by firms to terminate the registration of an individual.

Under SEC, FINRA and state securities rules, the Form U5 requests various information about the reasons that an individual's securities registration has been terminated. There are also several places on that form where the financial firm must expound on the circumstances. It is required by regulation that someone with supervisory authority at the financial firm "verify" the accuracy of representations made on a Form U5 because the information is available to federal and state regulators, and for the most part, to anyone with an Internet connection. FINRA summed it up succinctly in a widely distributed and well-known regulatory notice:

> Form U5 requires an appropriate signatory of a firm to verify the accuracy and completeness of the information contained in it prior to filing with FINRA. It is imperative that firms file complete and accurate Forms U5 in a timely manner because the reported information is used by a number of constituencies for a variety of reasons. For instance, FINRA uses the information to help identify and sanction individuals who violate FINRA rules and applicable federal statutes and regulations. FINRA, other self-regulatory organizations and state regulatory and licensing authorities also use the information to make informed registration and licensing decisions. Firms use the information to help them make informed employment decisions. Further, investors use the Form U5 information that is displayed through BrokerCheck when considering whether to do business with a registered (or formerly registered) person.

Regulatory Notice 10-39 ("*Form U5 Obligation to Provide Timely, Complete and Accurate Information on Form U5*").

This same regulatory mandate is echoed directly above Ms. Sexton's signature on the Form U5

---

[1] "Chief Compliance Officer" Sexton's false marketing on her own biography page is available here. https://investrafinancial.com/jessica-sexton/

discussed below: "*I verify the accuracy and completeness of the information contained in and with this form.*" She signed it, verifying the accuracy and completeness, but as discussed below, her representations on that form were so blatantly false and defamatory that it is difficult to find examples of *more* defamatory statements among the FINRA Awards granting compensatory and punitive damages to defamed Claimants. The assassination of Mr. Dickman's character here is inexcusable from a compliance standpoint and downright disgusting in terms of basic human decency.

## THE DEFAMATORY STATEMENTS

The main Form U5 at issue was filed by Ms. Sexton on December 20, 2018 and is attached at **Exhibit A**. Her signature, in which she represents: "I verify the accuracy and completeness of the information contained in and with this form" appears on page 5 of 7. Her signature there is one of the most egregious actions a Series 24 principal could ever make. There are literally no comparison cases to the degree of outright defamation involved here.

The first defamatory falsehood on this Form U5 is found in the "Termination Disclosure," which is question 7F (on page 4). On that page, Ms. Sexton reported that Mr. Dickman was terminated:

> "after allegations were made that accused the individual of: *2. fraud or the wrongful taking of property.*"

This is false.

Falsely checking "yes" on this box (7F.2.) is the equivalent of handing Mr. Dickman a career death sentence. As everyone in the industry knows, FINRA *permanently bars* representatives for conversion of customer funds "regardless of amount converted."[2]

This false disclosure alone destroyed any possibility of Mr. Dickman joining another investment advisor or broker-dealer after leaving LPL Financial. Financial firms reading this Form U5 well know that Mr. Dickman inevitably faces an imminent FINRA, SEC and/or state securities inquiry, with the very real prospect of a permanent bar looming. This falsehood alone rendered Mr. Dickman *unemployable*.

As will be shown at the hearing, Ms. Sexton never even bothered to call Mr. Dickman to verify the supposed "fraud" or "wrongful taking of property" allegation before checking this career-destroying box. Mr. Dickman was apparently not even deserving of the courtesy of a call from *anyone* at Ms. Sexton's firm (or firms, whichever is accurate).

With nearly three decades of impeccable service, Mr. Dickman deserved more. Any advisor would. This conduct falls well below what is expected of a Series 24, registered principal with one of the largest broker-dealers in the country. It is sanctionable misconduct.

Regrettably, this false and essentially criminal disclosure is only the beginning. In box 3 (on page 1), which requests a "Termination Explanation," Ms. Sexton reported that her firm was notified by LPL Financial that "*the advisor is currently undergoing a federal investigation for improper*

---

[2] FINRA Sanctions Guidelines, page 36. https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf

**money movement of a client's funds.**"

This is false. And also outrageous.

It is difficult to imagine a more defamatory statement to place on an advisor's Form U5. No financial institution would hire someone under "federal investigation" for "improper money movement of a client's funds." One would expect a Series 24 at LPL Financial to look into the matter with some care before reporting such a devastating disclosure.

Contrary to Ms. Sexton's false report, there was no "investigation" here.

Question 7A (on page 2) is the "**Investigation Disclosure**" question. Ms. Sexton falsely answered "yes" to this question, which asks:

> Currently is, or at termination was, the individual the subject of an *investigation* or *proceeding* by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over *investment-related* businesses? (Note: Provide details of an *investigation* on an Investigation Disclosure Reporting Page and details regarding a *proceeding* on a Regulatory Action Disclosure Reporting Page.

As anyone in the industry knows, the italicized words on Form U5 are specifically defined terms. And if anyone in the industry does not know this, the Form U5 itself explains this, directly above Ms. Sexton's false "yes" answer, where the form states, in all capital letters: "REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U5 INSTRUCTIONS FOR EXPLANATION OF ITALCIZED WORDS." *See* Exhibit A, page 2.

The word "investigation" is italicized because it is a carefully defined word for the purposes of Form U5 reporting. In order to answer "yes" here, Ms. Sexton had the regulatory obligation to *verify* that there was an "*investigation*" that fits this definition:

**Investigation**
Includes: (a) grand jury investigations; (b) U.S. Securities and Exchange Commission investigations after the "Wells" notice has been given; (c) FINRA. investigations after the "Wells" notice has been given or after a person associated with a member, as defined by The FINRA By-Laws, has been advised by the staff that it intends to recommend formal disciplinary action; (d) NYSE Regulation investigations after the "Wells" notice has been given or after a person over whom NYSE Regulation has jurisdiction, as defined in the applicable rules, has been advised by NYSE Regulation that it intends to recommend formal disciplinary action; (e) formal investigations by other SROs; or (f) actions or procedures designated as investigations by jurisdictions. The term investigation does not include subpoenas, preliminary or routine regulatory inquiries or requests for information, deficiency letters, "blue sheet" requests or other trading questionnaires, or examinations.

*See* FINRA Form U5 Explanation of Terms, page 5.[3]

---

[3] Form U5 Explanation of Terms ("The following definitions apply to terms that are italicized in Form U5") https://www.finra.org/sites/default/files/AppSupportDoc/p468051.pdf

Looking at this definition, it is clear that none of these categories ever existed here. There was no "grand jury investigation" (item a); no "wells notice[s]" (items b through d); no formal investigation by some "other SRO" (item e), and no actions or procedures designated as investigations by "jurisdictions," which is defined on page 4: "Jurisdiction - Means a state, District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands or any subdivision or regulatory body thereof." None of that happened here.

Moreover, the last sentence expressly states that the term "investigation" "does not include" "requests for information."

There simply was no "investigation."

Checking "yes" to this question falsely reported that Mr. Dickman was under "investigation" as that term is specifically defined for reporting purposes. As defined, that would ordinarily be considered a very serious situation by a potential employer. For example, a "Wells notice" is sent *after* FINRA or the SEC has already decided to recommend the filing of a disciplinary action against an individual, has already identified the securities laws violated, and requests a submission from the individual addressing the recommendation. No reputable financial firm would hire someone facing that situation.

But the defamatory content did not end there. Because Ms. Sexton answered "yes" to the Investigation Disclosure question, she was required to fill out the Investigation Disclosure Reporting Page (DRP), which is found on pages 5-6. On page 6, Ms. Sexton informed the regulators that "LPL informed us that the advisor was **currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds.**" And she reported at item 4 that this (non-existent) "*investigation*" was "*pending.*"

This is false.

But it gets worse still. Ms. Sexton then gratuitously availed herself of the "optional" right to make a "comment" on the Form U5. In item 6 (page 7), Ms. Sexton entirely unnecessarily and falsely suggested that LPL Financial had decided to terminate Mr. Dickman because of "additional information" learned about some supposedly pending federal investigation. This statement misrepresents the reasons for termination by Ms. Sexton's own broker-dealer, LPL Financial, one of the largest brokerages in the country. *LPL Financial terminated Mr. Dickman for no such reason.*

This is clear from LPL Financial's own Form U5 filing. LPL Financial's Form U5 is dated 12/27/2018 and is attached at **Exhibit B**.

As the Panel will notice, LPL Financial correctly checked "***no***" to the Investigation Disclosure question, unlike Ms. Sexton.

LPL was correct. There was no reportable investigation.

The Panel will also see that LPL Financial did not falsely check "yes" to question 7F.2., as Ms.

Sexton did, claiming that there were allegations that Mr. Dickman engaged in "fraud or the wrongful taking of property." LPL Financial did not include any false disclosures or references to "fraud" or "wrongful taking of property," or "federal investigations" or "improper movement" of client's funds.

Indeed, the only thing LPL Financial reported on Form U5 was that there were allegations of "Non-disclosure of beneficiary status within client trust, in violation of Firm policy." That was the only termination reason provided.[4]

Unfortunately, there is a final piece of defamatory information added (again gratuitously) by Ms. Sexton. On page 7, the Termination DRP asks what "product type" is involved. Ms. Sexton checked "other" and wrote this ominous sentence: "We were informed it was an *annuity* but have limited details as to the type *and aren't sure if this is the only account involved*."

That certainly allows the mind to wander, particularly when coupled with the false "investigation," the false "improper movement" of clients' funds, and the false "fraud" or "wrongful taking of property" assertions.

This is death by Form U5. And it is all false.

Ms. Sexton had a regulatory obligation (as well as an obligation of basic human courtesy and decency) to verify that these damning and ruinous assertions were accurate *before* etching them in stone on the Central Registration Depository system for all to see. Despite the regulatory obligation to verify the accuracy, it appears that Ms. Sexton conducted no internal review to verify the information. Thus, Form U5, Question 7B asks:

> Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct?

Ms. Sexton checked "no."

No?

She conducted no internal review before reporting the existence of a federal "investigation" and allegations of "fraud or the wrongful taking of property" and allegations of "improper money movement of a client's funds?"

Why not?

This is clearly sanctionable behavior by a Series 24 supervisor of LPL Financial.

As Ms. Sexton knew would happen, several of these defamatory statements appeared on various versions of Mr. Dickman's publicly available Investment Adviser Representative Public Disclosure

---

[4] The non-disclosure was an alleged failure to notify LPL Financial that Plaintiff had been named a *contingent* beneficiary in a trust. The primary beneficiary was the client's own wife. And nothing even happened as a result of that beneficiary designation.

Report ("IAR Report"). For example, the report dated January 28, 2019 – more than a month after his termination – falsely informed anyone with an Internet connection that Plaintiff had an "Investigation" as defined on Form U5. Page 8 of that public report informs the world that *"the advisor was currently under federal investigation from the USPS OIG for some form of improper money movement of a client's funds."* In the "Firm Statement" section of that same report (at page 8), Ms. Sexton falsely suggests that LPL Financial and her firm decided to terminate Plaintiff because of "additional information" about this so-called "pending" "investigation." Not true. Further, page 9 informs the world that an annuity was involved and that other accounts might be involved. Again, not true.

The same defamatory language was repeated on Mr. Dickman's public FINRA BrokerCheck report (which investors are encouraged to review), indicating that Mr. Dickman was discharged, referencing a "federal investigation" and also "some form of improper money movement of a client's funds."[5]

With these false and damning disclosures, no financial firm would consider associating with Mr. Dickman. Indeed, it is hard to imagine any reputable company even *outside* of the financial industry hiring him with this information publicly available. Further, no customer who read the public IAR Report or the public Brokercheck Report would seriously consider having their accounts managed by Mr. Dickman. They would be warranted in assuming that their funds would go missing.

As a Series 24 with LPL Financial, Ms. Sexton's conduct here is inexcusable. She has violated her regulatory duties to FINRA and the SEC, and also to the various state securities regulators. Her conduct here is sanctionable. She destroyed Mr. Dickman's reputation and vaporized over half his life's work in one afternoon. While she advertises herself as a Series 24 and a "Chief Compliance Officer" of two different firms, she is the one who is out of legal compliance. When the facts come in at the hearing, a panel referral to FINRA enforcement seems inevitable.

Despite Mr. Dickman paying attorneys to try address this disaster, it was not until March 20, 2019 – three months after his termination – that Ms. Sexton somehow found it in her heart to finally file an amended U5 to address the lingering publicly-available false information. As the panel will know, in an industry where days matter, sidelining an advisor for three months is outrageous.

Ultimately, Ms. Sexton changed course, and instead of continuing to fraudulently call Mr. Dickman a criminal, who wrongfully takes client funds from who knows how many accounts, she filed an amended Form U5 on March 20, 2019. This amendment omitted all of the false information and provided a revised reason for termination. The reason she provided: *"Terminated as a result of termination from his registered broker-dealer."* Fair enough. That sounds right. It is three months late, but at least it is accurate.

Unfortunately, some of her defamatory information (an "investigation") still resides on Mr. Dickman's CRD as an "archived" disclosure for potential brokerage or advisory employers to contemplate with justified concern.

---

[5] There are many other public examples as well. We are in the process of collecting all historical versions of the public IAR Report and the public Brokercheck Report which also reflected examples of the defamatory content that Ms. Sexton put there.

At the hearing, we will prove financial damages through documents, testimony and expert testimony that are conservatively estimated at 1.4 million dollars (and growing). This does not include accounting for the intense humiliation Mr. Dickman faced before industry colleagues, before his own long-term customers, and before his own family, which in fairness deserves substantial compensation. Further, as mentioned, we believe the circumstances here clearly warrant punitive damages of at least double the compensatory damages.

Claimant Dickman will amend this Statement of Claim as the facts are further developed, but for now, brings claims against Ms. Sexton for: defamation, fraud, tortious interference, breach of contract, breach of regulatory duty causing harm and unjust enrichment.

Respectfully submitted,

Mark J. Dickman, through counsel:

Jeremy L. Bartell
BARTELL LAW PLLC
700 12th Street, NW, Ste. 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

# EXHIBIT H

| | |
|---|---|
| In the Matter of an Arbitration Between: | ) |
| | ) |
| MARK JAMES DICKMAN, | ) |
| (CRD#: 2066229) | ) |
| | ) |
| Claimant, | ) |
| | ) |
| and | ) |
| | ) **FINRA NO. 19-02406** |
| JESSICA NADINE SEXTON, | ) |
| (CRD#: 5260955) | ) |
| | ) |
| and, | ) |
| | ) |
| ROBERT P. RUSSO | ) |
| (CRD#: 4466372), | ) |
| | ) |
| and, | ) |
| | ) |
| LPL Financial LLC | ) |
| (CRD#: 6413) | ) |
| | ) |
| Respondents. | ) |
| | ) |

## RESPONSE AND AFFIRMATIVE DEFENSES
## TO SECOND AMENDED STATEMENT OF CLAIM AND MOTION TO CHANGE
## HEARING LOCATION

Respondents, Jessica Nadine Sexton ("Ms. Sexton") and Robert P. Russo ("Mr. Russo," and together with Ms. Sexton, the "Respondents"), by and through the undersigned counsel, hereby submits the following Response and Affirmative Defenses to the Second Amended Statement of Claim filed by Mark James Dickman ("Mr. Dickman" or "Claimant"). Ms. Sexton's Response to Claimant's initial Statement of Claim is restated in its entirety except as otherwise amended to address the addition of Mr. Russo as a party, address the claims now brought against him, and to include Respondents' Motion to Change Hearing Location. Accordingly, each of the Respondents hereby state as follows:

1

## I.    Introduction and Initial Response

The allegations contained in Mr. Dickman's Statement of Claim are factually and legally without merit and should be dismissed. The inception of Mr. Dickman's troubles stem from his own failure to disclose to LPL Financial ("LPL") that he was a contingent beneficiary in a client's trust—a fact he also affirmatively attested to in the negative over the course of four (4) consecutive years. While seemingly minor, the omission violated LPL's fiduciary capacity policy and initiated a series of unfortunate events, the resulting consequences of which Mr. Dickman inappropriately blames on Respondents.

Ultimately, Mr. Dickman's non-disclosure and, upon information and belief, related investigation by the U.S. Postal Service Office of Inspector General ("USPS OIG"), led to the termination of his registration with LPL and, consequently, his relationship and registration with Independent Adviser Alliance ("IAA"). Contrary to Mr. Dickman's misstatement of the law in his Statement of Claim, the SEC, FINRA, and state securities regulations do not *request* information related to the termination of an investment advisor. Rather, the terminating firm is *required* to file with FINRA a Uniform Termination Notice on Form U5 ("Form U5" or "U5") providing the reasons for an involuntary termination within thirty days of termination. IAA was required to fill out the Form U5 in performance of its own regulatory obligations as an SEC-Registered Investment Advisor ("RIA").

Ms. Sexton, IAA's Chief Compliance Officer[1] ("CCO"), correctly and properly provided the required information related to Mr. Dickman's termination when she filed the Form U5. The information included therein was factual and accurate as provided by LPL. Although he attempts

---

[1]Mr. Dickman accuses Ms. Sexton of falsely representing that she is also the CCO for Investra Financial Services ("IFS"). However, a cursory review of IAA's registration status and public disclosures clearly denotes IFS as a doing-business-as ("d/b/a") entity of IAA. Acting as CCO for both IAA and IFS is entirely permissible under FINRA and SEC standards.

to downplay the severity of his omission, Mr. Dickman admits he *did* fail to disclose his beneficiary status in a client's trust in violation of LPL's firm policy[2]. Additionally, Respondents were in fact notified by LPL that Mr. Dickman was under investigation by USPS OIG for some sort of improper money movement as a result of, or related to, the non-disclosure. As a result, the filing of the Form U5 by Respondents was proper and in accordance with the standard of care that would be reasonably afforded to Mr. Dickman under the circumstances. Much to Mr. Dickman's chagrin, the mandatory reporting of the existence of allegations as reasons for his termination do not amount to defamation, or suggest any level of incompetence on behalf of Respondents, simply because the nature of the existing allegations against him are unsavory.

Additionally, the disclosures on Mr. Dickman's Form U5 relating to his termination are protected by, at a minimum, qualified privilege. Even assuming, *arguendo*, the truthful statements in the Form U5 do somehow amount to defamation, Mr. Dickman cannot recover absent a showing of actual malice on Ms. Sexton's part[3]. In fact, Ms. Sexton has never met Mr. Dickman, had no working relationship with him during Claimant's (less than one-week) association with IAA, and has had no interaction with him outside of limited email correspondence in December 2018 regarding the Commonwealth of Kentucky's initial approval of Claimant's IAR registration with IAA. To insinuate that she acted with any malice and would have had any reason or incentive to do so when submitting his Form U5 is completely unfounded and nonsensical. Mr. Dickman must agree as his Second Amended Statement of Claim is entirely devoid of any such allegations, failing to support even an inference of malice. Instead, Mr. Dickman wraps up his Second Amended Statement of Claim with a series of conclusory claims against Respondents of fraud, tortious

---

[2] Claimant's Second Amended Statement of Claim, fn 3.
[3] As Mr. Dickman brings allegations against Mr. Russo for derivative claims that rely on the existence of the commission of an actionable tort, any reference to Ms. Sexton's behavior, actions, knowledge, or drafting, filing, or submitting the Form U5 is also a response on behalf of Mr. Russo.

3

interference, breach of contract, breach of regulatory duty causing harm, and unjust enrichment—none of which he provides enumerated facts or allegations to support.

Finally, Mr. Dickman also makes a blanket demand for relief against Mr. Russo based on claims for negligent hiring, failure to train, failure to supervise, and respondent superior. Again, Mr. Dickman fails to meet event basic pleading standards required to support these claims. While North Carolina recognizes a cause of action for negligent supervision and retention of an employee, Mr. Dickman cannot satisfy the requisite elements to succeed on such theories. Not only does Mr. Dickman fail to establish an actionable tort has been committed, but he also fails to allege that Ms. Sexton is incompetent or that Mr. Russo had any prior knowledge, constructive or actual, that Ms. Sexton was incompetent. As a result, Mr. Dickman's claims against both Respondents fail to meet necessary pleading standards and should be dismissed.

## II.     Factual Background

Because Mr. Dickman purposefully attempts to attenuate the relationships between LPL, IAA, and Independent Financial Partners ("IFP")[4], it is necessary to briefly detail the actual working relationships between the three entities at the outset.

LPL Financial is a registered broker-dealer and FINRA member firm that provides financial services to clients through independent financial advisers and adviser firms. IAA is an RIA, and LPL office of supervisory jurisdiction ("OSJ") with its corporate offices located in North Carolina[5] that offers support and services to advisers through various advisory programs and by leveraging LPL's broker-dealer platform. IFP, at all times relevant to this matter, was an RIA and

---

[4] Mr. Dickman purposefully attenuates the relationships between IAA, LPL, and IFP in an effort to suggest some sort of nefarious recruiting scheme in support of any future claims of unjust enrichment, etc. that he has threatened but, thus far, failed to claim against IAA.

[5] Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision and a forum-selection clause acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA.

4

until May of 2019 (when it commenced operations as its own broker-dealer), also an LPL OSJ utilizing LPL's platforms. About one (1) year prior to IFP and LPL officially parting ways, LPL, in conjunction with IAA and a number of other LPL OSJ/RIA firms, offered an optional program where IFP advisers could choose to remain with LPL's broker-dealer platform through IAA's OSJ rather than breaking away from LPL to associate with IFP's new broker-dealer. Mr. Dickman was one such adviser who was associated with IFP's RIA/OSJ at the time of their well-publicized split from LPL. Although he fails to disclose so in his Second Amended Statement of Claim, and in direct contravention to his allegations regarding any "overly aggressive" recruiting efforts by Mr. Russo[6], Mr. Dickman contacted IAA in order to stay and remain on the LPL platform by taking advantage of the RIA programs offered by IAA.

Upon effectuation of Claimant's transfer from IFP to IAA in late 2018, Respondents and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status. After further discussions between Mr. Dickman, LPL, and IAA, IAA was informed by LPL that they would be terminating Mr. Dickman's registrations and terminating him for cause. Mr. Dickman was then terminated by both LPL as well as by IAA, as required in its own capacity as an RIA, and pursuant to its OSJ contractual relationship with LPL.

---

[6] Claimant's Second Amended Statement of Claim, p. 2, para. 3.

5

## III.     Specific Response to Defamation Claim

In order to establish a claim for defamation in North Carolina, Mr. Dickman must establish that Respondents published a statement that they knew or should have known was false and defamatory, and that Claimant incurred actual damages[7] as a consequence. *Tyson L'eggs Products, Inc.,* 84 N.C. App. 484 (2008). Mr. Dickman cannot satisfy these requisites.

Primarily, Mr. Dickman argues that Ms. Sexton made false assertions in the Form U5 related to the reasons for his termination. However, Mr. Dickman repeatedly conflates, for his benefit, actionable statements—false statements of fact regarding an individual—with the non-actionable—statements that certain allegations relating to an individual merely exist. At all times, the relevant statements at issue in this matter involve the latter and do not and cannot support a claim for defamation.

It is undisputed that LPL did in fact contact IAA and Ms. Sexton to notify her that Mr. Dickman had violated LPL's fiduciary policy by failing to disclose his beneficiary status in a client's trust, and that he was under investigation by the USPS OIG for some sort of improper money movement. Because this collective exchange between LPL and Ms. Sexton is undisputed, the gravamen of Mr. Dickman's claims is really that Ms. Sexton identified the allegations against him without fully investigating the truthfulness of the allegations relayed to her by LPL. By claiming Ms. Sexton instead "depicted Mr. Dickman as some sort of criminal[8]" in the Form U5,

---

[7]Because Ms. Sexton's statements were truthful, Mr. Dickman cannot satisfy the primary requisite element of a defamation claim. In addition, he fails to provide any basis whatsoever for alleged damages suffered by Mr. Dickman, how those damages have been calculated, and fails to allege or establish that Ms. Sexton's statements in the Form U5, rather than his own violation of fiduciary policy and resulting termination, were the causation of the supposed damages. Upon information and belief, Mr. Dickman's previous RIA/OSJ, IFP, was aware of the USPS OIG and non-disclosure shortly after, if not before, his termination with both LPL and IAA. Indeed, it is curious that while Mr. Dickman's Statement of Claim insinuates that "no reputable firm" would hire him, Mr. Dickman was able to quickly reaffiliate with IFP, shortly after his termination by LPL and IAA, and prior to Ms. Sexton's final U5 amendment.
[8] Claimant's Second Amended Statement of Claim, p. 2, para. 1.

6

he suggests that the allegations in the Form U5 carries an innuendo that Mr. Dickman was in fact guilty of such violations. This cannot give rise to a claim for defamation.

Question 7F(1) asked Ms. Sexton to provide information only about the *existence* of allegations related to violations of "investment-related statutes" or the wrongful taking of property and imposes no duty to withhold information until a full investigation can run its course. See *e.g. Whitaker v. Wells Fargo Advisors, LLC*, Civil Action No. 3:11CV380-HEH (E.D. Va. Sep. 29, 2011) (In representing merely that the subject was discharged after *allegations were made* that accused him of misconduct, an affirmative answer to Question 7F(1) neither indicates nor implies that the employee actually committed the underlying misdeeds) (emphasis in original). Where, as here, a statement cannot be reasonably interpreted as stating actual facts about an individual's conduct, it cannot be the subject of a defamation suit. *Craven v. Cope*, 656 S.E.2d 729 (N.C. Ct. App. 2008).

Nowhere in the Form U5 filed by Respondents is anything disclosed other than the mere existence of allegations of wrongdoing on Mr. Dickman's part. Where Respondents were either required by the Form U5 to provide additional details related to the reason for termination in the Investigation Disclosure Reporting Page ("DRP"), or were given the option to, it was again carefully and clearly denoted that LPL provided information relating only to *allegations* of improper money movement and pending investigation by USPS OIG, but that information was "limited." While Mr. Dickman claims this "certainly allows the mind to wander[9]" regarding Mr. Dickman's conduct, at no point do Respondents state actual facts regarding Mr. Dickman's culpability.

Further, the statements regarding the *existence* of these allegations are in fact true and therefore cannot be defamatory. Truth of the matter or substantial truth is a complete defense to a

---

[9] Claimant's Second Amended Statement of Claim, p. 8, para. 2.

7

claim for defamation. *Kwan-Sa You v. Roe,* 97 N.C. App. 1, 10-11 (challenged statements were "based on fact," true, and therefore not defamatory). It is true there were indeed allegations against Mr. Dickman related to violations of "investment-related" standards of conduct and this is the extent of the representations made by Respondents in the Form U5. It is also true that Mr. Dickman was terminated by LPL after "additional information" was received — Mr. Dickman admitted to repeatedly, over the course of four (4) years, failing to disclose his beneficiary status in a client's trust, a violation of LPL's fiduciary policy. As a result, Mr. Dickman was discharged for cause by LPL and, as required after termination by his registered broker-dealer, then terminated by IAA as his RIA.

<div align="center">Mr. Dickman's Claims for Punitive Damages Should be Stricken and Dismissed</div>

Punitive damages may be awarded only if Mr. Dickman proves Respondents are liable for compensatory damages *and* that one or more aggravating factors (malice, fraud, or willful and wanton conduct) were present and related to the injury for which the compensatory damages were awarded. N.C. Gen. Stat. § 1D-15. Because the claims alleged in the Second Amended Statement of Claim have no factual or legal merit, Mr. Dickman's blanket and conclusory demand for punitive damages should be stricken and denied. The allegations made by Mr. Dickman, and any evidence he could possibly present to support them, do not and cannot demonstrate any misconduct on behalf of Respondents or any other basis that would warrant or support a claim for defamation, much less an award of punitive damages. Because Mr. Dickman has not alleged, and cannot prove, any set of facts to support fraud, malice, or willful and wanton conduct on behalf of Respondents to warrant an award of punitive damages, his claims should be stricken and dismissed.

<div align="center">Statements Made in the Form U5 Termination Notice are Protected by Qualified Privilege</div>

As a preliminary matter and as discussed above, the information contained in the Form U5 truthfully reported the mere existence of allegations against Mr. Dickman regarding non-disclosure

<div align="center">8</div>

of beneficiary status, improper money movement, and pending investigation. Respondents' statements were accurate and non-defamatory. However, assuming, *arguendo,* the statements in the Form U5 are somehow defamatory, Mr. Dickman's claims are further unavailing because he cannot overcome the qualified privilege these statements enjoy[10].

Under North Carolina law, a statement is protected by a qualified privilege if made in good faith and without actual malice upon a subject in which the communicating party has an interest or with respect to which she has some duty, and made to a person or persons having a corresponding right, interest, or duty, even if its content would otherwise be actionable. *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278 (1971).

It is undeniable Respondents were required to provide an explanation for Mr. Dickman's registration termination by way of the Form U5. *See* Article V, Section 3 of the FINRA By-Laws. Where, as here, such a duty exists, North Carolina courts have consistently applied the qualified privilege defense to such corporate matters and interests. *See, e.g. Hanton v. Gilbert,* 126 N.C. App. 561, *rev. denied,* 347 N.C. 266 (1997) (statements concerning plaintiff's dismissal from employment); *Long v. Vertical Technologies, Inc.*, 113 N.C. App 598 (1994) (statement by corporation to employees regarding plaintiff's discharge); *Alpar v. Weyerhaeuser*, 20 N.C. Appl. 340, *cert. denied,* 285 N.C. 85 (1974) (statements to employees regarding plaintiff's mental state).

The Form U5 disclosure provides protection to future prospective customers of a registered representative who most certainly rely on accurate and unfiltered information regarding an individual when making decisions regarding their investments. Additionally, future prospective

---

[10] Respondents conservatively assert the affirmative defense of qualified privilege; however, it is likely the statements made on the Form U5 more appropriately enjoy an absolute privilege. See N.C. Gen. Stat. Ann. § 96-4(t)(5) (providing absolute immunity for employer's statements made to North Carolina's employment agencies in connection with unemployment benefits). Similar to FINRA's Form U5 compulsory disclosure requirement, the statute requires employers to provide requisite information to the state's employment agencies. *See also Rosenberg v. Metlife, Inc.,* 493 F.3d 290 (2d Cir. (N.Y.) 2007) (holding defamatory statements within a Form U5 are subject to an absolute privilege from civil liability); *accord, Fontani v. Wells Fargo Inv., LLC,* 28 Cal. Rptr. 3d 833, 842 (Cal. Ct. App. 2005).

broker-dealer employers of a registered representative are required to consider disclosures on the Form U5 when making hiring decisions. *See* FINRA Regulatory Notice 10-39 (September 2010).

There can be no doubt the statements made by Respondents in Mr. Dickman's Form U5 are protected by, at a minimum, qualified privilege. Where qualified privilege exists, any inference of malice is rebutted and makes a showing of falsity *and* actual malice essential to the right of recovery. *Stewart, supra,* at 285 (emphasis added). Actual malice may be proven by evidence of the declarant's ill-will or personal hostility toward the claimant, or showing the statements were made with knowledge they were false, made with reckless disregard for the truth, or with a high degree of awareness of probable falsity. *Clark v. Brown*, 99 N.C. App. 255 (1990). Mr. Dickman cannot meet his burden of showing actual malice and, as a result, qualified privilege bars any recovery from the communication, irrespective of its falsity. *Id.* at 262-263.

Again, as is the case relating to Mr. Dickman's claims for punitive damages, so lacking is the existence of any factual basis to support a showing of actual malice or any other basis of recovery that Mr. Dickman's Second Amended Statement of Claim is completely devoid of any such allegations. Given the extremely low pleading standard, his failure to even suggest malice on Ms. Sexton's part highlights the absence of facts necessary to overcome the qualified privilege afforded to Ms. Sexton in this case. See *Presnell v. Pell*, 298 N.C. 715, 720 (1979) (merely alleging a defendant's actual malice in making defamatory statements is sufficient to overcome the qualified privilege at the pleading stage). Because Mr. Dickman has not alleged that Ms. Sexton acted with actual malice or in filing his Form U-5 in connection with the termination of his employment, and Ms. Sexton did not act with any malice, Mr. Dickman has not met his burden, the statements are protected by qualified privilege, and he is barred from recovery from either Respondent.

.

10

## IV.    Specific Response to Derivative Claims Against Mr. Russo

In order to succeed on a claim for negligent supervision, Mr. Dickman must establish that (i) Ms. Sexton is an incompetent employee, either by inherent unfitness or by previous specific acts of negligence from which incompetency may be inferred[11], (ii) that Ms. Sexton committed a tortious act resulting in injury to Mr. Dickman; and (iii) that Mr. Russo knew or had reason to know of Ms. Sexton's incompetency.  Smith v. Privette, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998), (quoting Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 495, 340 S.E.2d 116, 124, *disc. review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986)).  Again, Mr. Dickman fails to meet his burden at each turn.

First, Mr. Dickman makes no such allegations that, even when viewed in the light most favorable to him, support even an inference that Ms. Sexton is an incompetent or unfit employee. As recognized by Mr. Dickman, Ms. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008[12] while serving as IAA's CCO since 2014.  Second, as discussed above, Respondents statements in the Form U5 were accurate and non-defamatory and therefore are not actionable statements resulting in injury to Mr. Dickman.  Finally, within the decade of Ms. Sexton's industry tenure preceding the submission of the Form U5 in this matter, Mr. Dickman is unable to provide a single previous act of negligence by Ms. Sexton that suggests she is inherently unfit or from which incompetency may be inferred.  Accordingly, he fails to allege with any specificity that Mr. Russo knew or had reason to know that Ms. Sexton was incompetent and is again barred from recovery.

---

[11] *See* Medlin v. Bass, 398 S.E.2d 460 (N.C. 1990).
[12] Claimant's Second Amended Statement of Claim, p. 3, para. 1.

## V.    Specific Response to Remaining Claims

The remaining claims in Mr. Dickman's Second Amended Statement of Claim are wholly unsupported by any factual allegations to state a plausible claim for relief and should therefore be dismissed. In a single-sentence paragraph at the end of Mr. Dickman's Second Amended Statement of Claim, he summarily states that, in addition to defamation, he also brings claims against Respondents "for defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm, and further, against Mr. Russo for negligent hiring, failure to train, failure to supervise, and respondeat superior[13]." However, there are no factual allegations related to these additional claims preceding this sentence or following it. No level of liberal review of the entirety of the Second Amended Statement of Claim would allow the panel to determine Mr. Dickman has pled any plausible claims for relief with such a bald assertion. Plausibility exists only when a claimant pleads factual content that would allow this panel to draw the reasonable inference that the respondent is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A speculation of a mere possibility of misconduct is insufficient to support a plausible claim. *Id.* at 679. Because Mr. Dickman makes only "naked assertion[s]" devoid of "further factual enhancement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), his conclusory statements with respect to the remaining claims fail to meet requisite pleading standards and should be dismissed.

## VI.    Other Affirmative Defenses

While the Second Amended Statement of Claim contains no enumerated allegations, Respondents deny any allegation or inference of wrongdoing contained throughout and deny that

---

[13] Claimant's Second Amended Statement of Claim, p. 12, para. 7.

12

Mr. Dickman is entitled to any monetary damages, including without limitation, any compensatory damages or punitive damages, attorney's fees, or costs. In addition to the affirmative defense of qualified privilege asserted above, Respondents also assert the following affirmative defenses:

1.  The Second Amended Statement of Claim fails to state any cause of action against Respondents.

2.  Respondents' statements in the Form U5 are protected by absolute privilege.

3.  Mr. Dickman's claims fails to allege any claim with the requisite particularity.

4.  Respondents are not liable for Mr. Dickman's claims because any damages sustained by Mr. Dickman were not actually or proximately caused by Respondents.

5.  Mr. Dickman has failed to state a claim for negligence, or any derivative thereof, as there was no duty owed or breached, at any time, by either Respondent.

6.  No private right of action exists for violations of FINRA Rules or the FINRA Code of Conduct.

7.  Respondents cannot be held individually or personally liable for any allegations contained herein, as at all times they acted within the scope of their employment at IAA.

8.  Mr. Dickman is not entitled to recovery for unjust enrichment because the parties had a relationship based upon a written contract.

9.  At all times, Respondents acted with due diligence, in good faith, and with the degree of care required.

## VII.  Reservation of Right to Amend

Respondents reserve the right to amend this Response and Affirmative Defenses as necessary and appropriate to assert any potential counterclaims, including attorney's fees[14], defenses, third-party defenses, facts, and affirmative defenses as further facts and information are developed.

## VIII.  Motion to Change Hearing Location Pursuant to FINRA Rule 13213(a)

The arbitration proceedings should be conducted in North Carolina rather than in Louisville, Kentucky, pursuant to FINRA Rule 13213(a) as North Carolina—not Kentucky—is the proper hearing location.  Mr. Dickman's claims against Respondents arise out of his affiliation with IAA.  As explained in greater detail below, North Carolina is the only state with any meaningful connection to the operative facts at issue in Mr. Dickman's Second Amended Statement of Claim.  Further, Mr. Dickman acknowledges in his Agreement[15] that North Carolina is the proper venue with respect to arbitration of any disputes, claims, or controversies relating to his association or termination from IAA.

Pursuant to FINRA Rule 13213(a), [t]he Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration."[16] "In cases involving members only or more than one associated person, the Director will consider a variety of factors, including: [t]he

---

[14] Mr. Dickman's Agreement with IAA provides the prevailing party shall be entitled to reasonable attorney's fees in addition to any such other relief that is just and proper.

[15] *See* n. 5, *supra.*

[16] FINRA Rule 13213(a) also states "[i]n cases involving an associated person, the Director will generally select the hearing location closest to where the associated person was employed at the time of the events giving rise to the dispute, unless the hearing location closest to the associated person's employment is in a different state, in which case the associated person may request a hearing location in his or her state of employment at the time of the events giving rise to the dispute." However, the remainder of the rule provides for the procedures in cases where more than one associated person is involved.  With the addition of Mr. Russo, this portion of the rule is inapplicable to this matter and an analysis considering the various factors in determining whether to change the hearing location is proper.

14

parties' signed agreement to arbitrate, if any; [w]hich party initiated the transaction or business in issue; and [t]he location of essential witnesses and documents." FINRA R. 13213(a); *see also* FINRA Office of Dispute Resolution Arbitrator's Guide pp. 44-45. Here, the facts supporting each factor weigh in favor of a finding that Mr. Dickman's claims should be arbitrated in North Carolina rather than Kentucky.

As to the first factor, Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision *and* forum-selection clause, acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA. The second factor weighs in favor of conducting the arbitration in North Carolina as IAA terminated the relationship with Mr. Dickman and filed the Form U5 at issue on December 20, 2018 from its North Carolina office. While IAA is not a party to this action, Mr. Dickman does bring claims against Respondents in their individual capacities for their role in the Form U5 submission, which he attributes to the initiation of the transaction at issue.[17] Both Respondents live and work in Charlotte, North Carolina in order to be close to IAA's home office there. As a result, the third factor also weighs in favor of conducting the arbitration in North Carolina. While some of Respondents' witnesses may reside in Kentucky, each of the Respondents, the entity terminating Mr. Dickman giving rise to the claims at issue, and a vast majority of all essential witnesses and documents, are located in North Carolina. LPL Financial does have office space in Kentucky but, "as one of the largest and most well-known broker-dealers in the country,"[18] also has locations throughout North Carolina. Their largest primary office is

---

[17] Claimant's Second Amended Statement of Claim, p. 4, para. 6.
[18] Claimant's Second Amended Statement of Claim, p. 3, para. 3.

15

located in Fort Mill, South Carolina[19], approximately fifteen to twenty minutes from IAA's Charlotte, North Carolina location.

In addition to FINRA Rule 13213, the federal venue statute and case law interpreting the same is instructive. 28 U.S.C. § 1404(a) provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought . . ." 28 U.S.C. § 1404(a). In deciding whether to transfer an action to a different venue, federal courts in the Sixth Circuit, which encompasses Kentucky, perform a two-step analysis: (1) whether the action could have initially been brought in the court where the transfer is sought[20] and, if so, (2) whether the transfer is appropriate under a balance of convenience and justice factors. *Badger v. Speedway, LLC,* No. 3:14-cv-7, 2014 U.S. Dist. LEXIS 184426, *2-3 (S.D. Ohio Dec. 5, 2014).

## The Convenience of the Parties and Witnesses and the Interests of Justice

In determining whether to transfer venue under § 1404(a), the court must consider "the private interests of the parties, including their convenience and the convenience of potential

---

[19] LPL's other two primary locations are located in San Diego, California and Boston, Massachusetts, respectively.

[20] 28 U.S.C. § 1404(a) specifically limits transfer authority to "actions commenced in a district court where both personal jurisdiction and venue are proper." *Newberry v. Silverman,* 789 F.3d 636, 641 (6th Cir. 2015). Where no personal jurisdiction exists over a Defendant, federal courts may only transfer cases under 28 U.S.C. §§ 1406(a) and 1631, *Flynn v. Greg Anthony Constr. Co.,* 95 F. App'x 726, 738 (6th Cir. 2003). In lieu of dismissal, courts may rely on §1406(a) "if it be in the interest of justice . . . to any district or division in which [the case] could have been brought," *Martin v. Stokes,* 623 F.2d 469, 471 (6th Cir. 1980), or §1631 "in the interest of justice" . . . when the court finds "a want of jurisdiction." *Stanifer v. Brannan,* 564 F.3d 455, 456-457 (6th Cir. 2009). As Mr. Dickman has brought claims against Respondents in their personal capacity, and failed to bring any claim against IAA, a federal court would likely not have personal jurisdiction over Respondents, therefore requiring a comparative analysis to 28 U.S.C. §§ 1406(a) or 1631, respectively rather than §1404(a). The statute applied is usually significant as where venue is transferred under §1404(a), the substantive law (including any choice of law rule) of the transferor court applies. *Newberry,* 789 F.3d at 640. However, here the technical distinction is without difference as FINRA rules govern the transfer and Mr. Dickman has consented to North Carolina as the proper forum. Further, where a change of venue is sought pursuant to §§1406(a) or 1631, the considerations as to the convenience of the parties, witnesses, operative facts relating to the claim, and other judicial interest concerns, are still given. Therefore, analysis between the federal rules and FINRA Rule 13213 is made within, for supporting purposes only, with § 1404(a), and addressing only the balance of convenience and justice factors consistent throughout §§1404(a), 1406(a), and 1631, respectively.

16

witnesses, as well as other public-interest concerns, such as systemic integrity and fairness which come under the rubric of "interests of justice." *Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1136-37 (6th Cir.), *cert. denied,* 502 U.S. 821 (1991). The private interests considered include the plaintiff's choice of forum and the location of records, as well as the convenience of witnesses. *Id.* Such an analysis is a fact-intensive inquiry, requiring case-by-case consideration of both convenience and fairness of the parties involved. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22 (1988). Therefore, no one factor is dispositive. *Id.* Here, considering the convenience of all parties, witnesses, operative facts relating to the claims, and the Agreement between the parties agreeing to venue, the appropriate forum for this arbitration is North Carolina. The only connection that this matter has to the state of Kentucky is that Mr. Dickman happens to reside there. This fact alone is wholly insufficient to justify conducting the arbitration in Kentucky rather than North Carolina.

As mentioned above, while some witnesses called by Respondents may live in Kentucky, the majority of the testimony will come from Respondents themselves. Mr. Dickman's claims arise out of his affiliation with both IAA and LPL. IAA's principle place of business is located in Charlotte, North Carolina. As a result, both Mr. Russo and Ms. Sexton reside in North Carolina as well and, at all relevant times related to the claims brought by Mr. Dickman, any communication between Mr. Dickman and Respondents originated from their office in North Carolina. The Form U5 containing the statements Mr. Dickman claims are defamatory, was filed by Respondents out of the North Carolina office as well. As the operative facts in this arbitration occurred in North Carolina, the vast majority, if not all, of the documents in this dispute are located on IAA's computer system in North Carolina.

17

While a plaintiff's home or chosen forum is generally given great weight, it is not the dispositive factor in determining appropriate venue. *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 413 (6th Cir. 1998). This is especially so where, as here, little to none of the conduct giving rise to the action—the filing of the allegedly defamatory Form U5— occurred in the chosen forum. *Neff Ath. Lettering Co. v. Walters*, 524 F. Supp. 268, 272-73 (S.D. Ohio 1981) (granting transfer and finding deference to plaintiff's freedom to select his home forum had "minimal value" given the cause of action had little connection to the same). Instead, given the geographic distribution of parties and witnesses[21], the most appropriate venue for this arbitration lies in North Carolina.

Finally, in his Investment Adviser Representative Agreement with IAA, Mr. Dickman expressly agreed that any such arbitration made necessary as the result of a dispute, claim, or controversy related to his association with or termination from IAA would occur in Charlotte, North Carolina. While the presence of such a forum-selection clause is not dispositive, it is "a significant factor that figures centrally in the district court's calculus." *Stewart Org.*, 487 U.S. at 31. However, when considered in conjunction of the other public- and private-interest concerns detailed above, this factor also weighs heavily in favor of transferring this arbitration to North Carolina.

Based on the foregoing, the arbitration should be conducted in North Carolina, and not in Kentucky. This matter has minimal connection to Kentucky, consisting entirely of Mr. Dickman's residence there. Under FINRA Rule 13213(a) and 28 U.S.C. § 1404(a), this, without more, is not enough to maintain the proceeding in Kentucky.

---

[21] The Initial Pre-Hearing Conference ("IPHC") with counsel for Ms. Sexton and Mr. Dickman occurred on January 7, 2020 wherein Ms. Sexton failed to raise any objection to venue. However, neither Mr. Russo nor LPL had been added as parties at that time and were therefore unrepresented during the IPHC and could make no objection. Now that Mr. Russo has been added as a Respondent and retained counsel, especially given his domicile in North Carolina along with Ms. Sexton's, the motion to change venue is both timely and appropriate.

**WHEREFORE**, Respondents respectfully request:

1. that the claims against them be denied in their entirety;

2. that all forum fees be awarded against Mr. Dickman;

3. that Respondents be awarded costs and attorney's fees associated with responding to these claims;

4. that the arbitration is conducted in North Carolina pursuant to FINRA Rule 13213(a);

5. that the panel grant such other and further relief as it deems just and proper.

This the 1st day of May, 2020.

<div style="margin-left: 45%;">

Respectfully submitted,
**AKERMAN LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Phone: (954) 463-2700
Fax: (954) 463-2224

By:_____ /s/ Jonathan S. Robbins_____
    **Jonathan S. Robbins, Esq.**
    Florida Bar Number: 989428
    Email: jonathan.robbins@akerman.com
    *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

    **Shea B. Ward, Esq.**
    North Carolina Bar Number: 49787
    Email: bree.ward@akerman.com
    *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

</div>

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was served on this 1st day of May, 2020, upon all other parties to this action through the FINRA DR Portal, addressed as follows:

Jeremy L. Bartall, Esq.
*Counsel for Claimant Mark J. Dickman*
Bartell Law PLLC
700 12th Street NW
Suite 700
Washington, D.C. 20005
Email:
jeremybartell@bartell-law.com

Michael A. Brady, Esq.
*Counsel for Respondent LPL Financial LLC*
The Tower at Peabody Place
100 Peabody Place
Suite 1300
Memphis, TN 38103
Email:
mbrady@bassberry.com

Elizabeth A. Muldoon
Senior Case Administrator
FINRA Office of Dispute Resolution
Midwest Regional Office
55 West Monroe Street
Suite 2600
Chicago, IL 60603-5104

_____/s/ Jonathan S. Robbins_____
Jonathan S. Robbins

20

# EXHIBIT I

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.

| | |
|---|---|
| In the Matter of an Arbitration Between:<br><br>MARK JAMES DICKMAN,<br>(CRD#: 2066229)<br><br>    Claimant,<br><br>and<br><br>JESSICA NADINE SEXTON,<br>(CRD#: 5260955)<br><br>and,<br><br>ROBERT P. RUSSO<br>(CRD#: 4466372),<br><br>and,<br><br>LPL Financial LLC<br>(CRD#: 6413)<br><br>    Respondents. | **FINRA NO. 19-02406** |

## RESPONSE AND AFFIRMATIVE DEFENSES
## TO SECOND AMENDED STATEMENT OF CLAIM AND MOTION TO CHANGE
## HEARING LOCATION

Respondents, Jessica Nadine Sexton ("Ms. Sexton") and Robert P. Russo ("Mr. Russo," and together with Ms. Sexton, the "Respondents"), by and through the undersigned counsel, hereby submits the following Response and Affirmative Defenses to the Second Amended Statement of Claim filed by Mark James Dickman ("Mr. Dickman" or "Claimant"). Ms. Sexton's Response to Claimant's initial Statement of Claim is restated in its entirety except as otherwise amended to address the addition of Mr. Russo as a party, address the claims now brought against him, and to include Respondents' Motion to Change Hearing Location. Accordingly, each of the Respondents hereby state as follows:

1

## I.      Introduction and Initial Response

The allegations contained in Mr. Dickman's Statement of Claim are factually and legally without merit and should be dismissed. The inception of Mr. Dickman's troubles stem from his own failure to disclose to LPL Financial ("LPL") that he was a contingent beneficiary in a client's trust—a fact he also affirmatively attested to in the negative over the course of four (4) consecutive years. While seemingly minor, the omission violated LPL's fiduciary capacity policy and initiated a series of unfortunate events, the resulting consequences of which Mr. Dickman inappropriately blames on Respondents.

Ultimately, Mr. Dickman's non-disclosure and, upon information and belief, related investigation by the U.S. Postal Service Office of Inspector General ("USPS OIG"), led to the termination of his registration with LPL and, consequently, his relationship and registration with Independent Adviser Alliance ("IAA"). Contrary to Mr. Dickman's misstatement of the law in his Statement of Claim, the SEC, FINRA, and state securities regulations do not *request* information related to the termination of an investment advisor. Rather, the terminating firm is *required* to file with FINRA a Uniform Termination Notice on Form U5 ("Form U5" or "U5") providing the reasons for an involuntary termination within thirty days of termination. IAA was required to fill out the Form U5 in performance of its own regulatory obligations as an SEC-Registered Investment Advisor ("RIA").

Ms. Sexton, IAA's Chief Compliance Officer[1] ("CCO"), correctly and properly provided the required information related to Mr. Dickman's termination when she filed the Form U5. The information included therein was factual and accurate as provided by LPL. Although he attempts

---

[1]Mr. Dickman accuses Ms. Sexton of falsely representing that she is also the CCO for Investra Financial Services ("IFS"). However, a cursory review of IAA's registration status and public disclosures clearly denotes IFS as a doing-business-as ("d/b/a") entity of IAA. Acting as CCO for both IAA and IFS is entirely permissible under FINRA and SEC standards.

to downplay the severity of his omission, Mr. Dickman admits he *did* fail to disclose his beneficiary status in a client's trust in violation of LPL's firm policy[2]. Additionally, Respondents were in fact notified by LPL that Mr. Dickman was under investigation by USPS OIG for some sort of improper money movement as a result of, or related to, the non-disclosure. As a result, the filing of the Form U5 by Respondents was proper and in accordance with the standard of care that would be reasonably afforded to Mr. Dickman under the circumstances. Much to Mr. Dickman's chagrin, the mandatory reporting of the existence of allegations as reasons for his termination do not amount to defamation, or suggest any level of incompetence on behalf of Respondents, simply because the nature of the existing allegations against him are unsavory.

Additionally, the disclosures on Mr. Dickman's Form U5 relating to his termination are protected by, at a minimum, qualified privilege. Even assuming, *arguendo*, the truthful statements in the Form U5 do somehow amount to defamation, Mr. Dickman cannot recover absent a showing of actual malice on Ms. Sexton's part[3]. In fact, Ms. Sexton has never met Mr. Dickman, had no working relationship with him during Claimant's (less than one-week) association with IAA, and has had no interaction with him outside of limited email correspondence in December 2018 regarding the Commonwealth of Kentucky's initial approval of Claimant's IAR registration with IAA. To insinuate that she acted with any malice and would have had any reason or incentive to do so when submitting his Form U5 is completely unfounded and nonsensical. Mr. Dickman must agree as his Second Amended Statement of Claim is entirely devoid of any such allegations, failing to support even an inference of malice. Instead, Mr. Dickman wraps up his Second Amended Statement of Claim with a series of conclusory claims against Respondents of fraud, tortious

---

[2] Claimant's Second Amended Statement of Claim, fn 3.
[3] As Mr. Dickman brings allegations against Mr. Russo for derivative claims that rely on the existence of the commission of an actionable tort, any reference to Ms. Sexton's behavior, actions, knowledge, or drafting, filing, or submitting the Form U5 is also a response on behalf of Mr. Russo.

3

interference, breach of contract, breach of regulatory duty causing harm, and unjust enrichment—none of which he provides enumerated facts or allegations to support.

Finally, Mr. Dickman also makes a blanket demand for relief against Mr. Russo based on claims for negligent hiring, failure to train, failure to supervise, and respondent superior. Again, Mr. Dickman fails to meet event basic pleading standards required to support these claims. While North Carolina recognizes a cause of action for negligent supervision and retention of an employee, Mr. Dickman cannot satisfy the requisite elements to succeed on such theories. Not only does Mr. Dickman fail to establish an actionable tort has been committed, but he also fails to allege that Ms. Sexton is incompetent or that Mr. Russo had any prior knowledge, constructive or actual, that Ms. Sexton was incompetent. As a result, Mr. Dickman's claims against both Respondents fail to meet necessary pleading standards and should be dismissed.

## II.    **Factual Background**

Because Mr. Dickman purposefully attempts to attenuate the relationships between LPL, IAA, and Independent Financial Partners ("IFP")[4], it is necessary to briefly detail the actual working relationships between the three entities at the outset.

LPL Financial is a registered broker-dealer and FINRA member firm that provides financial services to clients through independent financial advisers and adviser firms. IAA is an RIA, and LPL office of supervisory jurisdiction ("OSJ") with its corporate offices located in North Carolina[5] that offers support and services to advisers through various advisory programs and by leveraging LPL's broker-dealer platform. IFP, at all times relevant to this matter, was an RIA and

---

[4] Mr. Dickman purposefully attenuates the relationships between IAA, LPL, and IFP in an effort to suggest some sort of nefarious recruiting scheme in support of any future claims of unjust enrichment, etc. that he has threatened but, thus far, failed to claim against IAA.

[5] Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision and a forum-selection clause acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA.

4

until May of 2019 (when it commenced operations as its own broker-dealer), also an LPL OSJ utilizing LPL's platforms. About one (1) year prior to IFP and LPL officially parting ways, LPL, in conjunction with IAA and a number of other LPL OSJ/RIA firms, offered an optional program where IFP advisers could choose to remain with LPL's broker-dealer platform through IAA's OSJ rather than breaking away from LPL to associate with IFP's new broker-dealer. Mr. Dickman was one such adviser who was associated with IFP's RIA/OSJ at the time of their well-publicized split from LPL. Although he fails to disclose so in his Second Amended Statement of Claim, and in direct contravention to his allegations regarding any "overly aggressive" recruiting efforts by Mr. Russo[6], Mr. Dickman contacted IAA in order to stay and remain on the LPL platform by taking advantage of the RIA programs offered by IAA.

Upon effectuation of Claimant's transfer from IFP to IAA in late 2018, Respondents and IAA were contacted by LPL and notified that Mr. Dickman had failed to disclose his beneficiary status in a client's trust, violating LPL's fiduciary capacity policy, and that Mr. Dickman was, at that time, also "under investigation" (the specific terminology used by LPL's compliance and legal departments) by the USPS OIG for some form of improper money movement, that, upon information and belief, related to his initial non-disclosure and false certifications regarding his beneficiary status. After further discussions between Mr. Dickman, LPL, and IAA, IAA was informed by LPL that they would be terminating Mr. Dickman's registrations and terminating him for cause. Mr. Dickman was then terminated by both LPL as well as by IAA, as required in its own capacity as an RIA, and pursuant to its OSJ contractual relationship with LPL.

---

[6] Claimant's Second Amended Statement of Claim, p. 2, para. 3.

## III.    Specific Response to Defamation Claim

In order to establish a claim for defamation in North Carolina, Mr. Dickman must establish that Respondents published a statement that they knew or should have known was false and defamatory, and that Claimant incurred actual damages[7] as a consequence.  *Tyson L'eggs Products, Inc.,* 84 N.C. App. 484 (2008).  Mr. Dickman cannot satisfy these requisites.

Primarily, Mr. Dickman argues that Ms. Sexton made false assertions in the Form U5 related to the reasons for his termination.  However, Mr. Dickman repeatedly conflates, for his benefit, actionable statements—false statements of fact regarding an individual—with the non-actionable—statements that certain allegations relating to an individual merely exist.  At all times, the relevant statements at issue in this matter involve the latter and do not and cannot support a claim for defamation.

It is undisputed that LPL did in fact contact IAA and Ms. Sexton to notify her that Mr. Dickman had violated LPL's fiduciary policy by failing to disclose his beneficiary status in a client's trust, and that he was under investigation by the USPS OIG for some sort of improper money movement.  Because this collective exchange between LPL and Ms. Sexton is undisputed, the gravamen of Mr. Dickman's claims is really that Ms. Sexton identified the allegations against him without fully investigating the truthfulness of the allegations relayed to her by LPL.  By claiming Ms. Sexton instead "depicted Mr. Dickman as some sort of criminal[8]" in the Form U5,

---

[7] Because Ms. Sexton's statements were truthful, Mr. Dickman cannot satisfy the primary requisite element of a defamation claim.  In addition, he fails to provide any basis whatsoever for alleged damages suffered by Mr. Dickman, how those damages have been calculated, and fails to allege or establish that Ms. Sexton's statements in the Form U5, rather than his own violation of fiduciary policy and resulting termination, were the causation of the supposed damages.  Upon information and belief, Mr. Dickman's previous RIA/OSJ, IFP, was aware of the USPS OIG and non-disclosure shortly after, if not before, his termination with both LPL and IAA.  Indeed, it is curious that while Mr. Dickman's Statement of Claim insinuates that "no reputable firm" would hire him, Mr. Dickman was able to quickly reaffiliate with IFP, shortly after his termination by LPL and IAA, and prior to Ms. Sexton's final U5 amendment.
[8] Claimant's Second Amended Statement of Claim, p. 2, para. 1.

6

he suggests that the allegations in the Form U5 carries an innuendo that Mr. Dickman was in fact guilty of such violations. This cannot give rise to a claim for defamation.

Question 7F(1) asked Ms. Sexton to provide information only about the *existence* of allegations related to violations of "investment-related statutes" or the wrongful taking of property and imposes no duty to withhold information until a full investigation can run its course. See *e.g.* *Whitaker v. Wells Fargo Advisors, LLC*, Civil Action No. 3:11CV380-HEH (E.D. Va. Sep. 29, 2011) (In representing merely that the subject was discharged after *allegations were made* that accused him of misconduct, an affirmative answer to Question 7F(1) neither indicates nor implies that the employee actually committed the underlying misdeeds) (emphasis in original). Where, as here, a statement cannot be reasonably interpreted as stating actual facts about an individual's conduct, it cannot be the subject of a defamation suit. *Craven v. Cope*, 656 S.E.2d 729 (N.C. Ct. App. 2008).

Nowhere in the Form U5 filed by Respondents is anything disclosed other than the mere existence of allegations of wrongdoing on Mr. Dickman's part. Where Respondents were either required by the Form U5 to provide additional details related to the reason for termination in the Investigation Disclosure Reporting Page ("DRP"), or were given the option to, it was again carefully and clearly denoted that LPL provided information relating only to *allegations* of improper money movement and pending investigation by USPS OIG, but that information was "limited." While Mr. Dickman claims this "certainly allows the mind to wander[9]" regarding Mr. Dickman's conduct, at no point do Respondents state actual facts regarding Mr. Dickman's culpability.

Further, the statements regarding the *existence* of these allegations are in fact true and therefore cannot be defamatory. Truth of the matter or substantial truth is a complete defense to a

---

[9] Claimant's Second Amended Statement of Claim, p. 8, para. 2.

7

claim for defamation. *Kwan-Sa You v. Roe,* 97 N.C. App. 1, 10-11 (challenged statements were "based on fact," true, and therefore not defamatory). It is true there were indeed allegations against Mr. Dickman related to violations of "investment-related" standards of conduct and this is the extent of the representations made by Respondents in the Form U5. It is also true that Mr. Dickman was terminated by LPL after "additional information" was received — Mr. Dickman admitted to repeatedly, over the course of four (4) years, failing to disclose his beneficiary status in a client's trust, a violation of LPL's fiduciary policy. As a result, Mr. Dickman was discharged for cause by LPL and, as required after termination by his registered broker-dealer, then terminated by IAA as his RIA.

<p style="text-align:center;">Mr. Dickman's Claims for Punitive Damages Should be Stricken and Dismissed</p>

Punitive damages may be awarded only if Mr. Dickman proves Respondents are liable for compensatory damages *and* that one or more aggravating factors (malice, fraud, or willful and wanton conduct) were present and related to the injury for which the compensatory damages were awarded. N.C. Gen. Stat. § 1D-15. Because the claims alleged in the Second Amended Statement of Claim have no factual or legal merit, Mr. Dickman's blanket and conclusory demand for punitive damages should be stricken and denied. The allegations made by Mr. Dickman, and any evidence he could possibly present to support them, do not and cannot demonstrate any misconduct on behalf of Respondents or any other basis that would warrant or support a claim for defamation, much less an award of punitive damages. Because Mr. Dickman has not alleged, and cannot prove, any set of facts to support fraud, malice, or willful and wanton conduct on behalf of Respondents to warrant an award of punitive damages, his claims should be stricken and dismissed.

<p style="text-align:center;">Statements Made in the Form U5 Termination Notice are Protected by Qualified Privilege</p>

As a preliminary matter and as discussed above, the information contained in the Form U5 truthfully reported the mere existence of allegations against Mr. Dickman regarding non-disclosure

<p style="text-align:center;">8</p>

of beneficiary status, improper money movement, and pending investigation. Respondents' statements were accurate and non-defamatory. However, assuming, *arguendo,* the statements in the Form U5 are somehow defamatory, Mr. Dickman's claims are further unavailing because he cannot overcome the qualified privilege these statements enjoy[10].

Under North Carolina law, a statement is protected by a qualified privilege if made in good faith and without actual malice upon a subject in which the communicating party has an interest or with respect to which she has some duty, and made to a person or persons having a corresponding right, interest, or duty, even if its content would otherwise be actionable. *Stewart v. Nation-Wide Check Corp.*, 279 N.C. 278 (1971).

It is undeniable Respondents were required to provide an explanation for Mr. Dickman's registration termination by way of the Form U5. *See* Article V, Section 3 of the FINRA By-Laws. Where, as here, such a duty exists, North Carolina courts have consistently applied the qualified privilege defense to such corporate matters and interests. *See, e.g. Hanton v. Gilbert,* 126 N.C. App. 561, *rev. denied*, 347 N.C. 266 (1997) (statements concerning plaintiff's dismissal from employment); *Long v. Vertical Technologies, Inc.*, 113 N.C. App 598 (1994) (statement by corporation to employees regarding plaintiff's discharge); *Alpar v. Weyerhaeuser*, 20 N.C. Appl. 340, *cert. denied*, 285 N.C. 85 (1974) (statements to employees regarding plaintiff's mental state).

The Form U5 disclosure provides protection to future prospective customers of a registered representative who most certainly rely on accurate and unfiltered information regarding an individual when making decisions regarding their investments. Additionally, future prospective

---

[10] Respondents conservatively assert the affirmative defense of qualified privilege; however, it is likely the statements made on the Form U5 more appropriately enjoy an absolute privilege. See N.C. Gen. Stat. Ann. § 96-4(t)(5) (providing absolute immunity for employer's statements made to North Carolina's employment agencies in connection with unemployment benefits). Similar to FINRA's Form U5 compulsory disclosure requirement, the statute requires employers to provide requisite information to the state's employment agencies. *See also Rosenberg v. Metlife, Inc.,* 493 F.3d 290 (2d Cir. (N.Y.) 2007) (holding defamatory statements within a Form U5 are subject to an absolute privilege from civil liability); *accord, Fontani v. Wells Fargo Inv., LLC,* 28 Cal. Rptr. 3d 833, 842 (Cal. Ct. App. 2005).

broker-dealer employers of a registered representative are required to consider disclosures on the Form U5 when making hiring decisions. *See* FINRA Regulatory Notice 10-39 (September 2010).

There can be no doubt the statements made by Respondents in Mr. Dickman's Form U5 are protected by, at a minimum, qualified privilege. Where qualified privilege exists, any inference of malice is rebutted and makes a showing of falsity *and* actual malice essential to the right of recovery. *Stewart, supra,* at 285 (emphasis added). Actual malice may be proven by evidence of the declarant's ill-will or personal hostility toward the claimant, or showing the statements were made with knowledge they were false, made with reckless disregard for the truth, or with a high degree of awareness of probable falsity. *Clark v. Brown*, 99 N.C. App. 255 (1990). Mr. Dickman cannot meet his burden of showing actual malice and, as a result, qualified privilege bars any recovery from the communication, irrespective of its falsity. *Id.* at 262-263.

Again, as is the case relating to Mr. Dickman's claims for punitive damages, so lacking is the existence of any factual basis to support a showing of actual malice or any other basis of recovery that Mr. Dickman's Second Amended Statement of Claim is completely devoid of any such allegations. Given the extremely low pleading standard, his failure to even suggest malice on Ms. Sexton's part highlights the absence of facts necessary to overcome the qualified privilege afforded to Ms. Sexton in this case. See *Presnell v. Pell*, 298 N.C. 715, 720 (1979) (merely alleging a defendant's actual malice in making defamatory statements is sufficient to overcome the qualified privilege at the pleading stage). Because Mr. Dickman has not alleged that Ms. Sexton acted with actual malice or in filing his Form U-5 in connection with the termination of his employment, and Ms. Sexton did not act with any malice, Mr. Dickman has not met his burden, the statements are protected by qualified privilege, and he is barred from recovery from either Respondent.

10

## IV. Specific Response to Derivative Claims Against Mr. Russo

In order to succeed on a claim for negligent supervision, Mr. Dickman must establish that (i) Ms. Sexton is an incompetent employee, either by inherent unfitness or by previous specific acts of negligence from which incompetency may be inferred[11], (ii) that Ms. Sexton committed a tortious act resulting in injury to Mr. Dickman; and (iii) that Mr. Russo knew or had reason to know of Ms. Sexton's incompetency. Smith v. Privette, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998), (quoting Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 495, 340 S.E.2d 116, 124, *disc. review denied,* 317 N.C. 334, 346 S.E.2d 140 (1986)). Again, Mr. Dickman fails to meet his burden at each turn.

First, Mr. Dickman makes no such allegations that, even when viewed in the light most favorable to him, support even an inference that Ms. Sexton is an incompetent or unfit employee. As recognized by Mr. Dickman, Ms. Sexton has been a FINRA-registered Series 24 principal and supervisor since 2008[12] while serving as IAA's CCO since 2014. Second, as discussed above, Respondents statements in the Form U5 were accurate and non-defamatory and therefore are not actionable statements resulting in injury to Mr. Dickman. Finally, within the decade of Ms. Sexton's industry tenure preceding the submission of the Form U5 in this matter, Mr. Dickman is unable to provide a single previous act of negligence by Ms. Sexton that suggests she is inherently unfit or from which incompetency may be inferred. Accordingly, he fails to allege with any specificity that Mr. Russo knew or had reason to know that Ms. Sexton was incompetent and is again barred from recovery.

---

[11] *See* Medlin v. Bass, 398 S.E.2d 460 (N.C. 1990).
[12] Claimant's Second Amended Statement of Claim, p. 3, para. 1.

11

## V.  Specific Response to Remaining Claims

The remaining claims in Mr. Dickman's Second Amended Statement of Claim are wholly unsupported by any factual allegations to state a plausible claim for relief and should therefore be dismissed.  In a single-sentence paragraph at the end of Mr. Dickman's Second Amended Statement of Claim, he summarily states that, in addition to defamation, he also brings claims against Respondents "for defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, and intentional infliction of emotional harm, and further, against Mr. Russo for negligent hiring, failure to train, failure to supervise, and respondeat superior[13]."  However, there are no factual allegations related to these additional claims preceding this sentence or following it.  No level of liberal review of the entirety of the Second Amended Statement of Claim would allow the panel to determine Mr. Dickman has pled any plausible claims for relief with such a bald assertion.  Plausibility exists only when a claimant pleads factual content that would allow this panel to draw the reasonable inference that the respondent is liable for the misconduct alleged.  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  A speculation of a mere possibility of misconduct is insufficient to support a plausible claim.  *Id.* at 679.  Because Mr. Dickman makes only "naked assertion[s]" devoid of "further factual enhancement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), his conclusory statements with respect to the remaining claims fail to meet requisite pleading standards and should be dismissed.

## VI.  Other Affirmative Defenses

While the Second Amended Statement of Claim contains no enumerated allegations, Respondents deny any allegation or inference of wrongdoing contained throughout and deny that

---

[13] Claimant's Second Amended Statement of Claim, p. 12, para. 7.

12

Mr. Dickman is entitled to any monetary damages, including without limitation, any compensatory damages or punitive damages, attorney's fees, or costs. In addition to the affirmative defense of qualified privilege asserted above, Respondents also assert the following affirmative defenses:

1. The Second Amended Statement of Claim fails to state any cause of action against Respondents.

2. Respondents' statements in the Form U5 are protected by absolute privilege.

3. Mr. Dickman's claims fails to allege any claim with the requisite particularity.

4. Respondents are not liable for Mr. Dickman's claims because any damages sustained by Mr. Dickman were not actually or proximately caused by Respondents.

5. Mr. Dickman has failed to state a claim for negligence, or any derivative thereof, as there was no duty owed or breached, at any time, by either Respondent.

6. No private right of action exists for violations of FINRA Rules or the FINRA Code of Conduct.

7. Respondents cannot be held individually or personally liable for any allegations contained herein, as at all times they acted within the scope of their employment at IAA.

8. Mr. Dickman is not entitled to recovery for unjust enrichment because the parties had a relationship based upon a written contract.

9. At all times, Respondents acted with due diligence, in good faith, and with the degree of care required.

13

## VII.  Reservation of Right to Amend

Respondents reserve the right to amend this Response and Affirmative Defenses as necessary and appropriate to assert any potential counterclaims, including attorney's fees[14], defenses, third-party defenses, facts, and affirmative defenses as further facts and information are developed.

## VIII.  Motion to Change Hearing Location Pursuant to FINRA Rule 13213(a)

The arbitration proceedings should be conducted in North Carolina rather than in Louisville, Kentucky, pursuant to FINRA Rule 13213(a) as North Carolina—not Kentucky—is the proper hearing location.  Mr. Dickman's claims against Respondents arise out of his affiliation with IAA.  As explained in greater detail below, North Carolina is the only state with any meaningful connection to the operative facts at issue in Mr. Dickman's Second Amended Statement of Claim.  Further, Mr. Dickman acknowledges in his Agreement[15] that North Carolina is the proper venue with respect to arbitration of any disputes, claims, or controversies relating to his association or termination from IAA.

Pursuant to FINRA Rule 13213(a), [t]he Director will decide which of FINRA's hearing locations will be the hearing location for the arbitration."[16] "In cases involving members only or more than one associated person, the Director will consider a variety of factors, including: [t]he

---

[14] Mr. Dickman's Agreement with IAA provides the prevailing party shall be entitled to reasonable attorney's fees in addition to any such other relief that is just and proper.

[15] *See* n. 5, *supra*.

[16] FINRA Rule 13213(a) also states "[i]n cases involving an associated person, the Director will generally select the hearing location closest to where the associated person was employed at the time of the events giving rise to the dispute, unless the hearing location closest to the associated person's employment is in a different state, in which case the associated person may request a hearing location in his or her state of employment at the time of the events giving rise to the dispute." However, the remainder of the rule provides for the procedures in cases where more than one associated person is involved.  With the addition of Mr. Russo, this portion of the rule is inapplicable to this matter and an analysis considering the various factors in determining whether to change the hearing location is proper.

14

parties' signed agreement to arbitrate, if any; [w]hich party initiated the transaction or business in issue; and [t]he location of essential witnesses and documents." FINRA R. 13213(a); *see also* FINRA Office of Dispute Resolution Arbitrator's Guide pp. 44-45. Here, the facts supporting each factor weigh in favor of a finding that Mr. Dickman's claims should be arbitrated in North Carolina rather than Kentucky.

As to the first factor, Mr. Dickman's Advisory Representative Agreement (the "Agreement") includes a choice of law provision *and* forum-selection clause, acknowledging North Carolina as the proper controlling authority *and* proper venue with respect to his Agreement and arbitration of any disputes, claims or controversies relating to Mr. Dickman's association with or termination from IAA. The second factor weighs in favor of conducting the arbitration in North Carolina as IAA terminated the relationship with Mr. Dickman and filed the Form U5 at issue on December 20, 2018 from its North Carolina office. While IAA is not a party to this action, Mr. Dickman does bring claims against Respondents in their individual capacities for their role in the Form U5 submission, which he attributes to the initiation of the transaction at issue.[17] Both Respondents live and work in Charlotte, North Carolina in order to be close to IAA's home office there. As a result, the third factor also weighs in favor of conducting the arbitration in North Carolina. While some of Respondents' witnesses may reside in Kentucky, each of the Respondents, the entity terminating Mr. Dickman giving rise to the claims at issue, and a vast majority of all essential witnesses and documents, are located in North Carolina. LPL Financial does have office space in Kentucky but, "as one of the largest and most well-known broker-dealers in the country,"[18] also has locations throughout North Carolina. Their largest primary office is

---

[17] Claimant's Second Amended Statement of Claim, p. 4, para. 6.
[18] Claimant's Second Amended Statement of Claim, p. 3, para. 3.

15

located in Fort Mill, South Carolina[19], approximately fifteen to twenty minutes from IAA's Charlotte, North Carolina location.

In addition to FINRA Rule 13213, the federal venue statute and case law interpreting the same is instructive. 28 U.S.C. § 1404(a) provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought . . ." 28 U.S.C. § 1404(a). In deciding whether to transfer an action to a different venue, federal courts in the Sixth Circuit, which encompasses Kentucky, perform a two-step analysis: (1) whether the action could have initially been brought in the court where the transfer is sought[20] and, if so, (2) whether the transfer is appropriate under a balance of convenience and justice factors. *Badger v. Speedway, LLC,* No. 3:14-cv-7, 2014 U.S. Dist. LEXIS 184426, *2-3 (S.D. Ohio Dec. 5, 2014).

### The Convenience of the Parties and Witnesses and the Interests of Justice

In determining whether to transfer venue under § 1404(a), the court must consider "the private interests of the parties, including their convenience and the convenience of potential

---

[19] LPL's other two primary locations are located in San Diego, California and Boston, Massachusetts, respectively.

[20] 28 U.S.C. § 1404(a) specifically limits transfer authority to "actions commenced in a district court where both personal jurisdiction and venue are proper." *Newberry v. Silverman,* 789 F.3d 636, 641 (6th Cir. 2015). Where no personal jurisdiction exists over a Defendant, federal courts may only transfer cases under 28 U.S.C. §§ 1406(a) and 1631, *Flynn v. Greg Anthony Constr. Co.,* 95 F. App'x 726, 738 (6th Cir. 2003). In lieu of dismissal, courts may rely on §1406(a) "if it be in the interest of justice . . . to any district or division in which [the case] could have been brought," *Martin v. Stokes.* 623 F.2d 469, 471 (6th Cir. 1980), or §1631 "in the interest of justice" . . . when the court finds "a want of jurisdiction." *Stanifer v. Brannan,* 564 F.3d 455, 456-457 (6th Cir. 2009). As Mr. Dickman has brought claims against Respondents in their personal capacity, and failed to bring any claim against IAA, a federal court would likely not have personal jurisdiction over Respondents, therefore requiring a comparative analysis to 28 U.S.C. §§ 1406(a) or 1631, respectively rather than §1404(a). The statute applied is usually significant as where venue is transferred under §1404(a), the substantive law (including any choice of law rule) of the transferor court applies. *Newberry,* 789 F.3d at 640. However, here the technical distinction is without difference as FINRA rules govern the transfer and Mr. Dickman has consented to North Carolina as the proper forum. Further, where a change of venue is sought pursuant to §§1406(a) or 1631, the considerations as to the convenience of the parties, witnesses, operative facts relating to the claim, and other judicial interest concerns, are still given. Therefore, analysis between the federal rules and FINRA Rule 13213 is made within, for supporting purposes only, with § 1404(a), and addressing only the balance of convenience and justice factors consistent throughout §§1404(a), 1406(a), and 1631, respectively.

16

witnesses, as well as other public-interest concerns, such as systemic integrity and fairness which come under the rubric of "interests of justice." *Moses v. Business Card Exp., Inc.,* 929 F.2d 1131, 1136-37 (6th Cir.), *cert. denied,* 502 U.S. 821 (1991). The private interests considered include the plaintiff's choice of forum and the location of records, as well as the convenience of witnesses. *Id.* Such an analysis is a fact-intensive inquiry, requiring case-by-case consideration of both convenience and fairness of the parties involved. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22 (1988). Therefore, no one factor is dispositive. *Id.* Here, considering the convenience of all parties, witnesses, operative facts relating to the claims, and the Agreement between the parties agreeing to venue, the appropriate forum for this arbitration is North Carolina. The only connection that this matter has to the state of Kentucky is that Mr. Dickman happens to reside there. This fact alone is wholly insufficient to justify conducting the arbitration in Kentucky rather than North Carolina.

As mentioned above, while some witnesses called by Respondents may live in Kentucky, the majority of the testimony will come from Respondents themselves. Mr. Dickman's claims arise out of his affiliation with both IAA and LPL. IAA's principle place of business is located in Charlotte, North Carolina. As a result, both Mr. Russo and Ms. Sexton reside in North Carolina as well and, at all relevant times related to the claims brought by Mr. Dickman, any communication between Mr. Dickman and Respondents originated from their office in North Carolina. The Form U5 containing the statements Mr. Dickman claims are defamatory, was filed by Respondents out of the North Carolina office as well. As the operative facts in this arbitration occurred in North Carolina, the vast majority, if not all, of the documents in this dispute are located on IAA's computer system in North Carolina.

17

While a plaintiff's home or chosen forum is generally given great weight, it is not the dispositive factor in determining appropriate venue. *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 413 (6th Cir. 1998). This is especially so where, as here, little to none of the conduct giving rise to the action—the filing of the allegedly defamatory Form U5— occurred in the chosen forum. *Neff Ath. Lettering Co. v. Walters*, 524 F. Supp. 268, 272-73 (S.D. Ohio 1981) (granting transfer and finding deference to plaintiff's freedom to select his home forum had "minimal value" given the cause of action had little connection to the same). Instead, given the geographic distribution of parties and witnesses[21], the most appropriate venue for this arbitration lies in North Carolina.

Finally, in his Investment Adviser Representative Agreement with IAA, Mr. Dickman expressly agreed that any such arbitration made necessary as the result of a dispute, claim, or controversy related to his association with or termination from IAA would occur in Charlotte, North Carolina. While the presence of such a forum-selection clause is not dispositive, it is "a significant factor that figures centrally in the district court's calculus." *Stewart Org.*, 487 U.S. at 31. However, when considered in conjunction of the other public- and private-interest concerns detailed above, this factor also weighs heavily in favor of transferring this arbitration to North Carolina.

Based on the foregoing, the arbitration should be conducted in North Carolina, and not in Kentucky. This matter has minimal connection to Kentucky, consisting entirely of Mr. Dickman's residence there. Under FINRA Rule 13213(a) and 28 U.S.C. § 1404(a), this, without more, is not enough to maintain the proceeding in Kentucky.

---

[21] The Initial Pre-Hearing Conference ("IPHC") with counsel for Ms. Sexton and Mr. Dickman occurred on January 7, 2020 wherein Ms. Sexton failed to raise any objection to venue. However, neither Mr. Russo nor LPL had been added as parties at that time and were therefore unrepresented during the IPHC and could make no objection. Now that Mr. Russo has been added as a Respondent and retained counsel, especially given his domicile in North Carolina along with Ms. Sexton's, the motion to change venue is both timely and appropriate.

**WHEREFORE**, Respondents respectfully request:

1. that the claims against them be denied in their entirety;

2. that all forum fees be awarded against Mr. Dickman;

3. that Respondents be awarded costs and attorney's fees associated with responding to these claims;

4. that the arbitration is conducted in North Carolina pursuant to FINRA Rule 13213(a);

5. that the panel grant such other and further relief as it deems just and proper.

This the 1st day of May, 2020.

Respectfully submitted,
**AKERMAN LLP**
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999
Phone: (954) 463-2700
Fax: (954) 463-2224

By:_____/s/ Jonathan S. Robbins_____
   **Jonathan S. Robbins, Esq.**
   Florida Bar Number: 989428
   Email: jonathan.robbins@akerman.com
   *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

   **Shea B. Ward, Esq.**
   North Carolina Bar Number: 49787
   Email: bree.ward@akerman.com
   *Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

**I HEREBY CERTIFY** that a copy of the foregoing was served on this 1st day of May, 2020, upon all other parties to this action through the FINRA DR Portal, addressed as follows:

| | | |
|---|---|---|
| Jeremy L. Bartall, Esq. | Michael A. Brady, Esq. | Elizabeth A. Muldoon |
| *Counsel for Claimant Mark J. Dickman* | *Counsel for Respondent LPL Financial LLC* | Senior Case Administrator FINRA Office of Dispute Resolution |
| Bartell Law PLLC | The Tower at Peabody Place | Midwest Regional Office |
| 700 12th Street NW | 100 Peabody Place | 55 West Monroe Street |
| Suite 700 | Suite 1300 | Suite 2600 |
| Washington, D.C. 20005 | Memphis, TN 38103 | Chicago, IL 60603-5104 |
| Email: jeremybartell@bartell-law.com | Email: mbrady@bassberry.com | |

    /s/ Jonathan S. Robbins

Jonathan S. Robbins

<div align="center">

20

</div>

# EXHIBIT J

 **Bartell Law**

Sincerely,

Jeremy L. Bartell

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

April 18, 2023

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe, Suite 2600
Chicago, Illinois 60603
Phone: 312-899-4425

**VIA: FINRA Portal**

**RE: 19-02406 - Dickman vs. Sexton, Russo and LPL Financial LLC**
**Prehearing Exchange, Witness List**

Dear Ms. Muldoon:

Pursuant to FINRA Rule 13514, this is Claimant Mark Dickman's Witness list:

1.  Claimant Mark Dickman (in-person)
2.  Respondent Sexton (in-person)
3.  Respondent Russo (in-person)
4.  Daniel Cruse  – LPL Financial, Manager, Supervisor (video conference)
5.  Ian Frimet    – LPL Financial, Senior VP, Associate Counsel (video conference)
6.  Brad Jacobs   – LPL Financial, Senior VP, Associate General Counsel (video conference)
7.  Alan J. Besnoff, CFP® Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
8.  Thomas R. Kerr, Esq., 732 Scott Street Covington, Kentucky 41011 (telephone, if needed).
9.  Tammy L. Dickman (40 Linden Hill Drive, Crescent Springs, KY 41017) (video conference).
10. Any witness identified by Respondents.

Claimant reserves the right to call witnesses in rebuttal, impeachment, or to authenticate an exhibit if necessary. In addition, under separate cover, Claimant has produced to Respondents' counsel documents Claimant intends to use at the hearing not already provided, pursuant to Rule 13514.

Claimant reserves the right to use as exhibits all documents Respondents produce in response to the Order dated April 11, 2023. Further, Claimant reserves the right to introduce any documents exchanged between the parties and any documents Respondents produce in their Rule 13514 exchange, and any publicly available information and legal and regulatory authority.



## BartellLaw

Sincerely,

Jeremy L. Bartell

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 288 of 343

# EXHIBIT K

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is made as of the date this Agreement is executed by the parties, by and between Mark James Dickman ("Dickman"), on the one hand, and LPL Financial, LLC ("LPL" or "Respondent"), on the other hand. Claimant and Respondent are collectively referred to as the "Parties".

WHEREAS the Parties wish to compromise and fully resolve the issues between them arising from all claims Claimant and Respondent asserted or could have asserted in the arbitration captioned *Mark James Dickman v. Jessica N. Sexton, Robert P. Russo, and LPL Financial, LLC,* FINRA No. 19-02406 (the "Arbitration Action"), and thus obviate the need for the Parties to incur the burden and expense of further litigation;

NOW, THEREFORE, the Parties, intending to be legally bound, and in consideration of the mutual covenants and other good and valuable consideration set forth below, agree as follows:

1.      Payment. Subject to the terms and conditions of this Agreement, LPL shall, within thirty (30) days of receipt by its counsel of a copy of this fully executed Agreement and an IRS W-9 form from Claimant, pay or cause to be paid to Claimant the sum of five thousand dollars ($5,000.00)(the "Settlement Payment") by wiring the funds in that amount pursuant to the following wire instructions for the payee, as supplied and verified by Claimant:

Receiving Bank: PNC Bank

PNC Bank ABA: 031000053

Beneficiary: Bartell Law PLLC DC Iolta Account

Beneficiary Account Number: 5310813456

The Parties agree that each Party shall pay its own respective attorneys' fees and costs, including all forum fees, as assessed by FINRA.

2.      LPL Documents and Witnesses. Provided Claimant has provided LPL with a signed copy of the Agreement, LPL will use its best efforts to provide Claimant with documents reflecting fees and commissions paid to Claimant, by client name, for 2017 and 2018 ("Documents") by March 28, 2022. LPL agrees to provide as witnesses at a final hearing of the Arbitration Action (if Claimant wants them), Daniel Cruse, Ian Frimet, and Brad Jacobs, provided they are still employed with LPL at the time of the hearing. Claimant agrees to employ his best efforts to avoid redundancy to limit the number of witnesses if possible and to allow the LPL witnesses to appear via video conference or telephone if permitted by the panel.

3.      Dismissal of Claims. Claimant shall promptly notify FINRA of the settlement of the claims against LPL in the Arbitration Action so that LPL will not have to further participate

1

in the Arbitration Action and agrees to take all steps necessary to dismiss his claims with prejudice. No more than five (5) days after receipt of the Settlement Payment and the Documents from LPL, Claimant will dismiss LPL from the Arbitration Action with prejudice, each party to bear his/its own costs. The Parties agree to take all other executory actions necessary to withdraw, discontinue, and end the Arbitration Action as to LPL with prejudice.

4.      No Other Proceedings.  With the exception of the Arbitration Action, the Parties represent and warrant that they and/or their affiliates have filed no claims and know of no other claims filed, in court, arbitration, or in any other forum between these Parties pertaining to the specific subject matter of the Arbitration Action and/or this Agreement, and in the event that any such claims do exist, the Parties agree to immediately withdraw and dismiss such claims with prejudice.

5.      Mutual Releases.  Claimant, on the one hand, and Respondent, on the other hand, hereby mutually release each other and their past, present and future agents, shareholders, partners, principals, affiliates, parent companies, subsidiaries, employers, officers, directors, employees, agents, predecessors, successors, heirs, executors, attorneys, and assigns, from any and all legal, equitable or other claims, counterclaims, demands, setoffs, defenses, contracts, accounts, suits, debts, agreements, actions, causes of action, sums of money, reckonings, bonds, bills, covenants, promises, variances, trespasses, damages, extents, executions, judgments, findings, controversies and disputes, and any past, present or future duties, responsibilities or obligations, from the beginning of the world to the date hereof, whether known or unknown, related to Dickman and his employment by and separation from LPL and any U5s filed in connection with his separation from LPL or Independent Advisors Alliance, including any and all claims and counterclaims raised and/or that could have been raised in the Arbitration Action.

Notwithstanding the foregoing, this Release does not apply to: a) claims asserted by Claimant in the Arbitration Action against Jessica Sexton and Robert Russo; b) claims initiated by third parties, including customer complaints; c) compliance, regulatory or other matters initiated by a government entity or a securities industry self-regulatory organization; d) claims that arise as a result of conduct that occurs after the Effective Date; and e) the enforcement of the terms of this Agreement.

6. Confidentiality.

(a)      The Parties agree to maintain in confidence, and not to disclose to any other person or entity (but subject to subparagraphs 6(b) and (c) below), including, without limitation, members of the press, communications media, and/or social media, the terms of this Agreement.

(b)      Notwithstanding the foregoing, this paragraph 6 does not prohibit or restrict the Parties (or their attorneys) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, FINRA, any other self-regulatory organization or any other state or federal regulatory authority, regarding this settlement or its underlying facts and circumstances.  In addition, this Agreement does not prohibit or restrict the Parties from testifying truthfully in any FINRA arbitration or court

2

proceeding so long as they do not disclose the terms of this Agreement other than as provided in this paragraph 6. To the extent the Parties are asked by a client about the Arbitration Action, they may state that the matter has been amicably resolved. Further, to the extent this Agreement and/or its terms are the subject of a subpoena or discovery request in litigation, arbitration, and/or a regulatory request involving any of the Parties, the Party receiving such subpoena or request shall undertake reasonable efforts to provide the other Parties with sufficient notice to allow for the assertion of an objection to disclosure and/or the implementation of other reasonable steps to preserve the confidentiality thereof.

(c)     LPL may disclose the terms or existence of this Agreement to its accountants, employees and attorneys on an as-needed basis, upon strict instructions to and an agreement by them to preserve the confidentiality of this Agreement and its terms. Claimant may, likewise, disclose the terms or existence of this Agreement to accountant(s) and attorneys on an as-needed basis, upon strict instructions to and an agreement by them to preserve the confidentiality of this Agreement and its terms.

7.     Compromise.  This Agreement and the mutual general releases contained herein effect the compromise and settlement of disputed claims and nothing contained herein shall be construed as an admission by any party hereto of any liability of any kind to any other party.

8.     Further Assurances.  The Parties agree to execute such other documents and to take such other action as may be reasonably necessary to further the purposes of this Agreement.

9.     Amendments: Waivers.  This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by each of the Parties affected thereby. No failure to exercise and no delay in exercising any right, remedy, or power under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power under this Agreement preclude any other or further exercise thereof, or the exercise of any other right, remedy, or power provided herein or by law or in equity.

10.     Voluntary Agreement.  The Parties represent that they have carefully read this Agreement, know its contents and execute the Agreement voluntarily.

11.     Severability.  If any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement shall be construed, performed, and enforced as if the invalid or unenforceable provision had not been included in the text of the Agreement.

12.     Drafting.  The Parties have each participated in the drafting and negotiation of this Agreement.

13.     Counterparts. This Agreement may be executed in any number of counterparts by the Parties and/or in separate counterparts, each of which when signed and delivered by

3

any means, including mail, email, or facsimile, to the Parties' representatives shall be deemed to be an original, and all of which, taken together, shall constitute one and the same Agreement.

14. Entire Agreement. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties hereto concerning the subject matter hereof are contained in this Agreement. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning this subject matter hereof are merged herein.

15. Attorneys' Fees and Costs. Each party shall bear its, his own attorneys' fees and costs.

16. Authority. The Parties represent and warrant that they have full power, authority and capacity to execute this Agreement and perform this obligation hereunder.

17. Signatures. The Parties signify their agreement to the above terms by their signatures below. Signatures may be electronically affixed to the documents to the same effect as an actual "wet" signature. The Parties are executing this Agreement on his/its own behalf and represent that he/ it has had sufficient time to review this Agreement and has had an opportunity to consult with an attorney prior to signing this Agreement.

**As agreed by the Parties and intending to be legally bound:**

DATED _____       MARK JAMES DICKMAN


By: _____
Name:
Title:


DATED_____       LPL FINANCIAL, LLC


By: _____
Name:
Title:

4

# EXHIBIT L

# BartellLaw

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, D.C. 20005
jeremybartell@bartell-law.com
202.430.1040

April 18, 2023

Elizabeth Muldoon
FINRA Dispute Resolution Services
55 W. Monroe, Suite 2600
Chicago, Illinois 60603
Phone: 312-899-4425

**VIA: FINRA Portal**

**RE: 19-02406 - Dickman vs. Sexton, Russo and LPL Financial LLC**
**Prehearing Exchange, Witness List**

Dear Ms. Muldoon:

Pursuant to FINRA Rule 13514, this is Claimant Mark Dickman's Witness list:

1. Claimant Mark Dickman (in-person)
2. Respondent Sexton (in-person)
3. Respondent Russo (in-person)
4. Daniel Cruse – LPL Financial, Manager, Supervisor (video conference)
5. Ian Frimet – LPL Financial, Senior VP, Associate Counsel (video conference)
6. Brad Jacobs – LPL Financial, Senior VP, Associate General Counsel (video conference)
7. Alan J. Besnoff, CFP® Securities Expert Witness & Litigation Support, LLC (93 Godfrey Lane, Fremont, NH 03044) (in-person)
8. Thomas R. Kerr, Esq., 732 Scott Street Covington, Kentucky 41011 (telephone, if needed).
9. Tammy L. Dickman (40 Linden Hill Drive, Crescent Springs, KY 41017) (video conference).
10. Any witness identified by Respondents.

Claimant reserves the right to call witnesses in rebuttal, impeachment, or to authenticate an exhibit if necessary. In addition, under separate cover, Claimant has produced to Respondents' counsel documents Claimant intends to use at the hearing not already provided, pursuant to Rule 13514.

Claimant reserves the right to use as exhibits all documents Respondents produce in response to the Order dated April 11, 2023. Further, Claimant reserves the right to introduce any documents exchanged between the parties and any documents Respondents produce in their Rule 13514 exchange, and any publicly available information and legal and regulatory authority.

# BartellLaw

Sincerely,

Jeremy L. Bartell

# EXHIBIT M

# AFFIDAVIT OF THOMAS KERR

COMES NOW the Affiant Thomas Kerr, and after having been duly sworn states as follows:

1. My name is Thomas Kerr. I have been a licensed attorney in the Commonwealth of Kentucky since 1977. I served in the Kentucky House of Representatives, representing District 64, from 1985 to 2016. From 2016 through 2020, I also served as the Chief of Staff for the Commonwealth of Kentucky Justice and Public Safety Cabinet.

2. In my capacity as an attorney, I have represented Norbert and Bonnie Keissler since 2000. Between 2014 and 2019 I assisted the Keisslers in the drafting of documents in connection with their estate plan.

3. In October of 2018 I learned from Mr. Keissler that his estate plan and transactions with his beneficiary and trustee, Mark Dickman, were being questioned by The US Postal Inspectors. My understanding was that US Postal Inspectors were concerned that Keissler was somehow victimized by Mark Dickman.

4. On October 18, 2018, I specifically met with the US Postal Inspectors, the FBI, and FINRA representatives and advised them that I was Norbert Keissler's attorney. I advised them that I was aware of his estate plan and his designation of beneficiaries, that Norbert Keissler voluntarily determined the beneficiaries of his estate, and that he was of sound mind when doing so. I further advised them that I was familiar with the transactions between Norbert Keissler and Mark Dickman, and that they were all above board.

5. As far as I know, following an investigation into these transactions, the US Postal Inspectors closed the case.

6. In 2019 I became aware of a U-5 defamation case being brought by Mark Dickman, specifically FINRA Case No. **19-02406,** *Dickman v. Sexton et. al.* **My understanding is the U-5 defamation case stemmed directly from Mark Dickman's** transactions with Keisslers.

7. In early March 2023, was contacted by Jeremy Bartell, of Bartell Law. Mr. Bartell represented Mark Dickman in FINRA Case No. **19-02406. He sought my assistance as a witness in** FINRA Case No. **19-02406, specifically as it related to the transaction between** Norbert Keissler and Mark Dickman.

8. Through my conversations with Bartell, I learned that the primary defense being raised in FINRA Case No. **19-02406 was a claim of "wrongful conduct" on the part of** Mark Dickman. My understanding was that the Respondent's claimed that Dickman had taken advantage of the Keisslers.

9. I advised Mr. Bartell that I would be prepared to offer testimony at the hearing in FINRA Case No. **19-02406. My testimony would have been that, as the attorney for the Keisslers, I was intimately familiar with all of the financial transactions in question, that it was my opinion that the Keisslers were not victimized, and that Mark Dickman acted in accordance with the Keisslers' wishes.**

10. In early 2023 had a specific phone conversation with Jeremy Bartell regarding the hearing. I was informed that the hearing would be held on May 7-9, 2023. I agreed to be available via telephone or video conference to offer my testimony as outlined above.

11. Mr. Bartell stated that my testimony would work to demonstrate to the arbitration panel that the conduct by Mark Dickman, as part of the transactions with my clients, was above board, and in the best interest of Keissler.

12. On the day of the hearing, I was ready, willing, and able to testify on behalf of Mark

Case 3:26-cv-00280    Document 4-1    Filed 04/08/26    Page 298 of 343

Dickman as detailed above. My understanding was that I was listed on the "witness list" submitted by Mr. Bartell prior to the hearing. Bartell had my contact information. I never received a call, and I was never asked to provide testimony.

13. Based on my understanding of the issues involved in FINRA Case No. **19-02406**, **it is my belief that my testimonial evidence regarding these financial transactions with my client, which were the core of the respondent's defense, was material evidence which the panel should have heard prior to rendering any decision.**

FURTHER AFFIANT SAYETH NAUGHT.

THOMAS KERR

COMMONWEALTH OF KENTUCKY

COUNTY OF KENTON

The above affidavit was acknowledged and signed before me, a notary public, this 29th day of _April_ , 2024, by **THOMAS KERR**

Notary Public, State at Large

My Commission Expires: _3-31-2026_

Notary ID# KYNP 45616

# EXHIBIT N

# Mark Dickman / Keissler    Inbox



**Thomas Kerr** <tom@thomaskerr.com>
to Jeremy, me

Received!

On Apr 17, 2023, at 6:57 PM, Jeremy L. Bartell <jeremybartell@bartell-law.com> wrote:


Tom:

It was nice speaking with you and Mark on Friday. Attached is the affidavit I mentioned.

As also mentioned, Mark and I have a FINRA arbitration on May 9, 10, and 11.

If for some reason opposing counsel insists on authenticating this affidavit, we would like to telephone you during the hearing. Of course we would

Please let me know of any questions. I will keep you posted as we move closer.

Please let me know you received.

Best regards,

Jeremy L. Bartell

## BartellLaw

Jeremy L. Bartell
Bartell Law pllc
700 12th Street NW, Suite 700

Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

Notice: This email and any attachments are confidential and may contain proprietary and privileged information. Any review, distribution, disclosur
recipient, or received this email in error, please notify me immediately by reply email, delete the email and any copies, and do not disclose its cont

# EXHIBIT O

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## DISPUTE RESOLUTION

MARK JAMES DICKMAN
(CRD#: 2066229)

CLAIMANT,

V.

JESSICA N. SEXTON
(CRD#: 5260955),

and

ROBERT P. RUSSO
(CRD#: 4466372),

RESPONDENTS.

FINRA ARBITRATION
NO. 19-02406

## RESPONDENTS' MOTION TO DETERMINE AMOUNT OF ATTORNEYS' FEES AND COSTS

Respondents Jessica Sexton and Robert Russo ("Respondents"), by and through their undersigned counsel, hereby move this Panel to determine the amount of reasonable attorneys' fees and costs incurred in this action, and in support thereof states as follows:

## INTRODUCTION

The parties appeared before the FINRA Arbitration Panel on May 9 and 10, 2023, to arbitrate claims asserted by Claimant Mark Dickman ("Dickman") against Respondents in their individual capacity. As the Panel is aware, the claims asserted by Dickman arise out of his employment with Independent Advisor Alliance ("IAA") and subsequent termination by IAA. Importantly, Dickman's Advisory Representative Agreement that he signed with IAA specifically provides that "the prevailing party shall be entitled to reasonable attorney's fees in addition to any other relief to which he/she may be entitled." A true and correct copy of Dickman's Advisory

1

70845406;5

Representative Agreement is attached hereto as **Exhibit 1**. Moreover, in Dickman's Second Amended Statement of Claim, Dickman requested an award from the Panel including "Reasonable Attorneys' fees in pursing this case; All filing fees, hearing fees and other FINRA arbitration costs; Reimbursement of all other costs, including for the Claimant's expert witnesses." *See* Claimant's Second Amended Statement of Claim. In Respondents' Answer, Respondents similarly requested "that all forum fees be awarded against Mr. Dickman; [and] that Respondents be awarded costs and attorneys' fees associated with responding to these claims." *See* Respondents' Answer to Claimants Second Amended Statement of Claim.

After the conclusion of Claimant's case, Respondents' moved for a directed verdict or dismissal of all claims asserted by Dickman and asked the Panel to grant Respondents' request for entitlement to attorneys' fees and costs. After careful consideration, the Panel granted Respondents' motion for directed verdict and determined that there was no evidence presented against Mr. Russo, and that the evidence presented against Ms. Sexton was insufficient to meet the evidentiary standard for liability. A true and correct copy of the Panel's May 15, 2023 Order is attached hereto as **Exhibit 2**. Additionally, the Panel awarded Respondents their costs and attorneys' fees in defending against Dickman's unfounded and meritless claims.[1] *See* Exhibit 1, Rulings. Accordingly, as set forth herein, Respondents' are entitled to their reasonable attorneys' fees and costs in defending against Dickman's claims.

---

[1] Because the Panel has already evaluated and ruled upon Respondents' entitlement to attorneys' fees and costs, this Motion will not discuss Respondents' entitlement but will focus solely upon the reasonableness of the attorneys' fees and costs associated with Respondents' defense to Dickman's claims.

2

<center>**MEMORANDUM OF LAW**</center>

**Legal Standard**

As the Panel is patently aware, FINRA Code of Arbitration Procedure for Industry Disputes, Rule 13904 permits the Panel to issue an award containing, among other items: "The damages and other relief requested; the damages and other relief awarded; [and,] The allocation of forum fees and any other fees allocable by the panel." North Carolina courts have determined that an arbitration panel's award of attorneys' fees is proper where the NYSE allows for costs and expenses to be awarded and where both parties request attorneys' fees be awarded. *See First Union Securities, Inc. v. Lorelli*, 168 N.C. App. 398 (2005). In *First Union*, the court held that NYSE Rule 629 allowed the arbitrator to determine in the award "the amount of costs incurred…and…other costs and expenses of the parties. The arbitrator(s) shall determine by whom such costs shall be borne." The court went on to state that the fact that both parties requested that an award include attorneys' fees, provided a separate ground for which the court can affirm the panel's decision to award attorneys' fees. Moreover, in *Prudential-Bache Securities, Inc. v. Tanner*, 72 F.3d 234 (1st Cir. 1995), the court held that "the rule states that it provides for 'costs and expenses, unless applicable law directs otherwise.' We read this language to include attorney's fees, and have no case law suggesting otherwise." The court further held that "the record reveals that both parties requested attorney's fees from the panel, suggesting that awarding fees was contemplated by the parties to be within the scope of the agreement to arbitrate."

As such, because FINRA rule 13904 similarly allows for the panel to award fees, which the courts have continuously held includes attorneys' fees, coupled with the fact that both Claimant and Respondent requested attorneys' fees, the Panel properly awarded Respondents' its attorneys' fees, therefore, entitlement to fees is not in dispute.

<center>3</center>

70845406;5

Turning to the fees themselves, the Panel must determine what attorneys' fees are reasonable given the circumstances. In North Carolina, when determining reasonable fees, courts consider the following factors: 1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; 2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; 3) the fee customarily charged in the locality for similar legal services; 4) the amount involved and the results obtained; 5) the time limitations imposed by the client or by the circumstances; 6) the nature and length of the professional relationship with the client; 7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and 8) whether the fee is fixed or contingent. *See* N.C. Rule of Professional Conduct 1.5.

**Respondents' Attorneys' Fees in this Action Are Reasonable**

In connection with this action, Respondents' retained Akerman LLP and agreed to pay reasonable attorneys' fees for services and any legal costs or charged incurred in connection with this action. As of May 31, 2023, the Respondents have incurred reasonable attorneys' fees in connection with Akerman LLP's representation in this matter totaling $380,067.[2][3]

The below analysis will assist the Panel's determination of reasonableness:

(a) <u>The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.</u> The total amount of time recorded by Akerman LLP with regard to its representation of Respondents, from on or about September 2019

---

[2] The amount of attorneys' fees listed above does not include the fees associated with the drafting and preparation of the motion, and redaction of the invoices. Respondents' request that the Panel add an additional 20 hours to the attorneys' fee recovery to account for the fees associated with the preparation of this motion and attached exhibits.
[3] The Panel has not requested an affidavit in support of the Motion, but upon request, Respondents' can supplement this Motion with an affidavit.

4

70845406;5

through May 2023, is 819.9 hours, and the total fees sought are $380,067. *See* **Composite Exhibit 3**. The rates charged by Akerman LLP timekeepers on this matter are:

| Timekeeper | Position | Rate |
|---|---|---|
| Jonathan S. Robbins | Partner - 2019 | $565.00 |
| Paul J. Foely | Partner - 2019 | $550.00 |
| S.B. Ward | Associate - 2019 | $275.00 |
| Jonathan S. Robbins | Partner - 2020 | $575.00 |
| S.B. Ward | Associate - 2020 | $300.00 |
| Jonathan S. Robbins | Partner - 2021 | $595.00 |
| S.B. Ward | Associate - 2021 | $315.00 |
| Angela M. Starling | Paralegal - 2021 | $290.00 |
| Kimberly Shinder | Paralegal - 2021 | $310.00 |
| Bobbi Engelke | Paralegal - 2021 | $290.00 |
| Jonathan S. Robbins | Partner - 2022 | $645.00 |
| Paul J. Foely | Partner - 2022 | $675.00 |
| Kiki M. Scarff | Partner - 2022 | $545.00 |
| S.B. Ward | Associate - 2022 | $375.00 |
| Scott Miller | Associate - 2022 | $550.00 |
| C.R. Cotler | Paralegal - 2022 | $340.00 |
| Nicole Villamar | Associate - 2022 | $490.00 |
| Kelly S. Connolly | Paralegal - 2022 | $335.00 |
| Jonathan S. Robbins | Partner - 2023 | $645.00 |
| Scott Miller | Associate - 2023 | $580.00 |
| Kelly S. Connolly | Paralegal - 2023 | $385.00 |
| C.W. Wood | Library | $140.00 |

(b)     <u>The preclusion of other employment.</u> Although no specific employment was precluded as a result of the acceptance of this case, counsel for the Respondents has devoted significant time and effort to this case and were unable to devote that time to other client matters. At a minimum, this factor should be neutral, especially where counsel is seeking its reasonable attorneys' fees actually expended in this matter and is not seeking a contingency fee or multiplier.

5

70845406;5

(c) <u>The fee customarily charged in the locality for similar legal services.</u> The rates charged by Akerman LLP are within range of the fees customarily charged by similar attorneys handling similar matters in the Charlotte, North Carolina area. Additionally, Akerman LLP maintains an office in Winston Salem, North Carolina, where the hourly rates charged are similar to that charged here.  It should be noted that, as the result of Akerman's long-standing relationship with the Respondents, Akerman LLP actually discounted its standard rates by over 6%, thus there should be no dispute as to the reasonableness of hourly rates. Additionally, Akerman LLP extended a courtesy discount of almost $5,000 to Respondents.

(d) <u>The amount involved and the results obtained.</u> The Respondents' successfully obtained a directed verdict upon the close of Claimant's case in chief on all claims asserted by Claimant. Claimant sought recovery of at least $1,400,000 plus punitive damages of treble the compensatory damages, exposing Respondents to over $4,200,000 in potential damages.

(e) <u>The time limitations imposed by the client or by the circumstances.</u> Prior to arbitration, there were no time limitations imposed by the client or the circumstances in particular, other than the normal imitations and necessity to comply with deadlines arising in litigation. At arbitration, the circumstances required that counsel be present in Charlotte, North Carolina, from May 8-10, 2023.

(f) <u>The nature and length of the professional relationship with the client.</u> Akerman LLP has represented the Respondents since 2019 in this matter, spanning the institution of this action, multiple amendments to the statement of claim, mediations, extensive discovery, extensive motion practice and a postponement of the arbitration from October 2022 to May 2023. The matter has taken several years due to the delays concerning Claimant's substitution and addition of parties, discovery disputes, and the postponement of the arbitration by the previous panel.

70845406;5

(g)     The experience, reputation, and ability of the lawyer or lawyers performing the services.  Akerman LLP is a full-service law firm employing experienced litigators at all levels who are capable of performing the legal work required in litigation matters of this type at a satisfactory level. Akerman LLP timekeepers involved in this matter have previous experience litigating FINRA arbitrations.  The biographies of the Akerman attorneys involved in this matter are attached hereto as **Composite Exhibit 4**.

(h)     Whether the fee is fixed or contingent.  The fee is fixed and is to be paid based on the number of hours worked multiplied by an hourly rate.  No contingency multiplier is sought in this case.

**Respondents' Are Entitled To Recover Their Costs in this Action and Are Reasonable**

In addition to the attorneys' fees, the Panel also awarded Respondents their costs associated with the defense against Dickman's claims. Respondents' costs include FINRA fees, flights to Charlotte for the arbitration, hotels in Charlotte for the arbitration, copying and shipping fees for the materials used during the arbitration, and the fees for Respondents' expert, Alan Wolper. Respondents' costs are reasonable and necessary to its defense against Dickman's claims for damages in excess of $4,000,000. An accounting of Respondents costs outlined above are outlined in the chart below.

7

70845406;5

| VENDOR | DATE | COSTS |
|---|---|---|
| Service of Process - Subpoena for Darpel | 08/19/21 | $130.00 |
| Service of Process - Subpoena for Bosch | 08/20/21 | $130.00 |
| Service of Process - Subpoena for US Postal Service | 08/24/21 | $130.00 |
| Service of Process - Subpoena for Harrington | 08/30/21 | $130.00 |
| Mediation | 03/18/22 | $250.00 |
| Library Fees | 03/31/23 | $35.27 |
| Travel Expense - Jonathan Robbins | 04/26/23 | $850.28 |
| Federal Express | 05/04/23 | $479.80 |
| Pictera - Copies of Exhibits | 05/04/23 | $3,413.35 |
| Uber/Lyft - Jonathan Robbins | 05/08/23 | $37.80 |
| Uber/Lyft - Jonathan Robbins | 05/08/23 | $37.80 |
| Hotel Expense - Jonathan Robbins | 05/10/23 | $816.14 |
| Parking - Jonathan Robbins | 05/10/23 | $60.00 |
| Travel Expense - Scott Miller | 05/15/23 | $756.25 |
| Hotel Expense - Scott Miller | 05/15/23 | $562.42 |
| Uber/Lyft - Scott Miller | 05/15/23 | $140.31 |
| Technology during Arbitration | 05/15/23 | $412.80 |
| | | |
| **GRAND TOTAL** | | **$8,372.22** |

**WHEREFORE**, Respondents respectfully request that the Panel award Respondents their reasonable attorneys' fees and costs in the amount of $388,439.22, plus post-judgment interest at the statutory rate, along with any and other relief that this Panel deems just and proper.

Respectfully submitted this the 12 day of June, 2023.

Respectfully submitted,
**AKERMAN LLP**
201 East Las Olas Boulevard – Suite 1800
Ft. Lauderdale, Florida 33301
Tel.: 954-463-2700
Fax: 954-468-2454

By: */s/ Jonathan S. Robbins*
Jonathan S. Robbins, Esq.
Florida Bar No. 989428
Telephone: (954) 463-2700

8

Facsimile: (954) 463-2224
E-Mail: jonathan.robbins@akerman.com

*Counsel for Respondents Jessica N. Sexton and Robert P. Russo*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I have caused a copy of the foregoing has been submitted electronically through the FINRA DR Portal to Jeremy L. Bartell, Esq., 700 12th Street NW, Suite 700, Washington, D.C. 20005 and to Elizabeth A. Muldoon, Senior Case Administrator, FINRA Office of Dispute Resolution, Midwest Regional Office, 55 West Monroe Street, Suite 2600, Chicago, IL 60603-5104 on this the 12 day of June, 2023.

*/s/ Jonathan S. Robbins*

9

70845406:5

# EXHIBIT P

MARK JAMES DICKMAN
(CRD#: 2066229)

    CLAIMANT,

    v.

JESSICA N. SEXTON
(CRD#: 5260955),

    and

ROBERT P. RUSSO
(CRD#: 4466372),

    and,

LPL Financial LLC
(CRD#: 6413) (dismissed)

    RESPONDENTS.

FINRA ARBITRATION
NO. 19-02406

## CLAIMANT'S OPPOSITION
## TO RESPONDENTS' MOTION ON COSTS

### I.    Introduction

In the Order dated May 15, 2023, the Panel granted a motion for directed verdict, and ordered that: *"The cost[s] will be awarded to Respondents after the parties have prepared a motion for the amount requested..."* Although the Respondents have prevailed in this arbitration, they are not entitled to attorneys' fees as part of costs under the governing law of North Carolina. As discussed below, North Carolina specifically prohibits awards of attorneys' fees as costs unless expressly allowed by a North Carolina statute. Here, no statute applies. As such, awarding

1

attorneys' fees in this case would be in disregard of governing law and subject to vacatur by a court.

Further, an award of fees in this case would be entirely unjust. While the panel dismissed Claimant's case, it was nevertheless a meritorious case. We have shown that Respondents Sexton filed a Form U5 in December of 2018 – the completeness and accuracy of which she verified – that reported there were allegations of fraud or wrongful taking of property (and a federal investigation and other statements). She subsequently filed *four* Form U5s reporting that there were *no* allegations of fraud or wrongful taking of property (and that there was *no* investigation). Quite clearly the first Form U5 was not accurate.

As discussed at length in Claimant's Prehearing Brief, untrue statements about someone's profession are *per se* defamatory and malice can be presumed in such case. *See* Claimant's Prehearing Brief at 15, citing among others, Gibby v. Murphy, 73 N.C. App. 128, 131 (1985) *"Statements that are slanderous per se may form the basis of an action because in such cases **malice and damages are presumed as a matter of law.** Among statements which are slanderous per se are accusation of crimes or offenses involving moral turpitude, defamatory **statements about a person with respect to his trade or profession,** and imputation that a person has a loathsome disease."*).

Further, in the Brief, we set forth at great length how the defense of qualified privilege is *not* available here for three different reasons (page 16). One of those reasons is that the defense is not available if the defendant published the statement, as the North Carolina Supreme Court put it, *"**without checking for truth by means at hand.**" See* Prehearing Brief at 16-17, citing *Ponder v. Cobb,* 257 N.C. 281, 294 (1962) and other cases on the "means at hand" test. At the

2

hearing, Mr. Dickman testified that Respondent Sexton never even called him or the client before reporting fraud or wrongful taking of property or an investigation. Clearly a phone call is a "means at hand." Nor for that matter, did Respondent Sexton follow LPL Financial's Form U5, which did not report *any* of the defamatory information, and, as the evidence at the hearing showed, *LPL Financial was the one conducting the internal review of Claimant*. A simple call to LPL Financial would have avoided her false reporting entirely, and that is also clearly a "means at hand." *See* Prehearing Brief at 17.

In addition, you heard from Alan Besnoff, an experienced expert witness with decades of experience as a manager recruiting in the financial industry, who repeatedly testified that the disclosures on the Form U5 – fraud or wrongful taking of property, or the "investigation" disclosure that kept appearing in the subsequent Form U5s Respondent Sexton filed, would all but preclude employment. And it did preclude employment, as Claimant testified, until the damage was finally amended away in Respondent Sexton's four subsequent Form U5s.

Further, we presented evidence of the precipitous drop in Claimant's income following the Form U5 as he scrambled to try to sell his book in a fire sale, and ultimately managed to get back on his with old firm when the Form U5 had been finally cleaned up. Because the Panel gave no reasons, we do not know why the Panel feels the burden was not met. But it cannot be said the case lacks merit. It is a sound case and that is why, as discussed below, Respondents fought it with six attorneys (three partners, three associates, and four paralegals), including a lead out-of-state attorney, and why they had to expend substantial funds defending the case. Had Respondent filed an accurate Form U5 as FINRA rules require, and as would have happened if Respondent availed herself of "means at hand" for ascertaining the truth, this case would have

3

been avoided. Instead, Claimant had to endure being falsely associated with fraud or wrongful taking of property and the other defamatory statements, all of which Respondent Sexton later removed.

II.      **Attorneys' Fees Cannot be Awarded Under Governing North Carolina Law Unless Expressly Authorized by Statute, and No Statute Authorizes Fees as Damages or Costs in this Case.[1]**

As the Supreme Court of North Carolina has repeatedly held, attorneys' fees may not be recovered, whether as costs or as an item of damages, unless such a recovery is expressly authorized by *statute*:

> *"[T]he general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. Hicks v. Albertson, 284 N.C. 236, 200 S.E.2d 40 (1972).*

Stillwell Enterprises, Inc. v. Interstate Equip. Co., 300 N.C. 286, 289 (1980) (reversing attorneys' fees award).

> *The general rule in this State is that, in the absence of statutory authority therefor, a court may not include an allowance of attorneys' fees as part of the costs recoverable by the successful party to an action or proceeding.' In re King, 281 N.C. 533, 540, 189 S.E.2d 158, 162.*

Hicks v. Albertson, 284 N.C. 236, 238 (1973).

> *"Except as so provided by statute, attorneys' fees are not allowable."*

Baxter v. Jones, 283 N.C. 327, 330 (1973).

> *"Except as otherwise provided by statute . . . attorneys' fees are not now regarded as a part of the court costs in this jurisdiction."*

---

[1] In this case, the parties agree that North Carolina law is governing. *See* Respondents' Response and Affirmative Defenses to the Statement of Claim, page 3, n. 4 (referring to North Carolina law as "the proper controlling authority...") and both parties have cited North Carolina cases throughout their prehearing briefs.

4

<u>Wachovia Bank & Tr. Co. v. Schneider</u>, 235 N.C. 446, 454 (1952) (citations omitted).

In addition to these binding Supreme Court cases, the Court of Appeals of North Carolina

has also repeatedly so held. Here are just a few examples:

> *"[A] successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute." . . . The general rule in North Carolina is that attorney's fees are not allowed as a part of the costs in civil actions or special proceedings, unless there is **express statutory authority** for fixing and awarding the attorney's fees.* Bowman v. Comfort Chair Co., *271 N.C. 702, 704, 157 S.E.2d 378, 379 (1967) (citations omitted).*

<u>Alston v. Fed. Exp. Corp.</u>, 200 N.C. App. 420, 424, 684 S.E.2d 705, 707 (2009) (internal cite

omitted).

> *Moreover, "'the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**.'" Delta Env. Consultants,* 132 N.C.App. at 167, 510 S.E.2d at 695. . .

<u>Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp.</u>, 145 N.C. App. 290, 297–

98 (2001).

> *The general rule in this state is "a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**." Southland Amusements and Vending, Inc. v. Rourk,* 143 N.C.App. 88, 94, 545 S.E.2d 254, 257 (2001) (internal quotations omitted).

<u>Calhoun v. WHA Med. Clinic, PLLC</u>, 178 N.C. App. 585, 603 (2006).

> "[T]he general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is **expressly authorized by statute**." *Enterprises, Inc. v. Interstate Equipment Co.,* 300 N.C. 286, 289, 266 S.E.2d 812, 814 (1980).

<u>Delta Env't Consultants of N. Carolina, Inc. v. Wysong & Miles Co.</u>, 132 N.C. App. 160, 167, 510

S.E.2d 690, 695 (1999)

5

Under these governing authorities, attorneys' fees cannot be recovered unless expressly authorized by statute. While there are several statutes that allow for attorney fees in specific types of cases in North Carolina, none of them apply to this case. Nor have the Respondents identified any such statute. As such, attorneys' fees may not be recovered under the clearly governing authorities.

**III.    Under Governing North Carolina Law, Respondents' Cannot Rely on an Attorney Fee Provision in a Contract with Claimant.**

Respondents' Motion asserts that the "claims asserted by Dickman arise out of his employment with Independent Advisor Alliance ("IAA")." Respondents' Motion at 1. Respondents then point to an attorneys' fees provision in a contract between IAA and Claimant. *See* Exhibit 1 to Respondents' Motion (IAA contract with Claimant). The provision of that contract provides:

> This Agreement shall be construed in accordance with the laws of the State of North Carolina. If any legal action is necessary to enforce any of the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees in addition to any other relief to which he/she may be entitled.

Exhibit 1 to Respondents' Motion.

This contract, however, provides no basis for an award of attorneys' fees in this case. First, ***this contract is between the company, IAA, and Claimant*** – Respondents Sexton and Russo are not parties:

> *This Agreement is entered into between Independent Advisor Alliance, LLC ("IAA") and Mark Dickman, an Advisory Representative ("Representative).*

*See* Exhibit 1 to Respondents' Motion. As such, it is signed only by Claimant, and by a "compliance analyst" on behalf of "Independent Advisors, Alliance, LLC":

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on _October 30 2018_

_[signature]_     _Mark J Dickman_     _October 30 2018_
Representative Signature     Name Printed     Date

Independent Advisors Alliance, LLC
_[signature]_     _Compliance Analyst_     _11/1/18_
By     Title     Date

Second, the attorneys' fees provision only applies where: *"legal action is necessary to enforce any of the terms of this agreement..."* Exhibit 1 to Respondents' Motion (Respondents omit this language from their quote). IAA has obviously not brought any legal action to enforce any terms of the agreement – IAA has brought no action at all. As for Respondents Sexton and Russo, who are not even parties to the agreement, they have also not brought any "legal action" to "enforce any terms of the agreement." Neither IAA, nor Sexton or Russo have a breach of contract claim. So this agreement involves the *wrong party* (IAA, not Sexton or Russo); and no legal action has been brought to enforce its terms, which is required to trigger its application. It is simply not relevant to this case.

Moreover, *even if* this contract were between the right parties, and there were a breach of contract action brought to enforce its terms, it still does not provide a basis for an award of attorneys' fees under North Carolina Law. As the North Carolina Supreme Court has held, even if there is a contract provision, the provision is "invalid" absent express statutory authority:

> Thus the general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute. . . . ***Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor.***

Stillwell Enterprises, Inc. v. Interstate Equip. Co., 300 N.C. 286, 289 (1980) (emphasis added; citations omitted).

7

In North Carolina, "'[a]s a general rule[,] _contractual provisions_ for attorney's fees are invalid in the absence of statutory authority. This is a principle that has long been settled in North Carolina and fully reviewed by our Supreme Court....'"

Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp., 145 N.C. App. 290, 297–98 (2001) (emphasis added).

> It is well established in this State that "[e]ven in the face of a carefully drafted contractual provision indemnifying a party for such attorney[']s[ ] fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor." _Stillwell Enterprises, Inc. v. Interstate Equipment Co.,_ 300 N.C. 286, 289, 266 S.E.2d 812, 814–15 (1980); _see Delta Env. Consultants of N.C. v. Wysong & Miles Co.,_ 132 N.C.App. 160, 167, 510 S.E.2d 690, 695, _disc._ *12 _review denied and appeal dismissed,_ 350 N.C. 379, 536 S.E.2d 70 (1999) (successful litigant cannot recover attorney's fees as costs absent an express statutory basis for such an award). **In this case, despite a contractual provision in the agreement providing the breaching party pay attorney's fees in the event the non-breaching party brings suit to enforce the agreement, there is no express statutory authority permitting the award of attorney's fees in breach of contract cases.**

Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc., 143 N.C. App. 1, 11–12, aff'd, 354 N.C. 565, 556 S.E.2d 293 (2001).

> [E]ven though the consent order contained an express provision permitting the parties to seek recovery of attorneys' fees, **neither party is entitled to an award of fees absent statutory authority.** _See Harborgate Prop. Owners Ass'n v. Mountain Lake Shores Dev. Corp.,_ 145 N.C.App. 290, 297–98, 551 S.E.2d 207, 212 (2001) (**provision in consent judgment for attorneys' fees invalid in absence of statutory authority**). . .

Carswell v. Hendersonville Country Club, Inc., 169 N.C. App. 227, 231 (2005); Ehrenhaus v. Baker, 216 N.C. App. 59, 94 (2011) (same).

As such, even if the agreement were with the Respondents (it is not; it is with IAA); and even if Respondents had brought a "legal action" to "enforce any of the terms" (they did not), such a clause would still be _"invalid"_ because there is no express statutory basis. As quoted

8

above, in binding North Carolina Supreme Court precedent, *"contractual provisions for attorney's fees are invalid in the absence of statutory authority..."*). <u>Stillwell</u>, 300 N.C. at 289.

Further, North Carolina has a statute that applies to attorney fees provisions in business contracts, but it is not applicable here. The statute is N.C. Gen. Stat. Ann. § 6-21.6 (*Reciprocal attorneys' fees provisions in business contracts*). This statute provides:

> Reciprocal attorneys' fees provisions in business contracts are valid and enforceable for the recovery of reasonable attorneys' fees and expenses only if all of the parties to the business contract sign by hand the business contract....

<u>Id.</u> This provision is inapplicable for two clear reasons. First, "business contract" is defined in the statute to *exclude* "an employment contract":

> Business contract. --A contract entered into primarily for business or commercial purposes. The term does not include a consumer contract, *an employment contract*, or a contract to which a government or a governmental agency of this State is a party.

Further, the statute defines "employment contract" to specifically include *independent contractors* like Claimant:

> Employment contract. -- A contract between an individual and another party to provide personal services by that individual to the other party, *whether the relationship is in the nature of employee-employer or principal-independent contractor*.

<u>Id.</u> The contract between IAA and Claimant expressly provides it is an independent contractor relationship. *See* Exhibit 1 to Respondents' Motion, page 4 (describing independent contractor relationship).

Further, under this statute, fees are awarded "only if all of the parties to the business contract sign by hand the business contract..." N.C. Gen. Stat. Ann. § 6-21.6(b). Here,

9

Respondents Sexton and Russo are not even parties to the agreement and obviously did not sign

it by hand, or at all.

Finally, Respondents' Motion refers to "Dickman's unfounded and meritless claims." (at

page 2). Although Respondents cite no statute, North Carolina does have a statute for

"nonjudiciable cases" but the standard to meet that statute could never be met in this case, as it

applies to "imagined or fanciful" cases:

> A justiciable issue is one that is "real and present as opposed to imagined or fanciful." *Sunamerica,* 328 N.C. at 257, 400 S.E.2d at 437. " 'Complete absence of a justiciable issue' suggests that it must conclusively appear that such issues are absent even giving the losing party's pleadings the indulgent treatment which they receive on motions for summary judgment or to dismiss." *Sprouse v. North River Ins. Co.,* 81 N.C.App. 311, 326 (1986), *disc. rev. denied,* 318 N.C. 284 (1986).

Lincoln v. Bueche, 166 N.C. App. 150, 154 (2004).

> ***As an exception to the general rule that each party bears its own costs, the statute [N.C. Gen.Stat. § 6–21.5] must be strictly construed.*** *Winston–Salem Wrecker Ass'n v. Barker,* 148 N.C.App. 114, 121 (2001). To impose attorneys' fees upon an unsuccessful litigant, "plaintiff must reasonably have been aware, at the time the complaint was filed, that the pleading contained no such issue or plaintiff must be found to have persisted in litigating [a] case after [the] point when he or she should reasonably have become aware that pleading filed no longer contained justiciable issue." *Brooks v. Giesey,* 334 N.C. 303, 309, 432 S.E.2d 339, 342 (1993). In this case, the court cannot find that Mr. Anderson had a reasonable belief that his legal actions contained no justiciable issues, and the court will not award attorneys' fees under N.C. Gen.Stat. § 6–21.5.

In re Brokers, Inc., 396 B.R. 146, 171 (Bankr. M.D.N.C. 2008).

Here, however, it cannot be said Claimant's case is "imagined or fanciful." As discussed in

the introduction above, this case undeniably has merit *and respondents treated it as such.*

Respondents cite two cases that supposedly allow for attorneys' fees here. Neither are

applicable. Respondents cite Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234, 237 (1st Cir. 1995)

and First Union Sec., Inc. v. Lorelli, 168 N.C. App. 398, 607 S.E.2d 674 (2005). Both of these cases

10

involve a plaintiff, not a defendant, seeking fees. As an initial matter, Prudential is an opinion from the United States Court of Appeals, First Circuit, in Massachusetts, reviewing a federal district court case in Puerto Rico. As such, this federal case is neither binding nor even relevant in North Carolina.[2] Further, Prudential and First Union both involve a New York Stock Exchange arbitration, and both turn on their interpretation of New York Stock Exchange Rule 629 (a rule that has been defunct since 2007) which does not apply to this arbitration. See First Union, supra ("attorneys' fees were properly awarded pursuant to NYSE Rule 629(c)"); Prudential (same, NYSE Rule 629(c)).

The North Carolina cases cited above prohibit an award of attorneys' fees to Respondent as there is no statutory basis. An award of fees here would be in disregard of the controlling legal authority presented above that holds that a statutory basis for fees is required, and none is available here.

## IV.     The Requested Fees are Highly Unreasonable.

As discussed above, an award of attorneys' fees in this case is contrary to North Carolina law (in addition to being grossly unfair to Claimant). But for completeness, we will review the factors supplied by Respondents most of which do not support the reasonableness of the fees claimed.

---

[2] State v. Woods, 136 N.C. App. 386, 390, 524 S.E.2d 363, 365 (2000) ("[f]ederal appellate decisions are not binding upon either the appellate or trial courts of this State.").

**Respondents' First Factor**

In claiming attorneys' fees, Respondents' Motion cites as factor (1) *"the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly."* Respondents' Motion at page 4. In addressing this factor, Respondents include a chart of the timekeepers involved in this matter (page 5). Against Claimant and his sole practitioner attorney, Respondents list billings from *three* partners (Robbins, Foley, Scarff), *three* associates (Ward, Miller and Villamar), and *four* paralegals (Starling, Shinder, Engelke, Cotler, and Connolly). No explanation is provided for why six attorneys are on this case, or four paralegals. Further, no explanation is provided on how "novel" or "difficult" the questions involved were.

Nor could Respondent's claim anything novel or difficult here. This was a straight forward Form U5 defamation case as was apparent from the documents in Respondent's possession from the beginning of the case. It is highly unreasonably for three partners, three associates and four paralegals to bill on a straightforward case. Further, no explanation is provided for the "skill" needed to conduct this case; the factor is simply ignored. No more than one attorney is appropriate here. Should the panel order fees, only the billings for one attorney, Mr. Robbins as lead counsel, should be permitted as reasonable.

**Respondents' Second Factor**

As for Respondents' second factor – *preclusion of other employment* – Respondents admit that "no specific employment was precluded" (page 5). This factor weighs against the reasonableness of the fees requested.

12

**Respondents' Third Factor**

As for Respondent's third factor — *the fee customarily charged in the locality* — Respondents simply assert — without any support — that the fees are reasonable for legal services in North Carolina (page 6). Indeed, the only support provided at all is the assertion that the Akerman firm charges "similar" rates for its office in North Carolina. That may be so (although Respondents provide no evidence of that), but the question is what the prevailing rates are in North Carolina, not what Akerman's rates are in that state. Further, no explanation is provided for why it is reasonable for North Carolina based Respondents to hire Mr. Robbins who is in Fort Lauderdale, Florida. As set forth in the chart, Mr. Robbins claims $645 per hour. No explanation is provided at all for how $645 per hour is reasonable — this rate is entirely unsupported by Respondents and therefore cannot support an award for attorneys' fees. WFC Lynnwood I LLC v. Lee of Raleigh, Inc., 259 N.C. App. 925, 935 (2018) ("*[T]he affidavit offers no statement with respect to comparable rates in this field of practice...It is therefore clear that there was insufficient evidence before the trial court of "the customary fee for like work" for the trial court to make a finding on that point, and to award attorneys' fees accordingly.*").

Indeed, the rates seem highly inflated for a North Carolina attorney. For example, Clio, the well-known national provider of law firm case management, reports that the prevailing hourly rate for an arbitration lawyer in North Carolina is $267 per hour.[3] Because the

---

[3] The Clio report is found here: https://www.clio.com/resources/legal-trends/compare-lawyer-rates/nc/

Respondent's rates are entirely unsupported, if the panel awards fees, the attorneys' hourly rates should be adjusted to $267 per hour.

Further, no explanation or support is offered for the paralegal rates in the chart which range from $385 to $290. They are simply asserted as reasonable. But again, as Clio reports in the same report, the hourly rate for non-lawyers such as the four paralegals is $136 per hour. Because no support is provided for the paralegal fees, the rate for them should be limited to $136 per hour.

### Respondents' Fourth Factor

In Respondent's fourth factor — *the amount involved and the results obtained.* — Respondents provide no explanation or support other than to claim exposure to $4.2 million. The claimed exposure of $4.2 million is exaggerated, as it assumes treble damages of the full amount of the damages claimed, a highly unlikely scenario. Indeed, Claimant testified his damages were approximately $1 million, and Claimant offered to settle for $325,000 in mediation on May 21, 2022, *a year before the hearing*. This factor is considered relevant in North Carolina. For example, "the timing of settlement offers" and "the amounts of settlement offers" are both listed factors for reasonableness under N.C. Gen. Stat. Ann. § 6-21.6, the statute referenced above for reciprocal attorney fees which does not apply here, but informs the panel on relevant factors considered by the court. The panel should weigh this factor against reasonableness of fees.

### Respondents' Fifth Factor

Respondents' fifth factor — *"the time limitations imposed by the client or by the circumstances"* — Respondents admit in their brief "there were no time limitations imposed by the client or the circumstances in particular." Indeed, this case was repeatedly delayed during

14

Covid, was delayed while the parties mediated, and was delayed when the first three arbitrators simply abandoned the case not long before the hearing. Because no support is offered on this factor, it must be rejected as a basis for reasonableness of fees.

**Respondents' Sixth Factor**

Respondents' sixth factor — *"the nature and length of the professional relationship with the client"* — Respondents offer no support at all for this factor. Instead, they assert only that they have represented Respondents in this case since 2019. This detracts from the reasonableness of the fees.

**Respondents' Seventh Factor**

Respondents' seventh factor — *"the experience, reputation, and ability of the lawyer or lawyers performing the services"* — Respondents simply assert, as a full-service firm, that the lawyers have the requisite experience, reputation and ability, and that the timekeepers involved have previous experience litigating FINRA arbitrations. That may be so, but as discussed above, the rates are excessive for North Carolina and there are too many attorneys and paralegals involved. Because this factor is unsupported, it too should be weighed against the reasonableness of the fees.

**Respondents' Eighth Factor**

Respondent's eight Factor — *whether the fee is fixed or contingent* — is not relevant as the fees are neither fixed nor contingent.

In addition, the Panel should know that the vast majority of the litigation action in this case was generated by the Respondents. Thus, for example, on March 9, 2020, Respondent Sexton responded to Claimant's request for Discovery. In that response, *Respondent Sexton*

15

*objected to every single request* for documents and information. Respondent Russo did the same. Repeated efforts to get compliance failed and as a result Claimant had to file a motion to compel discovery. This was filed on August 28, 2021. The (then) Chairman of the Panel held a hearing, and on November 7, 2021 ordered Respondents to produce documents, overruling their baseless objections that Respondent Russo did not have custody of his own firm's documents. As the panel knows, this led to further motions and hearing on the scope of the prior order, litigation activity that was only necessitated because of Respondents' blanket objections and failure to produce documents for years. Any potential award of attorneys' fees should be discounted greatly due to Respondents' uncooperative discovery practices.

## CONCLUSION

As discussed above, Respondents are not entitled to an award of attorneys' fees as costs under governing North Carolina law, and thus their motion for costs — insofar as it seeks attorneys' fees — should be rejected.

June 17, 2023

Counsel for the Claimant,

Jeremy L. Bartell
Bartell Law PLLC
700 12th Street NW, Suite 700
Washington, DC 20005
202-430-1040
jeremybartell@bartell-law.com

## Certificate of Service

I certify that I served this on counsel for all parties through the FINRA DR Portal on June

16

17, 2023.

Jeremy L. Bartell

17

# EXHIBIT Q

**Award**
**FINRA Dispute Resolution Services**

In the Matter of the Arbitration Between:

Claimant
Mark James Dickman

Case Number: 19-02406

vs.

Respondents
LPL Financial LLC,
Jessica N. Sexton, and
Robert P. Russo

Hearing Site: Charlotte, North Carolina

Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.

Nature of the Dispute: Associated Person vs. Member and Associated Persons

The evidentiary hearing was conducted partially by videoconference.

## REPRESENTATION OF PARTIES

For Claimant Mark James Dickman ("Claimant"): Jeremy L. Bartell, Esq., Bartell Law PLLC, Washington, District of Columbia.

For Respondent LPL Financial LLC ("LPL"): Michael A. Brady, Esq., Bass, Berry & Sims PLC, Memphis, Tennessee.

For Respondents Jessica N. Sexton ("Sexton") and Robert P. Russo ("Russo"): Jonathan S. Robbins, Esq., Akerman LLP, Ft. Lauderdale, Florida.

LPL, Sexton, and Russo, collectively, are referred to as "Respondents".

## CASE INFORMATION

Statement of Claim filed on or about: August 20, 2019.
Claimant signed the Submission Agreement: August 20, 2019.
First Amended Statement of Claim filed on or about: November 11, 2019.
Second Amended Statement of Claim filed on or about: December 20, 2019.

Statement of Answer to the Second Amended Statement of Claim filed by LPL on or about: May 1, 2020.
LPL signed the Submission Agreement: April 30, 2020.

Statement of Answer filed by Sexton on or about: October 16, 2019.
Statement of Answer to the Second Amended Statement of Claim filed by Sexton and Russo on or about: May 1, 2020.
Sexton signed the Submission Agreement: November 15, 2019.
Russo did not sign the Submission Agreement.

## CASE SUMMARY

In the Second Amended Statement of Claim, Claimant asserted a claim alleging that the Form U5 filed by Respondent, as part of registration records maintained by the Central Registration Depository ("CRD"), is defamatory in nature and asserted the following causes of action: defamation, libel, slander, fraud, misrepresentation, tortious interference, unfair trade practices, breach of contract, breach of regulatory duty causing harm, unjust enrichment, intentional infliction of emotional harm, negligent hiring, failure to train, failure to supervise, respondeat superior, and aiding and abetting tortious conduct.

Unless specifically admitted in the Statement of Answer to the Statement of Claim, Sexton denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Statement of Answer to the Second Amended Statement of Claim, LPL denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in the Statement of Answer to the Second Amended Statement of Claim, Sexton and Russo denied the allegations made in the Second Amended Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim, as amended, Claimant requested expungement of the Form U5 filed by LPL, compensatory damages of at least $1,400,000.00; punitive damages; attorneys' fees; pre and post award interest at the statutory rate; all filing fees, hearing fees, and other FINRA arbitration costs; reimbursement of all other costs, including for Claimant's expert witness; and an Order that Sexton draft a corrective letter that may be sent to Claimant's past or current customers.

In the Statement of Answer to the Statement of Claim, Sexton requested that the claims against her be denied in their entirety, that all forum fees be awarded against Claimant, that she be awarded costs and attorneys' fees associated with responding to these claims, and that the Panel grant such other and further relief as it deems just and proper.

In the Statement of Answer to the Second Amended Statement of Claim, LPL requested that the claims be denied in all respects, that the Panel direct that all costs and assessments by FINRA be borne by Claimant and that LPL be awarded its preparation costs, travel expenses, attorneys' fees, expert witness fees, and such other further and general relief to which it may be entitled.

In the Statement of Answer to the Second Amended Statement of Claim, Sexton and Russo requested that the claims against them be denied in their entirety, that all forum fees be

awarded against Claimant, that Sexton and Russo be awarded costs and attorneys' fees associated with responding to these claims, and that the Panel grant such other and further relief as it deems just and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

Russo did not file a properly executed Submission Agreement but is required to submit to arbitration pursuant to the Code of Arbitration Procedure ("Code") and, having answered the claim, appeared, and testified at the hearing, is bound by the determination of the Panel on all issues submitted.

On December 20, 2019, Claimant filed a Motion to Amend Statement of Claim, to which no response was filed. In an Order dated January 7, 2020, the Panel granted the Motion to Amend Statement of Claim.

On April 11, 2022, Claimant filed a Withdrawal of Claims Against LPL. Therefore, the Panel made no determination with respect to any of the relief requests against LPL contained in the Second Amended Statement of Claim.

At the evidentiary hearing on May 10, 2023, after Claimant's case-in-chief, Sexton and Russo moved for a directed verdict and requested an award of costs. In an Order dated May 15, 2023, the Panel granted Sexton and Russo's Motion for a Directed Verdict because the evidence presented was insufficient to meet the evidentiary standard for liability with respect to Sexton and there was no evidence presented by Claimant with respect to Russo. The Panel ordered briefing and oral argument on the request for costs.

On June 12, 2023, Sexton and Russo filed a Motion to Determine Amount of Attorneys' Fees and Costs. On June 17, 2023, Claimant filed an Opposition to Motion to Determine Amount of Attorneys' Fees and Costs.

The Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimant's claims, including Claimant's request for expungement, are denied in their entirety.

2. Claimant is liable for and shall pay to Sexton and Russo the sum of $380,067.00 in attorneys' fees pursuant to *First Union Securities, Inc. v. Lorelli*, 168 N.C. App. 398 (2005) and *Prudential-Bache Securities, Inc. v. Tanner*, 72 F.3d 234 (1st Cir. 1995).

3. Claimant is liable for and shall pay to Sexton and Russo the sum of $28,372.00 in costs.

4. Claimant is liable for and shall pay to Sexton and Russo interest on the sums in Items #2 and #3 above at the rate of 8% per annum from the Date of Service of the Award through and including the date the Award is paid in full.

5. Any and all claims for relief not specifically addressed herein, including any requests for punitive damages and treble damages, are denied.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution Services assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial Claim Filing Fee | =$ | 2,000.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, LPL is assessed the following:

| | | |
|---|---|---|
| Member Surcharge | =$ | 3,025.00 |
| Member Process Fee | =$ | 6,175.00 |

### Postponement Fees
Postponements granted during these proceedings for which fees were assessed or waived:

| | | |
|---|---|---|
| October 21-23, 2020, postponement requested jointly by the parties | =$ | 1,400.00 |
| October 12-14, 2022, postponement requested jointly Claimant, Sexton, and Russo | | Waived |
| Total Postponement Fees | =$ | 1,400.00 |

The Panel has assessed $700.00 of the postponement fees to Claimant.

The Panel has assessed $700.00 of the postponement fees jointly and severally to Respondents.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the Arbitrator(s), including a pre-hearing conference with the Arbitrator(s), which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1) pre-hearing session with a single Arbitrator @ $450.00/session | =$ | 450.00 |
| Pre-Hearing Conference: November 3, 2021    1 session | | |

| | | | |
|---|---|---|---|
| Six (6) pre-hearing sessions with the Panel @ $1,400.00/session | | =$ | 8,400.00 |

Pre-Hearing Conferences:
| | | |
|---|---|---|
| January 7, 2020 | 1 session | |
| June 29, 2021 | 1 session | |
| March 24, 2022 | 1 session | |
| December 15, 2022 | 1 session | |
| March 14, 2023 | 1 session | |
| April 10, 2023 | 1 session | |

| | | | |
|---|---|---|---|
| Five (5) hearing sessions @ $1,400.00/session | | =$ | 7,000.00 |

Hearings:
| | |
|---|---|
| May 9, 2023 | 2 sessions |
| May 10, 2023 | 2 sessions |
| June 27, 2023 | 1 session |

| | | |
|---|---|---|
| Total Hearing Session Fees | =$ | 15,850.00 |

The Panel has assessed $11,425.00 of the hearing session fees to Claimant.

The Panel has assessed $2,325.00 of the hearing session fees jointly and severally to Respondents.

The Panel has assessed $2,100.00 of the hearing session fees jointly and severally to Sexton and Russo.

All balances are payable to FINRA Dispute Resolution Services and are due upon receipt.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Lisa Bass Morris | - | Public Arbitrator, Presiding Chairperson |
| Eric C. Chilton | - | Public Arbitrator |
| Rebecca Sofley Henderson | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument, which is my award.

## Concurring Arbitrators' Signatures

**Lisa Bass Morris**
_____
Lisa Bass Morris
Public Arbitrator, Presiding Chairperson

**07/17/2023**
_____
Signature Date


**Eric C  Chilton**
_____
Eric C. Chilton
Public Arbitrator

**07/18/2023**
_____
Signature Date


**Rebecca Sofley Henderson**
_____
Rebecca Sofley Henderson
Non-Public Arbitrator

**07/17/2023**
_____
Signature Date


Awards are rendered by independent arbitrators who are chosen by the parties to issue final, binding decisions. FINRA makes available an arbitration forum—pursuant to rules approved by the SEC—but has no part in deciding the award.


July 18, 2023
_____
Date of Service (For FINRA Dispute Resolution Services use only)

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No.
25CV063076-590

In The General Court Of Justice
☐ District  ☒ Superior Court Division

*Name Of Plaintiff*
MARK JAMES DICKMAN

*Address*
40 Linden Hill Drive

*City, State, Zip*
Crescent Springs, KY 41012

## CIVIL SUMMONS
☒ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

*Name Of Defendant(s)*
JEREMY L. BARTELL
BARTELL LAW PLLC

*Date Original Summons Issued*
11/21/2025

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

| *Name And Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Jeremy L. Bartell | Bartell Law PLLC |
| 700 12th Street, NW | 700 12th Street, NW |
| Suite 700 | Suite 700 |
| Washington, DC 20005 | Washington, DC 20005 |

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* | |
|---|---|
| Dennis O'Dea | *Date Issued* 1/23/2026  *Time* 8:32:12 am ☐ AM ☐ PM |
| 6416 Rea Road | *Signature* /s/ Harvey Frison |
| Suite 7B 78588 | |
| cHARLOTTE, nc28277 | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court |

| ☐ ENDORSEMENT (ASSESS FEE) | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC | ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 1.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|
| | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Acceptance of service.
Summons and complaint received by: ☐ Defendant 2.
☐ Other: *(type or print name)*

| Date Accepted | Signature |
|---|---|
| | |

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| *Service Fee Paid* <br> $ | *Signature Of Deputy Sheriff Making Return* |
|---|---|
| *Date Received* | *Name Of Sheriff (type or print)* |
| *Date Of Return* | *County Of Sheriff* |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV063076-590

| | |
|---|---|
| MARK JAMES DICKMAN,<br><br>        Plaintiff,<br><br>        v.<br><br>JEREMY BARTELL and BARTELL LAW PLLC,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT, JEREMY BARTELL'S MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S AMENDED COMPLAINT**

**COMES NOW,** Defendant, Jeremy Bartell, by and through undersigned counsel, pursuant to Rule 6(b) of the North Carolina Rules of Civil Procedure, and respectfully moves the court for a thirty (30) day extension of time within which to serve an answer or otherwise respond to Plaintiff's Amended Complaint. In support of this motion, Jeremy Bartell respectfully avers as follows:

1. Jeremy Bartell was allegedly served with a copy of Plaintiff's Amended Complaint on or about on February 13, 2026.

2. The time for Jeremy Bartell to respond to Plaintiff's Amended Complaint has not yet expired (March 16, 2026).

3. Counsel for Jeremy Bartell needs additional time to respond to Plaintiff's Amended Complaint.

**WHEREFORE,** Jeremy Bartell respectfully request that the Court grant a thirty (30) day extension of time to serve an answer or otherwise respond to Plaintiff's Amended Complaint by Jeremy Bartell on or before **_April 15, 2026._**

173409820.1

Electronically Filed Date: 3/13/2026 2:53 PM Mecklenburg County Clerk of Superior Court

This 13th day of March, 2026.

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**

BY:*/s/ Christopher J. Derrenbacher*
Christopher J. Derrenbacher
N.C. Bar No. 25402
3600 Glenwood Avenue, Suite 350
Raleigh, North Carolina 27612
Email: christopher.derrenbacher@lewisbrisbois.com
*Attorneys for Defendant Jeremy Bartell*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the opposing party or counsel for the opposing party in the foregoing matter with a copy of **Defendant Jeremy Bartell's Motion for Extension of Time to Respond to Plaintiff's Amended Complaint**, through North Carolina e-Courts e-file and Serve, via electronic correspondence addressed as follows:

Dennis O'Dea
SFS Law Group
6416 Rea Road
Suite B-7 78588
Charlotte, NC  28277
*Attorneys for Plaintiff*

This 13th day of March, 2026.

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**

BY:*/s/ Christopher J. Derrenbacher*
Christopher J. Derrenbacher
N.C. Bar No. 25402
*Attorneys for Defendant Jeremy Bartell*

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV063076-590

MARK JAMES DICKMAN, )
)
Plaintiff, )
)
v. )
)
JEREMY BARTELL and BARTELL LAW )
PLLC, )
)
Defendants. )
)

**ORDER**

This matter came before the undersigned upon motion of Jeremy Bartell and it appearing that the time for serving an answer or otherwise responding to Plaintiff's Amended Complaint has not yet expired, and that good cause has been shown:

**IT IS THEREFORE ORDERED** that Jeremy Bartell shall have up to, and including *April 15, 2026* to serve an answer or otherwise respond to Plaintiff's Amended Complaint.

3/13/2026 3:11:12 pm

_____/s/ Mitchell Woodard_____
Mecklenburg County Clerk Of Superior Court

173400853.1